# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| **KAREEM JACKSON,** | ) | **Case No. 2:20-cv-03934** |
| | ) | |
| **Petitioner,** | ) | **Chief Judge Algenon L. Marbley** |
| | ) | |
| | ) | **Magistrate Judge Kimberly A. Jolson** |
| **v.** | ) | |
| | ) | |
| **TIM SHOOP, WARDEN,** | ) | **Death Penalty Case** |
| **Chillicothe Correctional Institution,** | ) | |
| | ) | **Execution is scheduled for** |
| **Respondent.** | ) | **December 10, 2025** |

---

## PETITIONER KAREEM JACKSON'S REPLY (TRAVERSE)

---

STEPHEN C. NEWMAN (0051928)
Federal Public Defender

*/s/ Alan C. Rossman*
ALAN C. ROSSMAN (0019893)
Assistant Federal Public Defender
Director, Capital Habeas Unit

*/s/ Bevlynn J. Sledge*
Bevlynn J. Sledge
Research and Writing Attorney
Office of the Federal Public Defender,
Northern District of Ohio
1660 West Second Street, Suite 750
Cleveland, Ohio 44113
(216) 522-4856; (216) 522-1951 (f)
alan_rossman@fd.org
bevlynn_joann_sledge@fd.org

**Counsel for Petitioner Kareem Jackson**

## TABLE OF CONTENTS

**Page(s)**

I. INTRODUCTION ............................................................................................................ 1

II. STATEMENT OF FACTS ............................................................................................. 2

III. REQUIREMENTS UNDER 28 U.S.C. §2244: THE FACTUAL PREDICATE FOR THESE CLAIMS REASONABLY COULD NOT HAVE BEEN DISCOVERED PREVIOUSLY THROUGH THE EXERCISE OF DUE DILIGENCE ................................. 6

  A. AN INTRODUCTION. ................................................................................................ 6
  B. SIXTH CIRCUIT'S STANDARD FOR DUE DILIGENCE. ................................................ 8
  C. JACKSON MEETS HIS BURDEN UNDER § 2244(B)(2)(B)(I): CASE HISTORY PIOR TO SUCCESSOR HABEAS PETITION. ............................................................................ 12
    1. Trial and Appeal. ......................................................................................... 12
    2. State Post-Conviction. .................................................................................. 14
    3. Federal Habeas Corpus Litigation. .............................................................. 15
    4. Clemency. .................................................................................................... 15
    5. Seeking Authorization to litigate back in State court. ................................... 19
    6. State Successor Post-Conviction Petition (Franklin County Common Pleas Court, 97-CR-001902). ....................................................................................... 21
    7. State Appeal of the Successor Post-Conviction Litigation. ........................... 24
    8. Successor Federal Habeas Petition. ............................................................. 25
    9. Jackson has been diligent in bringing his new claims before this Court. ....... 26

IV. REQUIREMENTS UNDER 28 U.S.C. §2244: THE FACTS UNDERLYING THE CLAIM, IF PROVEN AND VIEWED IN LIGHT OF THE EVIDENCE AS A WHOLE, WOULD BE SUFFICIENT TO ESTABLISH BY CLEAR AND CONVINCING EVIDENCE THAT, BUT FOR CONSTITUTIONAL ERROR, NO REASONABLE FACTFINDER WOULD HAVE FOUND THE APPLICANT GUILTY OF THE UNDERLYING OFFENSE ................................................................................................. 26

  A. THE STANDARD ................................................................................................... 26
  B. THE EVIDENCE AND TESTIMONY PRODUCED AT TRIAL MADE CLEAR THIS CASE WAS ALL ABOUT IDENTITY ............................................................................................ 28
    1. Surviving Eyewitnesses Rebecca Lewis and Nikki Long Identified Jackson as the "Short Guy" with the "Little Gun" ............................................................... 32
    2. Jackson Planned the Robbery and Only He had a Motive for Murder ........... 34
    3. Only Jackson had a Handgun. ...................................................................... 35
    4. Malaika returned the murder weapon to "Jackson's Uncle." ........................ 36
    5. Jackson confessed to Ivana King .................................................................. 36
  C. BUT FOR UNCONSTITUTIONALLY SUPPRESSED EVIDENCE, NO REASONABLE FACTFINDER WOULD HAVE FOUND JACKSON GUILTY OF THE UNDERLYING OFFENSE. ...................... 38
    1. The Withheld Reports Regarding Lewis' Statements That the Shooter was 5'4" Tall Critically Undermine the Surviving Witnesses Identification of Jackson. ............ 38
      a. There is evidence Little Bee was shorter than Jackson. ........................... 42
      b. Lewis' cross-racial identification of Jackson was problematic. ............... 44

     c.    The introduction of Lewis's description corroborating Long's initial 5'4" description, coupled with elimination of King's testimony regarding Jackson's alleged confession, would leave Boone as the sole eyewitness. .................................................. 53

     d.    It is possible there were only three people involved in the actual robbery, eliminating Jackson entirely if the "short" guy with the "little gun" was only 5'4". ......................... 54

    2.   "Little Bee" Had A Handgun and A Motive................................................................. 57

     a.    Little Bee had a handgun. ................................................................................. 57

     b.    Little Bee knew the victims just as the State alleged Jackson did. ........................... 58

    3.   The Unconstitutionally Withheld Evidence Lessens Credibility of The "Uncle" Ruse Used To Tie The Murder Weapon To Jackson. ......................................................... 65

    4.   Law Enforcement Intimidated a Critical Witness Who Has Recanted Testimony Jackson Confessed to Her. ............................................................................. 70

  D.  BASED ON THE FOREGOING ANALYSIS, JACKSON SATISFIES THE CLEAR AND CONVINCING STANDARD SET OUT IN § 2244. .................................................................... 73

V.   KAREEM JACKSON IS ENTITLED TO HABEAS RELIEF ........................................... 76

  A.  REVIEW UNDER AEDPA: THE STANDARD ......................................................... 76

  B.  PRESENTATION OF JACKSON'S CLAIMS IN STATE COURT ..................................... 76

  C.  DE NOVO REVIEW IS PROPER ....................................................................... 78

  D.  MERITS ................................................................................................. 79

    1.   Brady Claims ....................................................................................... 79

     a.    Favorableness and Suppression of the Evidence ................................................. 80

     b.    Materiality .......................................................................................... 83

    2.   Napue Claim ........................................................................................ 88

VI.  CONCLUSION.................................................................................................. 89

CERTIFICATE OF SERVICE ...................................................................................... 90

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Arizona v. Youngblood*, 488 U.S. 51 (1988) ........................................................................... 45

*Banks v. Dretke*, 540 U.S. 668 (2004) .................................................................................... 82

*Berger v. United States*, 295 U.S. 78 (1935) .......................................................................... 79

*Bies v. Sheldon*, 775 F.3d 386 (6th Cir. 2014) ........................................................... 78, 83, 87

*Bowling v. Haeberline* (*In re Bowling*), 422 F.3d 434 (6th Cir. 2005) ...................................... 1

*Brady v. Maryland*, 373 U.S. 83 (1963) ........................................................................... *passim*

*Carter v. Mitchell*, 443 F.3d 517 (6th Cir.2006) .................................................................... 18

*Clark v. Nagy*, 934 F.3d 483 (6th Cir. 2019) ........................................................................ 27

*Coleman v. Thompson*, 501 U.S. 722 (1991) ......................................................................... 78

*Cullen v. Pinholster*, 563 U.S. 170 (2011) ..................................................................... 20, 76

*DiCenzi v. Rose*, 452 F.3d 465 (6th Cir. 2006) ....................................................................... 9

*Dobbert v. Wainwright*, 468 U.S. 1231 (1984) ..................................................................... 18

*Gumm v. Mitchell*, 775 F.3d 345 (6th Cir. 2014) ............................................................. 78, 87

*Humphrey v. U.S. AG Off.*, 279 F. App'x 328 (6th Cir. 2008) ..................................... 80, 82, 89

*In re Freeman*, No. 17-1280, 2017 U.S. App. LEXIS 19043 (6th Cir. Oct. 2, 2017) ................. 11

*In re Jackson*, 12 F.4th 604 (6th Cir. 2021) ........................................................ 2, 49, 54, 70

*In re McDonald*, 514 F.3d 539 (6th Cir. 2008) ............................................................ 1, 10, 11

*In re Wogenstahl*, 902 F.3d 621 (6th Cir. 2018) ............................................................ *passim*

*Jackson v. Bradshaw*, 681 F.3d 753 (6th Cir. 2012) ............................................................. 15

*Jackson v. Bradshaw*, No. 2:03-cv-983, 2007 WL 2890388 (S.D. Ohio Sept. 28, 2007.) ........... 15

*Jackson v. Bradshaw*, No. 2:03-cv-983, 2015 WL 5679632 (S.D. Ohio Sept. 28, 2015) ........... 16

*Jackson v. Bradshaw*, No. 2:03-cv-983, 2017 WL 1829773 (S.D. Ohio May 8, 2017) .............. 21

*Jackson v. Robinson*, 568 U.S. 1145 (2013) ........................................................................ 15

*Jefferson v. United States*, 730 F.3d 537 (6th Cir. 2013) ...................................................... 12

*Johnson v. Williams*, 568 U.S. 289 (2013) .......................................................................... 78

*Jones v. Warden, Corr. Inst.*, No. 2:13-CV-155, 2014 U.S. Dist. LEXIS 29601 (S.D. Ohio
    Mar. 7, 2014) ...................................................................................................................... 9

*Kyles v. Whitley*, 514 U.S. 419 (1995) ........................................................................... *passim*

*Long v. Hooks*, 972 F.3d 442 (4th Cir. 2020) ....................................................................... 27

*Lott v. Bagley*, 569 F.3d 547 (6th Cir. 2008) .................................................................... 9, 10

*Lott v. Bagley*, No. 1:04CV822, 2007 WL 2891272 (N.D. Ohio Sept. 28, 2007) ....................... 9

*McCray v. Vasbinder*, 499 F.3d 568 (6th Cir.2007) .............................................................. 18

*McQuiggin v. Perkins*, 569 U.S. 383 (2013) .................................................................... 26, 27

*Montgomery v. Bobby*, 654 F.3d 668 (6th Cir. 2011) ............................................................ 11

*Murray v. Carrier*, 477 U.S. 478 (1986) .............................................................................. 78

*Napue v. Illinois*, 360 U.S. 264 (1959) ........................................................................... *passim*

*Person v. Clipper*, No. 5:17CV1274, 2019 U.S. Dist. LEXIS 64970 (N.D. Ohio Jan. 23,
    2019) ................................................................................................................................ 10

*Robinson v. Howes*, 663 F.3d 819 (6th Cir. 2011) ................................................................. 76

*Rosencrantz v. Lafler*, 568 F.3d 577 (6th Cir. 2009) ............................................................ 88

*Schlup v. Delo*, 513 U.S. 298 (1995) .............................................................................. 27, 28

*Smith v. Cain*, 565 U.S. 73 (2012) ....................................................................... 83
*Smith v. Metrish*, 436 F. App'x 554 (6th Cir. 2011) ........................................... 88
*State ex rel. Caster v. City of Columbus*, 89 N.E.3d 598 (2016) ...................... 19
*State ex rel. Steckman,* 70 Ohio St.3d 420 (1994) ....................... 14, 17, 18, 19
*State v. Bethel,* 187 N.E.3d 564 (2022) ........................................................ 25, 77
*State v. Bethel*, --N.E.3d.--, 2022 WL 838337 (Ohio Mar. 22, 2022) ........... 25, 77
*State v. Jackson*, 751 N.E.2d 946 (2001) ............................................................ 13
*State v. Jackson*, 756 N.E.2d 116 (2001) ............................................................ 13
*State v. Jackson*, 761 N.E.2d 44 (2002) .............................................................. 13
*State v. Jackson*, 777 N.E.2d 277 (2002) ............................................................ 15
*State v. Jackson*, No. 01AP-808, 2002 WL 1379001 (Ohio Ct. App. June 27, 2022)........... 14, 15
*State v. Jackson*, No. 18AP-758, 2019 WL 6615076 (Ohio Ct. App. Dec. 5, 2019).............. 25, 77
*Strickler v. Greene,* 527 U.S. 263 (1999) ...................................... 12, 79, 80
*Trest v. Cain*, 522 U.S. 87 (1997) ..................................................................... 78
*United States v. Agurs,* 427 U.S. 97 (1976) ....................................................... 88
*United States v. Ash*, 413 U.S. 300 (1973 ......................................................... 45
*United States v. Bagley*, 473 U.S. 667 (1985) ........................................ 13, 39, 80, 83
*United States v. MacDonald*, 641 F.3d 596 (4th Cir. 2011) ............................ 27
*United States v. Wade*, 388 U.S. 218 (1967) ..................................... 45, 52, 53
*Watkins v. Sowders*, 449 U.S. 341 (1981)........................................................... 45
*Wheat v. Bradshaw*, No. 1:12CV266, 2013 WL 821381 (N.D. Ohio Mar. 4, 2013) .................. 18
*Williams v. Taylor*, 529 U.S. 420 (2000) ........................................................... 11
*Wood v. Bartholomew*, 516 U.S. 1 (1995) ..................................................... 83
*Youngblood v. West Virginia*, 547 U.S. 867 (2006).......................................... 39, 80

## STATUTES

28 U.S.C. § 2244........................................................................................ *passim*
28 U.S.C. § 2244(b)(2)(B)..................................................................................... 1
28 U.S.C. § 2244(b)(2)(B)(i) ......................................................... 8, 9, 11, 26
28 U.S.C. § 2244(b)(2)(B)(ii) ........................................................ 26, 27, 28
28 U.S.C. § 2244(b)(3)(C) ...................................................................................... 1
28 U.S.C. § 2244(d)(1)(D)....................................................................................... 9
28 U.S.C. § 2254(a) ............................................................................................ 76
28 U.S.C. § 2254(d)(2) ....................................................................................... 76
28 U.S.C. § 2254(e)(2)............................................................................................ 2
28 U.S.C. § 2255(f)(4) ......................................................................................... 12
28 U.S.C.§ 2254(d) ............................................................................................ 76
O.R.C. § 149.43. ................................................................................................. 14
O.R.C. § 2953.21 ................................................................................................ 14
O.R.C. § 2953.23 ................................................................................................ 78
O.R.C. § 2953.23(A)(1)(a)............................................................................... 25

v

## OTHER AUTHORITIES

2 to 20 years: Boys, Stature-for-age and, Weight-for-age percentiles (2000),
  https://www.cdc.gov/growthcharts/data/set1clinical/cj41c021.pdf ........................................ 41

ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE
  COUNSEL IN DEATH PENALTY CASES (rev. ed. 2003), Guide 10.15.12 ....................... 17

Black's Law Dictionary (10th ed. 2014) ...................................................................................... 1

Chaunie Brusie, *When Do Boys Stop Growing?*, HEALTHLINE (updated on March 7, 2019),
  https://www.healthline.com/health/when-do-boys-stop-growing ........................................... 41

Rahaim & Brodsky, Empirical Evidence versus Common Sense: Juror and Lawyer
  Knowledge of Eyewitness Accuracy, 7 Law and Psych. Rev. 1, 2 (1982) .............................. 45

## RULES

Fed. R. Civ. P 60(d) ................................................................................................................ 16

Fed. R. Civ. P. 60(d)(1) ........................................................................................................... 16

Ohio Crim. R. 42 ...................................................................................................................... 23

Ohio Crim. R. 42(C) ................................................................................................................ 23

Ohio Crim. R. 42.2 .............................................................................................................. 22, 23

## CONSTITUTIONAL PROVISIONS

Fifth Amendment ........................................................................................................... 14, 21, 77

Sixth Amendment ......................................................................................................... 14, 21, 77

Eighth Amendment ........................................................................................................ 14, 21, 77

Fourteenth Amendment ................................................................................................. 14, 21, 77

## **PREFACE**

Petitioner Kareem Jackson uses the following abbreviations within to reference prior court proceedings and records:

| **Prior Court Proceedings and Records** | **Abbreviation** |
|---|---|
| *State v. Jackson*, Franklin County Common Pleas Case No. 97CR1902, **Docket Sheet References** | T.d. __ |
| *Jackson v. Bradshaw*, U.S. District Court, SD OH, Case No. 2:03-cv-00983 | Dist. Ct. Case No. 03-cv-00983 |
| *In Re: Kareem Jackson*, Sixth Circuit Court of Appeals Case No. 15-4055 | Sixth Cir. Case No.: 15-4055 |
| *In Re: Kareem Jackson*, Sixth Circuit Court of Appeals Case No. 21-3102 | Sixth Cir. Case No. 21-3102 |
| Return of Writ | ROW |
| Franklin County Sheriff's Office Records | FCSO |

## I.  INTRODUCTION

Kareem Jackson has spent over 25 years of his life paying for the crimes of another person, and this Court should grant his successive habeas corpus petition and order the State to vacate his conviction.

The Sixth Circuit here found a prima facie case that Jackson met the burden in 28 U.S.C. § 2244. "Prima Facie" is an adjective that means "[s]ufficient to establish a fact or raise a presumption unless disproved or rebutted." Black's Law Dictionary (10th ed. 2014). A Court of Appeals may authorize the filing of a second or successive habeas petition only if it determines that the petition "makes a prima facie showing" that "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence" and that "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B) and 28 U.S.C. § 2244(b)(3)(C).

A "prima facie showing requires the presentation of sufficient allegations of fact together with some documentation that would warrant a fuller exploration by the district court." *Bowling v. Haeberline* (*In re Bowling*), 422 F.3d 434, 436 (6th Cir. 2005); *In re McDonald*, 514 F.3d 539, 545 (6th Cir. 2008) ("McDonald's motion for permission to file a second habeas corpus petition also requires a finding that the facts surrounding Harris's perjured testimony, if found to be true, would indeed constitute a constitutional violation." (emphasis added)). Thus, in performing this inquiry, the Sixth Circuit necessarily determined the facts contained in Jackson's successor habeas Petition and supporting documents, if true, would meet the standard outlined in 28 U.S.C. § 2244(b)(2)(B). The dissent confirmed as much, dissenting on the ground Jackson's claims did not warrant fuller exploration in district court because "Jackson's allegations, even if proved, would

not entitle him to relief." *In re Jackson*, 12 F.4th 604, 616–17 (6th Cir. 2021). Once authorization was granted, this District Court secured the authority to order the Warden to respond. This Court can, in its discretion, hold an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2).

Here, the Sixth Circuit was "require[d]" to "evaluate [the] new evidence in light of the evidence as a whole." *McDonald*, 514 F.3d at 546. In its Return of Writ, the Warden does not offer any argument or evidence that would alter the Sixth Circuit's calculus except to allege the statements Jackson relies on were disclosed prior to trial or never made. (ROW, Doc. 27, PageID 3719, 3727.) Neither contention is true. In the event this Court rejects those demonstrably inaccurate arguments, the Warden urges that Jackson's conviction can rest on the word of his co-defendants. (Id., PageID 3731 (conceding "most of [the] evidence of guilt was provided by co-defendants Boone and Williamson, not to mention Jackson's girlfriend, Ivana King.") In its prima facie finding, the Circuit Court Majority addressed and rejected the contention that, in light of the unconstitutionally withheld evidence and record as a whole, the evidence offered by co-defendants Boone and Malaika, without more, could support Jackson's conviction and death sentence. *In re Jackson*, 12 F.4th at 610. Interestingly, the State admits the import of King's testimony alongside co-defendants Boone and Malaika, (ROW, Doc. 27, PageID 3731), but does nothing to address the implications of King's recantation. Accordingly, this Court should find consistent with the Circuit Court's decision that, in light of the evidence as a whole, no reasonable fact finder would have found Jackson guilty, but for constitutional error, and should further award Jackson relief on his habeas claims.

## II.    STATEMENT OF FACTS

At around half-past midnight on March 25, 1997, a robbery took place in a small apartment located at 3117 Lupo Court, Columbus, Ohio. The occupants, Antorio Hunter and Terrence Walker, were selling drugs out of the apartment. At the time of the robbery, two young women,

Nikki Long and Becky Lewis, were visiting Hunter and Walker. The Prosecutor told the jury there were a total of **five** participants in the robbery – Michael Patterson, Derrick Boone, Kareem Jackson, a fourth individual known mysteriously only as "Little Bee," and one female getaway driver, Malaika Williamson. According to the State's theory of the case, all four male participants in the robbery were inside the apartment during the shooting. (State of Ohio Opening Statement, Doc. 15-2, PageID 1757.) They entered the apartment, held its four occupants at gunpoint, and demanded money and drugs. When Jackson realized upon entry that the two male occupants knew his name, he decided they had to be killed. So, he did just that. (Id.) He left the two female occupants unharmed. (Id., PageID 1754-57.) The robbery netted the group a total of forty-five dollars and, "a couple of small bags of marijuana, not even enough to divide up between them." (Id., PageID 1758.)

The State indicted Jackson on a course of conduct specification and principal offender specification. A death sentence in this circumstance hinged on the jury determining Jackson was the actual killer. By the State's theory, the jury did not have to sift through the conflicting narratives of how events unfolded during the sudden and chaotic robbery to determine which co-defendant killed the young men. It was not complicated. Jackson had the **only** motive. (State of Ohio Closing Argument, Doc. 15-2, PageID 2458-59 (arguing, "[t]he only person who has a motive to eliminate the people is the only person who was known by the people.").)

