**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**KAREEM JACKSON,**

       **Petitioner,**

**v.**                            **Case No.  2:20-cv-3934**
                                           **CHIEF JUDGE ALGENON L. MARBLEY**
**WARDEN,**                     **Magistrate Judge Kimberly A. Jolson**
**Chillicothe Correctional Institute,**

       **Respondent.**

**<u>OPINION AND ORDER</u>**

Petitioner Jackson, a prisoner sentenced to death by the State of Ohio, has filed, with authorization by the United States Court of Appeals for the Sixth Circuit, a successive habeas corpus petition.  This matter is before the Court for consideration of Jackson's Motion to Request Evidentiary Hearing (ECF No. 35) and Motion for Leave to Supplement Doc. 29, Habeas Rule 7 Supplement to the Record (ECF No. 36).  Also before the Court are the Respondent-Warden's Memoranda in Opposition (ECF Nos. 37 and 38) and Jackson's Replies (ECF Nos. 39 and 40). Because the Court is satisfied that Jackson has both demonstrated that this Court should exercise its discretion to hold an evidentiary hearing and satisfied the standards for expansion of the record, both motions are **GRANTED**.

**I.  OVERVIEW**

As the United States Court of Appeals for the Sixth Circuit remarked in its decision authorizing the instant successive petition, this is not Jackson's second federal habeas petition,

but his fourth.[1] *In re Jackson*, 12 F.4th 604, 611 (6th Cir. 2021); ECF No. 12, at PageID 197.

Jackson raises the following three claims for relief:

> First Claim for Relief: Petitioner's sentence is void or voidable because material, exculpatory evidence was withheld from him in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution. *Brady v. Maryland*, 373 U.S. 83 (1963).
>
> Second Claim for Relief: Petitioner's sentence is void or voidable because his rights to Due Process and a fair trial were violated by the false and coerced testimony of Ivana King in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution. *Napue v. Illinois*, 360 U.S. 264 (1959).
>
> Third Claim for Relief: Ohio's successor post-conviction statute, O.R.C. § 2953.23(A)(1)(b), as applied, violates the Supremacy Clause because it mandates a post-conviction petitioner must satisfy an additional, higher, standard of proof than this Court's constitutional precedent requires in order to obtain post-conviction review, effectively raising the standard of proof necessary to win relief.

(Petition, ECF No. 1-2, at PageID 36, 38.)

The Sixth Circuit determined that Jackson had satisfied the statutory prima facie showing for filing a successive petition—namely that Jackson had presented sufficient allegations of fact together with some documentation that would warrant fuller exploration in the district court. At issue with respect to Jackson's *Brady* claim, as framed by the Sixth Circuit, is that police suppressed (1) "evidence that Rebecca Lewis, who was a key witness at trial, had initially described the suspect who had hit her in the head with a gun in a way that did not match Jackson, but did match a shorter alternative suspect, 'Little Bee;' " and (2) "a statement from a neighbor support[ing] the inference that Little Bee committed the murders." *In re Jackson*, 12 4.th at 609;

---

[1] The procedural history recounting the four petitions is set forth in this Court's Opinion and Order transferring the instant fourth petition to the Sixth Circuit. (Opinion and Order, ECF No. 11, at PageID 179-81.)

ECF No. 12, at PageID 194.  As for the *Napue* claim, Sixth Circuit noted that "Ivana King provided Jackson's counsel with a declaration that law enforcement had intimidated her into falsely testifying that Jackson had confessed to the murders."  *Id*.; Page ID 195.  The issues presently before this Court are *not* the merits of Jackson's claims, *or* even whether he can satisfy the gateway showing for successive claims set forth in 28 U.S.C. § 2244(b), *but*:  (1) whether the Court should exercise its discretion to hold an evidentiary hearing; and (2) whether Jackson has satisfied the standard for supplementing the record with an affidavit in support of the search warrant of Jackson's person.

## II.  LEGAL STANDARDS

### A.    Evidentiary Hearings

Evidentiary hearings are primarily addressed in 28 U.S.C.  2254(e)(2).[2]  Section 2254(e)(2) states in relevant part that a court shall not hold an evidentiary hearing on any claim that the petitioner failed to develop in state court proceedings unless the factual predicate could not have been previously discovered through the exercise of due diligence and the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the petitioner guilty of the underlying offense.  28 U.S.C. § 2254(e)(2); *see also Cunningham v. Shoop*, 23 F.4th 636, 649-50 (6th Cir. 2022) (discussing 28 U.S.C. § 2254(e)(2), and *Michael Williams v. Taylor*, 529 U.S. 420, 437 (2000)).

In *Clark v. Warden*, 934 F.3d 483, 491 n.2 (6th Cir. 2019), the Sixth Circuit observed that the standard for holding a hearing set forth in § 2254(e)(2) is similar to the standard for

---

[2]  Rule 8 of the Rules Governing Section 2254 Cases in United States District Courts

authorizing a successive petition set forth in § 2244(b)(2). But the Sixth Circuit in *Clark* also noted that the "heightened standard" for holding a hearing set forth in § 2254(e)(2) "applies only if the petitioner failed to develop the factual basis of a claim in State court proceedings," and that "[a] petitioner has not 'failed' to develop the record in the manner contemplated by this subsection where he was unable to develop his claim in state court despite diligent effort." *Id*. (quoting *Michael Williams*, 529 U.S. at 437) (cleaned up). *Clark* is particularly instructive because it involved the decision of whether to hold an evidentiary hearing not in connection with an initial habeas corpus petition, but with a successive habeas corpus petition.

### B. Motions to Supplement

Rule 7 of the Rules Governing Section 2254 Cases permits federal district courts to direct the record to be supplemented with materials relevant to the Court's resolution of the petition. Thus, under the language of the rule, expansion has only a relevancy limitation. That is, the materials need only be relevant to the determination of the merits of the constitutional claims in order to be added. *Loza v. Mitchell*, Case No. 1:98-cv-287, 2002 WL 31409881, *1 (S.D. Ohio Jul. 17, 2002). Under Fed. R. Evid. 401, evidence is relevant if it has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Further, expansion of the record is within the discretion of the judge. *Ford v. Seabold*, 841 F.2d 677, 691 (6th Cir. 1988).

