```
                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF OHIO
                         EASTERN DIVISION

KAREEM JACKSON,                    )
                                   )
  PETITIONER,                      )      CASE NO. 2:20-cv-3934
                                   )
        vs.                        )
                                   )
WARDEN, CHILLICOTHE CORRECTIONAL)
INSTITUTION,                       )
                                   )
  RESPONDENT.                      )
_____)
```

              TRANSCRIPT OF EVIDENTIARY HEARING PROCEEDINGS
                 BEFORE THE HONORABLE ALGENON L. MARBLEY
                      UNITED STATES DISTRICT JUDGE
                       JUNE 7, 2023; 9:30 A.M.
                          COLUMBUS, OHIO


     APPEARANCES:

     FOR THE PETITIONER:
          Office of the Federal Public Defender,
          Northern District of Ohio
          By:  Alan C. Rossman, Esq.
               Tiana S. Bohanon, Esq.
          1660 West Second Street, Suite 750
          Cleveland, Ohio  44113

     FOR THE RESPONDENT:
          Ohio Attorney General's Office
          Criminal Justice Section
          By:  Stephen E. Maher, Esq.
          30 East Broad Street
          Columbus, Ohio  43215




                              - - -


          Proceedings recorded by mechanical stenography,
     transcript produced by computer.

          SHAWNA J. EVANS, OFFICIAL FEDERAL COURT REPORTER
            85 MARCONI BOULEVARD, COLUMBUS, OHIO  43215
                          614-719-3316

                                                                    2

1                          WEDNESDAY MORNING SESSION

2                             JUNE 7, 2023

3                                - - -

4          THE COURT:  Good morning.

5             Ms. Stash, would you please call the case.

6          THE DEPUTY CLERK:  Case No. 2:20-cv-3934, Kareem

7    Jackson versus Warden Chillicothe Correctional Institution.

8          THE COURT:  Would counsel please identify themselves

9    for the record beginning with counsel for the petitioner.

10         MR. ROSSMAN:  Thank you, Judge.  My name is Alan

11   Rossman, R-o-s-s-m-a-n.  And sitting at counsel table is Tiana

12   Bohanon.

13            MS. BOHANON:  Good morning, Your Honor.

14         THE COURT:  Good morning, Ms. Bohanon.

15         MR. ROSSMAN:  And Ms. Donetta Bray.  They're both with

16   my office which is the Federal Public Defender's Office from

17   the Northern District of Ohio.

18         THE COURT:  Counsel for the warden.

19         MR. MAHER:  Stephen Maher with the Attorney General's

20   Office, counsel for the warden.

21         THE COURT:  We're here on the petitioner's -- pursuant

22   to the petitioner's motion for an evidentiary hearing that the

23   Court granted.  The petitioner has the burden of proof and the

24   burden of going forward.

25            Mr. Rossman, I ask you to begin with whatever opening

1    remarks you have which will be followed by Mr. Maher and

2    opening remarks on behalf of the warden.  I didn't ask when we

3    were in chambers, but is there a motion for a separation of

4    witnesses by either side?

5        MR. ROSSMAN:  Yes, Judge.

6        THE COURT:  Ms. Stash, are the witnesses presently all

7    separated?

8        Mr. Maher, are your witnesses or potential witnesses

9    here in court?

10        MR. MAHER:  Sitting outside, Your Honor.

11        THE COURT:  And they can either sit outside or they

12    can sit in my jury room if they would rather do that.  Do you

13    want to check with them?

14        Ms. Stash, would you accompany him so you can take them

15    to my jury room.

16        Mr. Rossman, I understand you only have Ms. King as a

17    witness.

18        MR. ROSSMAN:  That's correct.

19        THE COURT:  She can remain in.

20        Is Ms. King in the courtroom?

21        Mr. Maher, do you have any objection to Ms. King hearing

22    the opening statement?

23        MR. MAHER:  No, sir.

24        THE COURT:  Mr. Rossman, are you ready to proceed?

25        MR. ROSSMAN:  Yes, sir.

4

1          THE COURT:  Please proceed.

2          MR. ROSSMAN:  May it please the Court.  I speak for

3   myself, my client Mr. Jackson, for my very dedicated colleagues

4   who are at the table in thanking this Court for allowing us

5   this evidentiary hearing.  Since my office's appointment in

6   February of 2013 solely for the purposes of clemency at that

7   time as all litigation was over, we have managed six execution

8   dates that have come and gone.  And it was one month and one

9   day after our appointment that the state moved the Ohio Supreme

10  Court to set yet another date to execute Mr. Jackson.

11         If nothing else over the years, I would suggest that

12  this case has become a sad tale of officers clothed with the

13  awesome power of the state run amuck.

14         During closing argument at trial, Judge, the prosecutors

15  seeking death for Mr. Jackson implored the jurors to believe

16  Ivana King, that was even if they didn't believe the testimony

17  of the co-defendants whose testimony was admittedly laden with

18  credibility issues.

19         Ms. King, then a 22-year-old, unwed mother of four,

20  including a three-month old baby girl for whom she has always

21  said Mr. Jackson was a loving father, she had just testified

22  under oath that while she had no independent recollection of

23  Mr. Jackson ever having uttered that four-word confession,

24  "he'd done two people," she did tell law enforcement that.  She

25  said Mr. Jackson had said just that.  After all, they had it on

5

1   a tape recording that law enforcement had made, a taped

2   interview of less than five minutes that translated into

3   three-and-a-half pages of transcript, a tape recording they had

4   obtained from her at the detective bureau just this side of

5   eight o'clock at night on the day of Kareem Jackson's arrest at

6   her townhouse.

7        Ms. King is now 48 years old.  Amid some very

8   frustrating Public Records Act requests that led to our *Brady*

9   concerns, we tracked this gentle lady down as part of what we

10  believed to be a responsible investigation at the time

11  consistent with our clemency and ancillary responsibilities.

12       The 2015 declaration of Ms. King that we have provided

13  this Court and we have provided other courts, speaks for itself

14  and says what it says and explains in detail why she had no

15  independent recall.  The confession was never said.  She told

16  law enforcement what they wanted to hear.  She wanted to go

17  home to her babies.

18       In the seven-and-a-half years since then and throughout

19  what has admittedly been a somewhat tortured litigation

20  history, we have simply asked for some trier of fact, any trier

21  of fact, to listen to Ms. King's story, to listen to her

22  testimony as to all those declared statements and assertions

23  and assess her credibility.  And to that extent, we thank this

24  Court for its discretion in choosing to decide for itself what

25  to believe.  Thank you.

6

```
1              THE COURT:  Thank you.

2              MR. MAHER:  Your Honor, thank you.  Stephen Maher with

3    the attorney general's office.  By way of opening statement --

4              THE COURT:  Mr. Maher, I'm going to give Mr. Rossman

5    an opportunity to be seated, and you may approach the podium

6    and address the Court.

7              MR. MAHER:  Yes, sir.

8              THE COURT:  Mr. Maher.

9              MR. MAHER:  Yes, sir.  Thank you, Your Honor.  This is

10   an evidentiary hearing over a *Napue* claim which involves active

11   wrongdoing by the prosecutor in the presentation of false

12   evidence.  The warden's view of the existing evidence, what has

13   been produced to date, does not implicate any wrongdoing by the

14   prosecutors.  And on that basis, the warden would say by way of

15   opening statement that since this is a *Napue* claim, if, in

16   fact, there are allegations of wrongdoing of some sort by the

17   prosecutors, those would be the first -- this would be the

18   first time they've been revealed.  They're not in the record.

19          And that also implicates the warden's difficulty in

20   trying to determine what rebuttal witnesses may be produced

21   since, at least to the warden's position, we don't have

22   allegations of wrongdoing by either the prosecutors or the

23   detectives, from the warden's view.  So that's my opening

24   statement, Your Honor.

25             THE COURT:  Thank you.  Thank you much, Mr. Maher.
```

7

1        Mr. Rossman, are you ready to proceed?

2            MR. ROSSMAN:  Yes, sir, we are.

3            THE COURT:  Would you call your first witness, please.

4            MR. ROSSMAN:  Thank you.  We would call to the stand

5    Ms. Ivana King.

6            THE COURT:  Ms. King, please come forward and be

7    sworn.

8        (Witness sworn.)

9            THE COURT:  Ms. King, would you bend the microphone

10   toward you and speak clearly into it, please.

11       Mr. Rossman, please proceed.

12                          - - -

13                       IVANA KING

14    Called as a witness on behalf of the Petitioner, being first

15   duly sworn, testified as follows:

16                   DIRECT EXAMINATION

17    BY MR. ROSSMAN:

18    Q.   Good morning, Ms. King.  Would you please state your

19   name, spell your name for the record.

20    A.   It's Ivana King, I-v-a-n-a.  Last name is King, K-i-n-g.

21    Q.   And Ms. King, what city do you currently reside in?

22    A.   Columbus.

23    Q.   Are you here today under subpoena?

24    A.   Yes.

25    Q.   Are you aware of who issued that subpoena for your

8

1   appearance today?

2   A.   Yes.

3   Q.   Who did?

4   A.   Alan Rossman.

5   Q.   Me?

6   A.   Yes.

7   Q.   You're aware, are you not, that I'm a federal public

8   defender who represents Kareem Jackson?

9   A.   Yes.

10   Q.   Is it fair to say that you are testifying under oath

11   today in response to that subpoena?

12   A.   Yes.

13   Q.   Ms. King, how old are you?

14   A.   Forty-eight.

15   Q.   We're here in general to talk about events in

16   March 1997.  How old were you back then?

17   A.   Twenty-two.

18   Q.   Are you married now?

19   A.   No.

20   Q.   Were you married then?

21   A.   No.

22   Q.   Do you have children, Ms. King?

23   A.   Yes.

24   Q.   Can you tell us their current ages?

25   A.   Thirty-two, 30, 29, 26 and 21.

9

1 Q. Can you tell the Court how old those children were back

2 in March of 1997?

3 A. '97 -- 6, 4, 3, and then a newborn, or three months.

4 Q. Do you know Mr. Kareem Jackson?

5 A. Yes.

6 Q. Ms. King, tell the Court approximately how long you've

7 known Kareem Jackson.

8 A. Thirty years.

9 Q. Has it been a long 30 years?

10 A. A very long 30 years.

11 Q. Is Mr. Jackson the father of any of those children?

12 A. Yes.

13 Q. And what is that child's name?

14 A. Kyanna, K-y-a-n-n-a.

15 Q. And back in March of 1997, how old was Kyanna?

16 A. Four months.

17 Q. Ms. King, are you in regular contact with Mr. Jackson

18 today?

19 A. Yes.

20 Q. And can you tell us approximately how frequently you

21 speak with Mr. Jackson?

22 A. About three times a week.

23 Q. Mr. Jackson has been in prison since March of '97; is

24 that correct?

25 A. Yes.

1    Q.   Can you tell us generally -- tell the Court generally

2    why you maintain contact with Mr. Jackson?

3    A.   When he first went to prison, I was in love.  And, yes,

4    I remained there with him.  We had an altercation, an argument,

5    at Mansfield prison when my daughter was two; so we stopped

6    talking for seven years.  His mother asked to take my daughter

7    to the prison, and that is how -- that is how my daughter

8    started seeing him.  Once his mother passed, I started taking

9    my daughter to see him on a regular basis and which is where we

10   came to be in contact.

11   Q.   So you maintained the relationship with Mr. Jackson

12   because you have a child by him and you wanted the child to

13   know?

14   A.   Yes.

15        THE COURT:  Just a second, Mr. Rossman.  I want you to

16   rephrase that question.

17   BY MR. ROSSMAN:

18   Q.   So Mr. Jackson is the father of your daughter?

19   A.   Yes.

20   Q.   As a father, does that have any bearing on the reasons

21   why you maintained your relationship with him?

22   A.   I wanted my child to know her father because I believe

23   regardless of where he's at and what he's ever done in his

24   life, she has one and she needs to know that's her father and

25   no one else's.

11

1    Q.    How would you describe your relationship with

2    Mr. Jackson today?

3    A.    We're friends.  We don't coparent because my child is

4    grown.  But we're friends and we can maintain a decent

5    conversation.

6    Q.    Ms. King, are you currently employed?

7    A.    Yes.

8    Q.    Can you tell the Court where you're employed and what

9    your job responsibilities are?

10   A.    I'm employed for Columbus Ohio Transit Authority.  We

11   are responsible for safe and reliable and courteous

12   transportation to and from wherever you are going and to be

13   knowledgeable of information of the city.

14   Q.    If you were not subpoenaed to be present in court today,

15   would you typically be at work today?

16   A.    Yes.

17   Q.    Can you take a moment and briefly describe your job

18   history for the Court throughout the last few years?

19   A.    The last few years I've been -- for 12 years I worked at

20   Walmart as well as other jobs in between; KNG.  I've been at

21   the Columbus City School Board.  I worked for Aspen as well.

22   Then the last 12 years --

23   Q.    Excuse me.  You worked for?

24   A.    Aspen.  It's a home health agency in the last 12 years,

25   but I've always been employed.

12

1    Q.    In 1997, did you hold a job --

2    A.    Yes.

3    Q.    -- back then?

4          Can you tell the Court where you were employed back then

5    and briefly describe the nature of your responsibilities there?

6    A.    I was employed at United Dairy Farmers on Sunbury and

7    Morse Road.  I was a cashier which was responsible for customer

8    service, dipping ice cream, small inventory and stocking

9    coolers.

10   Q.    And that was in '97.  Prior to UDF, United Dairy

11   Farmers, did you maintain employment prior to that time too?

12   A.    Yes.  My first job was at BP gas.  I've also worked at

13   Schottenstein's which is a retail store which no longer exists

14   now; but, yes.