This motive was supplied by co-defendant Derrick Boone. (Derrick Boone Direct Examination Testimony, Doc. 15-2, PageID 2088.) Boone came forward after police circulated a composite sketch closely resembling him. The composite was prepared based on Long's accurate description of Boone as approximately 6'0", light-skinned, and slim. (FCSO Composite Witness Interview Form of Nikki Long, 3/25-26/1997, Doc. 29-1, PageID 3767.) Boone informed police

3

that Jackson committed the murders with a .38 caliber revolver that Boone described in detail as "a dingy silver color" with "black tape around the handle." (Derrick Boone, Police Interview 10:56PM, 3/27/1997, Doc. 24-1, PageID 3350.) Ultimately Boone assisted police in recovering the gun. Boone claimed he feared Jackson, who was on parole at the time for an **unarmed** bank robbery. (Id., Doc. 24-1, PageID 3357-58.) However, Boone later admitted he did not fear Jackson and simply wanted to direct attention away from himself and onto Jackson. (Derrick Boone Cross Examination, Doc. 15-2, PageID 2127, 2145-46; Doc. 29-1, PageID 3775 (indicating Jackson's prior charged was for unarmed bank robbery).)

Boone also identified Malaika Williamson, the getaway driver, to the police. (Derrick Boone, Police Interview 10:56PM, 3/27/1997, Doc. 24-1, PageID 3345.) Prior to Jackson's trial, Malaika admitted her involvement and accepted a ten-year plea bargain from the Prosecutor. She was facing at least thirty years otherwise. (Malaika Williamson Cross Examination, Doc. 15-2, PageID 1978.) Boone told the police there was another male involved. Boone provided the police almost no identifying information about this unknown African-American male and claimed not to know who he was. (Derrick Boone, Police Interview 10:56PM, 3/27/1997, Doc. 24-1, PageID 3345.) This person was later identified only as "Little Bee." (State of Ohio Opening Statement, Doc. 15-2, PageID 1757.) Malaika was equally evasive claiming she did not even know the unknown individual by the alias "Little Bee," although he was "little." (Malaika Williamson, Police Interview 7:46PM, 3/28/1997, Doc. 24-1, PageID 3418 (stating she'd never heard the name "Little Bee"); Malaika Williamson, Police Interview 6:21PM, 3/28/1997, Doc. 24-1, PageID 3402 (stating Kareem and "the little guy" ["Little Bee"] were in the house).)

Astoundingly, especially given subsequently uncovered records indicating both Rebecca Lewis and Nikki Long described the likely shooter as approximately 5'4" whereas Jackson is 5'9",

police never investigated the unknown "little" male named "Little Bee." At trial, then-detective Zachary Scott testified there were no leads regarding the identity of "Little Bee" and "it's not a closed case." (Detective Zachary Scott Direct Examination Testimony, Doc. 15-2, PageID 2274.) Detective Scott eventually became Sheriff of the Franklin County Sherriff's Office and, in response to a Public Records Act Request submitted by Jackson's counsel in October 2014 while under Scott's command, the Franklin County Sheriff's Office confirmed it did not investigate "Little Bee" and lacked any responsive records pertaining to any investigations of an individual known as "Little Bee." (Public Records Request and Response, Doc. 24-1, PageID 3709-11.)

Lastly, Boone informed the police that Michael Patterson participated in the crime as well. (Derrick Boone, Police Interview 10:56PM, 3/27/1997, Doc. 24-1, PageID 3345.) Police arrested Patterson whom it turned out surviving eyewitness Long also accurately described as a "tall, big guy." (Nikki Long, Direct Examination Testimony, Doc. 15-2, PageID 2024.) Patterson stood 6'3" tall and weighed 250lbs. (FCSO Booking Sheet, Doc. 24-1, PageID 3626.) Like Boone, Patterson received a fifteen-year manslaughter plea agreement. Patterson's plea deal required that he "cooperate" with the State, and also that he "testify truthfully" if called as a witness by the State. Malaika never entered the apartment and was not a witness to the shooting so she could not corroborate Boone's version of what happened. Nonetheless, and consistent with the Prosecutor's opening statement, Malaika testified that at the time of the shooting all **four** male participants – co-defendants "Little Bee", Patterson, Boone, and Jackson – were **inside** the house to her knowledge from her vantage point. (Malaika Williamson Direct Examination Testimony, Doc. 15-2, PageID 1953, 1954; Malaika Williamson Cross Examination, Doc. 15-2, PageID 1975.) She said it three times. (Id.) This was an important acknowledgement as it supported the fact co-defendant Patterson witnessed the shootings and, as such, could provide critical corroboration of

Boone's story for the jury if it were, in fact, truthful. The State ultimately did not call Patterson as a witness when it became apparent from an unsolicited letter Patterson wrote to Jackson that his "cooperation" was incompatible with his "truthful testimony." [1] The State, on record, said Patterson's letter and the loss of his testimony was a "problem" for its case against Jackson. (Prosecutor, Doc. 15-2, PageID 2386.) Ultimately Boone testified only he and Jackson were inside the apartment when the murders occurred. (Derrick Boone, Direct Examination, Doc. 15-2, PageID 2085-90.)

The Prosecutor told the jury it was Jackson who planned this robbery of a known drug house, and when Jackson arrived at this drug house and realized two of the robbery victims knew his name he decided then and there to execute them. Any evidence contradicting this theory, or obfuscating the shooter's identity, would undoubtedly undermine the jury's confidence in the State's case against Jackson. As it would turn out, the State's case had many contradictions and plenty of obfuscation brought out by the discovery of unconstitutionally withheld material exculpatory evidence.

## III. REQUIREMENTS UNDER 28 U.S.C. §2244: THE FACTUAL PREDICATE FOR THESE CLAIMS REASONABLY COULD NOT HAVE BEEN DISCOVERED PREVIOUSLY THROUGH THE EXERCISE OF DUE DILIGENCE.

### A. An Introduction.

The following discussion about Jackson's "due diligence" is a recounting of Jackson and his FPD counsels' efforts to get this near-tragically-late disclosed and discovered exculpatory

---

[1] Just before prosecutors called him to testify, Patterson sent an unsolicited letter to Jackson indicating he wanted to "tell the truth" (consistent with his plea bargain). The letter also indicated, however, the "truth" was "Boone did it." (*State v. Jackson*, Franklin County Common Pleas No. 97CR1902, Defendant's Exhibit A - Michael Patterson Letter, Doc. 29-1, PageID 3772.) When the Prosecutor warned Patterson the State could revoke his plea deal, Patterson refused to testify for the defense. The prosecution understandably did not call him either. The jury remained oblivious.

6

information in front of *any* court that would give him an honest hearing. This incredibly uphill effort has taken literally years, which in itself seems remarkable given that the evidence Jackson seeks to litigate speaks directly to the State trial prosecutors' now 25-year-old dishonest efforts to have Jackson put to death. For Jackson and counsel, given how close to being executed Jackson has come four times, (and how close to witnessing their client's execution Jackson's counsel have similarly come), there is no need to argue the premise that "death is different." If nothing else, this litigation has *finally* come to rest upon the steps of this Court's courtroom such that Jackson presents this evidence with a legal sigh of relief, even with the acknowledgement that he faces the punishing consequences for the State's deceptions, of having to manage the extremely difficult "clear and convincing" standard of § 2244. That is the State's reward for its hidden misdeeds for all these years.

But even before that case can be made, Jackson must prove to this Court he was both "reasonable" and "diligent" over these past years in his efforts fighting to get his *Brady* and *Napue* claims timely into this Court's forum. That in itself presents an opportunity for Jackson to bring to light the no-holds-barred efforts by the State to prevent Jackson from presenting this evidence from being given any merits consideration. For only in the retelling of this nightmare of procedural hurdles Jackson navigated to get himself before *this* Court, might he *finally* get a fair opportunity and challenge the State's unconstitutionally won conviction in this case on the *merits*. Only here, in this detailed narrative of several years of frustrating diligence is there, finally, a last opportunity to hold these State trial prosecutors (and lately State Attorneys General) legally accountable for their two and a half decades of adamant refusal to acknowledge any deception or misdeeds at all in their efforts to once again have this uncovered exculpatory evidence and law enforcement intimidation ignored on *procedural* grounds to ensure Jackson is put to death by the State of Ohio.

7

In that sense, this is Counsel's objective defense of their diligent efforts, which serve to highlight the State's now disdainful efforts to have Jackson executed despite the fact that their colleagues have not played fair.

The Warden in answer raises the solitary diligence argument that "[t]he existing trial record confirms that the defense was in possession of FCSO interview tapes and transcripts of Becky Lewis, Nikki Long, Malaika Williamson, Derrick Boone and Ivanna King," therefore "pursuant to 2244(B)(i) [] Jackson has been aware of the supposed "factual predicate" of this claim since before commencement of the trial." (ROW, Doc. 27, PageID 3719). As discussed *infra*, the Warden either misapprehends or purposely mischaracterizes the factual predicate of Jackson's claim. Jackson never alleged Lewis made the 5'4" statement in her FCSO interview or that said interview was withheld. Jackson alleged Lewis made the statement in suppressed police investigative documents. (Petition for Writ of Habeas Corpus, Doc. 1-2, PageID 68) (In his post-conviction petition, Jackson presented newly-uncovered, previously withheld police reports indicating surviving witness Rebecca Lewis initially described the shooter as 5'4" tall.").

**B. Sixth Circuit's standard for due diligence.**

In the Sixth Circuit, whether a petitioner has exhibited "due diligence" pursuant to 28 U.S.C. § 2244(b)(2)(B)(i) requires a fact-specific inquiry to determine whether that particular petitioner "has done as much as could *reasonably be expected* from someone in his circumstances." *In re Wogenstahl*, 902 F.3d 621, 629 (6th Cir. 2018). In that sense, it is a recounting of counsel's good faith decision-making to get these claims back in front of a court all *post* federal habeas. In other words, "[t]he proper task in a case such as this one is to determine when a duly diligent person in petitioner's circumstances would have discovered" the factual predicate for his claims.

*DiCenzi v. Rose*, 452 F.3d 465, 470 (6th Cir. 2006).[2] The petitioner "need not have practiced the maximum feasible diligence;" it is enough that his actions were reasonable under the circumstances. *In re Wogenstahl*, 902 F.3d at 629; *see also Munchinski v. Wilson*, 694 F.3d 308, 330 (3d Cir. 2012).

Similarly, the reasonableness of the diligence requirement includes consideration of efforts made by the petitioner to preserve his claims by first exhausting them in State court. *Jones v. Warden, Corr. Inst.*, No. 2:13-CV-155, 2014 U.S. Dist. LEXIS 29601, at *18 (S.D. Ohio Mar. 7, 2014) ("[I]f a petitioner did what he reasonably thought was necessary to preserve his rights based on information he received then he can hardly be faulted for not acting more 'diligently' than he did." (Emphasis added) (internal quotation marks and ellipses omitted)); *Lott v. Bagley*, No. 1:04CV822, 2007 WL 2891272, at *15 (N.D. Ohio Sept. 28, 2007), *aff'd*, *Lott v. Bagley*, 569 F.3d 547 (6th Cir. 2008) (discussing 2004 Successor Habeas Petition specific to due diligence and ruling, "Lott's failure to present his *Brady* and actual innocence claims in a timely fashion is undisputable. As Lott concedes in the successor petition, Lott's post-conviction counsel obtained the City of Cleveland and Cuyahoga County Prosecutor's Office records that form the basis of his *Brady* and actual innocence claims by October 1991. **Although Lott could have presented these claims based on this information to the state court at that time, he failed to do so**. ... Thus, there is no doubt that Lott fails to demonstrate that he could not have discovered the factual

---

[2] Though the court in *DiCenzi* was performing a diligence inquiry under 28 U.S.C. § 2244(d)(1)(D), the analysis is the same under § 2244(b)(2)(B)(i). Indeed, the language in the two sections is almost identical. *Compare* 28 U.S.C. § 2244(d)(1)(D) ("The limitation period shall run from…the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."), *with* 28 U.S.C. § 2244(b)(2)(B)(i) ("the factual predicate for the claim could not have been discovered previously through the exercise of due diligence."). That is why the Sixth Circuit often cites § 2244(d)(1)(D) case law in performing the inquiry under § 2244(b)(2)(B)(i). *See, e.g., In re Wogenstahl,* 902 F.3d at 629 (citing *DiCenzi v. Rose,* 452 F.3d 465, 470 (6th Cir. 2006)).

predicate of his claims previously, as is required under the [successor habeas] statute.") (emphasis added); *Lott v. Bagley*, 569 F.3d 547, 549 (6th Cir. 2008) (upholding District Court's analysis in its entirety and reiterating that "[i]t is difficult to read these statements by Lott's present counsel [that habeas counsel 'intentionally bypassed' state court exhaustion requirement to secure a more favorable ruling in federal habeas] as anything other than an admission that Lott's previous post-conviction counsel failed to meet the 'due diligence' requirement of Section 2244."); *In re McDonald*, 514 F.3d 539, 543 (6th Cir. 2008) (considering successor request and leaving diligence inquiry specific to statute of limitations to district court upon remand noting relationship between statute of limitations and initial filing in state court: "[I]n the instant case, it is difficult to determine whether McDonald would run afoul of the one-year statute of limitations given that Harris's affidavit is dated December 21, 2001 and McDonald first commenced state court proceedings on account of Harris's affidavit on May 1, 2003.")

The standard in the Sixth Circuit, as explained above, is "fact specific." *Person v. Clipper*, No. 5:17CV1274, 2019 U.S. Dist. LEXIS 64970, at *23-24 (N.D. Ohio Jan. 23, 2019), and asks whether the petitioner "has done as much as could reasonably be expected from someone in his circumstances," *In re Wogenstahl*, 902 F.3d at 629. The question is therefore not whether the evidence hypothetically could have been discovered at trial or some specific time thereafter; it is whether the evidence could have been discovered *by a person in the petitioner's circumstances* exercising reasonable (not maximum) diligence.

For example, in *In re Wogenstahl*, the Court noted that the petitioner had requested discovery from the prosecution numerous times throughout his appeals, finding "[t]hat Wogenstahl did not obtain the evidence he now presents until that final request is hardly attributable to a lack

of reasonable due diligence on his part." 902 F.3d at 629; *see also, In re Freeman*, No. 17-1280, 2017 U.S. App. LEXIS 19043, at *6-8 (6th Cir. Oct. 2, 2017) (finding sufficient evidence to satisfy diligence threshold, despite the State's argument that the evidence was available due to the prosecution's open file policy, because "Freeman's unsuccessful attempts to obtain the photos on direct appeal and collateral review call into question the completeness of the prosecution's file.").

Significantly, it must be acknowledged that the State's conduct *is* relevant to the due diligence inquiry. *See, e.g., In re Wogenstahl*, 902 F.3d at 629 ("The prosecution has a constitutional obligation under *Brady* to provide material exculpatory and impeachment evidence, *see, e.g., Montgomery v. Bobby*, 654 F.3d 668, 678 (6th Cir. 2011) (en banc), and the defendant is not required to request continuously *Brady* information in order to show due diligence."). The Sixth Circuit has not treated the § 2244(b)(2)(B)(i) diligence requirement as distinctly different than the subjective diligence standard required to prevail on a *Brady* claim. As the Supreme Court has explained, "a person is not at fault when his diligent efforts to perform an act are thwarted, for example, by the conduct of another or by happenstance." *Williams v. Taylor*, 529 U.S. 420, 432 (2000). Instead, "[f]ault lies, in those circumstances, either with the person who interfered with the accomplishment of the act or with no one at all." *Id. See also In re McDonald*, 514 F.3d 539, 545 (6th Cir. 2008) (considering 28 U.S.C. § 2244(b)(2)(B) and holding "the evidence now proffered by McDonald could not have been discovered at the time of his first habeas petition, which constituted the last federal proceeding in this matter. Harris only recanted her trial testimony in an affidavit dated December 21, 2001. McDonald's previous habeas corpus petition was filed on May 28, 1998, and denied on May 31, 1999. As a result, the evidence presented now by McDonald could not have been previously discovered for the purposes of § 2244(b).")

The "due-diligence standard d[oes] not require [petitioners] continuously to seek out evidence that the government had a constitutional duty to disclose." *Jefferson v. United States*, 730 F.3d 537, 546 (6th Cir. 2013).[3] Particularly where the government represents that it has disclosed all *Brady* material, a petitioner can "assume that his prosecutors would not stoop to improper litigation conduct to advance prospects for gaining a conviction." *Id.* at 545 (internal quotation marks omitted). In *Jefferson*, for example, the court held that "given the prosecution's representation that it would disclose impeachment evidence, [the defendant] had no basis for believing the prosecution had failed to comply with *Brady*." *Id.* (internal brackets and quotation marks omitted). Accordingly, the court rejected "the government's position that [the defendant] failed to exercise due diligence because he did not seek information 'the very existence of which the [government] had improperly withheld in violation of *Brady*.'" *Id.* at 546; *see also Strickler v. Greene,* 527 U.S. 263, 283 (1999) (noting it was "conduct attributable to the State that impeded [] counsel's access to the factual basis for making a *Brady* claim.")

### C. Jackson meets his burden under § 2244(b)(2)(B)(i): Case History Prior to Successor Habeas Petition.

#### 1. Trial and Appeal.

On April 30, 1997, following Jackson's indictment for the double homicides of Antorio Hunter and Terrance Walker, defense counsel filed a Motion for Discovery, and on May 12, 1997, a Bill of Particulars was sought. (T.d. 18, 23, Doc. 29-1, PageID 3746.) On October 16, 1997, defense counsel filed a Motion to Compel Disclosure of and Specific Requests for Exculpatory and Impeachment Evidence. (T.d. 38, Doc. 29-1, PageID 3747.) The State filed a Memorandum Contra Defendant's Motion for Disclosure of Impeaching Information, asserting "[t]he State of

---

[3] *Jefferson* applied a nearly identical diligence standard in 28 U.S.C. § 2255(f)(4), applicable to federal prisoners.

Ohio intends to comply liberally and fully with these rules. This will include any impeaching evidence which must be disclosed under the rule in *United States v. Bagley*, 473 U.S. 667 (1985). Defendant shall receive all information to which he is lawfully entitled." On October 16, 1997, defense counsel filed a <u>Motion for an Order Directing That a Complete Copy of the Prosecutor's File Be Made, Turned Over to the Court for Review and Sealed for Appellate Review</u>. (T.d. 39, Doc. 29-1, PageID 3747.) The Prosecutors promptly filed a <u>Memorandum Contra Defendant's Motion for an Order Directing that a Copy of the Prosecuting Attorney's File be Made and Turned Over to the Court and Sealed for Appellate Review</u>. (Doc. 29-1, PageID 3749.) Within that <u>Memorandum</u> the Prosecutor wrote:

> Defendant also makes a sanctimonious attack upon the professional integrity and trustworthiness of the prosecution. Apparently, Defendant feels that such self-aggrandizing discourse is a suitable substitute for intelligent, reasoned legal argument. However, Defendant has seriously undermined the credibility of his motion by including such an attack upon the prosecution.

On October 31, 1997, defense counsel filed a <u>Motion to Compel Law Enforcement Officials to Turn Over and Advise Prosecuting Attorney of All Information Acquired During the Course of Investigation</u>. (T.d. 54, Doc. 29-1, PageID 3748.) On December 18, 1997, the State again filed a <u>Memorandum Contra</u> (T.d. 29-1, PageID 3749) and asserted that "Defendant is attempting to manipulate the discovery process by interfering in the actions of non-parties to this case."

Jackson was tried and convicted of aggravated murder and sentenced to death. (<u>Sentencing Opinion</u>, T.d. 211, Doc. 29-1. PageID 3755.) Jackson timely appealed his conviction and sentence to the Ohio Supreme Court, which affirmed his case. *State v. Jackson*, 751 N.E.2d 946 (2001). Jackson moved for Reconsideration that was denied. *State v. Jackson*, 756 N.E.2d 116 (Table) (2001). Jackson applied to reopen his appeal. The application was denied. *State v. Jackson*, 761 N.E.2d 44 (Table) (2002).

### 2. State Post-Conviction.

Jackson also sought post-conviction relief under O.R.C. § 2953.21. As the State prosecutors had not yet disclosed the exculpatory evidence withheld from Jackson and his trial counsel, this initial post-conviction litigation did not include the instant *Brady* and *Napue* claims. However, on April 19, 1999, Jackson's counsel filed Petitioner's First Motion for Leave of Court to Conduct Discovery, or, in the Alternative, an Order Requiring Disclosure of Specific Items. (T.d. 259, Doc. 29-1, PageID 3758.) Included in the requests counsel sought discovery of a "deposition and / or subpoena duces tecum of case files maintained by the Franklin County Prosecutor's Office" pertaining to his case.[4] The Prosecutor opposed all discovery citing to *State ex rel. Steckman,* 70 Ohio St.3d 420 (1994)[5], and arguing that pursuant to that case and Ohio's post-conviction statute the trial court was "prohibited" from granting discovery at any stage of post-conviction. That argument was premised upon the Ohio Supreme Court's holding that a post-conviction petitioner is "unentitled to anything under [Ohio's Public Records Act] R.C. 149.43," again citing *Steckman.*

The trial court summarily dismissed the petition without allowing discovery or an evidentiary hearing. (Entry Denying Motion for Post-Conviction, T.d. 287, Doc. 29-1, PageID 3760.) Jackson appealed the denial of his post-conviction petition to the Court of Appeals, which affirmed the denial. *State v. Jackson*, No. 01AP-808, 2002 WL 1379001 (Ohio Ct. App. June 27,

---

[4] In his Successor Post-Conviction Petition, Jackson's First, Second, and Fourth Grounds for Relief asserted that his sentence is void or voidable because his rights to due process and a fair trial were violated when the prosecution withheld material exculpatory evidence from the defense in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

[5] In *Steckman*, decided September 7,1994, the Ohio Supreme Court held that "[a] defendant in a criminal case who has exhausted the direct appeals of her or his conviction may *not* avail herself or himself of [Ohio's Public Records Act] O.R.C.§ 149.43 to support a petition for postconviction relief." *Id*. at 85, syllabus ¶ 6.