### III. MOTION FOR EVIDENTIARY HEARING

### A. Factual Context

In the late evening of March 24, 1997, four young men, driven by a young woman, set

---

addresses whether a hearing should be held and various procedures to follow if a hearing is held.

out to steal drugs and money from an apartment on Lupo Court, from which two other young men were known to sell drugs. The perpetrators and their driver were Derrick Boone/"Red," Michael Patterson, "Little Bee," Petitioner herein Kareem Jackson, and Malaika Williamson (the driver). Due to inconsistent police statements and testimony, it remains unclear who planned the robbery. However, it appears to have been Little Bee who knew the occupants of the targeted apartment, Antorio Hunter and Terrance Walker. (Boone testimony, ECF No. 15-2, at PageID 2065-66.) It also appears that Jackson was how the other four perpetrators had come to know each other. Jackson and Little Bee were the first to enter the apartment, ostensibly to purchase drugs, but all four men at various times also entered the apartment after that initial entry/drug purchase by Jackson and Little Bee. In connection with the robbery, shortly after midnight on March 25, 1997, Hunter and Walker were both killed by a single gunshot (from a handgun) to the backs of their heads while they were lying or kneeling down. The identity of the shooter was always the primary question. Boone, Patterson, and Williamson struck plea deals with the prosecution. Boone and Williamson testified at Jackson's trial; Boone identified Jackson as the sole shooter and Williamson linked Jackson to the handgun determined to be the murder weapon. Little Bee was never apprehended or ever even identified by any other name than Little Bee (although Boone testified he thought Little Bee's name was Brian (Boone testimony, ECF No. 15-2, at PageID 2111)).

Rebecca Lewis and Nikki Long were with Hunter and Walker in the apartment when Jackson and Little Bee, and eventually all four men, entered the apartment. Lewis was struck on the head with a "little gun" by a man she identified from a photo array and at trial as Jackson. Both women were in the kitchen when Hunter and Walker were shot in the living room, and did

not witness the shootings. Long was able to give police enough of a description of Boone/Red for the police to construct and distribute a sketch—a sketch so accurate that Boone immediately turned himself in and implicated the others in the robbery and shootings. Patterson and Williamson followed suit in eventually cooperating with police striking plea deals with the prosecution. Only Williamson and Boone testified at Jackson's trial.[3]

Williamson testified in relevant part that on the evening of the murders, when she drove the four perpetrators to the Lupo Court apartment, it was Jackson who had given her directions as to where to drive and who had told her, as had been relayed to him by someone else, that they were planning to rob the apartment for drugs and money. She also testified that Jackson and Little Bee had handguns that evening, while Boone and Patterson each took a long gun from the trunk once they arrived at the Lupo Court apartment. She testified that Jackson and Little Bee went into the apartment first, followed almost immediately by Boone and Patterson. According to Williamson, Little Bee came back out and sat in the car, then went back toward the apartment, which is when Williamson heard gunshots.[4] Williamson also testified that when they all returned to her apartment to hang out for a few hours, she saw Jackson place a handgun in the

---

[3] Patterson, who pleaded guilty to involuntary manslaughter and aggravated robbery and was sentenced to fifteen years in prison, was supposed to testify at Jackson's trial. But at some point prior to or during the trial, Patterson sent Jackson a letter from prison offering "to tell the truth" about what had happened in the apartment, and that "I got to tell them that Boone did it." (Jackson's Supplemental Document, ECF No. 29-1, at PageID 3772.) Eventually, after prosecutors met with Patterson and purportedly threatened to revoke Patterson's plea deal, Patterson was called by neither the prosecution nor defense counsel. (*See*, Case No. 2:03-cv-983, Opinion and Order, ECF No. 56, at PageID 730-43.)

[4] In her statements to police, Williamson initially said that no one was back in the car when she heard the gunshots (Warden's Rule 7 Supplemental Exhibits, ECF No. 24-1, at PageID 3402, but then repeatedly said that she heard the gunshots *after* Patterson and Little Bee had already returned to the car. (*Id.*, at PageID 3402-03, 3414, 3417, 3419, 3420.)

closet. Williamson confirmed that Boone, accompanied by a man Boone claimed was Jackson's uncle but who was actually an undercover officer, retrieved the handgun that Jackson had left in her closet. That handgun was identified at trial as the weapon from which the bullet that killed one of the victims was definitely fired, and from which the bullet that killed the other victim was likely fired (the bullet was too mangled for definitive identification).

Derrick Boone testified in relevant part that he learned about the plan to rob the Lupo Court apartment from Jackson and Little Bee just a day before the actual robbery and murders. Boone also testified, as Williamson had, that Jackson and Little Bee went into the apartment first and that Boone and Patterson followed right after them armed with long guns. As for the robbery, Boone testified that Patterson went through the house, that Little Bee kept leaving and coming back, and that Boone himself just stood by the door. Boone testified that Jackson had a handgun. Boone also testified that it was Jackson who told one of the male occupants to crawl over next to the other male occupant, that Jackson said he had to kill them because they knew his name, and that Jackson eventually shot each once in the back of the head through a couch cushion.

Several days after the murders, on the morning of Friday, March 28, 1997, police executed a search of Ivana King's apartment on Bancroft. Police arrested Jackson and eventually recovered several long guns from the apartment. (Warden's Rule 7 Supplemental Exhibits, Interview of Ivana King, ECF No. 24-1, at PageID 3586.) Several hours later, two detectives picked up King from her mother's nearby apartment in an unmarked car and took King to sheriff's headquarters to get her statement. In her statement, King said, among other

things, that Jackson, Boone, and several other men left her apartment on the evening of Monday, March 24, 1997, and that Jackson and Boone did not return until 5:00 or 6:00 am on Tuesday, March 25, 1997. She stated that she did not know where Jackson was during those hours, but that when Jackson did return to the apartment on March 25th, he told her that he had "done two people." (*Id*., at PageID 3583, 3585, 3587.)