15   Q.    And just for the record, what did you do at BP gas?

16   A.    I was a gas attendant which was at a full service gas

17   station where you pump gas for people and clean their windows.

18   Q.    Now, back in 1997, were you the primary supporter of

19   yourself and your four children?

20   A.    Yes.

21   Q.    Is it fair to say you've lived and worked in Columbus as

22   you described all your life?

23   A.    Yes.

24   Q.    So you've maintained a residence here in Columbus all

25   this time?

13

1    A.    Yes.

2    Q.    I want to talk to you briefly about your education.

3    We've presented Petitioner's Exhibit 6.  Do you have that in

4    front of you?

5    A.    No, I do not.

6          I think it just turned on.

7    Q.    All right.  So we have presented in front of you

8    Petitioner's Exhibit 6A, 6B, 6C, and 6D.  Do you see those?

9    A.    Yes.

10   Q.    Would you take a look at them.  Tell us if you identify

11   them, recognize them, and if so, could you tell us what they

12   reflect?

13   A.    So the first page is my GED, my general education, which

14   was attained in 2021.  The next page was my HVAC certification

15   which I completed after that.  And then the next page is also

16   my EPA which came with my HVAC certification.  The Honorable

17   Academics Certificate, the last page, is where I went to school

18   for medical assisting with applied science, an Associate's

19   Degree.

20   Q.    Let me just be a little more specific.  If you could

21   look at 6A.

22   A.    Okay.

23   Q.    You said that's your GED certificate?

24   A.    Yes.

25   Q.    Can you just tell the Court how you went about getting

14

1    your GED?

2      A.    Well, at this point, I was tired of working as cashier.

3    I was working at Dovetop (phonetically) which is another retail

4    store.   I was working and going to school there as well as

5    being pregnant at this time, to just obtain -- to be better for

6    my children.

7      Q.    And when you were going to study for your GED, were you

8    still employed?

9      A.    Yes.

10     Q.    So at that time, you were studying and employed.  Were

11   you still the primary caretaker for your children?

12     A.    Yes.

13     Q.    What was your study schedule like, if you recall?

14     A.    Get it where you can find it.  With four children and

15   one on the way, you have to find some kind of ground that you

16   just -- it might be 20 minutes today, an hour tomorrow.  Just

17   get it where I can.

18     Q.    Let's look at 6B.  Do you have that in front of you?

19     A.    Now I do, yes.

20     Q.    All right.  Tell us in a little more detail what that is

21   a certificate for.

22     A.    That's heating and air conditioning, or heating,

23   ventilation and air conditioning program which also entailed a

24   little bit of broiler.  We didn't take a test for that.  It was

25   an 18-month program which you had to go through.  It was five

1    days a week.  At that time I also maintained a job and I went

2    to school as well.  You just had to do a lot of things.  And

3    you had to do a mentorship as well -- well, an internship, as

4    well, to complete the program.

5       Q.    Ms. King, I notice on this certificate, it indicates

6    that you've completed a 900-hour course?

7       A.    Yes.

8       Q.    Is that accurate?

9       A.    Yes.

10      Q.    How did you find time to do 900 hours while supporting

11   your children and working?

12      A.    I don't know if you can say "find."  I just was

13   determined to better my life situation for my children.

14      Q.    And you did complete the 900 hours?

15      A.    Yes.

16      Q.    And that was awarded in June of 2004 as it says.  Is

17   that correct?

18      A.    Yes.

19      Q.    If you could look at Petitioner's Exhibit 6C.  Can you

20   tell us in more detail something about the certificate of

21   competency for the AC and heating exam?

22      A.    That's an EPA regulated certification through the state

23   of Ohio.  So you can only purchase freon with that

24   certification.  You had to be knowledgeable of freon, the

25   environmental hazards and safe ways to use it as well.  That

16

1   was a test we had to take through the state.

2       Q.    And who awarded the Honorable Academics Certificate?

3       A.    That would be the dean of the Ohio Institute of Health

4   Careers.  They don't know you by face or person.  They just

5   look at your grade point average.

6       Q.    And in the bottom certificate, that indicates that you

7   received the Honorable Academics Certificate for attributing

8   3.5 or above.  Is that accurate?

9       A.    Yes.

10      Q.    Did you have a 3.5 or above?

11      A.    Yes.

12      Q.    And this was in November of 2006.  At that time, were

13  you still maintaining employment and supporting your children?

14      A.    Yes.

15      Q.    Finally, if you could look at Petitioner's Exhibit 6D.

16  Tell us just in a little more detail how you managed and what

17  is the associate of applied science medical assisting.

18      A.    Medical assisting with applied science you just get a

19  little more science, learning about blood, more detail about

20  blood, just about the body -- a little bit of body.  So you

21  learn about how bones and muscles are connected and just the

22  little things of that.  The main thing you learn is how to

23  take -- when you take patients into the room, how to document

24  what they're coming in for, any medication that they're taking,

25  how to take blood pressure and give shots as well.  You just

17

1    learn how to deal with people in everyday situations of being

2    sick or healthy as well.

3    Q.   Thank you.

4         And when you were going to school or taking this time,

5    did you manage child care at all?

6    A.   Yes.

7    Q.   How was that managed?

8    A.   I applied for Title 20.  And that was with a small fee

9    instead of a large fee which was about $60 a month, which I

10   still had to work.  So I let my kids go to daycare or into

11   school because some of my kids were in school as well.

12   Q.   And during this period of time you were still an active

13   parent?

14   A.   Yes.

15   Q.   Who did the grocery shopping?

16   A.   I did.

17   Q.   Took care of the kids at night?

18   A.   I did.

19   Q.   Who got them off to school and daycare in the morning?

20   A.   I did.

21   Q.   In 1997, can you tell us where you and your children

22   resided?

23   A.   2220 Bancroft.

24   Q.   Was that subsidized housing?

25   A.   Yes.

18

1    Q.    Due to your financial situation?

2    A.    Yes.

3    Q.    Was it Section 8 housing?

4    A.    No.

5    Q.    And in whose name was the townhouse leased?

6    A.    Mine, Ivana King.

7    Q.    Who paid the monthly rent?

8    A.    Me.

9    Q.    Do you recall when you first leased that residence?

10   A.    A little bit after I was 18.

11   Q.    In relation to 1997, how --

12   A.    Just about three, four years.

13   Q.    Generally, did you live alone in that apartment or that

14   townhouse with your children?

15   A.    Yes.

16   Q.    Who did all the upkeep for the townhouse?

17   A.    I did.

18   Q.    Who did the laundry for the children?

19   A.    I did.

20   Q.    Who made the meals?

21   A.    I did.

22   Q.    Who got them ready for school or pre-K?

23   A.    I did.

24   Q.    Now --

25         THE COURT:  Excuse me just a second.  Am I correct,

19

1    Ms. King, in 1997 when you were living on Bancroft, you had

2    four children; is that right?

3           THE WITNESS:  Yes, including my daughter which was the

4    newest one.

5           THE COURT:  Including Kyanna?

6           THE WITNESS:  Yes.

7           THE COURT:  Please continue, Mr. Rossman.

8           MR. ROSSMAN:  Thank you.

9    BY MR. ROSSMAN:

10   Q.   Now, in 1997 at the townhouse, were all the children

11   staying with you?

12   A.   Yes.

13   Q.   Now, when you went to work or when all the children were

14   not staying with you, where would they generally stay?

15   A.   With my mother.

16   Q.   And where in relationship to your townhouse on Bancroft

17   did your mother stay?

18   A.   Four or five blocks down the street.

19   Q.   Do you remember the street she lived on?

20   A.   26th.

21   Q.   So how would you get back and forth to your mom's place?

22   A.   I walk or my stepfather would pick me up.

23   Q.   Is it fair to say you love those children as a mother?

24   A.   More than they would ever know, yes.

25   Q.   Did you work hard to support them?

20

1    A.   Yes.

2    Q.   As I said, when you went to work, who would take care of

3 the youngest ones?

4    A.   My mother or her husband which is my stepfather.

5    Q.   All right.  Again, in 1997, March 1997, at that time how

6 long had you known Mr. Jackson?

7    A.   About four years.

8    Q.   Can you tell the Court what -- describe for the Court

9 your relationship with Mr. Jackson at that time.

10    A.   In 1997, it was sexual.

11    Q.   You indicated you had a child by Mr. Jackson?

12    A.   Yes.

13    Q.   Was he there for the birth of the child?

14    A.   Yes.

15    Q.   Is there any doubt in your mind as to whether or not

16 Kareem Jackson loved his children or his child?

17    A.   No, no doubt in my mind.

18    Q.   Can you give a brief example of why you say that?

19    A.   When she was born and I brought her home -- because my

20 mom brought me home, he was there.  He tried to help as much as

21 he could due to the fact that I was breastfeeding.  So he tried

22 to change her diaper, hold her, just spend time with her.

23    Q.   And does he have any relationship with her today through

24 the prison?

25    A.   Yes.

21

1      THE COURT:  Ms. King, when you moved into the Bancroft

2  apartment in 1997, were you involved in a relationship with the

3  petitioner at that time?

4      THE WITNESS:  When I moved in, that would have been in

5  '93.

6      THE COURT:  You moved into --

7      THE WITNESS:  In '93.  At that time I believe he was

8  in prison prior to.

9      THE COURT:  Focusing on 1997, how long had you had a

10 relationship with him at that time?

11      THE WITNESS:  Maybe a year, sexually.  Or less.  A

12 year or less.

13      THE COURT:  Okay.

14  BY MR. ROSSMAN:

15  Q.   Just to follow up briefly on what the Judge was asking

16 you and your answer, you indicated that several years before

17 1997 that you knew Kareem Jackson but he had been in prison.

18 What was he in prison for, if you know?

19  A.   He was in prison for bank robbery which I called in on

20 him.

21  Q.   Was that unarmed bank robbery, to your knowledge?

22  A.   Yes.

23  Q.   You said you called in on him.  Tell us what you mean by

24 that.

25  A.   My mother saw the news.  She asked me was it the boy I

22

1   was seeing.  I came downstairs.  I looked at it.  Yes.  And

2   then I called the tip line.  And then they came out to my house

3   the next day, and I took him to where they was and that's how

4   he got arrested.

5       Q.    So for the unarmed bank robbery, you were the one who

6   turned Kareem Jackson in to the police?

7       A.    Yes.

8              THE COURT:  Do you remember when that was, what year

9   it was at least?

10             THE WITNESS:  End of '92, maybe the beginning of '93.

11  I was still pregnant.  I had a baby in April.

12             MR. ROSSMAN:  Judge, I think I can direct this

13  Court -- we have a -- I'm not sure it's part of our record, but

14  the case number was CR2-93-111.  In fact, we have no objection

15  if they want to make this a record.  It's the U.S. district

16  court's judgment in a criminal case for unarmed bank robbery,

17  and it's a certified copy from the court.  We're happy to make

18  that a part of the record.

19             THE COURT:  Could I see that, please?

20             MR. ROSSMAN:  Yes, sir.

21             THE COURT:  Please proceed, Mr. Rossman.

22             MR. ROSSMAN:  Thank you.

23      BY MR. ROSSMAN:

24      Q.    When you turned him in, Mr. Jackson, to your knowledge,

25  ended up doing some jail time on that?

1    A.    Yes.

2    Q.    Did you ever -- to your knowledge, did Mr. Jackson know

3    or come to know you were the one who turned him in?

4    A.    He came to know after he had gotten out on parole and we

5    ran into each other.  I let him know I turned him in.

6    Q.    You told him you turned him in?

7    A.    Yes.

8    Q.    And you were a very young mother when you turned him in.

9    Was there any reason that you can share with us as to why you

10   turned him in?

11   A.    Yes.  When me and Jackson met, it was sexual at that

12   point as well.  He asked to borrow $150.  And, well, I was like

13   just pay it back because I don't work.  I was only like 18.  I

14   was like I don't work, just give it back.  When I seen that he

15   had robbed banks, I was mad because he did not return the 150

16   when you had all of this money.  So I was like so you think

17   you're going to do that to me and my child?

18        So I called the tip line and took him over there and

19   told him that's how I was going to get my 150.  But I never did

20   make any claim on any of that.

21   Q.    But for the sake of your children, you called and turned

22   in Mr. Jackson?

23   A.    Yes, because he cheated my child out of their money, out

24   of his money because he is a boy.  At that time I didn't know.

25   Q.    And you told Mr. Jackson that you were the one who

24

1    turned him in?

2    A.    Yes.

3    Q.    So in 1997 he was aware at that time that you had turned

4    him in for the prior unarmed bank robbery; is that correct?

5    A.    Yes.

6    Q.    How would you describe your relationship with

7    Mr. Jackson in 1997?

8    A.    We were friends.  We were enemies.  We were lovers.  We

9    were just there, you know, just to have fun and enjoy life.

10   Q.    Were there times that Mr. Jackson would stay with you at

11   the townhouse?

12   A.    Yes, we were having sex.  Yes.

13   Q.    Can you tell the Court whether or not he had the ability

14   to come and go from your townhouse?

15   A.    Yes.  He did not have a direct door key, but when I'm

16   not home, I would leave a key for him to get in when I'm not

17   there.

18   Q.    So let's talk about the 1997 incident that sort of

19   brings us here to court.  In 1997, there is a -- there's

20   actually a news release article?

21          MR. ROSSMAN:  Judge, it's reflected in the record.

22   It's ECF docket 24-1 and it's page ID 3515.

23   BY MR. ROSSMAN:

24   Q.    It reflects there was a raid on your townhouse?

25   A.    Yes.

25

1    Q.    Do you recall that?

2    A.    I don't know if you would call it a raid.  But, yes, I

3    remember them coming to my house.