2022). The Ohio Supreme Court declined jurisdiction to review the post-conviction denial. *State v. Jackson*, 777 N.E.2d 277 (2002).

### 3. Federal Habeas Corpus Litigation.

Having exhausted his State court remedies, Jackson timely filed a petition for writ of habeas corpus in the United States District Court, Southern District of Ohio. The Ohio State Public Defender (OPD) was appointed to represent him. During that litigation Jackson's habeas counsel filed a Motion for Discovery, (Dist. Ct. Case No. 03-cv-00983: Doc. 30, PageID 397), in which he sought a "Record deposition and/or subpoena duces tecum of case files maintained by the Franklin County Prosecutor's Office pertaining to this case, including grand jury transcripts." Discovery specific to the Prosecutor's investigatory files was denied. The Petition was denied on September 28, 2007. *Jackson v. Bradshaw*, No. 2:03-cv-983, 2007 WL 2890388 (S.D. Ohio Sept. 28, 2007.)

Jackson appealed to the Sixth Circuit Court of Appeals. After extensive briefing, including a remand to the district court, the appellate court denied relief on the remanded issue and affirmed the District Court's original decision denying Jackson's habeas petition. Jackson filed a petition for writ of certiorari in the Supreme Court of the United States, which was denied on January 22, 2013. *Jackson v. Bradshaw*, 681 F.3d 753 (6th Cir. 2012), *cert. denied sub. nom. Jackson v. Robinson*, 568 U.S. 1145 (2013). The denial of the petition marked the end of Jackson's federal habeas proceedings, moving his case into the Clemency stage.

### 4. Clemency.

On February 27, 2013, the federal District Court entered an Order appointing the Office of the Federal Public Defender (FPD counsel) to assist original habeas counsel with the investigation and preparation for Clemency. (Dist. Ct. Case No. 03-cv-00983: Doc. 91, PageID 1201-02.) Jackson's original habeas counsel, OPD counsel, continued to represent Jackson as co-counsel, but FPD counsel assumed the primary responsibility for preparing for the anticipated Clemency

hearing. (*Id.*, noting "the CHU will provide experience, resources, and expertise to Petitioner's pursuit of clemency.")

On March 28, 2013, the State moved the Ohio Supreme Court to set an execution date for Jackson. The Ohio Supreme Court granted the request on November 11, 2013. The execution date was set for January 21, 2016.

While initially reviewing the record in preparation of Jackson's Clemency hearing, FPD counsel learned of a possible defect in the integrity of Jackson's federal habeas proceedings. On December 8, 2014, FPD counsel filed a Fed. R. Civ. P 60(d)(1) motion for independent relief. (Dist. Ct. Case No. 03-cv-00983: Doc. 97, PageID 1212-46.)[6] Three months before, on September 8, 2014, the Governor issued a Warrant of Reprieve rescheduling Jackson's execution for September 21, 2016.

The District Court denied Jackson's Fed. R. Civ. P. 60(d) motion and transferred the case to the Sixth Circuit Court of Appeals as an unauthorized second or successor *Jackson v. Bradshaw*, No. 2:03-cv-983, 2015 WL 5679632 (S.D. Ohio Sept. 28, 2015). On January 13, 2016, the Sixth Circuit affirmed the District Court's reasoning and denied authorization. On January 27, 2016, Jackson filed a Petition for Rehearing and Suggestion of Rehearing En Banc. (Sixth Cir. Case No.: 15-4055, Doc. 16-1.) On February 22, 2016, the State filed Warden's Opposition to Petition for Rehearing, (Id., Doc. 20), and Jackson successfully sought leave to Reply. (Id., Doc. 21, 22.) On October 7, 2016, the Sixth Circuit Court of Appeals rejected Jackson's 60(d). The mandate issued on October 26, 2016. (Id., Doc. 32.)

---

[6] That litigation was *not* based upon the subsequently disclosed and newly discovered exculpatory evidence which forms the foundation of this current litigation.

Simultaneous to that litigation, FPD counsel continued in its preparation for Clemency. Consistent with its professional and ethical obligations, (*see* ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (rev. ed. 2003), Guideline 10.15.2 – Duties of Clemency Counsel), FPD counsel sent out extensive Public Records Act requests including a September 23, 2014, Request to the Franklin County Sheriff's Department and an August 7, 2015, request to the Franklin County Prosecutor's Office. The Sheriff's department, now run by the former lead detective on Jackson's case, responded on October 8, 2014, citing *Steckman,* as the law that protected law enforcement investigation information from disclosure during the entire pendency of Jackson's litigation. (Public Records Request and Response, Doc. 24-1, PageID 3709-11.) Accordingly, the Sheriff's department declined to provide responsive records. Follow-up requests to the Franklin County Sheriff's Department were sent on July 8, 2015, but the agency was similarly insistent that no investigative reports were to be forthcoming consistent with Ohio law. No immediate response was forthcoming from the Prosecutor's Office.

Frustrated by the inability to secure law enforcement investigative files from either the Sheriff's Department or the Prosecutor's Office, FPD counsel continued to investigate and prepare for the upcoming Clemency. FPD counsel sought to speak with critical witnesses and in this case, given that most of the State's key witnesses were co-defendants who had secured plea agreements conditioned upon their aiding the State, counsel turned to perhaps the State's most important non-defendant witness, Ms. Ivana King. FPD counsel's investigator located Ms. King, counsel met with her, and on September 26, 2015, secured a Declaration from that critical trial witness in which she not only recanted the critical part of her trial testimony, (where she testified that she allegedly heard Jackson confess to the shootings), but detailed the reason for doing so was because law

17

enforcement had seriously intimidated and threatened her into implicating Jackson. Jackson himself has historically denied involvement in the killing. Recently paroled at the time for an **unarmed** robbery, (Doc. 29-1, PageID 3775 (indicating Jackson's prior charged was for unarmed bank robbery), he became a convenient fall guy for the other indicted co-defendants and is vehement he *never* confessed. Indeed, Jackson turned down a plea offer in order to exercise his right to a trial. (Court and Counsel, Doc. 15-2, PageID 2181.)

Less than one month later, on October 20, 2015, another Warrant of Reprieve was issued pushing back Jackson's execution to July 10, 2019.

The Clemency investigation continued.[7]

The Public Records Act requests were renewed yet again in March 2016. As noted above, *Steckman* was still the law in Ohio such that production of documents responsive to the Public Records Act requests by defendant / petitioners was not mandated during the pendency of any

---

[7] Petitioner's counsel was aware that recanting witnesses presented in litigation (as opposed to a Clemency proceeding which is extra-judicial), are viewed with extreme suspicion. *McCray v. Vasbinder,* 499 F.3d 568, 574 (6th Cir.2007). *See Wheat v. Bradshaw,* No. 1:12CV266*,* 2013 WL 821381, at *5 (N.D. Ohio Mar. 4, 2013) (Recantation "upsets society's interest in finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction." *Carter v. Mitchell*, 443 F.3d 517, 539 (6th Cir.2006) (citing *Dobbert v. Wainwright*, 468 U.S. 1231, 1233–34 (1984)). More evidence would be required to bring any legal challenge back into court, and Counsel was well aware there would, for all intents and purposes, be only one final chance to exhaust new claims before the State successor post-conviction court should additional evidence supporting new claims be found.

Indeed, when King's sworn Declaration *was* presented along with the subsequently discovered exculpatory evidence in a State successor post-conviction petition, the State prosecutor called the recantation "dubious" arguing that it was merely "part of paperwork" "provided in an effort to obtain clemency;" further suggesting that Ms. King "very likely would have expected that she would not need to testify in support of it." (T.d. 355, Motion of Plaintiff State of Ohio to Dismiss Untimely and Successive Post-Conviction Petition, pp. 10-11, Doc. 29-1, PageID 3763.) The State went on to argue, not surprisingly, that recantations "are looked upon with the utmost suspicion and by themselves do not warrant a new trial." *Id.*, p.12.

post-conviction litigation. As a matter of law, being able to *compel* complete disclosure of law enforcement and prosecutor's investigation files into the double homicide was essentially impossible. Nonetheless, on March 31, 2016, the Prosecutor's Office *did* partially disclose some police investigation records, noting that their office had *properly* declined to fulfill the records request but instead had produced the provided records as a courtesy.[8] Additionally, according to the Prosecutor's Office this disclosure of records came in spite of the exception in Ohio's Public Records Act for "confidential law enforcement investigatory records and work product." Included therein were what counsel believed to be some clearly exculpatory police reports.[9] FPD Counsel immediately sought to bring forth the exculpatory evidence into State court to exhaust Jackson's newly discovered *Brady* and *Napue* claims. This was not an easy matter to accomplish.

### 5. Seeking Authorization to litigate back in State court.

As agents of a federal agency, federal public defenders typically do *not* appear in State court proceedings without prior authorization from the federal court. That process can be extremely time consuming, particularly if the State Attorney General chooses to object and insist upon litigating the request before the federal court. That was the case here. As Jackson was then facing an execution date of July 10, 2019, FPD counsel sought first to find assistance to expeditiously bring these new claims in a State Successor Post-Conviction Petition and begin the

---

[8] It was not until *December 28, 2016, in State ex rel. Caster v. City of Columbus*, 89 N.E.3d 598 (2016), that the Ohio Supreme Court reconsidered and changed its "admittedly harsh" law concerning a defendant using public records law to obtain evidence. Before that, defendants could not use the Public Records Act to obtain evidence that they did not obtain through criminal discovery. A defendant such as Jackson could only obtain public records through "an act of bureaucratic grace (or a bureaucratic mistake)." *Caster*, 89 N.E.3d at 609. That is apparently how it came to pass that Jackson gained access to the exculpatory evidence.

[9] On April 21, 2017, FPD counsel followed up again with both the Sheriff's Department and the Prosecutor's Office, seeking whatever records remained, noting that on December 28, 2016, the Ohio Supreme Court decided *State ex rel. Caster v. Columbus*, 89 N.E.3d 598 (2016), which overruled *Steckman*.

exhaustion process. United States Supreme Court precedent then and now requires that newly discovered claims be first litigated (exhausted) in State court proceedings. *See Cullen v. Pinholster*, 563 U.S. 170 (2011). Jackson turned naturally to OPD.

On November 14, 2016, Jackson, represented temporarily by OPD counsel, returned to State Common Pleas Court of Franklin County, seeking a hearing to present, exhaust, and prove his recently uncovered *Brady / Napue* violations. (Successor Post-Conviction Petition, T.d. 315 - 319, Doc. 29-1, PageID 3761.) FPD counsel then returned to the District Court to seek the required State court authorization.

On January 30, 2017, Jackson's FPD counsel filed a Motion for Authorization to Appear in Ancillary State Court Litigation. (Dist. Ct. Case No. 03-cv-00983: Doc. 107, PageID 1340-46.) Perhaps not surprisingly given the new *Brady* and *Napue* claims that had been exposed, the State of Ohio, through the Ohio Attorney General's Office, opposed this request in the federal District Court to prevent FPD counsel from bringing these claims that had been developed by FPD counsel before the State court. (Dist. Ct. Case No. 03-cv-00983: Respondent's Opposition, Doc. 108, PageID 1428-37.) In Replying to the Warden's Opposition, Jackson secured an Affidavit dated February 10, 2017, from Jackson's original OPD state habeas counsel indicating that "[t]hrough the efforts of the Federal Defender's Office, documents were obtained from the State that had never been seen previously. These documents were determined to not only be relevant for clemency purposes but also as an independent appeal in the courts." The Affidavit continued to attest that "[t]he lack of co-counsel will seriously undermine my ability to provide adequate representation to Kareem Jackson and will place the client at a distinct disadvantage during the state court hearing." (Dist. Ct. Case No. 03-cv-00983: Affidavit of [OPD counsel] Kathryn Sanford, Doc. 110-3, PageID 1460-61.)

20

The State court authorization was denied by the federal court (*Jackson v. Bradshaw*, No. 2:03-cv-983, 2017 WL 1829773 (S.D. Ohio May 8, 2017)), and OPD counsel was required to continue the litigation of the State Successor Post-Conviction petition without FPD counsel's assistance.

### 6. State Successor Post-Conviction Petition (Franklin County Common Pleas Court, 97-CR-001902)

As noted, with newly disclosed evidence that FPD counsel considered to be exculpatory, Jackson turned to the Ohio Public Defender (OPD) to provide temporary counsel to present the new claims expeditiously in State court while FPD counsel sought permission to litigate directly from the District Court. On November 14, 2016, Jackson, represented temporarily by the OPD, returned to State Common Pleas Court of Franklin County, seeking a hearing to present, exhaust, and prove his recently uncovered *Brady / Napue* violations. (Successor Post-Conviction Petition, T.d. 315 - 319, Doc. 29-1, PageID 3761.)[10]

Jackson's Petition asserted his sentence is void or voidable because his rights to due process and a fair trial were violated when the prosecution withheld material exculpatory evidence from the defense in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution and *Brady v. Maryland*, 373 U.S. 83 (1963). Jackson's petition also asserted that his sentence is void or voidable because his rights to due process and a fair trial were violated by the false and coerced testimony of Ivana King in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution. *Napue v. Illinois*, 360 U.S. 264 (1959).

The State of Ohio filed its Answer on January 13, 2017, wherein the State stated: "[u]pon review of …[Jackson's] petition, plaintiff State of Ohio hereby answers that it does *not* oppose the

---

[10] This was less than three weeks after the October 27, 2016, Sixth Circuit Court of Appeals denied Jackson's 60(d) request.

holding of an evidentiary hearing to address the claims raised in the petition." (T.d. 326, Answer of Plaintiff State of Ohio at p. 1, Doc. 29-1, PageID 3762.) A status conference was held on April 27, 2017, and the trial court filed its Amended Case Schedule on April 28, 2017, setting forth pertinent discovery motion deadlines and scheduling the Evidentiary Hearing for December 14, 2017, over seven months away. (T.d. 333, Amended Case Schedule, Doc. 29-1, PageID 3762.) The several month interim accommodated the maternity leave of presiding Judge Colleen O'Donnell, a delay outside of Petitioner Jackson's control.

A Discovery motion was filed by Jackson on June 9, 2017. It was strongly opposed by the State on June 23, 2017. See, T.d. 339, Memorandum of Plaintiff State of Ohio Opposing Motion for Leave to Conduct Discovery (indicating in part, "[t]he State's concession of no opposition to an evidentiary hearing did not include a concession that unwarranted time-consuming discovery was also needed.") (Doc. 29-1, PageID 3763.) As of October 27, 2017, the trial court had yet to rule on the discovery motions, and OPD counsel filed a motion asking the court to expedite the discovery ruling. (T.d. 341, Motion to Expedite Discovery Ruling, Doc. 29-1, PageID 3763.) On December 1, 2017, thirteen (13) days before the scheduled evidentiary hearing, the trial court filed a Decision and Entry overruling Jackson's motion for leave to conduct discovery in its entirety but ordered an exception specific to records related to the newly enacted Ohio Crim. R. 42.2. (T.d. 343, Decision and Entry, Doc. 29-1, PageID 3763.)[11] Pursuant to the newly passed Crim. R. 42.2 discovery rule specific to State post-conviction litigation the State had been ordered to respond.

---

[11] On December 1, 2017, OPD counsel filed Petitioner's Witness List (T.d. 345); a Motion to Convey Jackson from prison (T.d. 346); a Motion to Compel (Pursuant to Crim. R. 42(C)) (T.d. 350); a subpoena for Ivana King was issued and she was noticed on Jackson's filed Witness List. Trial Counsel Rigg agreed to attend the evidentiary hearing and was identified on Jackson's file Witness List.); and a Motion for Partial Reconsideration of the Court's 12/1/17 Order Denying Discovery (T.d. 354.) (Doc 29-1, PageID 3763.)

On December 7, 2017, Jackson felt compelled to file a <u>Motion to Compel</u>, seeking a full disclosure of the Prosecutor's files pursuant to Crim. R. 42.2. (T.d. 350, Doc. 29-1, PageID 3763.) No response was forthcoming.

On December 12, 2017, the State withdrew its concession to the evidentiary hearing and filed a motion to dismiss the successor post-conviction proceedings entirely. (T.d. 355, <u>Motion to Dismiss Untimely and Successive Post-Conviction Petition</u>, Doc. 29-1, PageID 3763.) The evidentiary hearing was cancelled. The same day (December 12), the trial court, in answer to the flurry of pleadings filed by the parties, issued an <u>Entry</u> indefinitely continuing the December 14, 2017, evidentiary hearing, stating "[t]he Court will allow all motions to be briefed, then will determine when, *if ever*, a hearing on any and all motions shall be conducted." (T.d. 360, <u>Entry Continuing 12/14/2017 Hearing</u>, Doc. 29-1, PageID 3764.) (emphasis added.)

On December 19, 2017, the State of Ohio filed yet another <u>Memorandum in Opposition to Motion to Compel Discovery</u>, and on December 26, Jackson filed his <u>Reply in Support of His Motions to Compel Discovery Pursuant To Crim. R. 42(C) And Partial Reconsideration Of The Court's Order Denying Discovery</u>.[12](T.d. 364, 371, Doc. 29-1, PageID 3764.)

---

[12] That pleading noted that as early as July 3, 2017, Petitioner Jackson's OPD counsel had sent a letter to the State requesting access to the materials identified in the newly enacted Ohio Crim. R. 42(C). On July 20, 2017, Petitioner sent a follow-up email inquiring of the status of his July 3, 2017, request. On August 10, 2017, the prosecution advised Petitioner that the Crim. R. 42 material was ready. On September 12, 2017, Petitioner made a second clarifying request pursuant to Crim. R. 42(C). On October 11, 2017, the prosecution advised Petitioner that it had located additional material pursuant to Crim. R. 42(C) and that it was then available for pickup at the prosecutor's office. The additional material consisted of 495 pages of records. Thereafter the pleading details at length a continued back and forth as to whether the Prosecutor bore any obligation to disclose documents from the Sheriff's Department.

As OPD counsel pursued this back and forth, Jackson grew anxious about the looming hearing date. He sent two letters to the trial court prior to the scheduled hearing date in December 2017 indicating his desire for the hearing to move forward with whatever evidence OPD had already obtained, but to no avail. The trial court did not acknowledge Jackson's letters.

FPD counsel continued to anticipate the July 10, 2019, execution date, while the State court exhaustion process continued to languish. On March 7, 2019, the Governor issued another Warrant of Reprieve rescheduling Jackson's execution for January 16, 2020. The State Court continued to consider the discovery and dismissal motions without resolution. Then, on October 30, 2019, Jackson's execution date was pushed back eight months until September 16, 2020. Meanwhile, from January 2018 to August 2018, no action was taken by the trial court. The trial court dismissed the petition on procedural grounds without an evidentiary hearing on September 21, 2018, thereby denying jurisdiction. That dismissal mooted any pending and remaining Discovery requests. Jackson immediately appealed. (Notice of Appeal, T.d. 398, Doc. 29-1, PageID 3766.)

### 7. State Appeal of the Successor Post-Conviction Litigation.

Even with the evidentiary hearing cancelled, FPD counsel continued to investigate to support the prejudicial effect of the withheld evidence and provide a compelling case for Clemency or successor litigation should the common pleas court be reversed, and an evidentiary hearing ordered. With the original evidentiary hearing denied and the appeal underway, on October 17, 2019, FPD counsel returned to trial counsel Brian Rigg, and secured a signed Affidavit indicating that indeed the *Brady* documents *had* been withheld at trial and had they been provided counsel's trial strategy would have substantially changed. [13]

---

[13] Attorney Rigg was the sole surviving attorney from Jackson's trial. In his Affidavit signed by Mr. Rigg, he recognized the records indicating Lewis identified the shooter as 5'4" tall were not disclosed to the defense at the time of Jackson's trial. (Habeas Petition Exh. D, Affidavit of Brian Rigg, ¶ 8, Doc. 1-3, PageID 125.) Mr. Rigg discussed specifically how his trial strategy would have been substantially altered had the withheld evidence been disclosed at trial. Mr. Rigg attests that had these records been disclosed, "our trial strategy would have been significantly different." *Id.* at ¶9, PageID 126. Mr. Rigg further States: "Identity was a central issue in this case, and the Prosecutor acknowledged that to the jury from the start. Had the defense known that *both* witnesses [Rebecca Lewis and Nikki Long] estimated the shooter to be approximately 5'4", much shorter than Jackson's height of 5'9", we would have focused on and emphasized this important discrepancy. Especially since Jackson did not fit Lewis' "fat" description either." *Id.* at ¶14,

On December 5, 2019, the Ohio Court of Appeals for the Tenth Appellate District affirmed the trial court's order and dismissal. *State v. Jackson*, No. 18AP-758, 2019 WL 6615076 (Ohio Ct. App. Dec. 5, 2019). In dismissing Jackson's appeal, the appellate court assumed without deciding that Jackson *was* unavoidably prevented from discovering the facts upon which he relies. *Id.* at ¶ 34. Notably, it appears the Appellate Court's assumption that Jackson showed diligence was correct insofar as the Ohio Supreme Court recently clarified that a defendant asserting a *Brady* claim satisfies the "unavoidably prevented" requirement contained in O.R.C. § 2953.23(A)(1)(a) by establishing the prosecution suppressed the evidence underlying the claim. *State v. Bethel*, -- N.E.3d.--, 2022 WL 838337 (Ohio Mar. 22, 2022), reconsideration denied, *State v. Bethel,* 187 N.E.3d 564 (Table) (2022).