King testified at Jackson's trial that the apartment on Bancroft where she lived was in her name, and that Jackson, a few of his children, a few of her children, and the baby they shared together had been staying at the apartment for a few weeks before the murders. She testified that Boone also began staying with them a few nights a week, and that he kept some belongings there and had a key. She also testified about a telephone call that Jackson made to her just a week or so before her testimony in what she perceived to be his asking her to change the statement she had made to police when they questioned her at headquarters after the search and that Jackson threatened to say that she had been involved in the crimes if she did not change her statement. Specifically, she testified that Jackson wanted her to testify that he had been home with her on the evening of the murders. She also testified that she did not know anything about the guns that police found during their search of her Bancroft apartment. With respect to the statement that she had made to police about Jackson telling her that he had "done two people," King confirmed that even though she had heard the tape of her statement and had read the transcript of the statement, she denied when asked during her testimony having any recollection about Jackson having made that statement. King also testified that when one of the detectives who picked her up to give her statement said "I hope you have someone to watch your kids," she took that to mean that they were "going to keep" her if she "didn't say anything." (Transcript, King

8

testimony, ECF No. 15-2, at PageID 2189.)

      **B.**    **The *Brady* and *Napue* Evidence**

Jackson argues that the prosecution violated his due process rights, as set forth in *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose material, exculpatory evidence.  Jackson also argues that his rights to due process and a fair trial, as set forth in *Napue v. Illinois*, 360 U.S. 264 (1959), were violated when the prosecution presented the false testimony of Ivana King that Jackson had told her, when he returned home the morning after the murders, that he had "done two people."

Here, Jackson offers two pieces of *Brady* evidence and one piece of *Napue* evidence. The first piece of *Brady* evidence consists of police reports demonstrating that <u>both</u> female witnesses (not just Nikki Long) who were in the apartment at the time of the robbery and murders gave consistent descriptions of one of the perpetrators as being 5'4" or 5'5" in height, a description which Jackson argues is consistent with Little Bee and inconsistent with Jackson (Petition, ECF No. 1-2, at PageID 68-69, referencing 3/25/97 progress report by T.A. Shepard, ECF No. 24-1, at PageID 3287 and 3/26/97 Progress of Investigation by Detective Scott, ECF No. 24-1, at PageID 3288).  Jackson's explanation for why suppressed reports in which Rebecca Lewis expressly stated *5'4" or 5'5"* as the height of one of the perpetrators [the one who struck Lewis in the head with a handgun and most likely the shooter] are exculpatory is because without the withheld reports, defense counsel was aware only that each of the victims referred to the shooter as short, and compared to his co-defendants [Boone and Patterson] who were each 6'0" or taller Jackson certainly could be considered short.  (Petition, ECF No. 1-2, at PageID 68.)  But with the revelation that Lewis initially identified the perpetrator singled out as the shooter as

9

being 5'4", as Long also did, Jackson reasons that "[t]he prosecution knew that 'short' did not mean 5'9" in relation to 6'0" and carefully concealed that information from the defense and the jury." (*Id.*, at PageID 68-69.)

The second piece of *Brady* evidence that Jackson offers is a police report detailing an upstairs neighbor's (Lisa Flewellen) account that the gunshots rang out immediately after a young man exited an idling car and entered the apartment below. Jackson argues that this evidence is exculpatory because it is consistent with Malaika Williamson's testimony that she heard gunshots from the apartment immediately after Little Bee left her car and went toward/into the apartment (Petition, ECF No. 1-2, at PageID 72, referencing ECF No. 24-1, at PageID 3570, 3570).

The *Napue* evidence, according to Jackson, is a declaration by Ivana King, obtained by habeas counsel on September 26, 2015, while preparing for Jackson's clemency hearing. (Petition, ECF No. 1-2, at PageID 73, referencing Declaration, ECF No. 24-1, at PageID 3701-04.) In that declaration, King testified in relevant part that Jackson had never said to her that he "done two people." She also described in more detail than her trial testimony how she felt coerced by police to tell them what they wanted to hear (essentially to incriminate Jackson).

## C.    Analysis

As a preliminary matter, and as mentioned at the beginning of this decision, it is important to clarify what is presently before the Court and what is not. This motion presents a dual request:  (1) to hold a hearing to hear the testimony of Ivana King (Motion, ECF No. 35, at PageID 3899); and (2) to resolve factual disputes underlying Jackson's *Brady* claim on the basis of the arguments presented herein and the documents made a part of the record by the parties (*Id.*

10

at PageID 3900).[5]  The first is a request suitable for a motion for an evidentiary hearing and is thus properly before the Court.  The latter requests merits-related rulings and is thus premature.

The Warden argues (and Jackson essentially concedes) that Jackson is *not* requesting an evidentiary hearing on his *Brady* claim, only on his *Napue* claim.  (Opposition, ECF No. 37, at PageID 3932, 3933; Reply, ECF No. 39, at PageID 3957.)  And yet Jackson and the Warden argue extensively about the merits of Jackson's *Brady* claim.  According to Jackson, this is because "[t]he Sixth Circuit Court of Appeals authorized this successor petition premised upon evidence from both Jackson's *Brady* and *Napue* claims."  (Motion, ECF No. 35, at PageID 3907.)  Jackson continues:

> The question before this Court is whether all the *Brady* and *Napue* evidence considered together along with "the facts underlying the claim" – that is, the alleged *Brady* violation in failing to turn over evidence that "Little Bee" was shorter than Jackson, plus, the upstairs neighbor's statement that corroborated Malaika's trial testimony that the shots were heard immediately upon "Little Bee" re-entering the apartment, plus the evidence of Ivana's intimidation, "if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense" under § 2244(b)(2)(B)(ii).  The remaining question is whether as a factual matter the weight to be given this exculpatory evidence that "Little Bee" was [the] short guy referenced throughout the police investigation as the killer is offset by the State's argument that Jackson allegedly confessed to Ivana King.  It is in part to address this argument that this evidentiary hearing is requested.

(Motion, ECF No. 35, at PageID 3909.)  Jackson's argument is understandable, in view of the Sixth Circuit's premise for authorizing this successive petition.  It is nonetheless premature.