4    Q.    All right.  The news release, which is a -- this is

5    docket ECF number 24-1, page ID 3515 and 3516.  It's what I'm

6    referencing.  It's the Franklin County Sheriff's Office news

7    release.  It talks about -- on page ID 3515, it says that a

8    sheriff's office SWAT and Safe Streets Task Force executed a

9    search warrant at 2220 Bancroft for the body of Kareem Jackson.

10        Do you recall that day?

11   A.    I recall the rough parts, yes.

12        THE COURT:  What was the date of the arrest?

13        MR. ROSSMAN:  I believe it was March 28th, 1997.  And

14   the news release is actually March 28th, 1997.

15   BY MR. ROSSMAN:

16   Q.    So I want to talk to you specifically about that day.

17   All right?

18        How strong is your recollection of what happened in your

19   townhouse that morning?

20   A.    Strong on the parts that just stuck with me.  Then

21   there's times -- there's some part of the day I don't remember

22   as well.

23   Q.    But you remember law enforcement coming into the house?

24   A.    Yes.

25   Q.    Is it fair to say that 26 years later, you still have a

26

1   clear recall of some of those events?

2   A.   Yes.

3   Q.   So where were you when the intrusion into your townhouse

4   occurred?

5   A.   In the bathroom, in the shower.

6   Q.   The bathroom is where?

7   A.   On the second floor.  If you're coming up the steps, it

8   would be to your right.

9   Q.   Do you know where -- well, let me ask you this.  Was

10  Kareem Jackson in the house at that time?

11  A.   Yes.  He had spent the night.

12  Q.   What's the first thing you remember about that day?

13  A.   We had gotten up that morning so I can get ready for

14  work, and the phone rang with a Franklin County number.  When I

15  answered it --

16  Q.   Do you recall approximately what time the phone call

17  came?

18  A.   It was a little bit after nine.

19  Q.   And what time did you normally get up on --

20  A.   I usually get up about two hours before I had to be at

21  work because I had to get my newborn child ready, my new baby

22  ready, and my stepfather took me to work.

23  Q.   So this started out as a regular workday for you?

24  A.   Yes.

25  Q.   You were going to work.  What time did you have to be at

1    work, if you recall?

2    A.    That day I had to be at work at 11 a.m.

3    Q.    This was at United Dairy Farmers?

4    A.    Yes.

5    Q.    The phone rang.  Do you know who called?

6    A.    Yes.  Red called.

7    Q.    Red.  To your knowledge is Red Red's real name?

8    A.    No, Red is not his real name.  That's the name they

9    called him.

10   Q.    Is that the name you knew him by?

11   A.    Yes.

12   Q.    Do you know today what his real name is?

13   A.    Yes.

14   Q.    What is it?

15   A.    Derrick Boone.

16   Q.    At the time, March 28th, 1997, did you know Red's real

17   name?

18   A.    No.

19   Q.    So Red called.  Can you tell us what the nature of the

20   call was?

21   A.    No.  I cannot tell you what the call was.  He just asked

22   for Kareem.

23   Q.    And you let Kareem speak to him?

24   A.    Yes.

25   Q.    So getting back to the shower.  You're in the shower.

28

1    While you're in the shower, do you know where Mr. Jackson was?

2    A.    He was on his way to the shower with me.

3    Q.    All right.  What's the next thing you recall?

4    A.    A loud noise and then a bunch of people running in the

5    house, definitely coming up the steps because the door wasn't

6    shut, and hollering at us.

7    Q.    Were these law enforcement agents?

8    A.    Yes.

9    Q.    Can you tell the Court approximately how many men

10   entered your townhouse?

11   A.    At the time I didn't know exactly how many were

12   upstairs.  It was six of them which was not a lot of space on

13   the second floor landing.

14   Q.    How did they speak in terms of tone of voice upon

15   entering?

16   A.    They were aggressive and just telling us to come out the

17   shower -- or me to come out the shower.  And they already had

18   Kareem on the ground when I came out.

19   Q.    Do you know how they got into the house?

20   A.    I believe they kicked in the door.  They broke the hinge

21   off -- the door in.

22   Q.    And tell the Court how these men were dressed, if you

23   recall.

24   A.    They were in all black, full -- covered everything.

25   They had this plastic thing over their face and they had guns

29

1    drawn, very big guns.

2    Q.   I was going to ask you can you describe the weapons they

3    had?

4    A.   Very big guns.  I would say like an assault rifle or

5    something like that, something that shoots more than one bullet

6    at a time.

7    Q.   Can you tell us in which direction they were pointed?

8    A.   They constantly pointed them at me and Kareem the whole

9    time.

10   Q.   You mention that you were in the shower.  How were you

11   dressed?

12   A.   I was completely naked.

13   Q.   Do you recall how Kareem was dressed?

14   A.   He was completely naked.

15   Q.   When these six men you described were upstairs, did you

16   ask for something to cover your nakedness, and if so, what was

17   their response?

18   A.   Yes.  I asked could I grab the bathrobe or a towel, and

19   he stated no.  And then he gave me a hand towel which was

20   hanging in the bathroom for drying hands.  That's what he gave

21   me to cover myself with.

22   Q.   At any point did they provide you a bath towel or a

23   bathrobe at that time?

24   A.   It was 20 minutes later I was allowed to get a bathrobe

25   to cover myself.

30

1    Q.   And prior to then?

2    A.   Nothing.  And I was standing in a hallway while they

3    searched the bedroom.

4    Q.   Now, how did that make you feel?

5    A.   Very uncomfortable.

6    Q.   So when this intrusion occurred, could you hear anything

7    that was going on downstairs?

8    A.   Yes.  They were rambling is what I could hear, a lot of

9    stuff being moved just about downstairs, and my child was

10   crying.

11   Q.   There was a child at home?

12   A.   Yes.

13   Q.   Which child was that?

14   A.   My daughter, Kyanna.

15   Q.   And where was she at that time?

16   A.   She was in the crib.

17   Q.   And the crib is?

18   A.   Located in the bedroom at the top of the stairs which

19   would be considered the master bedroom.

20   Q.   And what was her reaction to all of this?

21   A.   She was just crying because of all the noise, and she

22   just wouldn't stop crying.

23   Q.   And at any point in time, did any of those law

24   enforcement officers lay a hand on any of your -- on your

25   daughter?

31

1    A.    Yes.

2    Q.    Can you describe for us how that came about and what

3    specifically happened?

4    A.    So when -- once after they searched the bedroom, and I

5    was like can I get my daughter?  Can I get my daughter?  And he

6    said no.  And he picked my daughter up by her arm.  He picked

7    her up and he continued to search the crib.  And he put her

8    down in the crib, and he was like now you can get your

9    daughter.

10   Q.    You all right?

11   A.    Yes, I'm okay.

12   Q.    And how did Kyanna react?

13   A.    She was just crying and crying and crying.  Finally, I

14   did get her to calm down but I was -- they were so rough on

15   her.

16   Q.    Can you tell the Court to what extent there has been any

17   lasting or lingering effect on you in the days to come based on

18   that incident?

19   A.    After that, I went to my mom's house.  I didn't go back

20   to the apartment.  My dad had to clean it out.  I walked the

21   floor for six months just not knowing if somebody is going to

22   kick in my door.  To this day I lock my door.  I still -- I'm

23   so afraid -- the police shoved in somebody's door the other day

24   and I just stood there because I don't know if somebody is

25   going to kick in my door.

1    Q.   Ms. King, at some point, the -- are you aware as to

2    whether or not they found any weapons in your house?

3    A.   I am aware that they found weapons only after they let

4    us come downstairs.  They told me there was guns in my house.

5    Q.   Do you know, do you have any sense in terms of how soon

6    after the search began that those guns may have been located?

7    A.   I don't know exactly a time that they were located.  But

8    they were found way before we even were allowed downstairs.

9    Q.   How do you know that?

10   A.   When I was allowed to come downstairs, which means I was

11   going out the door, they had already started tagging weapons.

12   Q.   Do you know where any of those weapons were found?

13   A.   I know where they were found now, but when I was coming

14   out, I did not know where they were at -- were coming from.

15   Q.   I would like to direct your attention to Plaintiff's

16   Exhibit 3.  First of all, I'd like you to take a look at

17   Plaintiff's Exhibit 3 through 3E.

18        THE COURT:  For the record, you're using plaintiff's

19   and petitioner's exhibits interchangeably?

20        MR. ROSSMAN:  I'm sorry.  Let's be the petitioners.

21   The P stands for petitioner.

22        This is a habeas-related incident.

23        This is the -- now, just for the record, what we are

24   presenting are photographs from the state court record, and

25   that's the designation.  For the record, I would indicate that

1   we tried to get copies of these photographs.  The courts

2   indicated to us that they had been returned to the trial court,

3   and the clerk of courts told us they did not have copies of

4   these photographs.

5        I made outreach to Mr. Maher.  Mr. Maher referred me to

6   the county prosecutor.  And I have two separate emails on two

7   separate occasions asking if the county prosecutors had copies

8   of these photographs and have not received an answer.

9        I say this only because in the course of this litigation

10  history, at some point post-conviction, counsel had a DVD that

11  included pictures of the state court exhibits, and these

12  pictures that we present are taken from that.  It is why

13  they're not so clear.  That said, they are the pictures

14  specific to, as we will have identified, Ms. King's townhouse

15  so she can identify them as they are.  But that's the reason.

16       I would apologize for the lack of clarity on them.  But

17  this was all we could get.  But they are relevant to this

18  hearing.

19       THE COURT:  The record should reflect that Mr. Rossman

20  directed that narrative to me.  That was not a question to the

21  witness.

22       Please proceed, Mr. Rossman.

23       MR. ROSSMAN:  Thank you.

24  BY MR. ROSSMAN:

25  Q.   Would you look at Petitioner's Exhibit 3, and that would

1  include 3A through 3E.  And just tell us whether you recognize

2  these pictures.

3    A.    Would you like me to use the book instead?

4    Q.    That's fine.

5    A.    I just want to make sure that he hadn't put anything up

6  there.  I'm ready.  I can see.  I'm ready.

7          So the top picture is --

8          THE COURT:  Would you tell us, Mr. Rossman, what

9  exhibit number this is.

10         MR. ROSSMAN:  Yes.

11   BY MR. ROSSMAN:

12   Q.    Ms. King, showing you what's been marked as Petitioner's

13  Exhibit 3A, can you take a look -- there's three pictures

14  there, and tell the Court what's reflected in that picture.

15   A.    The top photo is the -- of my front room which would

16  have been the front window, which is a door there, a couch.

17  And then the bottom picture is just like from the steps of

18  where they're standing.  And they're showing the other side of

19  the -- where you see the white chair to your left, that's the

20  white chair.  If you look down on the bottom, you got the white

21  chair, and it's a little bit more area of the front room.

22   Q.    Now, the picture can speak for itself, but the chairs

23  are turned over.  Is that how you kept your townhouse?

24   A.    Not at all.

25   Q.    And so what's reflected in this picture specifically?

35

1    A.    They had all the cushions -- the top picture you can see

2    where they had the cushions off of the chair.  The cushions

3    were not flat.  I don't know what they knocked over, but there

4    was a lot of knocking over of stuff.  There is a carrier on the

5    bottom picture which is also turned over onto its side.

6    Q.    And the chairs?

7    A.    The chairs turned onto the side.  Like they were

8    flipping stuff over, just knocking stuff over.

9    Q.    If you could take a look at Petitioner's Exhibit 3B.

10   A.    This is the kitchen.  Above is the kitchen sink.  They

11   pulled everything out.  They tore that area up really bad.  And

12   there's scouring powder on the floor which is on the top

13   picture.  You can see it's like a little powder substance on

14   the floor.  It was scouring powder.

15            THE COURT:  What kind of powder?

16            THE WITNESS:  Cleaning powder.

17            THE COURT:  Like Comet or something?

18            THE WITNESS:  Generic form of it, but, yes.

19   BY MR. ROSSMAN:

20   Q.    That wasn't how you kept your kitchen?

21   A.    Not at all.

22   Q.    Are you aware as to whether or not that was the location

23   where they found anything there?

24   A.    At the time of 1997, I did not know that's where they

25   found them.  After they took me downtown is where they told me.

1    Q.    When you were upstairs, did you -- do you have any sense

2    how soon it was that they tore up your kitchen?

3    A.    No.

4    Q.    Is that how you found the kitchen when you returned

5    home?

6    A.    I didn't go back.  My stepfather went back to clean it.

7    Q.    But that was your kitchen?

8    A.    Yes.

9    Q.    And the scouring powder, you didn't pour that on the

10   floor?

11   A.    No.

12   Q.    Would you look at Petitioner's Exhibit 3C.

13   A.    So this is my children's bedroom.  If you were coming up

14   the steps, it would be to your right and then to the right of

15   the bathroom.  It is a bunk bed in there which is only like

16   one.  And there would have been toys on the floor, but there

17   was not all that stuff on the floor.  They pulled everything

18   out the closet and they took the mattress off.

19   Q.    Take a look at Petitioner's Exhibit 3D.

20   A.    Now, this is the bedroom that me and Kareem were in.

21   Any time -- as you can see, my daughter's bed is -- the crib is

22   in the room with us at the top of the steps, and it was --

23   Q.    This is upstairs?

24   A.    This is the second floor which would have been directly

25   at the top of the steps.  And my daughter's crib is to the

37

1    right.  There is a lot of stuff on the floor which is -- came

2    from the police pulling out everything they could.

3         Then, on the bottom pictures, it's just a picture of the

4    dresser.  I can't see this other picture which is very -- but

5    the one picture to your right is the dresser and all the

6    clothes they had pulled onto the floor.