On April 14, 2020, the Ohio Supreme Court summarily declined jurisdiction to hear Jackson's discretionary appeal. *State v. Jackson,* Entry, Case No. 2020-0087. Jackson's *Brady* and *Napue* claims were finally exhausted. On June 5, 2020, Governor DeWine issued another Warrant of reprieve rescheduling Jackson's execution for September 15, 2022.[14]

### 8. Successor Federal Habeas Petition.

On August 4, 2020, Jackson filed a new federal habeas petition in the instant case seeking relief on the recently discovered and newly exhausted *Brady* / *Napue* claims. (Petition for A Writ Of Habeas Corpus, Doc. 1-1-3, PageID 1-130.) On February 2, 2021, the District Court transferred the petition to the Sixth Circuit as a successor pursuant to *In re Wogenstahl*. (Opinion and Order, Doc. 11, PageID 179-89). On February 18, 2021, Jackson moved to remand his petition to the

---

PageID 127. Mr. Rigg notes that the defense could have focused on demonstrating "that [unindicted co-defendant] Little Bee was shorter than Jackson, and thus more likely to be the height specifically identified by the two surviving witnesses." Id*.* at ¶19, PageID 128.

[14] Recently, on May 13, 2022, Governor DeWine issued another reprieve rescheduling Jackson's execution for December 10, 2025.

district court to proceed as a subsequent-in-time first habeas petition arguing *Wogenstahl* conflicts with Supreme Court precedent and contravenes prior panel precedent. (Sixth Cir. Case No.: 21-3102: <u>Motion to Remand</u>, Doc. 9.) In the alternative, Jackson filed a motion under 28 USC § 2244 for leave to file a second or successive petition. (Id., <u>Second or Successive Petition,</u> Doc. 8). On September 2, 2021, a panel of the Sixth Circuit granted Jackson's motion to proceed as a successive habeas petition subject to § 2244's heightened gateway provision. (Id., <u>Order</u>, Doc. 12-2). The panel denied Jackson's motion to remand citing *In re Wogenstahl* with one panel member writing separately to state that, having previously joined the *Wogenstahl* majority, that panel member now believes *Wogenstahl* was wrongly decided.

**9.  Jackson has been diligent in bringing his new claims before this Court.**

Based upon the above procedural history, this Court should find that Jackson has been diligent in bringing his claims before this District Court such that he meets the "diligence" criteria of the Successor Habeas Petition statute § 2244(b)(2)(B)(i).

## IV.  REQUIREMENTS UNDER 28 U.S.C. §2244: THE FACTS UNDERLYING THE CLAIM, IF PROVEN AND VIEWED IN LIGHT OF THE EVIDENCE AS A WHOLE, WOULD BE SUFFICIENT TO ESTABLISH BY CLEAR AND CONVINCING EVIDENCE THAT, BUT FOR CONSTITUTIONAL ERROR, NO REASONABLE FACTFINDER WOULD HAVE FOUND THE APPLICANT GUILTY OF THE UNDERLYING OFFENSE.

### A.  The Standard

Pursuant to the statute, 28 U.S.C. § 2244 requires that an applicant pursuing a claim in a second or successive habeas petition show "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii). This statute codified the "miscarriage of justice" or "actual innocence" exception under the common law. *See McQuiggin*

*v. Perkins*, 569 U.S. 383, 396 (2013). Accordingly, the term "actual innocence" has a specific and equivalent meaning under both the common law and as codified in 28 U.S.C. § 2244(b)(2)(B)(ii). It does ***not*** mean that a petitioner must show he did not commit the crime. Instead, to show actual innocence, a petitioner must "persuade[] the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty ***beyond a reasonable doubt***." *Schlup v. Delo*, 513 U.S. 298, 329 (1995) (emphasis added).

As codified, a petitioner must make the showing by "clear and convincing" evidence that, in light of the evidence as a whole, no reasonable juror would find the applicant guilty beyond a reasonable doubt. 28 U.S.C. § 2244(b)(2)(B)(ii). At common law, a petitioner only had to make the showing that it was "more likely than not," in light of the evidence as a whole, no reasonable juror would have found the applicant guilty beyond a reasonable doubt. *Schlup*, 513 U.S. at 327. The habeas statute did not alter the concept of "actual innocence" as understood at common law, but simply heightened the standard for showing actual innocence to "clear and convincing" evidence from "more likely than not." *McQuiggin*, 569 U.S. at 396. To that end, the Sixth Circuit has found that codification of the actual innocence standard did not curtail the concept of "evidence as a whole" in relation to the court's analysis. Specifically, the Court has clarified, "the 'evidence as a whole' is exactly that: all the evidence put before the court at the time of its § 2244(b)(2)(B)(ii) or § 2255(h)(1) evaluation." *Clark v. Nagy*, 934 F.3d 483, 496 n.5 (6th Cir. 2019) (quoting *United States v. MacDonald*, 641 F.3d 596, 610 (4th Cir. 2011)).[15]

---

[15] This understanding of "evidence as a whole" includes "'all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under [evidentiary rules].'" (*Long v. Hooks*, 972 F.3d 442, 470 (4th Cir. 2020) (quoting *United States v. MacDonald*, 641 F.3d 596, 612 (4th Cir. 2011)).

Furthermore, the phrase "reasonable juror" is "not without meaning." *Schlup*, 513 U.S. at 329. "It must be presumed that a reasonable juror would consider fairly all of the evidence presented" and that "such a juror would conscientiously obey the instructions of the trial court requiring proof beyond a reasonable doubt." *Id.* Thus, the question for this Court becomes: in the absence of King's false testimony that Jackson confessed to her, and with the benefit of the withheld *Brady* evidence considered in the context of the evidence in this case, would a reasonable juror in Jackson's case have found him guilty beyond a reasonable doubt?

For the following reasons, Jackson has shown by clear and convincing evidence that, given the evidence in this case as a whole, "but for constitutional error,"—*i.e.*, if the state had turned over the *Brady* evidence withheld in his case and refrained from presenting King's false testimony – "no reasonable juror" would have found him guilty beyond a reasonable doubt. 28 U.S.C. § 2244(b)(2)(B)(ii).

### B. The Evidence And Testimony Produced At Trial Made Clear This Case Was All About Identity

According to the State's theory of the case, Michael Patterson, Derrick Boone, Kareem Jackson, and a fourth individual known mysteriously only as "Little Bee" were **all** present in the apartment when the victims were killed. (State of Ohio Opening Statement, Doc. 15-2, PageID 1756-57.) The four males entered the apartment and held its four occupants at gunpoint while demanding money and drugs. (Id.) When Jackson realized that the male occupants knew his name, he decided to kill them. (Derrick Boone Direct Examination Testimony, Doc. 15-2, PageID 2088.) That alleged motive, supplied by co-defendant Boone, formed the foundation of the State's argument that Jackson, rather than any of the other participants, fired the fatal shots. (State of Ohio Closing Argument, Doc. 15-2, PageID 2458-59 (arguing, "[t]he only person who has a motive to eliminate the people is the only person who was known by the people.").) The State offered no

other motive. The case presented by the Prosecutor to the jury was very straightforward. The legal theory was direct and simple. Jackson was the actual killer. Jackson planned a robbery and then decided two young men had to die after he robbed them because he realized they knew his name. He then shot each one in the head. He executed them. It was incredibly cold and callous. How was death not warranted?

For their part, the surviving victims – two young women who evidently did not know Jackson's name since they were left unharmed – were in a separate room when the killings took place. (State of Ohio Opening Statement, Doc. 15-2, PageID 1757.) They did not witness the actual murders, but they did have opportunities to observe the intruders and vital information to relay.

Nikki Long provided a detailed description of one of the assailants as tall, light-skinned, and carrying a "long gun." (Nikki Long Direct Examination Testimony, Doc. 15-2, PageID 2204.) She also described him as "thin, but not bony." (FCSO Composite Witness Interview Form of Nikki Long, 3/25-26/1997, Doc. 29-1, PageID 3767.) Nikki provided a level of detail that allowed police to create the following computer-generated composite sketch:



By contrast, when officers requested that Rebecca Lewis assist in creating a composite sketch, she stated, "I would try, but I mean, I'm not really sure of what he looked like." (Rebecca

<u>Lewis, Police Interview 2:57AM, 3/25/1997</u>, Doc. 24-1, PageID 3605.) Lewis' ability (or rather **in**ability) to recall the individual alleged to be the gunman and later alleged to be Jackson resulted in this generic and cartoonish, hand-drawn composite:



Notably, a sketch artist drew the composite for Lewis because her difficulty remembering specific details made it impossible to use the computer program used by Long to create the extremely accurate likeness of the individual that turned out to be Boone. (Officer Gary S. Wilgus Direct Examination Testimony, Doc. 15-2, PageID 1817.)

The likeness of Boone was so accurate that when it was aired on television it caused him to immediately turn himself in. (State of Ohio Opening Statement, Doc. 15-2, PageID 1759.)



Once Boone surrendered himself to police, he struck a plea to save his life, gave names of accomplices, and told the State a story that the State subsequently told the jury, conveniently suppressing contradictory and exculpatory information so that the jury would reach a single conclusion to warrant a death sentence – of the four possible choices, Kareem Jackson was the gunman described by Rebecca Lewis who fired the fatal shots that killed two young men that night.

At trial, the jury heard five key pieces of non-forensic evidence to place the murder weapon in Jackson's hands and identify him as the shooter: (1) the surviving witnesses' courtroom identification of Jackson, especially the identification by Rebecca Lewis; (2) testimony that Jackson planned the robbery and was the only person with a motive for murder once he realized the victims knew his name; (3) testimony that Jackson was the **only** one who possessed a handgun that evening; (4) the recovery of the murder weapon from co-defendant Malaika Williamson using a "ruse" in which an undercover officer posed as Jackson's uncle; and (5) the testimony of girlfriend Ivana King that Jackson confessed to her that "he done two people."

This may seem a strong case at first glance, but when viewed in light of the evidence as a whole, and particularly in light of the exculpatory evidence kept from the jury due to constitutional violations, the State's identity-centered case crumbles. Each of these 5 key pieces of evidence will

31

be addressed separately, first from the perspective of the evidence presented by the Prosecutor at trial and secondly, from the perspective of how that evidence offered in support of the State's theory of prosecution is clearly and convincingly undermined and negated when viewed against all the evidence, including the unconstitutionally withheld *Brady* and *Napue* evidence.

### 1. Surviving Eyewitnesses Rebecca Lewis and Nikki Long Identified Jackson as the "Short Guy" with the "Little Gun"

Long described the individual that clearly was Boone as tall and light-skinned, carrying a "long gun." Driver's license records list Boone as 6'0" 180lbs, and he is light skinned in complexion. (Doc. 24-1, PageID 3617-19.) Long also testified that a "tall, big guy" [not Boone] entered the apartment carrying a long, silver gun, and told everyone to get down on the ground. (Nikki Long, Direct Examination Testimony, Doc. 15-2, PageID 2024.) Prison records show that [co-defendant] Patterson is 6'3" and weighed 250lbs at the time. (FCSO Booking Sheet, Doc. 24-1, PageID 3626.) Thus, Patterson fit the description of the "tall, big guy" carrying the long, silver gun. Long described the person later identified as Jackson as "short" and carrying "a little handgun." (Nikki Long Direct Examination Testimony, Doc. 15-2, PageID 2024.) According to Long, the "short" guy did most of the talking during the robbery, and she recognized his voice from the kitchen, where she could not see the killings, asking each deceased victim "are you going to talk" prior to a shot being fired. (Nikki Long Direct Examination Testimony, Doc. 15-2, PageID 2018.)

The robbery was quick, chaotic, and terrifying. Long was not able to identify the short guy for composite purposes and admittedly only identified Jackson after seeing him on television in handcuffs. (Nikki Long Direct Examination Testimony, Doc. 15-2, PageID 2035 (claiming she recognized Jackson as the short guy because he was wearing an earring in his arrest photo and claiming she recognized Jackson because he looked like a rap star)). Long testified that, although

Lewis and the other victims were drinking and smoking marijuana immediately before the robbery, she neither drank nor smoked and was sober that evening. (Nikki Long Direct Examination Testimony, Doc. 15-2, PageID 2013.)

Lewis substantially corroborated Long's recollection of events. Although Lewis initially told officers the assailant with the handgun was "short" and "fat," she removed all such references from her trial testimony. Instead, at trial she referred to him as the person with the "little gun." (Becky Lewis Direct Examination Testimony, Doc. 15-2, PageID 1890-91.) According to Lewis, the person with the little gun, whom she later identified as Jackson, came in to purchase marijuana at which point it appeared the male victims knew him. (Becky Lewis Direct Examination Testimony, Doc. 15-2, PageID 1884.) A second man accompanied Jackson during the transaction. (Id.) Lewis testified that Jackson and the second individual left the apartment after the transaction, but Jackson reappeared minutes later with a "little gun" accompanied by two guys with "long guns." (Becky Lewis Cross Examination Testimony, Doc. 15-2, PageID 1926.) The second person who was originally with him never returned. (Id.)

Lewis also testified that, after the two guys with long guns came in, they told everyone to get on the ground, and Jackson struck her in the head with the little gun when she did not immediately comply. (Becky Lewis Direct Examination Testimony, Doc. 15-2, PageID 1886.) He then placed her in the kitchen before bringing her back into the living room, placing a pillow behind her head, and threatening her with the handgun. (Becky Lewis Direct Examination Testimony, Doc. 15-2, PageID 1886-87.) Jackson then placed her back into the kitchen with Long for the duration of the robbery. (Becky Lewis Direct Examination Testimony, Doc. 15-2, PageID 1887.) Lewis claimed at trial that, because of these interactions, she had multiple opportunities before and during the robbery to view the individual with the "little gun" whom she later identified

33

as Jackson and felt confident in her courtroom identification of him. (Becky Lewis Direct Examination Testimony, Doc. 15-2, PageID 1891.) She admitted to smoking three blunts that day, including one shortly before the robbery, and consuming alcohol just before the robbery occurred, but insisted none of that affected her perception. (Becky Lewis Direct Examination Testimony, Doc. 15-2, PageID 1909-12.)

Based on her interaction with the individual with the little gun, Lewis explained she worked with a forensic artist to create the cartoonish composite, which she felt "was fairly close" to Jackson's appearance, and more accurate compared to anything that could be generated using the demonstrably more precise computer program utilized by Long. (Becky Lewis Direct Examination Testimony, Doc. 15-2, PageID 1902.) Lewis further testified that she subsequently picked Jackson's photo out of a photo array feeling confident he was the person with the little gun she had seen and described for the sketch artist. (Becky Lewis Direct Examination Testimony, Doc. 15-2, PageID 1906-07.)

### 2. Jackson Planned the Robbery and Only He had a Motive for Murder

During opening statements, the Prosecutor told the jury it was Jackson who initially planned and then involved everyone else in the scheme to rob the drug house. (State of Ohio Opening Statement, Doc. 15-2, PageID 1753.) The State indicted Jackson on a course of conduct specification and principal offender specification, basing its theory of prosecution strictly on the assertion that thereafter, during the robbery, Jackson realized the victims knew him, and therefore they had to die. (State of Ohio Closing Argument, Doc. 15-2, PageID 2461-62.) The prosecutor implored the jury, "[Jackson] took care of the problem. Now you take care of him." (Id.)

However, regarding Jackson's supposed planning and involving everyone else in the robbery, the State's witnesses did not deliver on this claimed assertion. Malaika admitted at trial that the planning for this robbery was done, not by Jackson as prosecutors told the jury, but by

both the never-apprehended "Little Bee," and Patterson. (Malaika Williamson Cross Examination Testimony, Doc. 15-2, PageID 2512-13.) Boone testified similarly that "Little Bee" was the one who planned the robbery, and that "Little Bee" was the one who provided all the inside information. (Derrick Boone Direct Examination Testimony, Doc. 15-2, PageID 2066-69.) According to Boone and Malaika's trial testimony, the extent of Jackson's planning was to suggest he and "Little Bee" go into the apartment first followed by Boone and Patterson who would "count to ten and then come on in." (Malaika Williamson Direct Examination Testimony, Doc. 15-2, PageID 1942; Derrick Boone Direct Examination Testimony, Doc. 15-2, PageID 2068.)

Along with this much less involved "planning" of the robbery by Jackson, whom Patterson and "Little Bee" initially recruited, Boone alone supplied for the State Jackson's alleged motive for the murders – a spontaneous decision made once Jackson entered the apartment and realized the two male occupants knew his name. (Derrick Boone Direct Examination Testimony, Doc. 15-2, PageID 2088.) Thus, through Long and Lewis, the State presented essential credible evidence from disinterested eyewitnesses that the individual they identified as Jackson in the courtroom appeared to know the male victims, lending some level of corroboration to Boone's otherwise unverified assertion that Jackson killed two young men simply because they knew his name.

### 3. Only Jackson had a Handgun.

The fact the victims were killed with a handgun was of vital importance to the State's identity case because Jackson was alleged to be the only person with a handgun that evening. At trial, the jury heard Boone testify that of the four people who robbed the drug house **only** Jackson possessed a handgun during the robbery. (Derrick Boone Direct Examination Testimony, Doc. 15-2, PageID 2075-76.) Likewise, the surviving eyewitnesses testified the "short guy" whom they identified as Jackson carried a handgun whereas the other intruders had "long guns." (Becky Lewis Direct Examination Testimony, Doc. 15-2, PageID 1889-90; Nikki Long Direct Examination

Testimony, Doc. 15-2, PageID 2024.) Once again, through the testimony and in-court identification of Jackson by Long and Lewis, the State presented essential credible evidence to support Boone's self-serving testimony that only Jackson possessed a handgun that evening.[16] This important testimony placed the murder weapon in Jackson's hands rather than Boone, Patterson, or the illusive "Little Bee."

### 4. Malaika returned the murder weapon to "Jackson's Uncle."

The jury was expected to infer the murder weapon indeed belonged to Jackson, the "short" guy, and therefore he wielded it on the night in question, because Malaika testified it belonged to him, he left it at Malaika's place immediately after the robbery, that she saw Jackson place the gun in her closet, and she turned it over to Boone when he arrived at her apartment in the presence of an undercover officer posing as Jackson's "uncle" who requested she give him the weapon. (Malaika Williamson Direct Examination Testimony, Doc. 15-2, PageID 1967.) Curiously, Malaika wiped the weapon down before handing it over. (Detective Mychal Turner Direct Examination Testimony, Doc. 15-2, PageID 2005.)

### 5. Jackson confessed to Ivana King

Lastly, Ivana King testified about Jackson's alleged confession. King testified that Jackson began staying with her in early March, shortly before the crime, and Boone moved in with them just a few days after that. (Ivana King Direct Examination Testimony, Doc. 15-2, PageID 2159.) King also testified that Boone came and went as he pleased and possessed a key to the apartment. (Ivana King Direct Examination Testimony, Doc. 15-2, PageID 2160; Ivana King Cross Examination Testimony, Doc. 15-2, PageID 2185.) King told the jury that, when police arrested Jackson at her residence and executed a search warrant there, she was surprised at the discovery

---

[16] At the time of trial, Boone had accepted and been sentenced to a plea of manslaughter conditioned on his cooperation and testimony against Jackson at trial.

of weapons and other evidence hidden in her apartment. (Ivana King Direct Examination Testimony, Doc. 15-2, PageID 2163-64.)[17] Although she was not technically under arrest, King did not go down to the police station for interrogation "of her own free will," and she believed the police would "make things tough" on her if she did not "tell the police what they wanted to hear." (Ivana King, Cross Examination Testimony, Doc. 15-2, PageID 2185.)

In an **un**sworn statement during the police interrogation, King claimed Jackson told her he had "done two people," meaning he killed two people. (Unsworn Taped Statement of Ivana Kerry King, 03/28/1997, Doc. 24-1, PageID 3706.) However, when questioned under oath at trial about the alleged confession, King testified multiple times that she did not remember the alleged conversation or confession ever taking place. (Ivana King Direct Examination Testimony, Doc. 15-2, PageID 2168-69.) She did remember watching television with Jackson at around 10:00PM on Wednesday, March 26, 1997, when the composites done by Rebecca Lewis and Nikki Long were displayed on the evening news. (Ivana King Direct Examination Testimony, Doc. 15-2, PageID 2170-71.) King commented to Jackson that one of the composites looked like Boone. (Id.) Jackson, who clearly agreed, responded by saying "sh" and asking her to call Boone's girlfriend, Michelle. (Id.) There was no indication or acknowledgement the other composite looked like Jackson.

King also testified that, during a phone call which took place a week prior to her trial testimony, Jackson told her his attorneys had made him aware of her police statement claiming that he had confessed and asked her several times to "tell the truth." (Ivana King Direct

---

[17] According to trial testimony, officers recovered a "Browning Arms shotgun" and "two additional long rifles" from the Bancroft residence. (Officer Gary Wilgus Direct Examination Testimony, Doc. 15-2, PageID 1827.) None of these long guns were ever identified by the eyewitnesses or linked in any way to the crime.

Examination Testimony, Doc. 15-2, PageID 2175-76.) She testified she interpreted Jackson's request to tell the truth as a request to provide a false alibi, and she felt Jackson threatened her during the call because he stated he would similarly give statements implicating her in the crime if she did not tell the truth as he asked. (Ivana King Direct Examination Testimony, Doc. 15-2, PageID 2175-76; Ivana King Cross Examination Testimony, Doc. 15-2, PageID 2194.) King further testified that she remained in contact with Jackson and, one week after the phone call, on the eve of her testimony, she visited him without fear. (Ivana King Cross Examination Testimony, Doc. 15-2, PageID 21943.) According to King, it was a pleasant visit. (Id.)