---

[5]  Those documents are:  ECF No. 1-3 (affidavits of three trial jurors and one trial counsel); ECF No. 15 (transcript of Jackson's 1998 trial); ECF No. 21 (pleadings from Jackson's successive state postconviction proceedings); ECF No. 24 (the Warden's supplement to the record); ECF No. 29 (Jackson's supplement to the record); and ECF No. 36 (Jackson's second supplement to the record).

It is beyond dispute that the Sixth Circuit authorized the instant successive petition premised upon evidence from both the *Brady* and *Napue* claims.  But at issue before the Court is only whether the Court should exercise its discretion to hold an evidentiary hearing.  And the only claim upon which Jackson has requested an evidentiary hearing is his *Napue* claim.  With respect to Jackson's contention  that "[t]his evidentiary hearing is similarly a request to resolve factual issues that support Jackson's assertion that 'the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense,' " (Motion, ECF No. 35, at PageID 3900 (quoting 28 U.S.C. § 2244(b)(2)(B) and 28 U.S.C. § 2233(b)(3)(C)), that determination is not yet before the Court.  In the interests of avoiding piecemeal substantive rulings, it is the preference and practice of this Court to make all merits and merits-related rulings in a single decision.  Thus, whether or to what extent the instant request for a hearing, and the arguments presented herein about the disputed aspects of Jackson's *Brady* claim independent of Ivana King's proffered testimony, would satisfy the § 2244 gateway standards is a determination this Court will make in its decision addressing the merits**.**

Turning to the question before the Court, Jackson asks the Court to hold an evidentiary hearing "to allow this court to assess the credibility of the State's key witness, Ivana King." (Motion, ECF No. 35, at PageID 3903.)  *Napue v. Illinois* involved a witness falsely testifying that the prosecution had not promised him anything in return for his trial testimony and the prosecutor, knowing that to be false, failing to correct the testimony.  The Sixth Circuit has developed a three-part test for determining if the prosecution has committed a *Napue* violation:

12

> The knowing use of false or perjured testimony constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. In order to establish prosecutorial misconduct or denial of due process, the defendants must show (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false. The burden is on the defendants to show that the testimony was actually perjured, and mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony. *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998) (quoting *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989)).

*Brooks v. Tennessee*, 626 F.3d 878, 894-95 (6th Cir. 2010) (cleaned up).

According to Jackson, the Warden's position in opposing Jackson's request for habeas relief is "that Jackson's conviction can simply rest on the testimony of his co-defendants, and Ivana King." (Motion, ECF No. 35, at PageID 3912 (citing Return of Writ, ECF No.27, at PageID 3731).)  But as Jackson notes, the Sixth Circuit, in authorizing this successive petition, questioned whether, considering the withheld evidence *and* the record as a whole, the evidence offered by co-defendants Boone and Williamson, *without more*, could support Jackson's conviction and death sentence.  (Motion, ECF No. 35, at PageID 3913 (citing *In re Jackson*, 12 F.4th at 610).)  It is that assessment by the Sixth Circuit, according to Jackson, that elevates the importance of Ivana King's testimony.  (Motion, ECF No. 35, at PageID 3913.)

*First*, when Ivana King was interviewed by police on March 28, 1997, she stated that Jackson told her the day after the murders that he had "done two people" (Warden's Rule 7 Supplemental Exhibits, ECF No. 24-1, at PageID 3706, 3708), which she took to mean that he had killed two people.  *Next*, when Ivana King testified at Jackson's trial one year later, she confirmed that she had made that statement to police in 1997, but did not at the time of her testimony have an independent recollection of Jackson telling her he had "done two people." (Transcript, King testimony, ECF No. 15-2, at PageID 2167-69.)  She also described on cross-

13

examination how she felt intimidated or threatened by police when they interviewed her because of statements that they had made hoping she had someone to watch her children.  (*Id.* PageID 2188-90.)  *Then*, Ivana King stated in her 2015 declaration, among other things, that "Kareem Jackson never told me he 'done two people,' or killed two people."  (Warden's Rule 7 Supplemental Exhibits, ECF No. 24-1, at PageID 3703.)  Her four-page declaration is also replete with examples and explanations for why she felt coerced by police to tell "them what they wanted to hear***."  (*Id.*, at PageID 3701-04.)  In view of these variations regarding a statement that the Sixth Circuit characterized as "quite incriminating evidence," *In re Jackson*, 12 F.4th at 611, the question before the Court is whether Ivana King's testimony, and attendant assessment of her credibility, would assist the Court in determining whether Jackson can meet the three elements of a *Napue* claim, (and eventually, whether Jackson can satisfy the gateway requirements for avoiding dismissal of his successive *Napue* and *Brady* claims).  The Court believes that it would.

**(1)  *Napue***

       *a. Actually False*

The first element of a *Napue* claim requires proof that the statement/testimony at issue was actually false.  " 'The burden is on the defendants to show that the testimony was actually perjured, and mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony.' "  *Coe*, 161 F.3d at 343 (quoting *Lochmondy*, 890 F.2d at 822).  That is, a petitioner must demonstrate that the statement in question was "indisputably false," not just misleading or inconsistent.  *Lochmondy*, 890 F.2d at 823; *see also Rosencrantz v. Lafler*, 568 F.3d 577, 585-86 (6th Cir. 2009) (citing *Coe*, 161 F.3d at 343.).

The Warden argues that "fatal ambiguity remains as to whether King's trial testimony about what Jackson said to her is actually false." (Opposition, ECF No. 37, at PageID 3951.) The Warden reasons that nowhere in her 2015 declaration did King describe or explain what police coercion prompted her statement that Jackson told her he had "done two people." (*Id*. at PageID 3951-52.) To that point, the Warden asserts that the police had no leverage over King and exerted no coercion, and that King denied during her trial testimony any improper police coercion. (*Id*. at PageID 3939-42, 3950, 3953.) The Warden questions the reliability of a recantation made in 2015, eighteen years after the crime, vis-à-vis her recorded statement to police three days after the crime. (*Id*. at PageID 3952.) Finally, the Warden argues that King in her 2015 declaration did *not* recant her testimony that Jackson had threatened her before trial to change her statement to police and to provide him with an alibi for the night of the murders.