7    Q.   So those clothes were not on the floor in that disarray

8    that's reflected.  Is that --

9    A.   No.

10   Q.   -- the way the house was kept?

11   A.   No.

12   Q.   Would you take a look at Petitioner's Exhibit 3E.

13   A.   This is the -- you can see that's also prior to the

14   other picture.  It's just a closer picture of that dresser

15   which they pulled all the clothes out.  That's when they told

16   me they were looking for a weapon.  They were looking for a

17   weapon.

18   Q.   And just for the record, in the previous exhibit,

19   Petitioner's 3D, is that crib the one you described where

20   Kyanna was staying?

21   A.   Yes.

22   Q.   To the best of your recollection, how long did that

23   search of your townhouse last?

24   A.   The search went -- because I left after about 11

25   o'clock.  I was out -- 11, 11:30 I was leaving.  But for me it

1   lasted a lifetime.  It was forever that I had to wait and wait

2   because I didn't drive.  My stepfather came and got me and my

3   child to go while they continued to search after I left.

4   Q.   Was anything said to you at the time by any of the law

5   enforcement?

6   A.   That I had to make a statement.

7   Q.   All right.

8        THE COURT:  Excuse me a second, Mr. Rossman.  At what

9   point during this process were you told that you had to make a

10  statement?

11       THE WITNESS:  When I was leaving the apartment.

12       THE COURT:  Do you recall who told you you had to make

13  a statement?

14       THE WITNESS:  No.  It was a whole lot of people there.

15       THE COURT:  Please continue.

16  BY MR. ROSSMAN:

17  Q.   And let's talk about that now.  Approximately what time

18  did this search end that you were leaving your place?

19  A.   I was leaving.  They were still there when I left.

20  Q.   Where did you go?

21  A.   I went to my mom's house.

22  Q.   That was -- was your mom still four or five blocks away

23  at that time?

24  A.   Yes.

25  Q.   So they said they're going -- did they tell you when you

39

1   had to make the statement or where?

2       A.    No, they never told me when or where.

3       Q.    So following the process that took place at your place,

4   at some point did your house -- that townhouse get cleaned back

5   up?

6       A.    My father cleaned up the apartment after -- when we were

7   able to go back in.  I'm assuming that CMHA, Columbus

8   Metropolitan Housing Authority, fixed the door because by the

9   time we got back -- well, he got back, the door was already

10  fixed.

11      Q.    You didn't go back to the townhouse?

12      A.    No.  He went to go fix the door for me so they could

13  secure the property.  But when he got there, it was already

14  done.

15      Q.    So you're at your mom's place.  Was there a time when

16  you ended up going with law enforcement to make a statement?

17      A.    Yes.

18      Q.    Can you tell us to the best of your recollection

19  approximately what time that was that you were taken down to

20  the station?

21      A.    I don't have an exact time.  I just know it was about --

22  around five o'clock.  I'm not going to say it was five on the

23  nose, but it was around five o'clock.  It was still daylight

24  outside.

25      Q.    You were at your mom's?

40

1    A.    Yes.

2    Q.    And was there advance knowledge on your part that they

3  were coming to get you or to make arrangements?

4    A.    They were coming to get a statement, yes.  I knew that.

5    Q.    But you didn't know when?

6    A.    No.

7    Q.    So what happened about five o'clock?

8    A.    They came to the house.  We were already outside.  We

9  were sitting in the driveway.  Two men came in suits in a car

10  that didn't say anything of law enforcement, anything of

11  officers, no sheriff, no police.  They came in a regular car.

12  And they said you have to come with us to make a statement.

13    Q.    Did you understand that you had a choice about that?

14    A.    No, I did not.

15    Q.    Now, you had taken your child to your mom's place as

16  well, correct?

17    A.    Yes, where the other children were.

18    Q.    Did you ask whether anyone could accompany you?  Were

19  you allowed anyone to come with you?

20    A.    I did not ask.  I felt I was not able to.

21    Q.    Two men came --

22    A.    Yes.

23    Q.    -- in a car?  It was not a police marked car?

24    A.    No.

25    Q.    And they picked you up?

41

1    A.    Yes.

2    Q.    And to your knowledge, where did they take you?

3    A.    At that time I did not drive; so I don't know where I

4    was going.

5    Q.    Did it appear to be the police station?

6    A.    No.  It did not look like a police station to me.

7    Granted, I do know not what the inside of a police station

8    would look like.

9    Q.    Let me ask you, approximately how long did it take from

10   the time they picked you up -- you said about five -- to the

11   time you arrived at wherever they took you?

12   A.    To me, it seemed like 20 to 30 minutes.

13   Q.    Okay.  Once you were -- so it was some -- it didn't look

14   like a police station, but it was some area.  What did they do

15   when you got there?

16   A.    When we got there, we got out the car.  We went through

17   these doors.  They took me to a room which had all the guns

18   that they supposedly found at my apartment, and then they took

19   me into another room which didn't have windows.

20   Q.    And when you say "they," you're talking about these two

21   law enforcement persons?

22   A.    Yes.

23   Q.    So you're there about 5:30.  And in this other room

24   you're talking about, what happened there?  Were you

25   interviewed there?

42

1    A.    By the statement that's -- that's what they say, that I

2    was interviewed.  But I was talked to for a long time.

3    Q.    Well, this is -- okay.  Just to be clear, there is a

4    taped interview, and you're talking about now the time -- from

5    the time you arrived at this place, this detective bureau, say,

6    until the taped interview, we're talking about this time in

7    between, okay?

8    A.    Okay.

9    Q.    Can you approximate for the Court how much time elapsed

10   between the time you arrived at this place and the time they

11   actually taped your interview?

12   A.    We was there hours before they even taped anything.

13   They were just talking and talking and talking about the

14   murders.

15   Q.    And was it just these two?

16   A.    It was -- when it started, when they first put me in the

17   room, there was one.  And then another one came in later and we

18   talked and talked and talked.

19   Q.    What sort of things were they saying to you?

20   A.    They were asking me about Kareem's whereabouts and about

21   Kareem talking to me and about Kareem, what he -- how he know

22   the people that he were with, which would have been Red to me,

23   and these other people which I don't know, can't remember their

24   names, but these other people.

25        And when I just wasn't, I guess, giving what they

1   needed, they asked me did I have somebody to take care of my

2   children.

3       Q.   What did you understand that to mean?

4       A.   That they were trying to put me in jail.

5       Q.   How long did this go on?

6       A.   To me, it seemed like a lifetime.  But it was hours and

7   hours, but it seemed like a lifetime.

8       Q.   To your understanding, what was it they wanted from you?

9       A.   They wanted me to make sure that Kareem -- Kareem would

10   go to jail for the murders.

11       Q.   Was there anything specific they told you to say?

12       A.   When they started, they said just tell us that Kareem

13   done two people.  They just kept bringing -- reiterating that

14   Kareem done these two people, just tell us.

15       Q.   Was that repeated to you?

16       A.   Yes.

17       Q.   Can you even estimate how many times they may have

18   repeated that to you over this period of time?

19       A.   Once they said it to me once, all I know is I did not

20   want to go to jail.  They just kept saying I need to take care

21   of my kids, and if I don't say -- tell me what happened because

22   Kareem, you know he done those two people.  They just kept

23   saying that.

24           THE COURT:  Ms. King, I want to clarify something

25   because you just told me that they told you once that they

44

1    wanted --

2            THE WITNESS:  I don't know if it was once.

3            THE COURT:  Let me finish my question, ma'am, so you

4    understand.  You said they told you once that they wanted you

5    to say that, quote, Kareem had done these two people.  Then you

6    tell me a few questions later that they just kept saying that

7    you needed to take care of your kids and tell them what

8    happened because Kareem had done these two people.

9        How many times, as best that you can recall, did they

10   tell you that they wanted you to say that Kareem had, quote,

11   done these two people?

12           THE WITNESS:  I can't remember how many.  I can't put

13   a number on it.  I can't put a number on it.

14           THE COURT:  Do you know whether it was more than once?

15           THE WITNESS:  Yes.

16           THE COURT:  It was more than once?

17           THE WITNESS:  Yes.

18           THE COURT:  Do you know who said it?

19           THE WITNESS:  The two -- there was two men in a room

20   and they both were talking to me.

21           THE COURT:  Do you recall their names?

22           THE WITNESS:  No, I do not.

23           THE COURT:  All right.  Please continue, Mr. Rossman.

24    BY MR. ROSSMAN:

25    Q.   Is it fair to say that you were -- you had no way of

45

1    getting home on your own; is that correct?

2    A.    Yes.   That is correct.

3    Q.    Is it fair to say that you were afraid you weren't going

4    to be allowed to go home?

5    A.    Yes.

6    Q.    And was it just one of these two people or were they

7    both talking to you?

8    A.    They both were talking to me.

9    Q.    Let me -- well, let me do this.  For the record, there

10   is a -- and this is ECF number 24-1.  It's page ID 3448.

11        There is a tape log slip.  Let me present it.  That

12   indicates that there was a tape being made at the time of

13   interview, and it's called a tape log slip from the detective

14   bureau.  It indicates 7:51 at night as the time of the

15   interview.

16        To your knowledge, does that sound approximately when

17   they would have started taping your interview?

18   A.    I don't know what time it was.  There was no clocks in

19   the room as well.

20   Q.    But you indicated previously it felt like two or three

21   hours since you had been taken there before they took your

22   interview?

23   A.    Yes.

24   Q.    And during that two- or three-hour period, was it pretty

25   much the police officers talking to you throughout?

46

1    A.   Yes.

2    Q.   So assuming that is correct, that it was 7:51 when they

3  finally got around to turning on the tape recorder, how were

4  you feeling by then?

5    A.   Scared to death.

6    Q.   And can you be specific in terms of what you were scared

7  about?

8    A.   Losing my kids, being in jail for the rest of my life

9  for a crime I didn't commit.

10   Q.   And assuming the taped interview started at 7:51, in

11  your opinion, how long did the whole taped interview last?

12   A.   To me it seemed like 10, 20 minutes.

13   Q.   If the -- have you seen a copy of the transcript of your

14  tape?

15   A.   Yes.

16   Q.   And who provided that to you?

17   A.   Alan Rossman, you.

18   Q.   All right.  I'm going to -- let's --

19        MR. ROSSMAN:  For the record, this taped interview, we

20  have designated this as Petitioner's Exhibit 4.  The docket

21  number reflected on it as part of this record is ECF document

22  24-1, and it's page ID number 3583 through 3586.

23  BY MR. ROSSMAN:

24   Q.   Do you have that in front of you?

25   A.   Yes.  Because I can see it here on the thing.

47

1    Q.   Just for the record, the second page, 3584, has nothing

2    to do with this.  It was filed erroneously.  It's not an

3    interview with -- part of this interview.

4         If I could just direct your attention that the -- I'm

5    sorry, 3587.  That's the final page of that interview.

6         That indicates, on page ID 3587, that your interview

7    concluded at 7:53 p.m.  That's just -- it was less than five

8    minutes.  Is that possible that your taped interview was less

9    than five minutes?

10   A.   I don't know.  But this is what they're saying so I'll

11   have to believe it.

12   Q.   It wasn't a long interview, was it?

13   A.   No.

14   Q.   And was it your understanding that the interview was

15   necessary?

16   A.   To my knowledge, no.  I was supposed to give a statement

17   and go home is what I thought.

18   Q.   So were you allowed to go home after they turned the

19   tape recorder off?

20   A.   After they finished with this, yes.

21   Q.   And assuming this to be accurate, it was close to eight

22   o'clock at night?

23   A.   Yes.

24   Q.   And were you taken home after that?

25   A.   Yes.

48

1    Q.   Now, I would just like to ask if you recall -- I'm going

2   to read you the fourth question and the fifth question and your

3   answers and ask whether you recall giving this, okay?

4    A.   Okay.

5    Q.   So they turned on the tape recorder, and four questions

6   in they ask:  Go ahead and begin Monday of this week.

7         And Monday night, Tuesday morning, was the time of the

8   homicide.

9         And you answer:  On Monday, I don't know the exact date

10   or anything, Monday evening to be exact, five guys left from my

11   house, Kareem Jackson, Derrick Boone, a guy named Red, another

12   guy named Sonny, and another guy unknown to me.  They left,

13   came back five or six o'clock in the morning on a Tuesday, left

14   again that same morning, didn't see them until dark on Tuesday.

15        And the question:  See who?

16        And your answer:  Kareem Jackson, Derrick Boone.

17   Derrick Boone left my house.  Kareem Jackson told me he done

18   two people.

19        You see where that's in the transcript of the taped

20   interview?

21    A.   No.  Because you took the paper away.  You have it in

22   your hand.

23        Alan, can you tell me what page you're on?

24    Q.   Bottom of page 1, Petitioner's Exhibit 4.

25    A.   Okay.  I just wanted to be on the right page with you.

49

1    Q.   Again, it's the question at the bottom, your answer,
2    then the question at the top of the next page, page 2 of your
3    interview which is:  See who?
4         And then you say Kareem Jackson, Derrick Boone.  Derrick
5    Boone left my house.  Kareem Jackson told me he done two
6    people.
7         Do you see that?
8    A.   Yes.
9    Q.   Now you previously indicated in your testimony that the
10   officers were telling you that Kareem Jackson done two people?
11   A.   Yes.
12   Q.   So in your answer, you indicate, Kareem Jackson told me
13   he done two people.
14        Are those your words?
15   A.   No.  That was the words they kept asking me just to tell
16   them, that he had just done those two people.
17   Q.   And you told them?
18   A.   Yes.
19   Q.   Something else I noticed in your answer on page 1 where
20   you say, Five guys left from my house, Kareem Jackson, Derrick
21   Boone, a guy named Red, another guy.  Now, Red is Derrick
22   Boone, you indicated; is that correct?
23   A.   I know Red.  Derrick Boone I didn't know was Red until
24   the date of the arrest.
25   Q.   When you gave this answer, did you know at that time

50

1   that Red was Derrick Boone?