And so, taken together, and without any forensic evidence at all, these five pillars of evidence formed the prosecution's identity-based case against Jackson as the instigator, planner, and actual killer, as opposed to any of the other assailants who participated in the robbery and entered the Lupo Court apartment on March 25, 1997.

### C. But For Unconstitutionally Suppressed Evidence, No Reasonable Factfinder Would Have Found Jackson Guilty of The Underlying Offense.

The unconstitutionally withheld evidence undermines the strongest portions of the State's case. Considering the unconstitutionally withheld evidence alongside previously uncovered and withheld evidence – none of which has ever been refuted –undermines each element of the State's case considerably further. Accordingly, Jackson has shown by clear and convincing evidence, but for the unconstitutionally withheld evidence, no reasonable factfinder would have found Jackson guilty beyond a reasonable doubt.

#### 1. The Withheld Reports Regarding Lewis' Statements That the Shooter was 5'4" Tall Critically Undermine the Surviving Witnesses Identification of Jackson.

The *Brady* duty extends to impeachment evidence as well as exculpatory evidence, and *Brady* suppression occurs when the government fails to turn over even evidence that is "known

only to police investigators and not to the prosecutor[.]" *Youngblood v. West Virginia*, 547 U.S. 867, 869-70 (2006) (citing *Kyles v. Whitley*, 514 U.S. 419, 438 (1995); *United States v. Bagley*, 473 U.S. 667, 676 (1985))). In his state post-conviction petition, Jackson presented newly uncovered, previously withheld police reports indicating surviving witness Rebecca Lewis initially described the shooter as only 5'4"inches tall. (FCSO Progress of Investigation, 03/25/1997, Doc. 24-1, PageID 3286, 3288.) The existence of separate police reports indicating Lewis identified the guy with the "little gun" as only 5'4" tall coupled with Long's FCSO interview where she gave the same height estimation is significant because, although the Warden disingenuously responds in his Answer Jackson was "at least 5'7" tall" at the time of the crime, (ROW, Doc. 27, PageID 3718), Jackson is listed at the time of his arrest and in both his mugshot and fingerprint card as 5'9" tall at the time of the crime. (FCSO Booking Information, Doc. 24-1, PageID 3317, 3320, 3323.)

Trial testimony as well as one of the withheld documents reflect both Lewis and Long were immediately separated into patrol cars when detectives arrived to interview them. (Detective Zachary Scott Direct Examination Testimony, Doc. 15-2, PageID 2249; Doc. 24-1 PageID 3286). The withheld documents indicate **both** surviving witnesses while apart separately and independently described the likely shooter as 5'4" tall immediately after their encounter with him. In her FCSO interview, which prosecutors turned over to defense, Nikki Long described the short guy as "probably about my height . . . I'm 5'3" and 3/8" so he must have been like 5'5", 5'4"." (Nikki Long Police Interview 3/25/1997, Doc. 24-1, PageID 3582, 3584). In a withheld investigative report, Detective Zachary Scott indicates Rebecca Lewis likewise identified the short guy as approximately 5'4" when he spoke with her immediately after the crime took place. (FCSO Progress of Investigation, 3/26/1997, Doc. 24-1, PageID 3288.) And in an on-scene investigative report, Officer T.A. Shepard indicated he relayed the 5'4" height description after speaking solely

to Rebecca Lewis who had been separated from Long. (<u>FCSO Progress of Investigation, 3/25/1997</u>, Doc. 24-1, PageID 3286-87.) These withheld investigative documents show that, at least initially, police were searching for a 5'4" individual pursuant to consistent descriptions by **both** surviving witnesses. The withheld investigative documents indicating Lewis initially identified the "short" guy as approximately 5'4", consistent with Long's description, are significant because the prosecution touted Lewis as the eyewitness most likely to correctly identify the defendant since she had the most interaction with the shooter. Without the withheld reports detailing Lewis' initial statements to police, defense counsel, while aware that each of the victims referred to the shooter as short, was **un**aware that they had separately and independently agreed on exactly what "short" meant, a 5'4" description that did not fit Jackson. Since defense counsel was unaware, the jury never became aware either.[18]

The importance of this information cannot be overstated given the critical role Lewis played in establishing Jackson's identity as the actual killer in order that the prosecution could secure a conviction and death sentence. At trial, without making any reference to her "short" and "fat" description or any height estimation, Lewis testified confidently that Jackson was the guy with the "little gun." (Rebecca Lewis Direct Examination Trial Testimony, Doc. 15-2, PageID 1916.) Given Long's vague characterization at trial of the likely shooter as "short," Kareem Jackson's 5'9" height was arguably "short" by comparison to Boone standing at 6'0" and Patterson

---

[18] It is noteworthy that police investigative documents indicate police understood Jackson was taller than "Little Bee" as an investigative report documents that Lewis' and Long's stories were "believable and consistent" and further explains: "Hunter let them in; a large male black (later IDed as Kareem Jackson) and the other smaller male black (identified as Little "Bee")." (FCSO Progress of Investigation, 3/28/1997, Doc. 24-1, PageID 3284.)

at 6'3". That arguably explains why the Prosecutor never asked either Long or Lewis to specify

how "short" was "short."[19]

It is evident the prosecution recognized the materiality of the withheld police investigative

reports. With full knowledge of the withheld information, and without disclosing it to the defense,

the Prosecutor emphasized that Lewis was in the best position to identify Jackson. (State of Ohio

Opening Statement, Doc. 15-2, PageID 1761.) With the withheld reports, defense counsel could

have undermined the prosecution's reliance on Lewis and questioned the thoroughness and even

the good faith of the police investigation, including the lack of investigation into *Little* Bee.[20] The

significance of this withheld evidence is demonstrated by the prosecutor's own words in closing

argument:

> [Mr. Stead]: We have been together a long time. If I ask each and every one of you
> to go back in that room and write down on a piece of paper how tall I am, what I
> weigh, hair color, eye color, description of eyes, clothing, you are not all going to
> come out the same. I bet there is a lot of difference.

(State of Ohio Closing Argument, Doc. 15-2, PageID 2557.) Thus, the prosecution explained that

more often than not different people who observe the same person will differently describe that

same person. There is an inference to be drawn then that the prosecution must have known the

---

[19] In reality, CDC data reflects Jackson was of **average** height. *See* Chaunie Brusie, *When Do Boys Stop Growing?*, HEALTHLINE (updated on March 7, 2019), https://www.healthline.com/health/when-do-boys-stop-growing (last visited 5/31/22); 2 to 20 years: Boys, Stature-for-age and, Weight-for-age percentiles (2000), https://www.cdc.gov/growthcharts/data/set1clinical/cj41c021.pdf.

[20] At trial, then-detective Zachary Scott testified there were no leads regarding the identity of "Little Bee" and "it's not a closed case." (Detective Zachary Scott Direct Examination Testimony, Doc. 15-2, PageID 2274). Detective Scott eventually became Sheriff and was captaining the office when, in response to a Public Records Act Request submitted by counsel in October 2014, the Franklin County Sheriff's Office confirmed it did not investigate "Little Bee" and lacked any responsive records pertaining to any investigations of an individual known as "Little Bee." (Public Records Request and Response, Doc. 24-1, PageID 3709-11).

significance of the fact, withheld from the defense, that despite how quickly things happened and how little time the girls had to observe the individuals who came into the apartment, withheld evidence indicated both Lewis and Long independently agreed that the "short" guy was smaller than Jackson's 5'9" stature, and both independently stated he was 5'4" tall.

This withheld information is extremely and obviously significant for the following additional reasons considering the prosecution's case centered around identification.

### a. There is evidence Little Bee was shorter than Jackson.

As previously mentioned, Boone told the police about the mysterious "Little Bee," referring to him originally as simply an unknown black male. (Derrick Boone, Police Interview 10:56PM, 3/27/1997, Doc. 24-1, PageID 3345.) The Warden claims the only description ever given of "Little Bee" was that he was skinny. (ROW, Doc. 27, PageID 3733.) This claim is belied by records filed in the Warden's own Rule 7 motion. Specifically, in her 6:21PM interview with detectives from the Franklin County Sherriff's office, which is reproduced in Doc. 24-1 beginning at PageID 3397, on March 28, 1997, co-defendant Malaika Williamson described "Little Bee" as "short."

In fact, throughout her interviews with detectives, Malaika – who never referred to "Little Bee" by name, not only described him as "short," but repeatedly called him "little" and also described him as "little" in relation to Jackson:

> A. [W]e went over to Mike's house . . . picked them up. We came back over here to my house. Okay and then we was there for a minute, then me, me, Kareem, Mike and Red and another gentleman and I can't even think of his name right now. . .
>
> Q. What's he look like?
>
> A. **He's short**, his hair is kind of growing out a little bit, medium build, eh, maybe a little darker than me.

(Doc. 24-1, PageID 3398.)

Q. Why did Kareem pick that particular location?

A. [B]ecause they were telling him about it, it was like Mike and the guy that I'm not for sure about, they called him, like I said, they called him and was telling him about you know that there's, that they know such and such I guess and you know that they could stand to make some money and probably get some dope and stuff, so, he didn't, he didn't know em, you know, he didn't know em, but I know that, I'm pretty sure that **the little one**, like I said, **I'm not for sure what his name is**, he knew em.

(Doc. 24-1, PageID 3406.)

A. Kareem and the guy, **the little guy** was in the house, Mike and Red, they were just standing along the side of the building, and I guess it was like they were counting, you know, I guess he told em, is to wait for a minute or whatever and then they came in, they went in.

(Doc. 24-1, PageID 3402.)

Malaika's repeated and consistent descriptions indicating the unknown fourth male identified only as "Little Bee" was "short" and "little" in comparison to Jackson contradict the Warden's claims that the only description of "Little Bee" ever proffered was Boone's reference to him as "skinny."

As discussed *infra*, contrary to the State's theory of the case, surviving eyewitnesses Lewis and Long steadfastly testified there were only three people involved in the actual robbery, eliminating Jackson entirely if the "short" guy with the "little gun" was only 5'4". Lewis testified that the individual the prosecution claimed was Jackson and a second individual left the apartment after a brief marijuana transaction, but the person she believed to be Jackson reappeared with a "little gun" accompanied by two guys with "long guns" whereas the person who was originally with Jackson never returned. (Rebecca Lewis Redirect Examination, Doc. 15-2, PageID 1925.) In her statement to detectives immediately after the robbery, Lewis also described the individual who never returned as "skinny." (Rebecca Lewis Police Interview, 2:57AM, 3/25/1997, Doc. 24-1,

PageID 3573.) At trial, Lewis testified that when she had a chance to view Jackson's co-defendants in person in court, **she did not recognize any of them**. (Rebecca Lewis Direct Examination Testimony, Doc. 15-2, PageID 1914). Thus, arguably she would not have recognized if Boone were himself the "skinny" guy whom she believed did not return, who initially came in alongside the "short" guy with the "little gun."

The Warden's claim that Boone's description of "Little Bee" as "skinny" is the only description of "Little Bee" in the record is demonstrably disingenuous, and Boone's description of Little Bee as "skinny" must be viewed through the lens of his dubious credibility with the understanding that Boone may very well have been yet again trying to exculpate himself.

### b. Lewis' cross-racial identification of Jackson was problematic.

In addition to the crucial withheld documents indicating her height estimation of 5'4", the jury was never made aware that when originally asked by police whether she got a good look at the individual she would later point to in court as Jackson, Lewis stated she was hit in the head at the start of the robbery immediately after looking at the short guy, at which point she "went blank" and fell to the ground. (Rebecca Lewis Police Interview, 2:57AM, 3/25/1997, Doc. 24-1, PageID 3575-77.) Lewis also admitted she "never really got to see [his] face again or anything" and when asked whether she could assist with a composite she insisted **twice** "I'm really not sure what he looked like." (Id., PageID 3577.) When it was suggested the police would try to have a sketch prepared, she remarked, "I mean, I can't remember his face. I mean I remember seeing him but I just can't remember his face." (Id., PageID 3580.)

Lewis' statements to detectives directly conflict with Lewis' trial testimony that she interacted with the guy with the little gun enough to be familiar with his face, give a detailed description of him, and later recognize him sitting at the defense table. (Becky Lewis Direct

Examination Testimony, Doc. 15-2, PageID 1891.) However, because defense counsel failed to cross examine Lewis regarding these statements, the jury was none the wiser.

The United States Supreme Court has recognized for decades "the dangers inherent in eyewitness identification." *United States v. Ash*, 413 U.S. 300, 329 (1973); *see also United States v. Wade*, 388 U.S. 218, 229 (1967) ("The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification"). Whether its problems are due to unreliable memory, inaccurate perception, or suggestion tactics, eyewitness identification has led to a "high incidence of miscarriage of justice." *Ash*, 413 U.S. at 329-330. Yet, "despite its inherent unreliability, much eyewitness identification evidence has a powerful impact on juries." *Watkins v. Sowders*, 449 U.S. 341, 352 (1981) (Brennan, J., dissenting).

Eyewitness identification is especially unreliable when the police have already made up their minds about the identity of the offender. "The fact that the police themselves have, in a given case, little or no doubt that the man put up for identification has committed the offense, and that their chief pre-occupation is with the problem of getting sufficient proof, because he has not 'come clean,' involves a danger that this persuasion may communicate itself even in a doubtful case to the witness in some way. . . ." *Wade*, 388 U.S. at 235. Moreover, it is well established that "[c]ross-racial identifications are much less likely to be accurate than same race identifications." Rahaim & Brodsky, Empirical Evidence versus Common Sense: Juror and Lawyer Knowledge of Eyewitness Accuracy, 7 Law and Psych. Rev. 1, 2 (1982) (cited with approval in *Arizona v. Youngblood*, 488 U.S. 51, 71 (1988)). Therefore, the simple fact that Lewis is white, and the suspect was black, rendered her identification of Jackson as the "short" guy with the "little gun" inherently less reliable.

In the aftermath of Jackson's conviction an eyewitness expert and Associate Professor of Psychology at John Jay College of Criminal Justice, who teaches courses at both the undergraduate and graduate levels and who conducts scientific research in the field of memory, psychology, and the law, reviewed materials, information and testimony specific to the identification made by Lewis and concluded that "her identification of Jackson should **not** be considered reliable based on a number of factors, including:

> **Stress.** People tend to believe that stress *improves* memory but that is simply not accurate. Instead, research reveals that extreme stress—the kind that might be experienced during a violent or unexpected encounter . . . negatively affects the person's memory for both the minor and major details of an event[.]
>
> * * *
>
> **Weapon-focus.** Research with both laypeople and trained weapons experts reveals that when a weapon is present during an event—or something people *believe* to be a weapon—memory for other details, such as facial features of an unfamiliar perpetrator or other peripheral details, are impaired[.]
>
> **Multiple perpetrators.** When there are multiple perpetrators to a crime, the ability of an eyewitness to accurately identify any particular perpetrator diminishes. There is evidence that as the number of perpetrators increases, an eyewitness's ability to identify any single individual decreases accordingly—especially when the witnessed event was violent[.]
>
> **Cross-race Identifications.** Research conducted over several decades has shown that there is a cross-race effect, such that people are more accurate at identifying strangers from their own racial group than from other racial groups[.] Indeed, a meta-analysis of 39 empirical articles with 91 independent samples and over 5000 participants suggests that there is a significant "moderately sized" Own-Race Bias. Put another way, people are 1.4 times more likely to correctly identify a previously-seen face from their own race compared to other-race faces and 1.56 times less likely to be falsely identified than other-race faces. Thus, generally speaking, people are more likely to falsely identify an innocent suspect when he is from a different racial group[.]

(Dr. Strange Expert Report, Doc. 24-1, PageID 3630-31.) Dr. Strange further pointed out in her expert report that phenomena she discussed were "not within the knowledge and understanding of the common juror or layperson[.]" (Id., PageID 3633.)

46

In addition to the cross-racial issues with Lewis' identification, jurors had no knowledge of the demonstrated versus theoretical impact that the stress of the chaotic robbery, Lewis' focus on the weapon she was beaten and threatened with, and the presence of multiple perpetrators would have definitely had on Lewis' ability to recall details about the "short" guy with the "little gun." Dr. Strange mentions multiple times that violence negatively affects a witness's ability to recall events, and it is a fact Lewis was struck in the head and began bleeding almost immediately when the robbery began. (Becky Lewis Direct Examination Testimony, Doc. 15-2, PageID 1886.) The robbery was a violent event, and Lewis suffered violence directly as well. Unconstitutionally withheld records indicate that immediately afterward she indicated the person who struck her was approximately 5'4", a height estimation corroborated by Long, but could not describe his facial appearance. This inability to describe the assailant's appearance is further reflected in the cartoonish composite the police generated based upon her best efforts to describe the short guy. However, the jury did not have Lewis' initial height description, nor the context within which to value the circumstances of the crime, the violence against her, and its impact on her eventual cross-racial identification of Jackson.

In answer, the Warden responds the record "shows that the day before Jackson was identified by co-defendants . . . as being a participant in the robbery and murder, FCSO detectives caused a Suspect Sketch Story to be published in the Columbus Dispatch." (ROW, Doc. 27, PageID 3729.) The Warden further points out that, along with the story detective Scott is quoted as saying: "Investigators yesterday released composite sketches of two of the men. One man is about 5'8" tall and weighs about 200 pounds[.] The other is about 6 feet tall and weighs 185 pounds." (ROW, Doc. 27, PageID 3730.) These descriptions allegedly came from the victims. (COLUMBUS DISPATCH, Doc. 24-1, PageID 3240.) However, a mere three pages prior, the Warden

claims "the record shows that eyewitness Becky Lewis did *not* describe the shooter by height." (ROW, Doc. 27, PageID 3727.) Which is it?

Rather than refute the material impact of the withheld documents on the jurors' decision whether the State proved Jackson's identity as the "short" guy with the "little gun," the Warden demonstrates their import. The Warden correctly points out, Lewis did not describe the guy with the "little gun" by height in her transcribed interview with FCSO, her suppression hearing testimony, or her testimony at trial. (ROW, Doc. 27, PageID 3727.) Yet somehow the height 5'8" ended up on the suspect sketch attributed to Lewis and alleged to be Jackson. (COLUMBUS DISPATCH, Doc. 24-1, PageID 3240.) The reporting source for this height, as per the Warden's Answer, was Detective Zachary Scott, the same detective who authored the withheld report wherein he stated Lewis conveyed a height of 5'4", not 5'8", immediately after the crime. (FCSO Progress of Investigation, 3/26/1997, Doc. 24-1, PageID 3288.) Moreover, a Composite Witness Interview Form accompanied Nikki Long's suspect composite. (FCSO Composite Witness Interview Form of Nikki Long, 3/25-26/1997, Doc. 29-1, PageID 3767.) The form provided detailed information she relayed describing Boone as light-skinned and "thin, but not bony" with no visible scars or tattoos. (Id.) The form also included Long's extremely accurate 6'1" estimation of Boone's 6'0" height, and a rating of the composite as an 8 on a scale from 1 being "bad" to 10 being "good." (Id.) No such document exists for Lewis' composite sketch to explain the 5'8" height when withheld documents show she reported to Scott, and others, a height of 5'4" in relation to the "short" guy with the "little gun" consistent with Nikki Long's description. (FCSO Progress of Investigation, 3/25/1997; 3/26/1997, Doc. 24-1, PageID 3286-87; 3288.)

Considering the existence of an unknown perpetrator of dubious height and given there were multiple perpetrators with weapons and the stress attendant to such circumstances, the fact

48

there is evidence the young ladies gave matching descriptions of the height of the "short" guy with the "little gun" is very significant. Where varying and likely inaccurate accounts are to be expected, the descriptors on which the witnesses agree are arguably the most reliable. However, Jackson's defense counsel remained unaware of the material, exculpatory information that Rebecca Lewis had independently identified the shooter as 5'4" because it was withheld by the prosecution. As the Circuit Court noted in finding Jackson established a prima facia case:

> Another eyewitness, Nikki Long, also initially provided police with a statement regarding the murder suspect consistent with Lewis' description of a shorter perpetrator than Jackson; however, Jackson's trial counsel did not focus their defense on the height of the perpetrator because they were unaware both Lewis and Long had provided an identical description in their first statements to police. The testimony of Jackson's co-defendant, Derrick Boone, would thus be left as the only eyewitness account that identified Jackson as the shooter.

*In re Jackson*, 12 F.4th 604, 610 (6th Cir. 2021). With an unknown perpetrator of unknown height, Lewis' "short" references must be placed in context. Documents authored by the same detective whom the Warden now quotes for the proposition that context was 5'8" reflect that true context was instead 5'4". Accordingly, those documents would have been vital to the defense, especially given Long's statements corroborating Lewis's initial height estimation and the existence of a viable alternate suspect insofar as Malaika described "Little Bee" as short and "little" in comparison to Jackson.

Long could not describe the "short" guy with the "little gun" for composite purposes since she was more focused on co-defendant Boone and only saw the short guy from the side. Perhaps most telling, the following troubling exchange occurred between Long and the prosecution at trial:

> Q. Now you said that you also got a look at the short guy that you described pretty much being in charge and doing most of the talking?
>
> A. Yes.
>
> Q. That's the same person that had the handgun; is that correct?