King's testimony goes directly to the "indisputably false" element of *Napue*. With respect to the Warden's argument about "fatal" ambiguities in her declaration, that is a reason for, not against, holding an evidentiary hearing. As for the Warden's argument that King denied any improper coercion during her trial testimony, and did not explain in her 2015 declaration what police coercion compelled her to make her "done two people" statement, the Court notes *first* that police coercion is not an element of a *Napue* violation, and *second* that King did testify on cross-examination that she felt threatened when the officer stated that he hoped she had someone to watch her children, that she was not permitted to call anyone until the interview was over, and that she did not accompany police to headquarters of her own free will. (Transcript, King testimony, ECF No. 15-2, at PageID 2188-90.) Finally, the Warden notes that King did not recant her testimony about Jackson threatening her to change her statement and provide him with

15

an alibi. But that is not the testimony that the Sixth Circuit characterized as "quite incriminating" or that the prosecution emphasized during rebuttal closing arguments. "In making the determination of whether an evidentiary hearing is necessary under Rule 8, courts focus on whether a new evidentiary hearing would be meaningful, in that a new hearing would have the potential to advance the petitioner's claim." *Sock v. Trombley*, Case No.05-cv-70379-DT, 2006 WL 2711506, at *28 (E.D. Mich. Sep. 20, 2006) (cleaned up). Here, again, *Clark v. Warden*, 934 F.3d 483 is instructive.

In *Clark*, the Sixth Circuit remanded the grant of a successive petition for the district court to hold an evidentiary hearing. At issue was whether police had suppressed an eyewitness account identifying a person other than the petitioner as the murderer. *Id.*, at 489, 494. The eyewitness, Kaneka Jackson, stated in her affidavit that she had told her detective father what she had seen but that he had told her not to tell anyone because he would take care of the situation. The Sixth Circuit explained why an evidentiary hearing was necessary to determine whether the petitioner's *Brady* claim could succeed:

> In many *Brady* cases, suppression is not contested at all—often because police or prosecutors later produced the exculpatory information. (citations omitted). But on these unusual facts, the only evidence that the police knew about Jackson's identification is her statement that she told her father, "an Inkster detective," about "the chain of events that [she] witnessed.: If Jackson did not tell her father what she saw, then the State could not have suppressed her evidence. Jackson's credibility is therefore critically important as to this second element. The commonly accepted method to determine whether a witness is telling the truth is to hold an evidentiary hearing. (citation omitted).

*Id*. at 493.

Here, as in *Clark*, King, (and arguably only King), can resolve the ambiguities that the Warden suggests are fatal to the "actually false" element of a *Napue* violation. Only Ms. King

16

and Jackson were present when Jackson allegedly told King that he had "done two people."  The Warden does not suggest, and it is not otherwise apparent to the Court, that any other direct evidence exists to prove or disprove whether Jackson made that statement to King.  The Court recognizes that recanting testimony is inherently suspect, and can be further undercut by other factors such as the passage of time between the original statement and the recanting statement or evidence of bias.  *See, e.g., Woods v. Booker*, 450 Fed. App'x 480, 487 (6th Cir. 2011) ("The recanting testimony is further discredited by the time that elapsed between Kemp's trial testimony and his recanting testimony, and the possibility that he may have received money transfers in exchange for his testimony.")  But in the instant case, King's testimony provides the only hope of resolving whether Jackson told King he had "done two people" or not.

    *b.  Materiality*

    A false statement or testimony gives rise to a *Napue* violation only if it is material.  "A false statement is material under this standard, and "[a] new trial is required[,] if the false testimony could in any reasonable likelihood have affected the judgment of the jury."  *Brooks*, 626 F.3d at 895 (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)).

    The Warden argues that Jackson did not address this materiality element.  (Opposition, ECF No. 37, at PageID 3952.)  As with the "actually false" element, the Warden appears to suggest that King's declaration is not material not only because of ambiguities in her recantation, as well as the inherent suspicion with which recantations are generally reviewed, but also because she did not recant her testimony about the telephone call during which Jackson threatened her to change her statement to police and provide him with an alibi.  As noted above,

17

however, this is not the part of King's testimony that the Sixth Circuit characterized as "quite incriminating" or that the prosecution emphasized during culpability-phase closing arguments.

There are several indicators that King's "done two people" statement was reasonably likely to have affected the judgment of the jury. Defense counsel and the prosecution clearly regarded King's "done two people" statement as important. Defense counsel spent a notable portion of their closing arguments trying to sow doubt in the jurors' minds about the veracity of King's "done two people" statement:

> [by Brian Rigg]: Ivana King, Kareem's girlfriend. She was taken down to police headquarters not willingly but by an undercover police officer, I believe she testified. She told the police that Kareem Jackson came home that night or earlier that morning, I just did two people. For somebody that would come in here and testify that I'm in love with Mr. Jackson to say something like this to the police department doesn't make any sense.

> Why would somebody who cares a lot for somebody go in and say that he confessed to me that he killed two people? It doesn't make any sense. Why would she say something like that? Whether she was intimidated by police, I think she indicated that they were saying, you know, you better find somebody to take care of your kids. You will be down here for a long time. I don't know the reason for that.

> We'll submit that Mr. Jackson was stupid by contacting her on the phone, they were upset, this trial is going on, he's been locked up. My interpretation of what was said to him, again, you heard what she said, but tell them the truth, tell them, you know, where I was that night. That's what he was trying to get across to her. She was scared. She was in here crying. She didn't want to testify. But it just doesn't make any sense.

> It's not like, you know, hi, honey, I'm home. Or hi, honey, I just killed two people. It doesn't make any sense that Mr. Jackson would confide with his girlfriend about doing something like this. You would think if something like this was going to be said, he would say something to his best friend or something of that nature, but not to his girlfriend.

(Transcript, Defense closing, ECF No. 15-2, at PageID 2440-41.) The prosecution's response to this argument evinces how important the state regarded King's statement. They devoted the final

18

four pages of their rebuttal closing argument to King's statement, (even coming close to the line

of improperly vouching for her credibility):

> [by Doug Stead]: But the final piece of this puzzle to think about is Ivana, Ivana King, because Ivana King was not a participant in this case. She didn't get any deals. Ivana King is a young lady, you know, who is living on her own basically trying to support a number of children, and she's in love with that man. She was in love with him back then, and she's still in love with him today.