2   A.   No.

3   Q.   So I believe your -- correct me if I'm wrong, your prior

4   testimony was you didn't know at that time Derrick Boone's real

5   name?

6   A.   No, I did not.

7   Q.   Where did you get the name Derrick Boone from?

8   A.   From the officers or the detectives, whoever they were

9   in the room.

10  Q.   And you mentioned that in your taped interview?

11  A.   That I learned it?  I'm not understanding that question.

12  Q.   That's my fault.

13       The fact that you mentioned Derrick Boone and Red

14  reflects to me that you didn't understand at the time that they

15  were the same person.

16  A.   No.  I did not understand they were the same person.

17  Q.   And prior to the tape recording, were you aware of who

18  Derrick Boone was?

19  A.   No.

20  Q.   So is it fair to say that you learned the name Derrick

21  Boone from the discussions that were had with you and the

22  police officers prior to the tape being made?

23  A.   Yes.

24  Q.   Is it correct to say that the use of that name was

25  consistent with your --

51

1          MR. MAHER:  Your Honor, objection.  Leading.

2          THE COURT:  Sustained.

3     BY MR. ROSSMAN:

4     Q.   Can you tell us how the name Derrick Boone came to be

5     used in your voice when they turned on that tape?

6     A.   After being talked to for hours and hours about Derrick

7     Boone, there was other people mentioned.  But they just keep

8     resaying and resaying that, you know, Derrick Boone and Kareem

9     were always together in the same sentence.

10    Q.   To be clear, the language Kareem Jackson told me he done

11    two people, where did that phrase he done two people come from?

12    A.   It came from the officer that kept -- that were talking

13    to me about the killing.

14    Q.   Is that a phrase that Kareem would have used?

15    A.   No.

16    Q.   Why do you say that?

17    A.   He was a street man, we'll say that.  He talked like he

18    belong on the streets.

19    Q.   The four words where it was indicated to be Kareem

20    Jackson's confession having killed those two young gentlemen,

21    when you testified at trial and you were under oath, you were

22    asked whether or not he confessed; is that correct?

23    A.   Yes.

24    Q.   And at trial you indicated that you didn't have any

25    recollection?

52

1          MR. MAHER:  Your Honor, I object to the leading nature

2      of the question.

3          THE COURT:  Sustained.

4      BY MR. ROSSMAN:

5      Q.   Do you remember your testimony at trial?

6      A.   No, I do not.

7      Q.   Let's be clear.  In your presence, did Kareem Jackson

8      ever say he done two people?

9      A.   From my recollection of my memory, no, he did not say

10     that.

11     Q.   Did you ever testify under oath that you had memory of

12     him saying that?

13     A.   I never testified -- under oath, I testified, but I

14     cannot say I remember if I said that he did it at that time.

15     Q.   Is that because he didn't say it?

16     A.   He did not say it.  I don't remember him saying it.

17     Q.   If he had said it, do you believe you would have

18     remembered?

19     A.   I would have remembered.  I probably would have turned

20     him in.  I ain't going to lie.

21     Q.   At trial the prosecutor asked whether you remembered

22     your interview; you told it to the police.

23     A.   At trial -- reading over the statements from the trial,

24     I did say, yes, I remembered talking to the police about it.

25     Q.   And you said it to the police, correct?

53

1    A.    Yes.

2    Q.    Let me quote to you.  This is from the record.  It's

3    transcript -- it's document 15-2.  It's page ID 2167.

4         MR. MAHER:  Your Honor, I object to the question.

5         THE COURT:  Sidebar.

6                             - - -

7    (The following proceeding was held at sidebar.)

8         MR. MAHER:  Yes, sir.  Mr. Rossman's posing a question

9    that begins with an excerpt from the transcript.  I would say

10   that that question would be leading because the only answer

11   would be is this what's in the transcript.

12        THE COURT:  Mr. Rossman.

13        MR. ROSSMAN:  Thank you, Judge.  What I was going to

14   do is quote from the transcript which is part of our record,

15   ask her specifically whether she has recall of being asked and

16   answering this question.

17        THE COURT:  All right.  I'm going to allow you to ask

18   her that.  But I'm going to ask -- you've been leading this

19   witness all along notwithstanding my explicit instructions.

20   Some of this stuff was innocuous.  Some of it, it's not.  This

21   is a critical point in the examination and I want her

22   testimony, not yours.

23        So I'm going to allow you to ask that question, but I

24   want you to ask it in the manner that you indicated to this

25   Court that you were going to ask it as opposed to telling her

54

1   what this said and then asking if that is right.

2              MR. ROSSMAN:  That's exactly what I was going to do.

3              THE COURT:  Your objection, for the purposes of the

4   record, is overruled.  You may inquire.

5              MR. ROSSMAN:  I apologize for the --

6              THE COURT:  I understand.  And it's easy to get in the

7   habit in these kinds of hearings of relaxing the method in

8   which you -- the proper method of asking nonleading questions.

9   That's why I'm there to get you back on track.

10             MR. ROSSMAN:  I appreciate that.

11        (The following proceeding was held in open court.)

12             THE COURT:  Please continue, Mr. Rossman.

13             MR. ROSSMAN:  Thank you.

14   BY MR. ROSSMAN:

15   Q.   So, Ms. King, I am referencing now for the record part

16   of the transcript that is part of this record.  It is document

17   15-2 and it is taken directly from page ID 2167, 68.

18        Ms. King, I'm going to read you a question and answer

19   and ask whether you recall the question and giving the answer,

20   okay?

21   A.   Okay.

22   Q.   So the question:  Kareem Jackson told me he done two

23   people?

24        And your answer:  I do not remember that much.  I

25   remember the transcript as far as that, but as far as the

55

1   conversation between me and Kareem Jackson, no.

2           As you sit here today, do you remember the conversation?

3           Answer:  No.

4           And then the question is followed up:  When you talked

5   to us, police, do you recall giving the answer I talked to

6   Kareem Jackson, he told me he done two people?

7           Answer:  No, I don't.

8           And the question:  You just don't recall the

9   conversation as you sit here today?

10          Answer:  Right.  Yes.

11          Do you recall that question and answer from trial?

12   A.   No, I do not.

13   Q.   Okay.

14       MR. MAHER:  Your Honor, at this point, I'd ask for

15   completeness in reference to the transcript.  There is an

16   additional statement on page ID 2168 which is --

17          THE COURT:  I'm going to allow you to explain all of

18   this at sidebar, Mr. Maher.

19                          - - -

20      (The following proceeding was held at sidebar.)

21          THE COURT:  Go ahead, Mr. Maher.

22          MR. MAHER:  Yes, Your Honor.

23          THE COURT:  Read on the record what you wanted to --

24   the doctrine of completeness, which one to read under doctrine

25   of completeness.  Go ahead.

1          MR. MAHER:  Page ID 2168, it would be Mr. Rossman

2     stopped at line three.

3          THE COURT:  Okay.

4          MR. MAHER:  And for sake of completeness, line four,

5     the question is:  When you listened to the tape last week, did

6     you, in fact, make those statements back on March 28th, the day

7     of the interview?

8          The answer was:  Yes.

9          Question:  Whether you remember it today or not?

10         The answer was:  Yes.

11         The question:  Back on March 28th, did you have any

12    reason to lie to the sheriff's department?

13         The answer was:  No.

14         Question:  To the best of your knowledge, did you tell

15    them the truth that day?

16         Answer:  To the best of my knowledge.

17         And then the rest of it is something else.

18          THE COURT:  Mr. Rossman?

19          MR. ROSSMAN:  Judge, the transcript speaks for itself,

20    and I'm assuming that if there's concerns that they would be

21    addressed on cross-examination with this lady.  But I have no

22    objection.  The record is what it is.

23          THE COURT:  I'm going to allow, under the doctrine of

24    completeness, you to read through on page -- it appears to be

25    123, lines 4 through 15 because, as you know, the doctrine is

1    codified in the rules.  The doctrine of completeness may be

2    invoked by, in this instance, opposing counsel.  And to do so

3    would provide context for the portion that you read, and

4    without which the portion that you read would not be

5    understandably complete.

6          So under that ruling, I would ask that you read lines 4

7    through 15 to the witness as well.

8          MR. ROSSMAN:  Four through 15?

9          THE COURT:  Four through 15 on that page.

10         (The following proceeding was held in open court.)

11         THE COURT:  Do you have it, Mr. Rossman?

12         If not, Mr. Maher, just give him that so that we can

13    move on.  That's pursuant to Rule 106 of the Federal Rules of

14    Evidence.

15         MR. MAHER:  Yes, sir.

16         MR. ROSSMAN:  I have the transcript.

17         THE COURT:  Please continue.

18         MR. ROSSMAN:  Thank you.

19    BY MR. ROSSMAN:

20    Q.   Ms. King, just to be complete, I'm going to read -- and

21    this is again from ECF 15.2, page ID is 2168.  This question

22    and answer from your testimony, trial testimony, I will ask you

23    again whether you recall it, whether you recall being asked and

24    whether you recall giving those answers.

25         So the question is:  When you listened to the tape last

58

1    week, did you, in fact, make those statements back on

2    March 28th?

3         And the answer was:  Yes.

4         The question:  Whether you remember it today or not?

5         And your answer is:  Yes.

6         And the question:  Back on March 28th, did you have any

7    reason to lie to the sheriff's department?

8         And your answer is:  No.

9         Do you recall that testimony, those questions and

10   answers?

11            MR. MAHER:  Two more, Your Honor.

12            THE COURT:  Line 13 or --

13            MR. MAHER:  Thirteen to 15.

14            MR. ROSSMAN:  One more question and one more answer.

15     BY MR. ROSSMAN:

16     Q.   To the best of your knowledge, did you tell them the

17   truth on that day?

18         And the answer:  To the best of my knowledge.

19         Do you remember testifying about that?

20     A.   No, I do not remember.

21     Q.   So you're telling us today that the statement, the

22   confession he done two people --

23            MR. MAHER:  Your Honor, I apologize.  Leading

24   question.

25            THE COURT:  I'm going to ask that you rephrase.

59

1    Sustained.

2          Mr. Rossman, rephrase.

3      BY MR. ROSSMAN:

4      Q.   We have talked about that four-word confession "he done

5    two people," correct?

6      A.   Yes.

7      Q.   Did Kareem ever make that statement to you?

8      A.   Not to my knowledge.

9      Q.   Would you remember if he had said it, do you believe?

10     A.   What I remember today, no.

11          THE COURT:  In other words, Ms. King, is that the kind

12   of statement that if made to you, you would remember even

13   today?

14          THE WITNESS:  Him stating he done two people, yes, I

15   would remember that if he talked in that language, yes.

16          THE COURT:  Are you saying that he didn't talk in that

17   language?

18          THE WITNESS:  He does not, and to this day does not

19   talk in that language.

20          THE COURT:  All right.

21     BY MR. ROSSMAN:

22     Q.   Ms. King, I want to show you what's been marked as

23   Petitioner's Exhibit 5.

24          THE COURT:  Mr. Rossman, could you hold on one second?

25   I'm having some technical difficulties.

60

1    BY MR. ROSSMAN:

2    Q.   Petitioner's Exhibit 5 is also part of this record that

3    I believe it's 24-1, page ID 3701.  Have you seen that before?

4    A.   Yes.

5    Q.   Can you tell the Court what it is?

6    A.   It's my statement of declaration.

7    Q.   And you provided that to me and people in my office

8    when?

9    A.   That was provided to me in 2015.  It was Jo and

10   Donzella.

11   Q.   Those are two people from my office at the time; is that

12   correct?

13   A.   Yes.

14   Q.   After you gave us that declaration in September of 2015,

15   were you prepared to testify about it in court?

16   A.   Yes.

17   Q.   Did there come a time where you were actually subpoenaed

18   to testify?

19   A.   Yes.

20   Q.   Did you testify?

21   A.   No, due to COVID.

22   Q.   Was there ever a hearing where you were asked to

23   testify?

24   A.   No.

25   Q.   Is it fair to say that this is the first time you've

61

1   ever been asked to testify?

2      A.    Yes.

3      Q.    Under oath about this declaration?

4      A.    Yes.

5      Q.    Do you recall whether or not you were appointed private

6   counsel back then to testify about this?

7      A.    Do you mean in 1997 or 2015?

8      Q.    Subsequent to you giving the declaration.

9      A.    They gave me -- I was appointed an attorney which I

10  never met.

11     Q.    And there was never an evidentiary hearing in state

12  court specific to this; is that correct?

13     A.    That is correct.

14     Q.    So let me ask you -- and this is specific to your

15  declaration which is Petitioner's Exhibit 5.  In paragraph two,

16  you indicate that in March of 1997, the police kicked in my

17  door and tore my house apart while serving an arrest warrant

18  for Kareem.

19          MR. MAHER:  Objection, Your Honor.  This is a series

20  of leading questions.

21          THE COURT:  Ms. Evans, would you read back the

22  question.

23      (Thereupon, the last question was read by the court

24  reporter.)

25          THE COURT:  He's simply -- I'm going to overrule the

1   objection at this time.  You may renew it.  He's simply reading

2   to her what was stated in her declaration.  It appears that the

3   question is as of yet incomplete because it's not in an

4   interrogative form.

5        So I'm going to give Mr. Rossman the benefit of the

6   doubt and assume that he doesn't speak in incomplete sentences

7   or ask incomplete questions.  That's why I'm going to give you

8   the opportunity to renew your objection once Mr. Rossman

9   completes his question.  So your objection is overruled.