49

A. Yes.

Q. Do you think that if you saw that person again you would be able to identify him?

A. **I don't know.**

Q. Can you look around the courtroom and tell me if the short guy that had the handgun is in the courtroom anywhere that you recognize?

A. Yes.

Q. **You said you weren't sure whether you would be able to recognize someone as being the short person?**

A. **Yes.**

Q. Can you point him out for us?

A. (Indicating).

(Nikki Long Direct Examination Testimony, Doc. 15-2, PageID 2033-34 (emphasis added).)

Thus, immediately after stating multiple times she was not sure whether she could identify the short guy in person, Long nonetheless pointed to Jackson at the defense table and claimed she recognized him as the short guy. The jury may have discounted Long's less than solid identification of Jackson in favor of Lewis' claimed confidence, however, because the jury lacked the complete context of Lewis' identification due to unconstitutionally withheld evidence.

Additionally, the jury was never made aware that the photo of Jackson identified by Lewis was not a recent mugshot. Rather, it was a 4-year-old photo of Jackson from 1993 when he was two inches shorter with much shorter hair and appeared more heavyset than at the time of his arrest and trial. Incidentally, it is the same photo the Warden puts forward now with the height of "at least" 5'7". Unbeknownst to the jury, the use of this photo and photo array posed independent problems insofar as it constituted presentation of misinformation to Lewis.

50

In her expert report, Dr. Strange explained that misinformation distorts memory. (Dr. Strange Expert Report, Doc. 24-1, PageID 3632.) For example, when highly trained military personnel were shown "doctored video" of a trainer wearing weapons during a previous exercise, 51% misremembered the exercise, agreeing the trainer had been wearing weapons. (Id.) This situational misinformation is analogous to Lewis being shown an inaccurate photograph of Jackson that more accurately resembled her description and composite sketch of the "short, fat" guy with the "little gun" although it looked nothing like Jackson's present-day appearance.

Compare:



 

male black
508' 195 lbs  20ish

    The presentation of this type of misinformation given its propensity to trigger inaccurate recall is even more troubling considering the cross-racial identification issues and unknown whereabouts of an unidentified individual whom Jackson's old photo very well may have resembled. Further tainting the reliability of the photo identification is the fact the Supreme Court has recognized the dangers of officers communicating their bias when a suspect shown in an array is already in custody. *Wade*, 388 U.S. at 235. Dr. Strange explained in her expert report that it is possible Lewis received non-verbal suggestions, even unintentionally, since the officer conducting the photo line-up was familiar with Jackson's arrest.

    The jury, however, remained clueless about the uncertainty introduced by using Jackson's old photo, which resembled more closely the generic, cartoonish composite created from Lewis' problematic cross-racial description, rather than Jackson's contemporary arrest photo. And all these problematic circumstances are in addition to Lewis' admission at trial that in the short time she was at the apartment **before** the incident unfolded, ("only about maybe 45 minutes"), she had

finished smoking a blunt, that she described as being like a "cigar" the size of "maybe like two joints." (Becky Lewis Direct Examination Testimony, Doc. 15-2, PageID 1909, 1920, 1922.) And she admitted she had smoked another two blunts earlier in the evening. (Becky Lewis Direct Examination Testimony, Doc. 15-2, PageID 1912.) Lewis asked the jury to believe her perceptions were unaltered, or at least reliable enough notwithstanding, and her identification of Jackson likewise reliable. Apparently, the jury did believe. However, knowledge of Lewis' original 5'4" height estimation corresponding with Nikki's identical height estimation coupled with the cross-racial and other issues attendant to Lewis' claimed recognition of Jackson is enough to create significant and reasonable doubt in the mind of any and every reasonable juror as to the validity of Lewis' claim that Jackson, rather than the unknown individual of unknown but shorter height, was the "short guy" with the "little gun." Especially given Lewis' inebriated state in addition to being so very high.

Nor could Lewis' in-court identification of Jackson remedy these troubling flaws. As the Supreme Court has pointed out, "it is a matter of common experience that, once a witness has picked out the accused at the line-up, he is not likely to go back on his word later on...." *Wade*, 388 U.S. at 229.

### c. The introduction of Lewis's description corroborating Long's initial 5'4" description, coupled with elimination of King's testimony regarding Jackson's alleged confession, would leave Boone as the sole eyewitness.

The unconstitutionally withheld evidence of matching disinterested witness descriptions undermines Boone's version of events and casts serious doubt over the State's identity-centered case. With the loss of Ivana King's testimony that Jackson confessed to her, the State's case rests on the credibility of Boone, Malaika, and Patterson. However, the fact all three co-defendants immediately struck plea deals for manslaughter and had been sentenced by the time Jackson's case was called to trial, made certain they would not want to jeopardize those deals and relatedly, they

would want to protect themselves, creating credibility issues all around. As discussed *infra*, Malaika evinced a willingness to fall in line to protect herself while testifying. For his part, Patterson proved to have something very interesting to say; however, after a visit from the Prosecutor, in which his plea agreement was threatened, he opted to protect his plea agreement and sentence rather than tell it to the jury.[21] And then there's Boone.

The Sixth Circuit Court recognized, if the surviving eyewitness identifications are undermined, the only remaining eyewitness identification of Jackson is the highly suspect identification by co-defendant Boone. *In re Jackson*, 12 F.4th 604, 610 (6th Cir. 2021). Given Boone's multiple, varied, and inconsistent statements – not to mention his bald admission that he wanted to direct attention away from himself and place it on Jackson – no reasonable juror would have believed Boone's uncorroborated testimony beyond a reasonable doubt. (Derrick Boone Cross Examination, Doc. 15-2, PageID 2146 (agreeing he wanted to direct attention away from himself and put it on Jackson when he came forward).) This is especially true considered in conjunction with the exculpatory and unconstitutionally withheld evidence.

> ### d. It is possible there were only three people involved in the actual robbery, eliminating Jackson entirely if the "short" guy with the "little gun" was only 5'4".

Inexplicably, indeed bafflingly, given that this was a double homicide, and in what may well be considered a true rush to judgment, police did not bother to investigate "Little Bee" or his

---

[21] The record in this case reflects that, just before prosecutors called him to testify, Patterson sent an unsolicited letter to Jackson indicating he wanted to "tell the truth" that "Boone did it." (*State v. Jackson*, Franklin County Common Pleas No. 97CR1902, Defendant's Exhibit A - Michael Patterson Letter, Doc. 29-1, PageID 3772.) When the Prosecutor warned he would revoke his plea deal, Patterson refused to testify for the defense. The prosecution understandably did not call him either.

role in the robbery and murders.[22] The failure to investigate "Little Bee" is extremely troubling for a number of reasons, not least of which is that the surviving victims **both** testified there were in fact only **three** assailants in the apartment during the murders, and the probable shooter was undeniably **"short"** or "little," as the case may be.

During opening statements, the Prosecutor insisted to the jury, in spite of what the non-co-defendant witnesses would testify to, that there were **four** persons involved in the actual robbery, and all four were inside the apartment during the shooting. (State of Ohio Opening Statement, Doc. 15-2, PageID 1756.) This four-person scenario accommodated Jackson as the fourth person and the shooter. Yet, Lewis testified that the individual the prosecution claimed to be Jackson and a second, "skinny" individual left the apartment after a brief marijuana transaction, but Jackson reappeared with a "little gun" accompanied by two guys with "long guns" whereas the "skinny" person who was originally with him never returned. (Rebecca Lewis Redirect Examination, Doc. 15-2, PageID 1925.)[23]

Likewise, Long testified there were only **three** assailants during the shootings:

Q. **How many total people I mean in the apartment?**

A. **It was three.**

Q. There was you and Becky and Terrence and Antorio?

A. So that would be seven.

Q. And then three other people in addition to the four of you?

---

[22] In response to a Public Records Act Request submitted by counsel in October 2014, the Franklin County Sheriff's Office confirmed it did not investigate "Little Bee." (Public Records Request and Response, Doc. 24-1, PageID 3709-11).

[23] As discussed *supra*, it is quite possible Boone was the individual whom Lewis described as "skinny" considering the complications of Lewis' inebriated cross-racial identification scenario, the fact she was struck in the head, and her inability to recognize any of the co-defendants, including Boone.

A.  Right. Four and three, seven.

(Nikki Long Direct Examination Testimony, Doc. 15-2, PageID 2023.)

Q.  How were the people dressed if you remember?

A.  Well, the one tall guy that came in with the gun at first had on like trenchcoat like. The **short guy** had on a black hat, and I'm not sure if it was a blue jean jacket or leather jacket. I'm not sure, but it was like a jacket.

Q.  Okay.

A.  And the tall light-skinned guy had on a long coat as well.

(Nikki Long Direct Examination Testimony, Doc. 15-2, PageID 2026-27.)

Q.  **There were basically three strangers in that apartment that night when everything happened, or at least three people, correct?**

A.  **Yes.**

Q.  **Could there have been a fourth that you may have seen?**

A.  **No, I don't think so.**

(Nikki Long Cross Examination Testimony, Doc. 15-2, PageID 2041-42.)

In an investigative interview shortly before trial, Long indicated that, although she had heard a fourth male was allegedly involved, she did **not** see a fourth male during the robbery. (Robert Tarpley Interview Summary re Nikki Long, Doc. 24-1, PageID 3616.) In a Franklin County Sheriff's Department Investigation Summary secured through Public Records Act requests, it is similarly reported that the 911 call that first reported the homicides indicates that the "Caller described the perps as **three male black subjects** in a boxey brown colored 4 door car." (FCSO Homicide Investigation Summary, Doc. 24-1, PageID 3247.)

Consider again the surviving witness's statements about the "short guy" with the "little gun." There are four initial possible gunmen based upon the prosecution's theory of the case, and

two (Boone and Patterson) are immediately eliminated because of their height, which simply cannot be considered short; the third ("Little Bee") is an unknown who was not subsequently investigated by law enforcement. The descriptions given by the surviving witnesses, and whether those descriptions match or **differ** from the remaining known suspect (Jackson) therefore become of utmost importance, as does any evidence implicating the unknown individual ("Little Bee") because such evidence invariably casts doubt over a case wherein identity is the key to conviction. The unconstitutionally withheld evidence casts ample doubt under these circumstances such that a reasonable juror would not have convicted Jackson in light of it.

### 2. "Little Bee" Had A Handgun and A Motive.

The record evidence supports Little Bee had a handgun and at least an equal if not greater motive than Jackson allegedly had for killing the victims, and unconstitutionally withheld evidence supports Little Bee did kill the victims.

#### a. Little Bee had a handgun.

During her testimony, when asked about the preparations that occurred at her apartment before the robbery, Malaika was asked specifically, "what weapons did you see at your house?" In response she testified repeatedly that **both** Little Bee and Jackson had handguns. (Malaika Williamson Direct Examination Testimony, Doc. 15-2, PageID 1946-47, 1951.) Significantly, the jurors seemed to recall this testimony with some confusion during deliberations when attempting to determine who ultimately wielded the murder weapon and killed the victims.

Specifically, the jurors lamented: "We want to request the testimony of Rebecca Lewis, Nikki Long and Malaika Williamson, and Red, in particular [with regards to] the questions regarding the handguns. Our collective memory is not in agreement with the number of handguns in the apartment." (Question to the Court, Doc. 15-2, PageID 2543-44.) This question by the jurors illustrates their struggle to credit the State's theory of the case, even without the unconstitutionally

withheld evidence to contend with. Jackson now bears the burden of establishing, but for the unconstitutionally withheld evidence, no reasonable juror in Jackson's case would have found him guilty beyond a reasonable doubt. It is therefore pertinent to illustrate how the revelations attendant to the discovery of the unconstitutionally withheld evidence likely would have made a difference in Jackson's fate to note that the jurors at Jackson's trial struggled to convict him on the strength of the State's case as presented and were evidently troubled by the conflicting handgun testimony.

### b. Little Bee knew the victims just as the State alleged Jackson did.

In his opening statement, the Prosecutor told the jury:

> The facts that caused this incident to initially occur began when this defendant, Kareem Jackson, and the other people that **he** involved in this, had obtained what ultimately turned out to be some bad information.

(State of Ohio Opening Statement, Doc. 15-2, PageID 1753.)

It was Kareem Jackson, the prosecution insisted, who planned to rob this known drug house. (Id.) The reason Jackson felt compelled to execute these two individuals was because he realized they knew his name and could identify him. (Derrick Boone Direct Examination Testimony, Doc. 15-2, PageID 2088.) The question was never raised as to why someone, arguably Jackson, would feel compelled to execute two drug dealers because they knew his name. It could hardly be expected that drug dealers would go to the police to report the robbery of their drug house. Especially considering the robbery netted a total of forty-five dollars and "a couple of small bags of marijuana, not even enough to divide up between them." (State of Ohio Opening Statement, ECF 15-2, PageID 1758.) Yet, the State offered no other motive. In closing argument, the Prosecutor reiterated, "[t]he **only** person who has a motive to eliminate the people is the **only** person who was known by the people." (State of Ohio, Closing Argument, Doc. 15-2, PageID 2458-59.) That turned out to be an evident misrepresentation of the facts insofar as Boone and

Malaika testified Patterson and "Little Bee" recruited Jackson. Significant to Jackson's defense, the misrepresentation went deeper.

Despite the Prosecutor's assertions, the evidence that emerged at trial and evidence that has emerged since indicates "Little Bee" and Patterson were the ones who knew the drug house and the male victims. There is **no** evidence that Jackson knew the victims at all. For instance, Boone testified that it was "Little Bee" who "was talking about how much money there was and how much weed there was. **He knew the people**." (Derrick Boone Direct Examination Testimony, Doc. 15-2, PageID 2067.) And with that being the case, Boone then testified that "Little Bee" gave this information to Jackson to try to persuade Jackson to participate in the robbery with him. (Id.)

Q.  Tell us what Mr. Jackson said.

A.  Little Bee was the one trying to plan everything out.

Q.  Okay. Tell us what was being said.

A.  I can't remember exactly everything that was said. He [Little Bee] was just planning everything out.

Q.  As best you can, tell us what was being said.

A.  He was just telling Kareem about a robbery or about some money and drugs, and he was trying to get Kareem to go and rob these people for it.

(Derrick Boone Direct Examination Testimony, Doc. 15-2, PageID 2066.)

Malaika similarly testified that "Mike [Patterson] and "Little Bee" told Kareem about these two guys sitting on this money and dope. And I guess about, you know, for us to go rob them." (Malaika Williamson Redirect Testimony, Doc. 15-2, PageID 1981.) Once again, trial testimony indicated Little Bee was the one planning and recruiting for the robbery and he was the one familiar with the drug house.

Consistent with this trial testimony, which directly contradicted the Prosecutor's opening statement that Jackson planned this whole thing, is a lot of corroborating evidence. The Prosecutor certainly knew about this information because the corroboration came in the form of word for word statements Malaika gave to the police when she was first arrested.

In Malaika's initial statements to police, she repeatedly referred to the unknown "Little Bee" as "little" or "the little one." And when police asked her directly who knew the victims, Malaika clearly explained that Jackson did **not** know them, but that the "little" guy did.

Q. OK, did you know the two individuals that were killed?

A. No sir.

Q. Who knew them? You don't know?

A. I think the [guy] that I'm not for sure about, [Little Bee], I'm pretty sure he's the one that knew em.

Q. Why did Kareem pick that particular location?

A. Because they were telling him about it, it was like Mike and the guy that I'm not sure about, they called him, like I said, they called him and was telling him about you know that there's, **that they [Little Bee and Patterson] know such and such** I guess and you know that they could stand to make some money and probably get some dope and stuff, **so he [Jackson] didn't he didn't know em, you know, he didn't know em**, but I know that, I'm pretty sure that **the little one, like I said, I'm not for sure what his name is, he knew em.**

Q. OK.

A. And so it was just more or less like they were sitting [sic] it up for him to come and help them do this.

(Malaika Williamson, Police Interview 6:21PM, 3/28/1997, Doc. 24-1, PageID 3406.) The jurors were never made aware of those statements and so were unaware that the Prosecutor's opening words were deliberately misrepresenting the evidence.

In yet a second police interview, Malaika reiterated, "the unknown person [Little Bee] that I keep referring to, what he said, when they was back at the house, from what I overheard him saying, it sound like to me, **he knew the guy that got shot, that guy knew him, okay.**" (Malaika Williamson, Police Interview 7:46PM, 3/28/1997, Doc. 24-1, PageID 3658.)

It makes as much sense if not more that the person who actually planned the robbery and knew the people prior to the robbery, the person described as "short" who was shorter than Jackson's decidedly average height, also likely intended to kill the occupants all along, and subsequently did so. This alternate suspect with equivalent, if not greater, motive and mounting circumstantial evidence against him infers an alternative course of events elevated from mere conjecture and speculation to an extremely reasonable and plausible inference when the unconstitutionally withheld evidence is considered.

At trial there was another moment when Malaika made statements consistent with "Little Bee" being the shooter. When asked about the moment of the killing, Malaika testified she was sitting in the getaway car just outside:

> I heard the door open and the door close. At that point they were all in the house. And I'd say about five minutes later "Little Bee" came back out to my car and got back in the car. He sat there for a minute, then he got back out of the car and went back in the House. At this point **Michael and Little Bee – at that point it was when I heard the shots go off**. Little Bee and Michael came back out the door and got in the car, and a few minutes later Derrick and Kareem came out and got in the car and I left. We went back to my house.

(Malaika Williamson Direct Examination Testimony, Doc. 15-2, PageID 1942.)

And just to be perfectly clear:

**When Little Bee went back in, I heard the shots.**

(Malaika Williamson Direct Examination Testimony, Doc. 15-2, PageID 1953.)

Boone confirmed that "Little Bee" did come and go, back and forth to the apartment "several times" during those few minutes in which the robbery took place. Perhaps not surprisingly, Boone was often unresponsive to the Prosecutor's questions about what "Little Bee" did while inside:

Q.  What did he do when he would come back in?

A.  I can't remember. []

Q.  Did he talk to anyone?

A.  I can't remember.

Q.  Did he say anything?

A.  I can't remember.

(Derrick Boone Direct Examination Testimony, Doc. 15-2, PageID 2082-83.) When later asked about what became of "Little Bee" after the robbery, Boone denied that Malaika dropped him off anywhere and simply claimed, "I don't know where [Little Bee] went." (Derrick Boone Direct Examination Testimony, Doc. 15-2, PageID 2095.)

An independent witness account given by a neighbor and similarly withheld by the State, clearly in the possession of law enforcement, corroborates Malaika's testimony that Hunter and Walker were killed immediately after "Little Bee" re-entered the apartment. (Statement of Lisa Flewellen, 3/25/1997 [Marked Supplemental Exh. 23], Doc. 24-1, PageID 3700.) Police interviewed neighboring people in the vicinity to determine whether anyone witnessed the crime. Upstairs neighbor Lisa Flewellen gave a detailed account of what she both saw and heard that evening. Flewellen's narrative, in conjunction with Makaika's testimony that the shooting occurred immediately after "Little Bee" reentered the apartment, (Doc. 15-2, PageID 1953), casts grave suspicion on the un-apprehended "Little Bee," and contradicts Boone's testimony that only

he and Jackson were in the apartment when the victims were killed. Specifically, Flewellen explained to an officer canvassing the area:

> I heard someone knock on the door downstairs[.] They open[ed] the[n] closed the door. I heard someone say get the fuck down. I heard things falling and tussling. I looked out my window and saw a 4-door dark brown car with one guy [in] the front and one in back. The car went to the side of the building. The one in back got out and went in the house downstairs too. I heard two or three muffle[d] sound[ing] shots. The brown car left Lupo C[our]t and went left on Oakland Park[.]

(Statement of Lisa Flewellen, 3/25/1997 [Marked Supplemental Exh. 23], Doc. 24-1, PageID 3700.) This statement was never turned over to defense counsel. Defense counsel was unaware of what Flewellen heard and saw, and unable to ask her for a description of the person who reentered the apartment just before shots rang out. Defense counsel was unable to ask Flewellen anything because defense counsel never knew of her existence due to the State's unconstitutional suppression of material, exculpatory evidence that directly contradicted the theory of its identity-centered case against Jackson.

Jackson has historically denied involvement in the killing. Indeed, he turned down a plea offer to exercise his right to a trial, confident in the fairness and justness of an impartial judicial truth finding process imbued with constitutional protections. (Doc. 15-2, PageID 2181.) At trial, Jackson's cousin William Woods testified that, in all likelihood, he and Jackson were together during the time Jackson supposedly committed the murders because he spent time with Jackson regularly so likely would have been with him during that time of day. (William Woods Direct Examination Testimony, Doc. 15-2, PageID 2394-95.) However, Woods admitted, he could not remember for sure whether he and Jackson were together that evening. (Id.)

Had defense counsel had the unconstitutionally withheld Flewellen Statement, counsel could have argued that the Statement of an independent eyewitness supported the proposition that Little Bee shot the victims upon returning to the apartment, contrary to Boone's testimony. Had

counsel had this information knowing that both Lewis and Long identified the shooter as being approximately 5'4", and statements that Little Bee was smaller than Jackson, possessed a handgun that evening, and had motive given that he was known to the occupants, there is plenty room for argument that no reasonable juror could find beyond a reasonable doubt that Jackson was the shooter, which would have changed counsel's strategy completely. (Habeas Petition Exh. D, Affidavit of Brian J. Rigg, Doc. 1-3, PageID 125-30.) The withheld information also would have bolstered Woods' uncertain testimony because both surviving eyewitnesses testified (in agreement once again) only **three** suspects were present during the robbery, and the withheld information indicates none of the descriptions matched Jackson. Defense counsel was prevented from making that argument to the jury when the prosecution failed to turn over the independent witness Statement of the neighbor Lisa Flewellen, once again withholding evidence material and exculpatory to the defense.