> Mr. Rigg says, why would Ivana go in and say those things to the police that night? It must have been because the police threatened her or coerced her to do it. I have a different option for you to consider. You think about it. Perhaps it is because she's honest. Anybody ever think about that? Perhaps when she was questioned by the police she told them the truth because she didn't do anything wrong, and she's not going to lie to protect someone, even if she loves them.

> Try honesty as an explanation for why she would have said those things that night. He told me he done two people, killed two people. When did that conversation come up? It just wasn't casually out of the blue. It was when the composites came up on the screen, that looks like Red. Sh, Sh. Get on the phone, call Derrick now. Why? Why such behavior from an innocent man?

> Why would Ivana say that. I mean, she knew at that point the guns were recovered from her house, she knew at that point Derrick was staying there. Why would she not say Derrick told me he done two people and protect her lover? Unless we go back to the simple solution, perhaps she's an honest woman. Is that so hard to accept?

> It was stipulated between the parties on January 7 of this year during the jury selection process the state provided to the defense Ivana King's transcript. They had on paper her statements saying he done two people. And lo and behold, five days later on January 12th, she gets a phone call. She gets a threatening phone call. A phone call where she tells you she was asked by this man to come in and change her story and make something up and give him an alibi for where he was that night.

> Even though back on March 28th she told the Sheriff's Department Kareem and Derrick and Williamson and another guy left about 6:00 that night and I didn't see Kareem until 6:00 o'clock the next morning. They have got that statement, and he's aware of it, and he knows how important it is. He can't have it come into evidence. So he resorts to threats against her. Tell them the truth. Tell them the truth. She told you what that meant. He wasn't wanting the truth.

19

He was wanting the truth per Kareem.  She told you that the instructions about telling the truth from this man was different than she got from the State of Ohio.

Ladies and Gentlemen, on January 12th, this man proved to you that he knew that he had told her that he had done two people, and that that evidence in its overwhelming and powerful nature, considering who it was coming from at the time it was said, would convict him in and of itself.  And he did his best to get rid of it and it didn't work.  And I ask you not to forget it.

(Transcript, Prosecution rebuttal closing, ECF No. 15-2, at PageID 2459-62.)

The Honorable Gregory L. Frost, in dismissing Jackson's initial habeas corpus action, recognized the importance of King's "done two people" statement.  (*See, e.g.*, Case No. 2:03-cv-903, Opinion and Order, ECF No. 56, at PageID 759 ("The prosecution presented other competent evidence—namely, testimony by accomplices Malaika Williamson and Derrick Boone—establishing that Petitioner was in the apartment and armed with a handgun. *Additionally, the prosecution presented testimony by Ivana King recounting that Petitioner had told her shortly after the incident that 'he had done two people'* (Tr. Vo. IX, at 122-23) and that Petitioner had asked her shortly before his trial to concoct an alibi for him (Tr. Vol. IX, at 131).") (emphasis added).)  The Sixth Circuit at a minimum found prima facie evidence of materiality as to King's statement.

*Napue* claims also have a prejudice-like prong in that "a new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the jury."  *Carter v. Mitchell*, 443 F.3d 517, 535 (6th Cir. 2006) (cleaned up). This threshold can be met when the knowingly misleading testimony is offered by a "key prosecution witness."  *Id*.  That is the case here, where King testified[6] that Jackson told her "he had done two people," which we previously described as "quite incriminating evidence."  *Jackson*, 681 F.3d at 763.

---

[6]  The Court reiterates that while King confirmed during her trial testimony that she had made the "done two people" statement to police when they interviewed her, she did not actually testify from independent recollection that Jackson had made that statement to her.  (Transcript, King testimony, ECF No. 15-2, at PageID 2167-69.)

*In re Jackson*, 12 F.4th at 611.

The foregoing is sufficient to establish that Ivana King's taped statement to police in 1997, as admitted to but not independently confirmed during her 1998 trial testimony, could in any reasonable likelihood have affected the judgment of the jury sufficient to establish its materiality.[7]

### c. Prosecutor's Knowledge

The third essential element of a *Napue* violation requires proof that the prosecution actually knew that the statement/testimony at issue was false. Absent direct evidence of the prosecutor's knowledge, courts have considered reasonable inferences of the prosecutor's knowledge, *see, e.g., Woods*, 450 Fed. App'x at 486-87 (considering but rejecting a witness's changed story over the course of case as sufficient proof that the prosecutor must have known the witness's trial testimony was false); knowledge of the investigative team, *see, e.g., Pouncy v. Macauley*, 546 F. Supp. 3d 565, 614 (E.D. Mich. 2021) ("This [*Napue*] claim fails because Pouncy failed to demonstrate that anyone on the prosecution team **or the investigative team** knew that Detective Gagliardi's testimony was false." (emphasis added)); and even a "knew or

---

[7]  The Court is aware that the last state court to address Jackson's *Brady* and *Napue* claims, the state appellate court in Jackson's successor postconviction proceedings, found that even if those claims were proven, they would not have implicated the other evidence identifying Jackson as the shooter and thus failed to establish that no reasonable factfinder could have found Jackson guilty if the errors had not occurred. (State Successor Proceedings pleadings, Appellate Court decision, ECF No. 21-1, at PageID 3048-49.) However, since the state courts rejected Jackson's successor petition on procedural grounds (failure to satisfy the statutory standard for filing a successive postconviction action), and not on the merits, the state court adjudication is not one to which this Court must defer. *See Clark v. Warden*, 934 F.3d at 491. And while the enforcement of a state procedural bar would normally invoke procedural default, that presents no barrier here because the Warden did not raise procedural default and thus waived that defense.

should have known" standard to establish knowledge, *see, e.g., Macleod v. Braman*, Case No. 2:

19-cv-12153, 2020 WL 5258478, at *27 (E.D. Mich. Sep. 3, 2020) ("To prevail on a claim that a

conviction was obtained by evidence that the government knew *or should have known* to be

false, a defendant must show that the statements were actually false, that the statements were

material, and that the prosecutor knew they were false." (emphasis added)).