10       Please complete your question, Mr. Rossman.

11  BY MR. ROSSMAN:

12  Q.   When you gave that statement, and to this day, do you

13  believe that to be true?

14  A.   Yes.

15  Q.   Paragraph three:  My daughter with Kareem was three

16  months old when the police served Kareem's arrest warrant.

17       MR. MAHER:  Your Honor, I would object.  Under this

18  format --

19       THE COURT:  I'm going to give you an opportunity to

20  make your argument at sidebar.

21                         - - -

22     (The following proceeding was held at sidebar.)

23       THE COURT:  Just so that both of you understand -- all

24  of you understand, I don't permit legal arguments while the

25  witness is on the stand.  It has many bad effects, leading the

1  witness to conclude things about the legal arguments that are

2  not a part of her testimony necessarily.

3         Go ahead with your objection.

4         MR. MAHER:  Yes, sir.  The objection is the question

5  is leading in that the format of the questioning is simply to

6  state previous allegations in an affidavit and ask if those are

7  accurate.  In a direct examination context, that would be a

8  leading format.

9         THE COURT:  That would.  But go ahead, Mr. Rossman.

10 Any response?  And then I'll make my ruling.

11        MR. ROSSMAN:  Yes.  May it please the Court.  In the

12 context of this hearing, the extensive nature of this hearing,

13 including the *Napue* claim that brings us here, the question is

14 whether or not this witness indicated falsely that Mr. Jackson

15 confessed and to what extent that was driven by police

16 intimidation and to the extent they were aware that what she

17 was saying was false.

18        This was driven in part by this declaration in which

19 these allegations are put forward that have been apparently

20 called into question in terms of the integrity of what she

21 says.  To the extent that the government has been aware of this

22 declaration, each of these allegations is specific to

23 reiterating that in 2015 she made each statement and swears to

24 this day -- swore at the time it was true and to this day that

25 this is true.

64

1          THE COURT: One of the issues that -- more so than

2     simply being leading, Mr. Maher, one of the issues is whether

3     this is redundant or cumulative testimony because the witness

4     has already testified to all of these things. This is a

5     declaration of the witness. It can expedite matters

6     significantly if you have her identify the circumstance under

7     which it was given and ask her if it was true.

8          If the representations made in it were true at the time

9     made and they're still true, we can go on because if she's

10    going -- if her testimony is going to be consistent with what

11    her testimony has been with the first two entries in that

12    declaration, it's simply matters that she's already stated and

13    then she's just going to reiterate them. So it's cumulative.

14         MR. ROSSMAN: I'll give you that, Judge. It is an

15    effort to perhaps overdo the issue.

16         THE COURT: I'm going to overrule your objection

17    because I don't believe that it's leading in the context in

18    which you argue it, but I do believe it is cumulative. So I'm

19    going to ask Mr. Rossman simply to inquire as to whether she

20    made these statements, whether they were true when made and

21    whether they're true now. We'll move on.

22         While I have you here, though, I have a meeting that I

23    could not and cannot reschedule from about noon to one, 1:15.

24    How much more do you have of this witness?

25         MR. ROSSMAN: We're probably within ten minutes.

1        THE COURT:  Okay.  So we're going to have a hard stop

2   at 11:45.  Then you will have the lunch hour to -- but do you

3   know at this time -- let's say that the testimony stops now.

4   Who are you calling, if anyone?

5        MR. MAHER:  If the testimony stops at this time, Your

6   Honor, I would have asked to be afforded an opportunity to

7   cross-examine --

8        THE COURT:  You're going to get that opportunity.  But

9   who are you calling?

10       MR. MAHER:  If the testimony stops at this point, I'm

11  not calling anybody.

12       THE COURT:  All right.

13     (The following proceeding was held in open court.)

14       THE COURT:  Mr. Rossman, please continue.

15       MR. ROSSMAN:   Thank you.

16   BY MR. ROSSMAN:

17   Q.   Ms. King, you can identify Petitioner's Exhibit 5, that

18  declaration?

19   A.   Are you asking me can I?

20   Q.   Yes.

21   A.   Yes.

22   Q.   Would you just take a quick read through it and tell the

23  Court whether you remember making each of those statements.

24   A.   Yes.  I remember making each of these statements.

25   Q.   As you indicated back in 2015, you believe each of those

1   statements to be true?

2     A.   Yes, I do.

3     Q.   As you sit here today, do you believe each of those

4   statements made in your declaration to be true?

5     A.   Yes.

6     Q.   In 2015 when you gave that declaration, were you under

7   any pressure from anyone to give it?

8     A.   No.

9     Q.   And when you gave the police officers the testimony that

10  Kareem Jackson said he done two people, you indicated that

11  wasn't true.

12    A.   True.

13    Q.   To your knowledge, did the police officers that took

14  your taped statement know that to be the case?

15         MR. MAHER:  Objection, Your Honor.  She would not

16  have --

17         THE COURT:  Sustained.

18  BY MR. ROSSMAN:

19    Q.   In your opinion, when you gave that statement --

20         MR. MAHER:  Objection, Your Honor.

21         THE COURT:  I'm going to allow him to finish the

22  question.  Do not answer it until I rule on the objection,

23  Ms. King.

24         Finish your question.

25         MR. ROSSMAN:  Thank you.

1    BY MR. ROSSMAN:

2    Q.   In your opinion, when you gave that statement during

3    your taped interview, did the officers know you were using

4    their words?

5         MR. MAHER:   Objection, Your Honor.  She's actually not

6    competent to offer an opinion.  This is a fact witness.  And

7    particularly in context of the question posed, I'd object as

8    she's not technically competent to answer that question.

9         THE COURT:   I'm going to sustain your objection as the

10   question as phrased.

11        However, Mr. Rossman, you may ask that question properly

12   phrased.  This is not an opinion witness under the definition

13   of opinion witnesses pursuant to the Sixth Circuit's ruling in

14   *Johnson*.  So she would not be an appropriate person to whom to

15   put an opinion question.  But you may ask this witness a

16   similar question, or you may derive the same evidence based on

17   her as a fact or lay witness.  Please proceed.

18        MR. ROSSMAN:   Thank you, Judge.

19   BY MR. ROSSMAN:

20   Q.   To your knowledge, Ms. King, to your knowledge, the

21   police are aware that you did not -- that that language was not

22   your own language; is that correct?

23        MR. MAHER:   And I -- same objection.

24        THE COURT:   I'm going to sustain that objection as to

25   form and it's leading.

68

1    BY MR. ROSSMAN:

2    Q.   Let's try this.  The language he done two people you

3    testified was not your language, correct?

4    A.   That is correct.

5    Q.   To your knowledge, the police knew that as well; is that

6    correct?

7         MR. MAHER:  Objection, Your Honor.  She's not

8    competent to say what's in somebody else's mind.

9         THE COURT:  Read the question back to me, please.

10       (Thereupon, the last question was read by the court

11   reporter.)

12        THE COURT:  Sustained.

13   BY MR. ROSSMAN:

14   Q.   To your knowledge, the police knew that?

15        THE COURT:  Sustained.  That's the same question as --

16   I want the record to reflect that Mr. Maher had rose to object,

17   and I'm going to sustain that objection because that's the

18   other side of the same coin.

19        You may give it another try, though.  You don't have a

20   finite number of chances.

21        MR. ROSSMAN:  Thank you.

22   BY MR. ROSSMAN:

23   Q.   So let me try again.  The language he done two people

24   you said were not your own words?

25   A.   Correct.

69

1   Q.   Whose words were they?

2   A.   They were the officers' that were talking to me prior to

3   being taped.

4   Q.   And what did you understand you were required to do when

5   they turned on the tape?

6   A.   I was required to let -- to state that Kareem had done

7   two people and that he had told me.

8   Q.   And what was your understanding as to why you needed to

9   do that?

10         MR. MAHER:  Same objection, Your Honor.  Asking for

11   her understanding relative --

12         THE COURT:  Mr. Maher, I'm going to tell you as I told

13   you at sidebar, I don't want narrative objections.  State the

14   legal basis.  If you want to explain it, we can do it at

15   sidebar.

16         MR. MAHER:  Yes, sir.

17         THE COURT:  Do you feel the need to explain it or are

18   you simply going to tell me what the legal basis is?

19         MR. MAHER:  The same objection, Your Honor.

20         THE COURT:  Overruled.  You may answer.

21         THE WITNESS:  Can you please repeat that question?

22         THE COURT:  It was:  What was your understanding as to

23   why you needed to do that?

24         Read the question back, Ms. Evans.  I want to make sure

25   we're precise.

70

1    (Thereupon, the last question was read by the court

2    reporter.)

3         THE WITNESS:  Because I was going to be charged with

4    association with the guns that were found in my apartment.

5    BY MR. ROSSMAN:

6    Q.   Was the confession true?

7    A.   The confession Kareem told me, no.

8    Q.   Did you make that known to the police?

9    A.   I told them repeatedly that I had no knowledge of Kareem

10   killing those people.  I didn't know anything about the guns as

11   well.

12   Q.   And still you told them?

13   A.   Yes.

14   Q.   And why?

15   A.   So that I can go home to my kids.

16   Q.   When you told them, did they let you go home to your

17   kids?

18   A.   Yes.

19   Q.   Is it fair to say you told them what they wanted to

20   hear?

21   A.   Yes.

22        MR. ROSSMAN:  If I can just have a minute, Judge?

23        THE COURT:  Sure.

24        MR. ROSSMAN:  Judge, I have no further questions for

25   Ms. King.

```
 1            THE COURT:  All right.  Thank you.

 2         Sidebar.

 3                           -  -  -

 4       (The following proceeding was held at sidebar.)

 5            THE COURT:  Is your position still the same in light

 6    of the testimony since our last sidebar, Mr. Maher?  That is,

 7    you only have cross-examination but no additional witnesses?

 8            MR. MAHER:  Yes, Your Honor.

 9            THE COURT:  All right.  We're going to stand in

10    recess, then, until 1:15.  When we return at 1:15, we'll begin

11    with your cross-examination.

12            MR. MAHER:  Yes, Your Honor.

13            THE COURT:  All right.  Thank you.

14       (The following proceeding was held in open court.)

15            THE COURT:  We're going to take our lunch recess now.

16    We'll stand in recess until 1:15.

17         Ms. King, you're still under oath.  When we return

18    at 1:15, you will submit to the cross-examination of Mr. Maher.

19         All right.  Thank you.

20       (Recess taken from 11:45 a.m. to 1:30 p.m.)

21                           -  -  -

22                      WEDNESDAY AFTERNOON SESSION

23                          JUNE 7, 2023

24                           -  -  -

25            THE COURT:  Ms. King, would you come back up and
```

72

1   resume the stand, please.

2          Mr. Maher, cross?

3                            - - -

4                      CROSS-EXAMINATION

5   BY MR. MAHER:

6   Q.   We're going back to the time of the crime.  And my

7   question is at the time of the incident, you lived in an

8   apartment located at 2220 Bancroft?

9   A.   Yes.

10  Q.   Your mother and stepfather lived by at 1654 26th Avenue?

11  A.   Yes.

12  Q.   Your apartment at 2220 Bancroft Street was in walking

13  distance from your mother's house at 1654 26th?

14  A.   Yes.

15  Q.   Because of school transportation, two of your

16  school-aged children lived full time with your mother at 1654

17  26th Avenue?

18  A.   At that time, one would only have been in school.  He

19  was six.  The other two were in pre-K.  They lived between me

20  and my mother but they resided at my address.

21  Q.   During this time period, your stepfather provided

22  transportation in help getting groceries and getting to work?

23  A.   Yes.  I didn't drive.

24  Q.   During this time period, you were frequently at your

25  mother's house?

1    A.   Yes.

2    Q.   During this time period, your mother and stepfather

3  helped out with you and your children on a daily basis?

4    A.   No.

5    Q.   During the late morning hours of Friday, March 28th,

6  there were three persons inside 2220 Bancroft being you, your

7  daughter Kyanna, and Mr. Jackson; is that correct?

8    A.   Yes.

9    Q.   Around 11:30 a.m. on Friday, March 28th, 1997, while you

10  and Mr. Jackson were in a shower, a number of law enforcement

11  officers forced entry into your apartment at 2220 Bancroft

12  Street?

13    A.   Yes.

14    Q.   The law enforcement officers who forced entry into your

15  apartment at 2220 Bancroft Street had tactical weapons and body

16  armor?

17    A.   Yes.

18    Q.   The law enforcement officers were yelling and shouting?

19    A.   They were being aggressively towards me, yes.

20    Q.   The law enforcement officers arrested Kareem Jackson?

21    A.   Yes.

22    Q.   The law enforcement officers found some guns under your

23  kitchen sink?

24    A.   That's what they stated, yes.

25    Q.   When you were asked if you knew anything about the guns

74

1   found under your kitchen sink, you told the law enforcement

2   officers you did not know there were guns under your sink?

3   A.   Is that a question or would you like me to make a

4   statement with that?

5   Q.   I'm just -- the question is when you were asked if you

6   knew anything about the guns found under your kitchen sink, you

7   told the law enforcement officers you did not know there were

8   guns in your apartment?

9   A.   That is a correct statement.

10  Q.   The law enforcement officers did not arrest you?

11  A.   No.

12  Q.   You had done nothing wrong to get yourself arrested?

13  A.   That is correct.

14  Q.   After the law enforcement officers left, your apartment

15  was messed up and things had been thrown around?