Considering evidence Little Bee knew the victims, planned the robbery, and shots rang out immediately after he reentered the apartment according to Malaika and supported by a withheld independent eyewitness statement in conjunction with (1) trial testimony that Little Bee had a handgun, (2) withheld records documenting statements by Lewis in agreement with Long that the shooter was only 5'4", (3) evidence that Little Bee was shorter than Jackson's 5'9" stature, and (4) the absence of Ivana King's testimony owing to her recantation, no reasonable juror would believe beyond a reasonable doubt the State's argument that Jackson killed the victims (based on the word of co-defendants - one of whom admittedly did not even witness the shootings - and no forensics) because he alone had the motive and means to do so.

**3. The Unconstitutionally Withheld Evidence Lessens Credibility of The "Uncle" Ruse Used To Tie The Murder Weapon To Jackson.**

In her initial police interview, taken at 6:21PM on March 28, 1997, get-away driver Williamson stated that Jackson came back to her home the Wednesday after the murders, to drop off the revolver with her:

Q.  [A]t what time did you become in possession of the gun?

A.  [W]hat's today, today is Friday[?]

Q.  Um huh.

A.  Wednesday, Wednesday[.].

Q.  [T]ell me how that occurred?

Q.  Okay, this happened Monday night, Tuesday morning[.]

A.  [R]ight . . . A, how I got the gun, I went, well he came over here, and, a, he had it with him, and he was just like, well, I'm just going to leave it here . . . .

(Doc. 24-1, PageID 3405-06.)

In her second police interview, taken about an hour and a half later at 7:46PM that same evening, Williamson's story of how she became the keeper of the murder weapon began to vary slightly to include a more detailed and a bit more sinister picture:

Q.  Okay. How did you come to have the gun that Kareem used in this? How did the gun come to be in your possession?

A.  Okay when it came in my possession, it was Wednesday and he was over at my house, okay, and he was headed back home and I guess because he didn't want to carry it on him walking home and probably do [sic] to the fact of all that had happened already. So, he was just like keep this and he was going, you know, he'll get it later or whatever . . . .

Q.  Repeat it for me, what day was it and about what time whenever he gave you the gun?

A.  That Wednesday, it was probably in the afternoon, cause it was early.

Q.  So Wednesday, you're saying two days ago?

A.  Yes sir[.].

Q.  And in the early afternoon?

A.  Yeah[.]

Q.  Okay. Did anyone else know you had the gun?

A.  Uh my cousin seen it, so she knew it was in the house.

Q.  What did you do with the gun after he gave it to you?

A.  Put it in the closet.

Q.  So he just gave you the gun because he didn't want to carry it walking home?

A.  Right, he didn't want it on him.

Q.  And to the best of your knowledge, other than your cousin, **no one else knew you had this gun? Did you tell anyone you had it?**

A.  **Besides him, oh no, I mean, I didn't go like I got a gun, no, no, no. Like I said, I put it up in the closet.**

(Doc. 24-1, PageID 3415-16.)

When conversing with the undercover detective believed to be Jackson's "uncle", Williamson's had provided another, significantly different story. This time, she stated she got the gun from Jackson, again on Wednesday, just a couple of days beforehand, but supposedly Jackson gave it to her when she dropped him off somewhere. (<u>FCSO Progress of Investigation 3/31/1997</u>, Doc. 29-1, PageID 3776-78.). By the time of trial, however, the Prosecutors evoked testimony from Williamson as to how she got the gun that was far more inculpatory to Jackson. Unlike each and every one of her recorded pre-trial statements to police, Malaika testified that Jackson **himself** placed the gun in a closet at her house, and that he did so on the night of the murders. (Malaika Williamson Direct Examination Testimony, Doc. 15-2, PageID 1966-67.) This version of events

66

painted a picture of Jackson ditching the murder weapon immediately after using it by hiding it in Malaika's closet, supporting his identity as the "short" guy with the "little gun."

Jackson's jury never became aware of Malaika's many inconsistent statements because, for unknown reasons, trial counsel engaged Malaika in only the most cursory and extremely truncated questioning about her inconsistent statements, before ending the questioning abruptly:

> Q. You also indicated that the gun that supposedly Kareem gave you right after all this happened would have been Tuesday morning; is that right?
>
> A. Yes.
>
> Q. Again, when you were talking to the detectives, when they arrested you that day, page 9, didn't you tell them that Kareem came over on Wednesday and it was not Tuesday morning but Wednesday?
>
> A. I don't remember that.
>
> Q. Okay.
>
> MR. RIGG:    May I approach the witness?
>
> THE COURT: Yes, you may.
>
> Q. (By Mr. Rigg) I have a copy of your transcript when you – I believe at the bottom you indicate that this happened on Monday night or Tuesday Morning. But it was Wednesday when Kareem came over to your house; is that right?
>
> A. I don't understand.
>
> Q. If you want to read that over, take a minute. I will withdraw the question, Ma'am.

(Malaika Williamson Cross Examination Testimony, Doc. 15-2, PageID 1974.)

After the Defense questioning, the prosecution engaged in the following misleading line of questioning:

> Q. There was a second place where [defense counsel] asked you questions concerning the guns. Do you recall those questions?
>
> A. Yes.

Q.  And the fact about at least initially you said Wednesday?

A.  Yes.

Q.  The next question, you corrected it, did you not?

A.  Yes.

Q.  And you told them then when you had done it?

A.  Yes.

Q.  Specifically describing how he left the guns behind on Tuesday morning?

A.  Yes.

(Malaika Williamson Redirect Examination Testimony, Doc. 15-2, PageID 1982.)

What the jury never found out was that Malaika gave separate, three separate **consistent** statements, to the police that Jackson left the gun with her on Wednesday. By the time of trial, however, she testified Jackson gave her the murder weapon **not** on Wednesday, but **immediately after the murders** in the early morning hours of Tuesday. The Prosecutor's attempt to make it seem like Malaika corrected herself during the 6:21PM interview and subsequently maintained Jackson left the gun with her the night of the murders is belied by the fact, unknown to the jury, that she claimed again in her 7:41PM interview that Jackson gave her the gun on Wednesday.

Interestingly, in none of her varying accounts did Malaika indicate anyone aside from Jackson, herself, and perhaps her female cousin, knew where the murder weapon was located. The detective posing as Jackson's "uncle" testified at trial, however, that an individual named "Baby Shawn" was present when he and Boone retrieved the handgun, and it was "Baby Shawn" who directed Malaika to get the handgun from the closet. (Detective Mychal Turner Direct Examination Testimony, Doc. 15-2, PageID 2004.) Thus, because Boone and "Baby Shawn" also knew the murder weapon's location, which is inconsistent with both Malaika's trial testimony and previous

statements to law enforcement, a reasonable juror could reasonably discredit Malaika's story about Jackson hiding the murder weapon in her closet, and even her previous stories about him giving her the weapon.

Malaika's conflicting accounts were not fully explored at trial, though the prosecutor surely understood the impeaching quality of the different statements. The failure to delve into her inconsistent stories lessened any impact of the further inconsistency in her insistence that **only** she and Jackson were aware of the murder weapon's location notwithstanding that Boone obviously knew where to retrieve it as did "Baby Shawn." However, when Malaika's apparent willingness to fall in line with the stories being told by everyone else is revealed – her willingness to misremember twice stating without correction, in separate interviews, that Jackson left the gun with her on an occasion other than what she testified to at trial – the decision to wipe down the gun before handing it over becomes more suspicious, the "uncle" ruse less significant, and her overall credibility less certain. (Detective Mychal Turner Direct Examination Testimony, Doc. 15-2, PageID 2005 (testifying Malaika wiped down the weapon before turning it over to him).)

There was no forensic evidence in this case, and none linked Jackson to the murder weapon. One might expect it would have been easy to lift fingerprints from the revolver with black tape around the handle, but Malaika chose to wipe it down before handing it off to Jackson's "uncle." With that in mind, and Malaika's credibility undermined by her own inconsistent statements to police and dishonest trial testimony about "correcting" herself, the impact of the unconstitutionally withheld evidence is increased.

As the Sixth Circuit Court Of Appeals explained, the suppressed evidence of Lewis' statements estimating the shooter's height at 5'4", considered alongside King's recantation serve to undermine eyewitness accounts connecting Jackson to the crime. *In re Jackson*, 12 F.4th 604,

610 (6th Cir. 2021). The Sixth Circuit Court of Appeals proceeded to note that Boone's testimony "would thus be left as the only eyewitness account that identified Jackson as the shooter. *Id*. This being the case, the link between Jackson and the murder weapon, also orchestrated by Boone, is equally suspect with only the weak support of Malaika's inconsistent statements and her conflicting trial testimony about Jackson supposedly leaving the weapon with her after the crime, and her strange decision to wipe it down before giving it to his "uncle." As the Circuit Court noted, "[t]he Supreme Court has recognized that 'incriminating testimony from inmates, suspects, or friends or relations of the accused'" when standing alone may have lessened probative value than when supported by independent corroborating evidence. *In re Jackson*, 12 F.4th 604, 610 (6th Cir. 2021). Doubt about whether Boone's solitary eyewitness identification of Jackson could be trusted given his dubious credibility and the young ladies' differing description of the shooter would also lead to doubt about the validity of the "uncle" ruse set up by Boone, especially given Malaika's inconsistencies.

### 4. Law Enforcement Intimidated a Critical Witness Who Has Recanted Testimony Jackson Confessed to Her.

In addition to the exculpatory evidence secured through Public Records Act Requests, Ivana King, the source of Jackson's alleged four-word confession, "he done two people," has declared under penalty of perjury that her testimony at trial was false and coerced by law enforcement. The questioning at trial failed to reveal the extent of what had happened to King, her young children, and her apartment when the police searched her residence based upon a warrant secured with information provided by Boone. The search can be described only as intentionally intimidating and humiliating. These stunning details provide the context for the interrogation and **un**sworn Statement King provided to the police just a couple hours later at the police station:

2.  In March of 1997, the police kicked in my door and tore my house apart while serving an arrest warrant for Kareem.

70

3. My daughter with Kareem was three months old when the police served Kareem's arrest warrant, and she started to cry when the police were ransacking my home.

4. I asked if I could pick up my crying daughter to comfort her, and the police refused.

5. I was naked while the officers tore my home apart, and they would not allow me to cover myself.

6. One officer grabbed my crying daughter by one arm and dangled her in the air while he looked in her crib and flipped her crib mattress; the officer then threw my three-month-old infant back into her crib and stated that I could pick her up.

7. It seemed like there were at least half a dozen officers in my home, and they were all males.

8. The officers kept their guns drawn and pointed at me and Kareem even though we were completely naked, unarmed, and surrounded.

9. I felt like if I moved at all I would be shot to death, and I was terrified.

(Declaration of Ivana King, Doc. 24-1, PageID 3701-02.)

A few hours later, down at the police station where her "official" statement was taken, King again clarified the context in which she acknowledged Kareem's alleged four-word confession, "He done two people." King declared:

12. The police picked me up in an unmarked police car, and they took me to a location that did not look like a police station.

13. The police took me into a room where the guns that were taken from my home were spread out on a table.

14. We walked into a smaller room where they interrogated me.

15. I was extremely intimidated and afraid when the police asked me if I had someone who could watch my children and implied I would not be seeing them for a very long time unless I said what the police wanted to hear.

16. It was late afternoon around the time that the police came to get me.

. . .

71

29. After the police destroyed my home, tossed my baby like a ragdoll, and accused me of being involved in a crime that I knew nothing about, I was scared, stressed, and confused.

(Id., PageID 3702-03.)

Finally, in support of the argument that Jackson's "confession" as she told it to the police in her unsworn taped interview was coerced and occasioned because of her having been intimidated, King is seemingly prepped as to what to say before the police turned on the tape recorder. As the prepared transcript from that taped conversation reflects, King literally blurts out the confession almost immediately upon the police turning on the tape recorder for the commencement of her "interview." The alleged confession comes a mere five (5) questions into the interview, and with no specific question having been asked that would warrant such an answer. Inferentially, she "told them what they wanted to hear" as soon as she could manage it:

Q: Go ahead and begin Monday of this week.

A: On Monday, I don't know the exact date or anything, Monday evening to be exact five guys left from my house, Kareem Jackson, Derrick Boone, a guy named Red,[24] another guy named Sonny and another guy unknown to me. They left came back 5 or 6 o'clock in the morning on a Tuesday, left again that same morning, didn't see them until dark on Tuesday.

Q: See who?

A: Kareem Jackson, Derrick Boone. Derrick Boone left my house. **Kareem Jackson told me he done two people.**

(Transcript of Tape Interview of Ivana King, Doc. 24-1, PageID 3705-06.)

During closing argument, the Prosecutor urged the jury to give great weight to King's testimony because she was "the final piece of the puzzle." (State of Ohio Closing Argument, Doc.

---

[24] "Red" **is** Derrick Boone. In claiming five people left her house, King named Boone twice.

15-2, PageID 2459.) "Ivana King was not a participant in this case. She didn't get any deals." (Id.)[25] The Prosecutor argued King was in love with Jackson (State of Ohio Closing Argument, Doc. 15-2, PageID 2415); therefore, her statement that he confessed to her "in its **overwhelming and powerful nature**, considering who it was coming from at the time it was said, **would convict him in and of itself**." (State of Ohio Closing Argument, Doc. 15-2, PageID 2461-62.)

In such a weak identification case, where the prosecution urged the force of these statements and King's testimony could, on its own, convict Jackson, the void left by King's recantation creates too much room for doubt to comfortably ensure the same outcome.

### D. Based On the Foregoing Analysis, Jackson Satisfies The Clear And Convincing Standard Set Out In § 2244.

Beginning with the identity-centered case presented by the State to the jury, then adding in the evidence withheld in violation of Jackson's constitutional rights, which is the basis of this habeas petition, and considering that evidence together with the evidence uncovered in this case as a whole, it is unequivocal that no juror acting reasonably would find, beyond a reasonable doubt, that Kareem Jackson was the "short guy" with the "little gun" who executed the two young men. The Warden admits the State's case rested almost entirely on Boone, a co-defendant with severe credibility issues, and Malaika, a co-defendant who could not tell a straight story about when Jackson supposedly gave her the murder weapon (undermining the impact of the ruse used to recover it, and her eventual claim that he gave it to her immediately after the crime occurred,

---

[25] While that is true in the sense that all the co-defendants (Boone, Patterson, Williamson) were given plea bargains, pled guilty to various criminal charges, and were sentenced accordingly, all in advance of Jackson's trial, King declared: "I was extremely intimidated and afraid when the police asked me if I had someone who could watch my children and implied I would not be seeing them for a very long time unless I said what the police wanted to hear." (Declaration of Ivana King, Doc. 24-1, PageID 3703.) As a result: "The police had a story they wanted to hear, and I told them what that they wanted to hear so that I could go home to my children because I had nothing to do with any crime and knew nothing about the guns the police took out of my house." (Id., PageID 3704.)

presumably because he had just used it to murder people). (ROW, Doc. 27, PageID 3731 (conceding "most of [the] evidence of guilt was provided by co-defendants Boone and Williamson, not to mention Jackson's girlfriend, Ivana King.")). Regardless of whether the jury ultimately credited Malaika's testimony that Jackson gave her the murder weapon, the task before the State at trial was to place the murder weapon in Jackson's hands in that Lupo Court apartment during the chaotic events that lead to the deaths of two young men. To accomplish that, the State had to prove Jackson was the "short" guy with the "little gun." Because the unconstitutionally withheld evidence, together with the evidence uncovered in this case as a whole and King's recanted testimony, so severely undermine the State's already weak identity case, Jackson has shown by clear and convincing evidence no reasonable juror would have found him guilty beyond a reasonable doubt.

Jackson need not absolve himself of any possibility of guilt. He need only show enough reasonable doubt that no juror could in good conscience condemn him to die to the exclusion of other reasonable probabilities. While addressing contentions that unconstitutionally withheld evidence undermines the identifications of Jackson by Rebecca Lewis and Nikki Long, the Warden does nothing to address the fact that the State's only other alleged disinterested witness, Ivana King, who testified about Jackson's alleged confession, has now recanted that testimony. Today, King admits she was intimidated, not by Jackson, but by the police. At trial, the prosecution urged the jury to place great weight on King's testimony estimating it alone would be enough to convict Jackson. (State of Ohio Closing Argument, Doc. 15-2, PageID 2461-62.) The void left by King's recantation creates too much room for doubt to comfortably ensure the same outcome.

Moreover, the material importance of the withheld documents, recognized by the Circuit Court in its prima facie finding, is demonstrated in the Warden's disingenuous response that the

74

only description provided for "Little Bee" was "skinny." Throughout her interviews with detectives, Malaika – who never referred to "Little Bee" by name, not only described him as "short," but repeatedly called him "little" and also described him as "little" in relation to Jackson. Further evidence indicates Little Bee truly planned the robbery, and therefore had as much motive as the State alleged for Jackson, if not more. Little Bee also had a handgun, and a withheld statement by an independent eyewitness supports those shots rang out immediately after Little Bee entered the Lupo Court apartment. Add to this the issues attendant to Lewis' intoxication, cross-racial identification of Jackson, and the use of Jackson's old photograph. Police never investigated Little Bee. There is no clear picture of what this individual looked like. The impact of evidence that both surviving eyewitnesses agreed the "short" guy with the "little gun" was approximately 5'4" tall whereas Jackson is 5'9" tall, and the existence of this unknown co-defendant of apparent shorter height cannot be overstated given the surrounding circumstances.

The State's case for Jackson's identity as the "short" guy with the "little gun" was already weak. The unconstitutionally withheld evidence drastically impacts the surrounding evidence and further diminishes the strength of the State's case such that, but for constitutional error, no reasonable juror would have found Jackson guilty beyond a reasonable doubt. Indeed, the jurors at Jackson's trial struggled to convict him on the strength of the State's case. The jurors were evidently troubled by the conflicting handgun testimony. They further implored the court for clarification whether aiding and abetting carries the same legal weight as actually committing the crime. (Question to the Court, Doc. 15-2, PageID 2522.) These questions illustrate the jurors' struggle to confidently agree Jackson was the actual shooter, and the revelations attendant to the discovery of the unconstitutionally withheld evidence likely would have made a difference in their ultimate determination. Thus, if the jurors in Jackson's case are a litmus for what any reasonable

juror would do (and one would hope that they are), it is not unreasonable to infer that, with the benefit of the unconstitutionally withheld *Brady* evidence, and without King's coerced testimony, no reasonable juror in Jackson's case would have found him guilty beyond a reasonable doubt. [26]

## V.     KAREEM JACKSON IS ENTITLED TO HABEAS RELIEF

### A.  Review Under AEDPA: The Standard

The Antiterrorism and Effective Death Penalty Act ("AEDPA") provides the standard for the federal courts' review of Jackson's claim for relief under 28 U.S.C. § 2254(a) because he is in custody in violation of the Constitution or laws or treaties of the United States. Under AEDPA, a federal court may not grant habeas relief for any claim adjudicated on the merits in state court unless the state court adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id*. § 2254(d)(2).

The stringent requirements of 28 U.S.C.§ 2254(d) apply only to claims that were "adjudicated on the merits in State court proceedings." *Cullen v. Pinholster*, 563 U.S. 170, 186 (2011). When a state court does not address a claim on the merits, as when it applies a state law procedural bar, "AEDPA deference" does not apply and the claim should be reviewed *de novo*. *Id*.; *see also Robinson v. Howes*, 663 F.3d 819, 822–23 (6th Cir. 2011).

### B.  Presentation of Jackson's Claims in State Court

In his Successor Post-Conviction Petition, Jackson asserted his sentence is void or voidable because his rights to due process and a fair trial were violated when the prosecution withheld

---

[26] To that end, the recently obtained juror affidavits attesting to the impact of the unconstitutionally withheld evidence, (Doc 1-3, PageID 119-124), are also pertinent to whether Jackson meets the clear and convincing standard.

material exculpatory evidence from the defense in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and *Brady v. Maryland*, 373 U.S. 83 (1963). Jackson's petition also asserted that his sentence is void or voidable because his rights to due process and a fair trial were violated by the false and coerced testimony of Ivana King in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution. *Napue v. Illinois*, 360 U.S. 264 (1959).

On September 21, 2018, the trial court filed an <u>Entry</u> Granting the State's 12/12/17 <u>Motion to Dismiss and Denying Jackson's Successor Post-Conviction Petition</u> (T.d. 396, <u>Entry</u>, Doc. 29-1, PageID 3766.) On December 5, 2019, the Ohio Court of Appeals for the Tenth Appellate District affirmed the trial court's order. *State v. Jackson*, No. 18AP-758, 2019 WL 6615076 (Ohio Ct. App. Dec. 5, 2019). In so doing, the Appellate court held:

> We need not decide the question of whether Jackson was unavoidably prevented from discovering the facts upon which he relied in the Second PCR Petition because we conclude the Second PCR Petition fails to satisfy the second prong of the R.C. 2953.23 (A)(1) standard. Assuming without deciding that Jackson was unavoidably prevented from discovering the facts upon which he relies, the Second PCR Petition fails to demonstrate by clear and convincing evidence that, but for the alleged errors, no reasonable factfinder would have found him guilty at trial. R.C. 2953.23 (A)(1)(b).[27]

*Id*. at *7. On January 17, 2020, Jackson filed an appeal with the Ohio Supreme Court, and the matter was assigned case number 2020-0087. On April 14, 2020, the Ohio Supreme Court summarily declined jurisdiction. *State v. Jackson,* <u>Entry</u>, Case No. 2020-0087.