The Warden emphasizes that Jackson never mentions the knowledge of the prosecution

(ECF No. 37, at PageID 3952-53.)[8]  But this is another reason in favor of, not against, holding an

evidentiary hearing.  While there may be other more direct, credible evidence to satisfy this

element, such as an affidavit or testimony by the prosecution or other law enforcement, Ms. King

can, at a minimum, be questioned about whether or to what extent she imparted to the

prosecution that she lied when she said that Jackson told her that he had "done two people," as

she had claimed during her taped interview with police (but could not confirm from independent

recollection during her trial testimony).  *See, e.g., Rosencrantz*, 568 F.3d at 587 (relying on a

witness's testimony at an evidentiary hearing as to what she told the police and/or prosecutor as

evidence of whether the prosecutor actually knew that testimony was false).

**(2)  § 2244(b)(2) Evidence as a Whole**

In view of the fact that the Court will be tasked with assessing not just the merits of

Jackson's claims, but also whether he can satisfy the gateway requirements set forth in 28 U.S.C.

§ 2244(b)(2) for a successive claim to avoid dismissal, it is important to take those gateway

---

[8]  Jackson actually stated in his Petition the falsity of King's statement and its resulting
from strong police coercion "was known to the State."  (Petition, ECF No. 1-2, at PageID 79.)  In
support, he cites only to King's 2015 declaration.  Nowhere in King's declaration does she state
or suggest that she told police or the prosecution that her "done two people" statement was false.

requirements into account when considering whether to hold the evidentiary hearing that Jackson requests.[9]  That said, as noted earlier, the Court will stop short of making any merits-related rulings and ask only whether an evidentiary hearing to assess Ivana King's credibility would be meaningful to the § 2244(b)(2) gateway determination.

The question before the Court, as framed by the Sixth Circuit in *Clark v. Warden*, is whether Ivana King's recantation, " 'if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.' "  *Clark*, 934 F.3d at 495 (quoting 28 U.S.C. § 2244(b)(2)(B)(ii)).  This "evidence as a whole" analysis sets up as follows:  If Ivana King's declaration and proffered testimony about Jackson's never having said he had "done two people," is proven, would the evidence as a whole – Ivana King's recantation, the *Brady* evidence, and the trial evidence – be sufficient to support Jackson's conviction and death sentence.

The Court begins by recapping "the evidence as a whole."  *Clark*, 934 F.3d at 495-96.  *First*, there is the testimony of Jackson's accomplices, Derrick Boone and Malaika Williamson.  Boone and Williamson explained the planning of, and their roles in, the robbery, and Boone identified Jackson as the lone shooter.  *Second*, Nikki Long and Becky Lewis identified Jackson as one of the two men who first entered the apartment to purchase marijuana, and as one of the men who subsequently entered to rob the occupants who was armed with a handgun and who

---

[9]  In his motion, Jackson suggests that § 2244's gateway standards must be satisfied *before* his *Brady* and *Napue* claims can be adjudicated.  (Motion, ECF No. 35, at PageID 3900.)  But Jackson does not cite any authority establishing the order in which those determinations must be made.  And the Court notes that in *Clark v. Warden*, 934 F.3d 604, the Sixth Circuit first addressed the petitioner's *Brady* claim and then addressed § 2244's gateway standards.

struck Lewis in the head with the handgun.  Because both victims were killed with a handgun, the prosecution's theory was that the perpetrator armed with a handgun was the shooter.  *Finally*, the handgun identified as having fired the bullet that definitively killed one of the victims and the bullet that probably killed the other victim (the bullet was too mangled for definitive identification) was recovered from a closet in Malaika Williamson's apartment where Malaika testified she saw Jackson put the handgun after leaving the scene of the murders.

Against this evidence, Jackson presents Ivana King's 2015 declaration and proffered evidentiary hearing testimony recanting her statement/testimony that Jackson had told her on the morning following the murders that he had "done two people," (as well as the *Brady* evidence, the disputed aspects of which are not presently before the Court).

The question is thus whether Jackson could be convicted of capital murder on the basis of the evidence uncontroverted by Ivana King's recantation, (and whether an evidentiary hearing to assess King's credibility would assist in answering that question).  *Clark*, 934 F.3d at 496 (citing *Keith v. Bobby*, 551 F.3d 555, 559 (6th Cir. 2009)).  With respect to Boone's and Williamson's testimony detailing the planning of the robbery, identifying Jackson as the lone shooter, and linking the probable murder weapon to Jackson, the Sixth Circuit questioned whether the testimony of accomplices, with motive to lie, without more, could support Jackson's conviction and death sentence.  *In re Jackson*, 12 F.4th at 610 (citing *House v. Bell*, 547 U.S. 518, 552 (2006)).  Although Long's and Lewis's identification testimony appears uncontroverted by Ivana King's recantation, (and expressing no opinion at this juncture about whether their testimony might be undercut by Jackson's *Brady* claim), it bears reminding that neither of the girls witnessed the shootings or, strictly speaking, identified "the shooter."  In view of *possible*

24

fallibilities in each category of evidence in "the balance of the evidence," the Court is convinced that an evidentiary hearing to assess Ivana King's credibility is warranted.