16  A.   That is correct.

17  Q.   Your stepfather came over to your apartment at 2220

18  Bancroft Street and helped you clean up the mess?

19  A.   He cleaned up, yes.

20  Q.   After your apartment was cleaned up, you and your

21  daughter Kyanna were over at your mother's house at 1654 26th

22  Avenue?

23  A.   Yes, me and all the rest of my children, yes.

24  Q.   Around dinnertime on Friday, March 28th, 1997, you and

25  your children were at your mother's house at 1654 26th?

75

1    A.   Yes.

2    Q.   At this time, two detectives came to your mother's

3    house?

4    A.   Yes.

5    Q.   Your mother let the detectives in her house?

6    A.   I believe we were already outside standing.

7    Q.   The detectives identified themselves and said they had

8    questions for you about Kareem Jackson?

9    A.   I do not remember that.

10   Q.   One detective had dark hair and one was taller with

11   blonde hair?

12   A.   Do not remember the description of the men.

13   Q.   You had not seen these -- the individuals that were at

14   your mother's house knocking on the door out in the front, you

15   had not seen them before with your eyes?

16   A.   At that time, I cannot remember.  There were so many of

17   them at the apartment.  So it could have been any of them.

18   Q.   You had not spoken with these detectives before?

19   A.   Not until that day.

20   Q.   These detectives that were at your mother's house were

21   not part of the officers who arrested Mr. Jackson?

22   A.   I don't know.

23   Q.   The detectives wanted to take you downtown to speak with

24   them about Kareem Jackson?

25   A.   They wanted a statement, yes.

76

1  Q.   The detectives did not say you were under arrest?

2  A.   No, they didn't.

3  Q.   You had done nothing wrong to get yourself arrested?

4  A.   That is true.

5  Q.   The detectives asked you if had someone to watch your

6  children while you were downtown with them?

7  A.   Yes.

8  Q.   You told the detectives your mother would be watching

9  your children, including Kyanna?

10 A.   Yes.

11 Q.   Your mother was standing nearby when you were speaking

12 with these detectives?

13 A.   I don't remember that.

14 Q.   You left your mother's home and got in an unmarked car

15 with the detectives?

16 A.   Yes.

17 Q.   You and the detectives drove downtown to the police

18 station?

19 A.   They took me, yes.

20 Q.   Once you got downtown, you went with the detectives into

21 the police station?

22 A.   At that time I did not know it was a police station.  It

23 was a building to me, yes.

24 Q.   The detectives had you sit by yourself for a short time?

25 A.   I don't remember that.

1    Q.    A short time after you came downtown to this location,

2    the detectives asked you questions about Kareem Jackson?

3    A.    They were talking to me, yes.

4    Q.    After you talked with these detectives, you made a taped

5    statement?

6    A.    Yes.

7    Q.    And when you made that taped statement, the detective

8    that was interviewing you notified you that we'd like to have a

9    statement on tape and produced a tape recorder?

10   A.    Yes.

11   Q.    While you were downtown, nobody said you were under

12   arrest?

13   A.    No one said it, no.

14   Q.    The detectives that were interviewing you about

15   Mr. Jackson did not say you were under arrest?

16   A.    They never said it, no.

17   Q.    You had done nothing wrong to get yourself arrested?

18   A.    No.

19   Q.    When the interview was over, the detectives told you you

20   were free to leave?

21   A.    Once it was -- once it was finished being taped, yes.

22   Q.    And you were then permitted to leave the downtown police

23   station, but you had arrived with the detectives.  How did you

24   get back to your mother's house?

25   A.    Most likely they took me.  I didn't drive.

1    Q.   You didn't call up your stepfather?

2    A.   I can't remember if I did or didn't.

3    Q.   Okay.  You got back to your mother's house that same

4    evening before nine o'clock at night?

5    A.   I don't remember what time, but it was dark, yes.

6    Q.   A week before you had to testify in Mr. Jackson's case,

7    you went to the courthouse to meet with the prosecutors and the

8    defense attorneys?

9    A.   I don't remember that.

10        MR. MAHER:  Your Honor, might I approach the witness

11   with an exhibit?

12        THE COURT:  Yes.  Or you can give it to Ms. Stash who

13   will provide it to the witness, or you can just use the ELMO,

14   whichever is more convenient.

15        Ms. Stash, would you give Mr. Maher an assist, please.

16        THE WITNESS:  Can you adjust it just a little further

17   down?  It's too far up.  There you go.  Thank you.

18   BY MR. MAHER:

19   Q.   I'm going to refer to an exhibit which is Warden's

20   Exhibit B which is an excerpt of your testimony.

21        It's first pages -- page ID 2183 of the federal record,

22   and page 138 of the transcript.

23        Mr. Rigg, the defense attorney, question:  Good

24   afternoon, Ms. King.

25        Answer:  Good afternoon.

1          Mr. Rigg, defense attorney:  We have met before, right?

2          Answer:  Yes.

3          Question:  A couple of weeks ago down here at court?

4          Answer:  Yes.

5          And at that time we met down on the sixth floor after

6     you talked to the prosecutors?

7          Answer:  Yes.

8          Question:  And I think it was Mr. Schumacher, who is one

9     of the defense attorneys, and myself and our investigator we

10    hired, Mr. Bob Tarpley, right?

11         Your answer was:  Yes.

12         In fact, Bob Tarpley picked you up so you could come

13    down to court and talk to us and the prosecutor?

14         Your answer was:  Yes.

15         So then a week before you had to testify in Kareem

16    Jackson's case, you went to the courthouse to meet with the

17    prosecutors and the defense attorneys?

18      A.   I don't remember that.

19      Q.   The prosecutors met with you before your testimony?

20      A.   I don't remember that.  But it's stated here so I'm

21    going to say yes.

22      Q.   You met with the defense attorneys after you met with

23    the prosecutors?

24      A.   Defense attorneys?  Do you mean as in Kareem's lawyers?

25      Q.   As what?

80

1    A.    As in Kareem's lawyers?

2    Q.    Yes.  Mr. Jackson's lawyers.

3    A.    I don't remember that.

4    Q.    If the transcript says that you did, would that be

5    accurate or inaccurate?

6              MR. ROSSMAN:  Objection.

7              THE COURT:  What's the legal basis of your objection?

8              MR. ROSSMAN:  She's already testified she has no

9    recollection.

10             THE COURT:  So your legal basis is asked and answered?

11             MR. ROSSMAN:  Yes, sir.

12             THE COURT:  All right.  Sustained.

13   BY MR. MAHER:

14   Q.    The defense investigator, Bob, brought you to the

15   courthouse to meet with them and the prosecutors a week before

16   your testimony?

17   A.    That's what it states on that paper, yes.

18   Q.    When you and the defense investigator Bob got to the

19   courthouse, the first thing you did was meet with the

20   prosecutors?

21   A.    I don't remember that day.

22   Q.    You met with the prosecutors before your testimony?

23   A.    That's what that paper states.

24             MR. ROSSMAN:  Objection.

25             THE COURT:  Sustained.  We've sort of been over this,

1    Mr. Maher.

2     BY MR. MAHER:

3     Q.    When you met with the prosecutors, they played the tape

4    so you could hear for yourself the statement that you gave the

5    dark-haired detective?

6     A.    I don't know what the gentleman looked like.  But the

7    transcript said they played it for me, and at this time I can

8    only agree to what the paper stated.

9     Q.    During that meeting, you would have listened closely to

10   your taped statement?

11    A.    No, I wouldn't have.

12    Q.    Did you recognize your own voice on the taped statement?

13    A.    I'm sure I did.

14    Q.    But you heard your voice on the tape say that Kareem

15   said he done two people?

16    A.    That's what it states on the paper.

17         MR. ROSSMAN:  Objection, Judge.

18         THE COURT:  Overruled.

19    BY MR. MAHER:

20    Q.    On Warden's Exhibit A, you were being asked about your

21   recollection about the statements to the police.  And the

22   question was posed:  Do you recall what answers you gave?

23         Your answer was:  A, very little.

24         Question -- this is Prosecutor Stead.

25         MR. ROSSMAN:  What page?

82

1          MR. MAHER:  Excuse me.  2156 page ID, 122 of the

2    transcript.  It would be in Warden's Exhibit A.

3      BY MR. MAHER:

4      Q.   The question was:  Would it refresh your recollection to

5    review the transcript?

6          MR. MAHER:  And that's Petitioner's Exhibit 4 is the

7    transcript, Your Honor.

8          THE COURT:  All right.

9      BY MR. MAHER:

10     Q.   Answer was:  Okay, yes.

11          Question:  Do you recognize this as the transcript?

12          The answer:  Yes.

13          Question:  And, in fact, see the corrections --

14          Answer:  That we made.

15          Question -- that we made.

16          Answer:  Uh-huh.

17          Question:  On page 2, do you recall being asked the

18    question, see who?

19          Answer:  See who, yes.

20          Do you recall giving the answer that Kareem Jackson and

21    Derrick Boone left my house?

22          The answer was:  Yes.

23          Question:  Kareem Jackson told me he done two people.

24          Answer:  I do not remember that much.  I remember the

25    transcript as far as that, but as far as the conversation

83

1   between me and Kareem Jackson, no.

2        Question:  As you sit here today, do you remember the

3   conversation?

4        Answer:  No.

5         THE COURT:  Mr. Maher, we can't see where you're

6   reading from because of how you have it positioned just on that

7   page.  Just on the page you were on.  Flip back.  Now, go back

8   to the top "as you sit here today."  Now we can see it.

9    BY MR. MAHER:

10   Q.   Question:  As you sit here today, do you remember the

11   conversation?

12        Answer:  No.

13        Question:  When you listened to the tape last week, did

14   you, in fact, make those statements back on March 28th?

15        Answer:  Yes.

16        Question:  Whether you remember it today or not?

17        Answer:  Yes.

18        Question:  Back on March 28th, did you have any reason

19   to lie to the sheriff's department?

20        Answer:  No.

21        Question:  To the best of your knowledge, did you tell

22   them the truth on that day?

23        Answer:  To the best of my knowledge.

24        You do recall then the prosecutor showed you that

25   written transcript?

84

1    A.    Again, I don't remember that, that whole time of showing

2    me transcripts.  It is in the paper and I'm going to say, yes,

3    that it's been stated.

4    Q.    After you met with the prosecutors, you met with the

5    defense -- Mr. Jackson's defense attorney and Investigator Bob?

6    A.    I don't remember.

7    Q.    I'll produce here Warden's Exhibit B which is excerpts

8    from Ms. King's testimony.  It's in the record.  It begins at

9    page ID 2183.  And there's actually -- it's 2183 and 2184 and

10   2194 and 2195.  But with that, during your testimony, Mr. Rigg,

11   the defense attorney, asked you this question.

12         You talked to the investigator regarding your --

13         THE COURT:  Mr. Maher, once again, we can only see

14   lines 15 through 25.

15         MR. MAHER:  I'm actually beginning down here at the

16   bottom.

17         THE COURT:  What line are you beginning on?

18         MR. MAHER:  On 23.

19         THE COURT:  All right.

20    BY MR. MAHER:

21    Q.    Mr. Rigg, the defense attorney, asked you this question:

22    You talked to the investigator regarding your involvement with

23    Kareem Jackson.  Our investigator being Mr. Tarpley.

24         Your answer was:  Bob.

25         Question:  Bob?

85

1      Answer:  Yes?

2          THE COURT:  Again, Mr. Maher, we can only see 10

3    through 25.  There you go.  Now, please continue.

4    BY MR. MAHER:

5    Q.   And the question:  You talked to him in the car over the

6    telephone, I believe?

7          Answer:  Once over the telephone to make arrangements to

8    come down here.  I talked to him in the car and on the way back

9    home.  He took me home also.

10         That was the time that you met with the defense

11   attorneys before your testimony?

12   A.   Again, I don't remember, but if that's what the paper

13   states.

14   Q.   Before you testified at the courthouse in Kareem's case,

15   you had told your mother and stepfather about the fact that you

16   had to testify in Mr. Jackson's case?

17   A.   Yes.

18   Q.   When you told your mother and stepfather about the fact

19   that you had to testify in Mr. Jackson's case, you told them

20   about the matters that troubled you about your upcoming

21   testimony?

22   A.   I probably did.

23   Q.   You talked to your mother about your upcoming testimony

24   and told her everything you thought was important to say?

25   A.   No.

86

1    Q.   If you were scared about anything, you would have told

2    your mother about it?

3    A.   No.

4    Q.   Before you began to testify, the male prosecutor that

5    was asking questions, you had seen him before; is that right?

6    A.   I don't remember.

7    Q.   There was a lady prosecutor.  Had you ever seen her

8    before?

9    A.   I don't remember.

10   Q.   During your testimony, the male prosecutor asked you --

11   asked questions about your taped statement that you made with

12   the detectives?

13   A.   I guess.

14   Q.   The prosecutor asked if you had listened to your taped

15   statement before your testimony?

16   A.   I don't recall.  Is this the conversation during trial

17   or just when I went to meet with them?

18   Q.   This is when you're on the witness stand.

19   A.   Okay.

20   Q.   And the prosecutor asked if you had listened to your

21   taped statement before you got on the witness stand.

22   A.   I don't remember the trial.  But if it says it in the

23   paper, then I assume that's what happened.

24   Q.   You testified that you did listen to your taped

25   statement before you testified in court?

87

1    A.    Yes, I did testify to that.

2    Q.    This is in reference to Warden's Exhibit A.

3          I am starting at line 4.  The male prosecutor said

4    question:  When you listened to the tape last week, did you, in

5    fact, make those statements back on March 28th?

6          Answer:  Yes.

7          Question:  Whether you remember it today or not?

8          Answer:  Yes.

9          Question:  Back on March 28th, did you have any reason

10   to lie to the sheriff's department?

11         Answer:  No.

12         Question:  To the best of your knowledge, did you tell

13   them the truth on that day?