---

[27] It appears the Appellate Court's assumption Jackson showed diligence was correct insofar as the Ohio Supreme Court recently clarified that a defendant asserting a *Brady* claim satisfies the "unavoidably prevented" requirement contained in O.R.C. § 2953.23(A)(1)(a) by establishing the prosecution suppressed the evidence underlying the claim. *State v. Bethel*, --N.E.3d.--, 2022 WL 838337 (Ohio Mar. 22, 2022), reconsideration denied, *State v. Bethel,* 187 N.E.3d 564 (Table) (2022).

### C. *De novo* Review is Proper

The state court did not determine the merits of Jackson's petition finding he failed to satisfy Ohio's successor post-conviction statute, O.R.C. § 2953.23. Accordingly, *de novo* review is proper. *Johnson v. Williams*, 568 U.S. 289, 302 (2013) ("The language of 28 U.S.C. § 2254(d) makes it clear that this provision applies only when a federal claim was 'adjudicated on the merits in State court.'"). Any conclusions by the court of appeals regarding the merits of Jackson's *Brady* claims are not entitled to AEDPA deference because ultimately the appellate court found it lacked subject matter jurisdiction over Jackson's claims. *See Gumm v. Mitchell*, 775 F.3d 345, 362 (6th Cir. 2014) (holding the Ohio Court of Appeals' conclusions on the merits of a petitioner's Brady claims were void ab initio and not entitled to AEDPA deference because the appeals court found it lacked subject matter jurisdiction over the petition pursuant to O.R.C. 2953.23).

Because the Ohio Court of Appeals applied a state law procedural bar to reject Jackson's *Brady* claim, the claim is arguably procedurally defaulted. *See Coleman v. Thompson*, 501 U.S. 722, 729–33 (1991); *see also Bies v. Sheldon*, 775 F.3d 386, 396 n.7 (6th Cir. 2014) (noting the court has consistently found procedural default when Ohio courts have held that O.R.C. 2953.23 bars review of second post-conviction petitions and further noting Ohio courts interpret O.R.C. 2953.23 "as a jurisdictional procedural rule."). Unexcused procedural default precludes federal habeas review. *See Murray v. Carrier*, 477 U.S. 478, 495–96 (1986). However, *de novo* review is proper where a state court declined to reach the merits of a petitioner's claims based on state law procedural grounds if the defense of procedural default is waived. *Trest v. Cain*, 522 U.S. 87, 89 (1997) (holding courts are not required to raise the issue of procedural default sua sponte in habeas because "a critical failure to comply with state procedural law is not a jurisdictional matter" and, thus, procedural default is a defense that the State is obligated to raise and preserve). The Warden did not raise, and so has waived, the defense of procedural default. *De novo* review is proper.

Nor does Jackson concede that he has procedurally defaulted the claims herein. To wit, Jackson renews the arguments raised in this habeas petition and, should the court find these claims have been procedurally defaulted, Jackson can further establish cause and prejudice to excuse the default through the merits of his *Brady* claim wherein cause and prejudice parallel two of the three components of the *Brady* violation with suppression of the evidence constituting cause and materiality of the evidence constituting prejudice. *Strickler*, 527 U.S. at 282.[28]

### D. Merits

#### 1. *Brady* Claims

"Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). For that reason, "the [prosecution's] goal in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). "A prosecution that withholds evidence . . . which, if made available, would tend to exculpate [the accused] . . . casts the prosecutor in the role of an architect of a proceeding that does not comport with the standards of justice, even though . . . his action is not 'the result of guile'[.]" *Brady*, 373 U.S. at 87-88. Premised on this understanding of justice and prosecutorial responsibility, the Court in *Brady* held "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. at 87. The Court further clarified the State has a duty to disclose all favorable evidence – even evidence

---

[28] Jackson further preserves the arguments raised in Claim III of this habeas petition insofar as, should this court determine Jackson does not meet the 28 U.S.C. § 2244 successor standard, but does have a meritorious *Brady* claim, Jackson would have no forum in which to adjudicate said claim due to the unconstitutionally heightened standard imposed by Ohio's successor statute thereby suspending the writ and allowing continued confinement of one whose *Brady* rights have been violated.

"known only to police investigators and not to the prosecutor." *Kyles v. Whitley*, 514 U.S. 419, 438 (1995) ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the governments behalf in the case, including the police."). *Id*. at 437. Favorable evidence is material for *Brady* purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). A reasonable probability exists when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

"There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999). When determining prejudice, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 453 (1995). The "*Brady* duty extends to impeachment evidence as well as exculpatory evidence," *Youngblood v. West Virginia,* 547 U.S. 867, 869 (2006) (citing *United States v. Bagley,* 473 U.S. 667, 676 (1985)), and the Supreme Court has "disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes." *Kyles*, 514 U.S. at 433.

### a. Favorableness and Suppression of the Evidence

The Warden does not address the merits of Jackson's *Brady* claim. Therefore, Jackson asserts the Warden has waived all argument that Jackson has failed to establish the merits of these claims because, when a party fails to respond to an argument, that argument is generally deemed to be unopposed and the proposition conceded. *See Humphrey v. U.S. AG Off.*, 279 F. App'x 328,

80

331 (6th Cir. 2008) (stating that where plaintiff failed to respond to argument, any opposition was waived). However, insofar as the Court may construe the Warden's argument Jackson cannot show diligence regarding his discovery of Rebecca Lewis 5'4" height estimation as an argument that Jackson also cannot show suppression of this evidence, Jackson reiterates his prior arguments in response. The Warden raises the solitary diligence argument that "[t]he existing trial record confirms that the defense was in possession of FCSO interview tapes and transcripts of Becky Lewis, Nikki Long, Malaika Williamson, Derrick Boone and Ivanna King," therefore "pursuant to 2244(B)(i) [] Jackson has been aware of the supposed "factual predicate" of this claim since before commencement of the trial." (ROW, Doc. 27, PageID 3719). The Warden either misapprehends or willfully mischaracterizes the evidence Jackson alleged the prosecution suppressed.

Jackson never alleged Lewis made the 5'4" statement in her FCSO interview. Jackson alleged Lewis made the statement in suppressed police investigative documents. (Doc. 1-2, PageID 68) (In his post-conviction petition, Jackson presented newly-uncovered, previously withheld police reports indicating surviving witness Rebecca Lewis initially described the shooter as 5'4" tall."). The Warden correctly points out, Lewis did not describe the guy with the "little gun" by height in her transcribed interview with FCSO, her suppression hearing testimony, or her testimony at trial. (ROW, Doc. 27, PageID 3727.) Yet somehow the height 5'8" ended up on the suspect sketch attributed to Lewis and alleged to be Jackson. (COLUMBUS DISPATCH, Doc. 24-1, PageID 3240.) The reporting source for this height, as per the Warden's Answer, was Detective Zachary Scott, the same detective who authored the withheld report wherein he stated Lewis conveyed a height of 5'4", not 5'8", immediately after the crime. (FCSO Progress of Investigation, 3/26/1997, Doc. 24-1, PageID 3288.) And in an on-scene investigative report, Officer T.A. Shepard indicated he relayed the 5'4" height description after speaking solely to Rebecca Lewis who had been

separated from Long. (FCSO Progress of Investigation, Doc. 24-1, PageID 3286-87.) As attested to by trial counsel, these documents were indeed suppressed. (Habeas Petition Exh. D, Affidavit of Brian J Rigg, Doc. 1-3, PageID 125-30.)

The Warden also observes that defense investigator Tarpley interviewed Long and Lewis prior to trial and therefore "it is implausible that after interviewing both Long and Lewis, defense investigator Tarpley was unaware that each provided a taped statement to FCSO investigators." (ROW, Doc. 27, PageID 3720.) Again, this is beside the point as Jackson never alleged the FCSO statements were suppressed, and it was not incumbent upon investigator Tarpley to discover through interviewing Lewis that the State was withholding exculpatory information. "A rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process." *Banks v. Dretke*, 540 U.S. 668, 696 (2004). Furthermore, nothing in the interview suggests Tarpley would have been placed on such notice. (Robert Tarpley's Interview Summary re Becky Lewis, Doc. 29-1, PageID 3768-69.)

The Warden does not contest that the unconstitutionally withheld evidence Rebecca Lewis identified the "short" guy with the "little" gun as 5'4" tall would have been favorable to Jackson had the information been turned over to Jackson's counsel at the time of trial. For this reason, any argument the evidence would not have been favorable to Jackson is waived. *Humphrey*, *supra*. The Warden apparently also concedes both the suppression and favorability of the Flewellen eyewitness statement insofar as the Warden does not make any argument regarding either, and any such arguments are now waived. *Id*.

The independent eyewitness statement and withheld 5'4" height description by Lewis, matching Long's height description undermine the State's theory of how the murders occurred and implicate an alternative suspect with motive, means, and opportunity as discussed *supra*, and

further discussed *infra,* with regard to the materiality of the withheld documents. Therefore, because the withheld evidence "puts the whole case in such a different light as to undermine confidence in the verdict," *Kyles*, 514 U.S. at 435, the evidence was favorable. *See Bies v. Sheldon*, 775 F.3d 386, 398 (2014) (finding suppressed evidence favorable when it undermined the State's theory of the case and implicated alternate suspects). Additionally, the Warden has yielded any argument to the contrary by focusing solely on the issue of diligence.

### b. Materiality

Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682 (1984)). The Supreme Court has emphasized that a defendant is not required to show that the disclosure of the evidence would have ultimately led to an acquittal. *Kyles*, 514 U.S. at 434-35. Rather, a defendant must show "only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial." *Smith v. Cain*, 565 U.S. 73, 75 (2012). In such circumstances, suppression of the evidence "deprives the defendant of a fair trial." *Bagley* at 678. "To that effect, the Supreme Court has made clear that it is not necessary that 'every item of the State's case would have been directly undercut if the Brady evidence had been disclosed.'" *Bies*, 775 F.3d at 399 (quoting *Kyles v. Whitley*, 514 U.S. 419. 451 (1995)). "Bagley materiality . . . is not a sufficiency of the evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles*, 514 U.S. at 434-35. "Withheld information is material under *Brady* only if it would have been admissible at trial or would have led directly to admissible evidence." *Bies*, 775 F.3d at 399 (citing *Wood v. Bartholomew*, 516 U.S. 1, 6 (1995))

The Circuit Court explained the appropriate *Brady* analysis as follows:

> In considering whether the failure to disclose exculpatory evidence undermines confidence in the outcome, "the omission must be evaluated in the context of the entire record." *United States v. Agurs*, 427 U.S. 97, 112, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976) (footnote omitted). As the Supreme Court observed in *Agurs*, "if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Id*. at 113, 96 S.Ct. 2392. The Supreme Court's precedent mandates that we "undertake a careful, balanced evaluation of the nature and strength of both the evidence the defense was prevented from presenting and the evidence each side presented at trial." *Boss v. Pierce*, 263 F.3d 734, 745 (7th Cir. 2001) (citing *Kyles v. Whitley*, 514 U.S. 419, 115 S. Ct. 1555 (1995)); *see also United States v. Jernigan*, 492 F.3d 1050 (9th Cir. 2007) (en banc).

*Id.* Additionally, when the State withholds numerous pieces of evidence, the proper focus of *Brady*'s materiality inquiry is on the cumulative effect of the suppressed evidence on the outcome of the trial. *Id.*

The State's case for Jackson's identity as the "short" guy with the "little gun" was a weak one. By the Warden's admission, it rested heavily on the word of co-defendants Malaika and Boone, both of whom received plea deals. (ROW, Doc. 27, PageID 3731 (conceding "most of [the] evidence of guilt was provided by co-defendants Boone and Williamson, not to mention Jackson's girlfriend, Ivana King.").) Also, by the State's admission, once Boone came forward, it seems the investigation was not much of an investigation at all. Detective Zachary Scott testified at trial law enforcement basically did not even bother trying to determine the identity of the fourth individual who participated in the robbery **and murders** of two young men because Kareem Jackson was served to them on a platter. Specifically, despite having three co-defendants who participated in a serious crime with this person, Scott claimed, "We don't have any actual direction. If we get a call on it, we would go after him." (Detective Zachary Scott, Direct Examination Testimony, Doc. 15-2, PageID 2274.)

84

The Warden correctly points out, Lewis did not describe the guy with the "little gun" by height in her transcribed interview with FCSO, her suppression hearing testimony, or her testimony at trial. (ROW, Doc. 27, PageID 3727.) Yet somehow the height 5'8" ended up on the suspect sketch attributed to Lewis and alleged to be Jackson. (COLUMBUS DISPATCH, Doc. 24-1, PageID 3240.) The reporting source for this height, as per the Warden's Answer, was Detective Zachary Scott, the same detective who authored the withheld report wherein he stated Lewis conveyed a height of 5'4", not 5'8" immediately after the crime. (FCSO Progress of Investigation, 3/26/1997, Doc. 24-1, PageID 3288.) And in an on-scene investigative report, Officer T.A. Shepard indicated he relayed the 5'4" height description after speaking solely to Rebecca Lewis who had been separated from Long. (FCSO Progress of Investigation, 3/27/1997, Doc. 24-1, PageID 3286-87.) As attested to by trial counsel, these documents were indeed suppressed. (Habeas Petition Exh. D, Affidavit of Brian J. Rigg, Doc. 1-3, PageID 125-30.)

Attorney Rigg further opined:

13. Without the police report indicating that Rebecca Lewis also estimated the shooter's height as 5'4" tall, defense counsel's impression upon reading the statements that were turned over was that Nikki Long made a possibly poor height estimation that, while notable, was not necessarily significant. As such, defense counsel did not press the issue at trial.

14. Identity was a central issue in this case, and the Prosecutor acknowledge that to the jury from the start. Had the defense known that both witnesses estimated the shooter to be approximately 5'4", much shorter than Jackson's height of approximately 5'8" to 5'9", we would have focused on and emphasized this important discrepancy. Especially since Jackson did not fit Ms. Lewis' "fat" description either.

16. This was particularly significant given that there was no forensic evidence linking Jackson to the crime.

19. If defense counsel had been aware that both surviving witnesses similarly identified the shooter as being only 5'3" to 5'4", the defense would have focused on the identifying height of the shooter and proved to the jury that Mr. Jackson did not fit that telling description. Nor did he fit the "short" and "fat" description.

85

Specifically, we would have demonstrated through the presentation of evidence that Mr. Jackson stood at a height of 5'8" to 5'9" tall, and that Little Bee was shorter than Mr. Jackson, and thus more likely to be the height specifically identified by the two surviving witnesses.

20. Defense counsel also would have emphasized that trial testimony (and pretrial statements) indicated the shorter individual known as Little Bee planned the robbery, knew the people at the apartment, and carried a handgun that night.

(*Id.,* PageID 127-29.)

Additionally, upstairs neighbor Lisa Flewellen gave a detailed account of what she both saw and heard that evening. Flewellen's narrative, in conjunction with Malaika's testimony the shooting occurred immediately after "Little Bee" reentered the apartment, (Malaika Williamson, Direct Examination Testimony, Doc. 15-2, PageID 1953), casts grave suspicion on the un-apprehended "Little Bee," and contradicts Boone's testimony that only he and Jackson were in the apartment when the victims were killed. Specifically, Flewellen explained to an officer canvassing the area:

I heard someone knock on the door downstairs[.] They open[ed] the[n] closed the door. I heard someone say get the fuck down. I heard things falling and tussling. I looked out my window and saw a 4-door dark brown car with one guy [in] the front and one in back. The car went to the side of the building. The one in back got out and went in the house downstairs too. I heard two or three muffle[d] sound[ind] shots. The brown car left Lupo C[our]t and went left on Oakland Park[.]

(Statement of Lisa Flewellen, 3/25/1997 [Marked Supplemental Exh. 23], Doc. 24-1, PageID 3700.) This statement was never turned over to defense counsel. Defense counsel was unaware of what Flewellen heard and saw, and unable to ask her for a description of the person who reentered the apartment just before shots rang out. Defense counsel was unable to ask Flewellen anything because defense counsel never knew of her existence due to the State's unconstitutional suppression of material, exculpatory evidence that directly contradicted the prosecution's theory of its identity-centered case.

86

With this missing information trial counsel could have both undermined the State's theory of the case and crafted a convincing counter-narrative implicating the missing fourth man whom police did not bother to investigate. Counsel also could have attacked the poor police investigation casting further doubt on the conclusion Jackson was the actual shooter. The revelation of the withheld Flewellen affidavit could also have led to further admissible evidence if defense counsel were able to speak with Flewellen and get her description of the individual who entered the house just before shots rang out. Would she also have corroborated that he was approximately 5'4" tall? How damaging would that have been to the State's case alongside **both** Lewis and Long's initial height descriptions of the "short" guy with the "little" gun?

Based on the foregoing, the withheld evidence is material and exculpatory in spades. *Bies*, 775 F.3d at 400 (finding evidence material where "defense counsel would have been able to construct a plausible alternative narrative of the crime and raise reasonable doubt in the minds of jurors," and withheld evidence would have raised opportunities to attack the thoroughness and even good faith of the police investigation as well as undermining the State's theory of the case); *Gumm*, 775 F.3d at 370 (same). In *Gumm* the Circuit Court noted the significance of such evidence especially where police had very little concrete evidence and the case came down to "what neighbors had seen that night" where the withheld evidence contradicted and poked holes in the eyewitness testimony. 775 F.3d at 370-71.

The prosecution's case to the jury was all about establishing Jackson's identity as the actual killer of the victims when multiple co-defendants were involved in the events that lead to their deaths. The prosecution withheld exculpatory evidence showing **both** surviving witnesses independently gave matching descriptions **inconsistent** with Jackson but **consistent** with an un-apprehended co-defendant whom police did not bother to investigate. The prosecution also

withheld an independent eyewitness statement supporting Malaika's testimony that the victims were killed immediately after this mystery defendant, whom likely more closely matched the withheld descriptive information, entered the apartment. This evidence substantially undermines the credibility of the State's theory of the case because it presents evidence from an independent eyewitness that contradicts Boone's already doubtworthy testimony that only he and Jackson were inside when the killings occurred. The withheld eyewitness statement also casts further suspicion onto the unknown "Little Bee" person whom none of the co-defendants seemed eager to provide any real details about. The prosecutor meticulously avoided *any* questioning that would have opened up the exculpatory descriptions to cross-examination and in so doing became the "architect of a proceeding that [did] not comport with the standards of justice[.]" *Brady*, 373 U.S. at 87-88. Merits relief is warranted on this claim.

2. *Napue* Claim

Specific to Jackson's *Napue* claim, the test here for materiality is *less* stringent than that for a *Brady* claim. *Rosencrantz v. Lafler*, 568 F.3d 577, 584 (6th Cir. 2009). *Napue v. Illinois,* 360 U.S. 264, 269 (1959), establishes that a conviction or sentence obtained through false evidence, "known to be such by representatives of the State must fall ...." In *United States v. Agurs,* 427 U.S. 97, 103 (1976), the Supreme Court elaborated that a conviction or sentence obtained by the knowing or uncorrected use of perjured or false testimony "is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Thus, the Sixth Circuit has explained that "[t]he petitioner need only show that there exists 'any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Smith v. Metrish*, 436 F. App'x 554, 566 (6th Cir. 2011) (quoting *Rosencrantz v. Lafler*, 568 F.3d 577, 584 (6th Cir. 2009)).

The Warden does not address the merits of Jackson's *Napue* claim. Therefore, Jackson asserts the Warden has waived all argument that Jackson has failed to establish the merits of this claim because, when a party fails to respond to an argument, that argument is generally deemed to be unopposed and the proposition conceded. *See Humphrey*, *supra*. Jackson further reiterates the arguments from his petition for habeas relief. Merits relief is warranted on this claim.

## VI.    CONCLUSION

Though he ought not have had to, for the myriad reasons detailed in the foregoing Traverse based upon the State's unconstitutional withholding of material exculpatory evidence and intimidation of a key trial witness, Jackson satisfies the exacting standard for relief pursuant to a second or successive habeas petition set out in 28 U.S.C. § 2244 as required by this Circuit's precedent in *In re Wogenstahl*, 902 F.3d 621 (6th Cir. 2018). These violations undercut the fundamental fairness of Jackson's trial and severely undermine confidence in the validity of his conviction and death sentence. Because the withheld evidence "puts the whole case in such a different light as to undermine confidence in the verdict," *Kyles*, 514 U.S. at 435, Jackson has likewise established the merits of his *Brady* and *Napue* claims. It would be tragic for this Court to deny Jackson the habeas relief he has fought so tenaciously for and herein justified.

Respectfully submitted,

STEPHEN C. NEWMAN (0051928)
Federal Public Defender

*/s/ Alan C. Rossman*
ALAN C. ROSSMAN (0019893)
Assistant Federal Public Defender
Director, Capital Habeas Unit

*/s/ Bevlynn Joann Sledge*
Bevlynn J. Sledge
Research and Writing Attorney
Office of the Federal Public Defender,
Northern District of Ohio

89

1660 West Second Street, Suite 750
Cleveland, Ohio 44113
(216) 522-4856; (216) 522-1951 (f )
alan_rossman@fd.org
bevlynn_joann_sledge@fd.org

**Counsel for Petitioner Kareem Jackson**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing **Petitioner**

**Kareem Jackson's Reply (Traverse)** was filed electronically this 21st day of June 2022. Notice

of this filing will be sent to all parties by operation of the Court's electronic filing system.

*/s/ Alan C. Rossman*
ALAN C. ROSSMAN
Assistant Federal Public Defender
Director, Capital Habeas Unit

90