**(3) Due Diligence and Discretion**

With respect to the "due diligence" component constricting when a district court may hold an evidentiary hearing, the Sixth Circuit in *Clark v. Warden* reminded that "due diligence" is not "maximum feasible diligence." 934 F.3d at 495 (citing *In re Wogenstahl*, 902 F.3d 621, 629 (6th Cir. 2018)). In its decision authorizing this successive habeas petition, the Sixth Circuit concluded that Jackson had made a prima facie showing that the witness statements at issue, as well as Ivana King's 2015 declaration, could not have been discovered earlier through the exercise of due diligence. *In re Jackson*, 12 F.4th at 609. Counsel for Jackson state that they obtained Ivana King's declaration on September 26, 2015, while preparing for Jackson's anticipated clemency hearing. (Motion, ECF No. 35, at PageID 3903.) Although Jackson did not file his successive postconviction action in the state trial court until a year later, on November 14, 2016 (State Successor Postconviction pleadings, ECF No. 21-1, at PageID 2846), that does not strike this Court as unreasonable in view of the fact that, after obtaining Ivana King's affidavit in September, 2015, Jackson embarked on a period of collecting public records from various agencies. (*Id.*, at PageID 2845-46.) And the fact that the trial court abruptly reversed course on holding an evidentiary hearing on Jackson's successive postconviction action appears to be attributable not to Jackson and his current counsel, but to actions on the part of Jackson's state public defender counsel that the trial court perceived to be dilatory. (Motion, ECF No. 35, at PageID 3905 n.1.) Moreover, the Warden does not credibly allege that Jackson

25

failed to exercise due diligence in discovering the factual bases underlying his *Napue* claim.[10]
The Court is satisfied that Jackson exercised due diligence in discovering the factual bases
underlying his *Napue* claim.

Once it is determined that an evidentiary hearing is *permitted* under § 2254(e)(2), then
the decision of whether an evidentiary hearing is *necessary* is within the discretion of the district
court. As noted above, in determining whether an evidentiary hearing is necessary under Rule 8,
courts should ask whether a hearing would be meaningful by having the potential to advance the
petitioner's claim. *Sock v. Trombley*, 2006 WL 2711506, at *28. In *Clark v. Warden*, the Sixth
Circuit suggested that a district court's decision to <u>hold</u> and evidentiary hearing is viewed even
more deferentially than a decision to <u>deny</u> an evidentiary hearing. *Clark*, 934 F.3d at 494
(discussing *Sowell v. Bradshaw*, 372 F.3d 821, 830 (6th Cir. 2004) (reversing district court's
grant of habeas corpus relief but not district court's decision to hold evidentiary hearing)). This
Court is persuaded that it should exercise its discretion to hold the requested evidentiary hearing.

For the foregoing reasons, the Court concludes that Jackson has satisfied the
requirements for an evidentiary hearing to hear the testimony of Ivana King. The parties will be
directed to contact the Court's chambers to schedule a status conference for the purpose of
establishing a schedule for the hearing and any attendant briefing.

### IV. MOTION TO SUPPLEMENT

Jackson seeks to supplement his previous ECF No. 29 motion to supplement with a

---

[10] The Warden does note that defense counsel's investigator interviewed King a few
months before Jackson's trial (Return, ECF No. 27, at PageID 3726-27), but stops short of
asserting or even suggesting that King told the investigator that she lied about Jackson telling her
he had "done two people." The Warden also suggests that Jackson had had certain records
underlying his *Brady* claim before trial (*Id.*, at PageID 3723), but that is not germane to the

26

Search Warrant and Affidavit that was not included in the discovery that the state provided during Jackson's successor state postconviction proceedings and has not otherwise been made a part of the record before this Court. (Motion to Supplement, ECF No. 36, at PageID 3923.) Police sought the warrant to search Jackson's person while he was being detained in the Franklin County Jail for the murders. Germane to Jackson's request is the following language in the search warrant affidavit (sworn by Franklin County Sheriff's Office Detective Zachary Scott): "Left at the residence were two witnesses which were in the apartment at the time of the murders: Nikki Long and Becky Lewis. Both were transported to the Sheriff's Office Detective Bureau and interviewed. *Statements from both witnesses were believable and consistent.* The witnesses/victims stated that shortly after midnight two male blacks came to the apartment. Hunter let them in; *a large male black (later identified as Kareem Jackson) and a small male black (identified as Little B).* * * *" (ECF No. 36-1, at PageID 3928 (emphasis added).)

The Warden opposes Jackson's motion, arguing that "the document lends nothing of pertinence to these proceedings since Jackson has waived an evidentiary hearing on the *Brady* claim." (Opposition, ECF No. 38, at PageID 3955.)

Jackson counters that this exhibit is relevant not only to this Court's determination of whether an evidentiary hearing is warranted regarding his *Napue* claim, but also to the remainder of Jackson's petition and obligation to satisfy the gateway showing under 28 U.S.C. § 2244(b)(2)(B)(ii) for a successive claim to avoid dismissal. (Reply, ECF No. 40, at PageID 3974.) Jackson explains:

> The Affidavit represents that law enforcement swore out this search warrant affidavit indicating "Little Bee" was the short individual in relation to Jackson

---

diligence determination as to Jackson's *Napue* claim.

according to Rebecca Lewis and Nikki Long and documenting that the two witnesses provided "consistent" statements to law enforcement to that effect. (Doc. #35-1). The Affidavit undermines the theory of the case presented by the State to the jury that Jackson was the short guy described to law enforcement by Lewis and Long. As such, the Affidavit supports Ms. King's Declaration Under Penalty of Perjury that law enforcement intimidated her into telling them what they wanted to hear to support the State's narrative rather than the truth. * * *

\*\*\*

With the benefit of the withheld evidence, and in the absence of Ms. King's coerced testimony, no reasonable juror in Jackson's case would have found him the principal offender of this crime beyond a reasonable doubt and sentenced him to death. * * *

(*Id*.)

The proffered exhibit is cumulative to, and thus by definition consistent with, at least one other document before this Court characterizing Long's and Lewis's statements to law enforcement as "believable and consistent," and characterizing Jackson as a large male black and Little Bee as a smaller male black. (Warden's Rule 7 Supplemental Exhibits, "Criminal Investigation Summary," ECF No. 24-1, at PageID 3250-55.) The proffered exhibit thus meets Evid. R. 401's definition of "relevant." Without expressing any opinion as to the veracity of Jackson's arguments or the import of the proffered exhibit, the Court is satisfied that the Search Warrant and Affidavit satisfies Rule 7's relevancy requirement.

## V. CONCLUSION

For the foregoing reasons, Jackson's motions for an evidentiary hearing and to expand the record (ECF Nos. 35 and 36) are **GRANTED**. The parties are **DIRECTED**, within twenty-

one (21) days of the date of this Order, to contact the Court's chambers to schedule a status conference for the purpose of establishing a schedule for the hearing and any attendant briefing.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED:  March 27, 2013**