14         Answer:  To the best of my knowledge.

15         And that was your testimony at that time?

16   A.    At that time, I'm assuming that's what the trial papers

17   say.

18   Q.    Is your testimony today that that statement that you

19   made in court is false?

20         THE COURT:  Wait a minute.  Before you answer that,

21   you're going to have to clarify which statement because both of

22   you have read numerous statements that the witness made in

23   court.

24   BY MR. MAHER:

25   Q.    In reference to Warden's Exhibit A, the question was

88

1  posed:  Back on March 28th, did you have any reason to lie to

2  the sheriff's department?

3        The answer:  No.

4        Question --

5          THE COURT:  Wait a minute.  You asked about a singular

6  statement.  Now you're going to read into the record multiple

7  statements.  I want you to make it clear which statement you're

8  asking is true or which statements about which you are

9  inquiring are true.

10          MR. MAHER:  Yes, sir.

11    BY MR. MAHER:

12    Q.   This is Warden's Exhibit A and we're on line 10.  I'm

13  narrowing it down.

14        Question:  Back on March 28th, did you have any reason

15  to lie to the sheriff's department?

16        The answer was:  No.

17        Is your testimony today that that prior testimony is

18  false?

19    A.   Yes.

20    Q.   So your testimony today is that you lied under oath at

21  Kareem's trial?

22    A.   I'm not understanding what you're trying to ask.  Are

23  you asking me am I lying?  I lied on oath at Kareem's trial?

24    Q.   Yes.

25    A.   Yes.  Under -- I didn't want to.

89

1      THE COURT:  I want this to be clear because of any

2   collateral issues.  I want you to be clear that you're asking

3   about this question, Mr. Maher, if that's what your question

4   was about.  First you asked her if she was telling the truth,

5   when she said back on March 28th, did you have any reason to

6   lie to the sheriff's department, she said no.  You asked her if

7   that was true.

8      Then you say, so when you testified under oath, you were

9   lying.  Are you talking about that one statement or her entire

10  testimony which was also under oath?  I want you to be specific

11  about what you were inquiring.

12      MR. MAHER:  Your Honor, I might be able to do that if

13  we go to question 13, the same thing, Warden's Exhibit A, pose

14  it again.

15      THE COURT:  Okay.  Go ahead.

16   BY MR. MAHER:

17   Q.   Warden's Exhibit A, page ID 2168, and line 13.  The

18  prosecutor asked you this question:  To the best of your

19  knowledge, did you tell them -- meaning the detectives.  To the

20  best of your knowledge, did you tell them the truth on that

21  day?

22      Answer:  To the best of my knowledge.

23      Is it your testimony today that that testimony was

24  false?

25   A.   That statement was -- that statement was not false.  I

1  just told them what they wanted to hear.  So it's not a truth

2  or a lie.  It's what they needed to hear to get the confession.

3  Q.  In reference to Warden's Exhibit A, the prosecutor --

4  this is -- we're starting on line 21.  This is Warden's Exhibit

5  A, page ID 2168.

6        The prosecutor asked you a question.  This is the

7  question:  And then the question when you talked to us, do you

8  recall giving the answer, I talked to Kareem Jackson, he told

9  me he done two people?

10        Answer:  No, I don't.

11        Question:  Do you recall hearing that you, in fact, made

12  that statement when you listened to your tape last week?

13        Answer:  Yes.

14        Question:  So that you, in fact, did say that?

15        The answer was:  Yes.

16        Question:  You just don't recall the conversation as you

17  sit here today?

18        Answer:  Right.  Yes.

19  A.  I'm going to ask you can you pull the page down because

20  I missed the first top of that page?  Just be still for a

21  second, right there.

22        Okay.  I can see here on the paper.  I'm going to say

23  yes, that was stated from me.

24  Q.  Ma'am, I'm sorry.  I didn't hear the last part.

25  A.  I said that I can see it on paper so I'm going to say,

91

1   yes, that it was stated from me.

2     Q.   This is Warden's Exhibit A, your excerpt from your trial

3   testimony, page ID 2179, Warden's Exhibit A.  The prosecutor

4   asked you the question which is:  There were several instances

5   where you indicated that Kareem told you he had done two

6   people?

7          Answer:  Yes.

8          Question:  What did you mean by the word, in quotes,

9   done?

10         Answer:  In the statement on -- in the tape, I said

11  killed.

12         Question:  That man right there, pointing to

13  Mr. Jackson.

14         Your answer was:  Yes.

15         Was that testimony true?

16    A.   Again, I don't remember this -- the trial, but it's

17  right here on paper.  And I'm going to say yes, I said it in

18  court -- in the courtroom.

19         MR. MAHER:  I have no further questions, Your Honor.

20         THE COURT:  Well, you may not have any further

21  questions.  I have a further question to clarify your last

22  question because what she -- what the witness has said is that

23  she said it, but she didn't answer your question which is

24  whether it was true, unless your question was did you read

25  correctly from the transcript.  And I don't think that was your

92

1    question.

2         So, Ms. King, did you understand Mr. Maher's question?

3         THE WITNESS:  No, I did not.

4         THE COURT:  Mr. Maher, you want to clarify that?

5         MR. MAHER:  I'll make an effort, Your Honor.

6         THE COURT:  If you can't, I will.  It's up to you.

7         MR. MAHER:  Yes, sir.  I'm trying to comply here.

8    BY MR. MAHER:

9    Q.   So this is Warden's Exhibit A, and page ID 2179.

10        MR. MAHER:  Your Honor, if I can regroup here just a

11   bit.

12        THE COURT:  Yes.  Take a moment.

13        MR. MAHER:  Thank you, Your Honor.

14   BY MR. MAHER:

15   Q.   Warden's Exhibit A, testimony excerpts.  I'm starting

16   here at page ID 2168, starting at line 21.

17        The prosecutor asked you this question:  And the

18   question when you talked to us, do you recall giving them the

19   answer, I talked to Kareem Jackson, he told me he done two

20   people?

21        Your answer was:  No, I don't.

22        Question:  Do you recall hearing that you, in fact, made

23   that statement when you listened to the tape last week?

24        Here at the top, 2169, the answer:  Yes.

25        The question was:  So that you, in fact, did say that?

93

1          Answer:  Yes.

2          And that testimony of yours was accurate.  Isn't that

3  right?

4     A.   I cannot say it was accurate today.  You all keep asking

5  me if these statements are true to the statement on the paper.

6  What's on the paper is not what was -- needed to be said or

7  asked.

8     Q.   Before you testified, when you came into the courtroom,

9  you saw there was a judge present, didn't you?

10    A.   Today?

11    Q.   No.  Back then when you testified in Mr. Jackson's case?

12    A.   There was a judge there, yes.

13    Q.   If you had concerns about your testimony, you could have

14 communicated them with the judge, couldn't you?

15    A.   No, I didn't feel like I was able to.

16    Q.   If you had concerns about your testimony, you could have

17 communicated them with the defense attorneys.  Isn't that

18 right?

19    A.   No.  They only -- like I said, they only contacted me

20 that one time.  I did not speak with Kareem's direct lawyers or

21 the prosecuting attorneys either outside of the -- that time

22 apparently we met.

23          MR. MAHER:  Your Honor, I have no further questions.

24          THE COURT:  All right.  Thank you, Mr. Maher.

25 Redirect, Mr. Rossman?

94

1      MR. ROSSMAN:  Just briefly.

2                      -  -  -

3                REDIRECT EXAMINATION

4    BY MR. ROSSMAN:

5    Q.   Good afternoon, Ms. King.

6         The trial testimony, as it's been recounted, you don't

7    deny that on the tape you told police he done two people?

8    A.   No.

9    Q.   And to the extent that's reflected in the trial

10   testimony, that's true, right?

11   A.   Yes.

12   Q.   The statement that you didn't have any independent

13   recollection of him saying that, that's also true, correct?

14   A.   Yes.

15   Q.   At the time of trial, you previously testified that you

16   were scared when you gave that statement --

17   A.   Yes.

18   Q.   -- to the police?

19   A.   Yes.

20   Q.   How did you feel at the time of trial?

21   A.   That they were going to put me in jail.

22   Q.   That hadn't ended that feeling?

23   A.   No.

24   Q.   There was a brief line of questioning about the period

25   of time when you were at the detective bureau as opposed to a

95

1   police station.  And you said no one told you you were under

2   arrest, using that language, correct?

3           MR. MAHER:  Leading, Your Honor.  Objection.

4           MR. ROSSMAN:  I'm just recounting the question.

5           THE COURT:  I understand.  It is leading.  And it is

6   redirect.  He was recounting the question.  I'm going to allow

7   it to stand.  I'll again caution Mr. Rossman to discontinue the

8   leading.

9           MR. ROSSMAN:  Thank you, and the caution is noted.

10    BY MR. ROSSMAN:

11    Q.   Let me ask you, at that time, did you feel you were free

12   to come and go as you pleased?

13    A.   No.

14    Q.   What, to your understanding, was required for you to be

15   able to leave?

16           MR. MAHER:  Objection, Your Honor.  Calls for a

17   conclusion.  This is a fact witness.

18           THE COURT:  He's asking for what her understanding is.

19   Your objection is noted but overruled.  You may answer,

20   Ms. King.

21           THE WITNESS:  That I had to tell them that Kareem had

22   killed two people, which in their statement was done two

23   people, and that would be the way I can go home.

24    BY MR. ROSSMAN:

25    Q.   Is that what you did?

1    A.    Yes.

2    Q.    And you went home?

3    A.    Yes.

4          MR. ROSSMAN:  If I could have one moment.

5          THE COURT:  Yes, you may.

6          MR. ROSSMAN:  I have no further questions, Judge.

7          THE COURT:  Thank you, Mr. Rossman.

8       Mr. Maher, do you have any recross?

9          MR. MAHER:  No, Your Honor.

10         THE COURT:  All right.  Thank you.

11      Ms. King, thank you very much, ma'am.  You may be

12   excused.

13      Mr. Rossman, do you have any additional witnesses?

14         MR. ROSSMAN:  We do not, Judge.

15         THE COURT:  Do you move into evidence the exhibits

16   that you identified during the hearing?

17         MR. ROSSMAN:  We would move Petitioner's 3 through 6

18   into --

19         THE COURT:  Any objection to 3 through 6?

20         MR. MAHER:  No objections, Your Honor.

21         THE COURT:  Petitioner's Exhibits 3 through 6 will be

22   received.

23      Mr. Maher, does the warden have any witnesses to

24   present?

25         MR. MAHER:  Your Honor, no witnesses to present.  But

1    we would move for the admission of Warden's Exhibits A and B,

2    which are transcript excerpts.

3              THE COURT:  Any objection, Mr. Rossman?

4              MR. ROSSMAN:  No, Judge, to the extent --

5              THE COURT:  Warden's Exhibits A and B will be

6    received.

7              MR. ROSSMAN:  As per the rule of completion, the

8    entire testimony is already in the record.

9              THE COURT:  Yes, that's right.

10         As we discussed previously, we will do post-hearing

11   briefing.

12         You should receive the transcripts by close of business

13   on the 12th of June which is next -- make it Wednesday.  You'll

14   receive them next Wednesday the 14th.

15         Mr. Rossman, how long do you anticipate needing to file

16   your brief after receipt of the transcript?

17             MR. ROSSMAN:  Judge, just to be clear, the attendant

18   briefing is the broad perspective of the gateway as well as the

19   arguable merits of these claims; is that correct?

20             THE COURT:  Yes.

21             MR. ROSSMAN:  Then, for the record, the rest of the

22   week of the 15th I'm scheduled for an office retreat.  That

23   said -- and I have an argument in the court of appeals on the

24   28th.  If we could have a month.

25             THE COURT:  Thirty days?

98

1          Mr. Maher, how long do you anticipate you will need for

2    a response?

3          MR. MAHER:  Thirty days will be fine.

4          THE COURT:  Okay.  You can't get it done in 21?

5          MR. MAHER:  Your Honor, I will do it in 21.

6          THE COURT:  We'll do 20 -- we'll do 30, 21 and 7.

7          I'm assuming, Mr. Rossman, that seven will be adequate

8    for your reply?

9          MR. ROSSMAN:  Yes, sir, it will be.

10          THE COURT:  I will get out -- so 30 days from the

11    12th -- I'm sorry, from the 14th of June will be -- so your

12    opening brief will be due on the 14th of July.  Three weeks

13    from that date will be August 4th, your memorandum contra will

14    be due, Mr. Maher.  And then August 11th any reply will be due,

15    Mr. Rossman.

16          MR. ROSSMAN:  Thank you.

17          THE COURT:  I'll file a scheduling order reflecting

18    that.  Is there anything further from the petitioner,

19    Mr. Rossman?

20          MR. ROSSMAN:  Only to thank this Court again for the

21    day in court.

22          THE COURT:  Absolutely.

23          Anything further from the warden, Mr. Maher?

24          MR. MAHER:  Not today, Your Honor.

25          THE COURT:  All right.  Thank you very much, everyone.

99

1    With that, Ms. Stash, you may adjourn court.

2        (Proceedings concluded at 2:18 p.m.)

3                             - - -

100

1                              C E R T I F I C A T E

2

3           I, Shawna J. Evans, do hereby certify that the

4    foregoing is a true and correct transcript of the proceedings

5    before the Honorable Algenon L. Marbley, Judge, in the United

6    States District Court, Southern District of Ohio, Eastern

7    Division, on the date indicated, reported by me in shorthand

8    and transcribed by me or under my supervision.

9

10

11                              s/Shawna J. Evans_____
                                Shawna J. Evans, RMR, CRR
12                              Official Federal Court Reporter

13

14                              June 14, 2023

15

16

17

18

19

20

21

22

23

24

25