# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **KAREEM JACKSON,** | : | **Case No. 2:20-cv-3934** |
| | : | |
| **Petitioner,** | : | |
| | : | **Chief Judge Algenon L. Marbley** |
| **v.** | : | |
| | : | **Magistrate Judge Kimberly A. Jolson** |
| **TIM SHOOP, Warden,** | : | |
| | : | |
| **Respondent.** | : | *Death Penalty Case* |

---

## PETITIONER KAREEM JACKSON'S MERIT BRIEF

---

Petitioner Kareem Jackson submits the instant Brief addressing that: 1) Mr. Jackson has satisfied the gatekeeping provision under 28 U.S.C. § 2244(b)(2)(B), 2) Mr. Jackson's *Brady* claim warrants him relief, and 3) Mr. Jackson's *Napue* claim warrants him relief.

Respectfully submitted,

STEPHEN C. NEWMAN (0051928)
Federal Public Defender

*/s/ Alan C. Rossman*
ALAN C. ROSSMAN (0019893)
Assistant Federal Public Defender
Director, Capital Habeas Unit
Office of the Federal Public Defender,
Northern District of Ohio
1660 West Second Street, Suite 750
Cleveland, Ohio 44113
(216) 522-4856; (216) 522-1951 (f)
alan_rossman@fd.org

/s/ Tiana S. Bohanon
TIANA S. BOHANON (100435)
Research and Writing Attorney
Office of the Federal Public Defender,
Northern District of Ohio
1660 West Second Street, Suite 750
Cleveland, Ohio 44113
(216) 522-4856; (216) 522-1951 (f)
tiana_bohanon@fd.org

**Counsel for**
**Petitioner Kareem Jackson**

\* *This pleading was written with the able assistance of legal interns Olivia Cobb and John Erikson.*

# TABLE OF CONTENTS

**MEMORANDUM** ..................................................................................................... 1

I.   PROCEDURAL HISTORY ........................................................................................ 1

II.  RELEVEANT FACTUAL HISTORY ........................................................................ 3

   *A.   The Death of Two Young Men* ........................................................................ 3
   *B.   The Aftermath.* .................................................................................................. 5
   *C.   Remarkably, there was no Subsequent Investigation into Little Bee* ............ 11
   *D.   The Story Presented by The State of Ohio, Framing Mr. Jackson As the Individual Who Planned the Robbery and Was the Actual Shooter.* ..................... 11
      1.   Kareem Jackson planned the burglary, robbery, and attack on local drug dealers ... 12
      2.   Kareem Jackson - The sole shooter ........................................................ 14

III. ACTUAL INNOCENCE - 2244(B)(2)(B) ............................................................... 17

   *A.   The Factual Predicate for These Claims Reasonably Could Not Have Been Discovered Previously Through the Exercise of Due Diligence. (2244(b)(2)(i))* ............ 17
   *B.   2244(b)(2)(ii) A Reasonable Factfinder* ...................................................... 17
   *C.   A Rush to Judgement.* ..................................................................................... 19
   *D.   The Identification of Mr. Jackson as the Shooter is Unreliable.* ................... 20
      1.   Becky Lewis's identification of Mr. Jackson is unreliable. ...................... 20
      2.   Nicki Long's in-court identification of Mr. Jackson is equally troubling. .......... 26
      3.   Boone's testimony is unreliable, inconsistent, and lacking in credibility ................ 28
         a.   Little Bee had a handgun. ................................................................. 29
         b.   Little Bee was the one who knew the victims and thus possessed the sole motive asserted by the Prosecutor as the reason for the killings. .................... 30
         c.   Little Bee is shorter than Mr. Jackson. ........................................... 32
   *E.   It Is Possible There Were Only Three People Involved in The Actual Robbery, Eliminating Mr. Jackson Entirely If The "Short" Guy with The "Little Gun" Was Only 5'4".* ............ 34
   *F.   Contrary To the States Theory of Prosecution, Little Bee Planned the Robbery, NOT Mr. Jackson* ............ 36
   *G.   The State's Theory Of Prosecution That The Handgun Recovered From Williamson Was Left At Her House By Mr. Jackson On The Night Of The Homicides Is Contradicted By Information Provided By Williamson Herself.* ............ 38
   *H.   There was no Confession by Mr. Jackson made to Ivana King.* ................... 43
      1.   The Evidentiary Hearing. ......................................................................... 48
      2.   The impact of Ivana King's evidentiary hearing testimony on the gateway assessment pursuant to 2244. ............ 50
   *I.   Michael Patterson's Letter that "Boone did it."* .......................................... 54
   *J.   Conclusion.* ..................................................................................................... 57

IV.  THE MERITS OF MR. JACKSON'S BRADY AND NAPUE CLAIMS ............................... 58

*A.*     *Brady – Withheld Statements Presenting Proof That Mr. Jackson Was NOT the Shooter*................................................................................................ *58*
    1.    Withheld Reports were Exculpatory .................................................. 60
    2.    Materiality of the Suppressed Reports .............................................. 63

*B.*     *Napue – Intimidation by Law Enforcement Resulting in King's False Statement That Mr. Jackson Confessed*.......................................................... *66*
    1.    Facts giving rise to Mr. Jackson's *Napue* Claim ............................ 66
    2.    Evidentiary Hearing – Ivana King's Truth ...................................... 67
    3.    *Napue* Standard ............................................................................. 74
       a.    Ivana King's Statement that Mr. Jackson told her he had "done two people" was false. ................................................................................. 75
       b.    The Statement "done two people" was material. ................................ 78
       c.    The Falsity of the Statement Was Known By The Government. ......... 79

**CONCLUSION** ...................................................................................................... **81**

# **TABLE OF AUTHORITIES**

**Cases**

*Berger v. United States*, 295 U.S. 78 (1935) ........................................................................ 58

*Brady v. Maryland*, 373 U.S. 83 (1963) ........................................................................ passim

*Burks v. Egeler*, 512 F.2d 221 (6th Cir. 1975) ........................................................................ 80

*Caldwell v. Lewis*, 414 Fed. Appx. 809 (6th Cir. 2011) ........................................................................ 68

*Clark v. Warden*, 934 F.3d 483 (6th Cir. 2019) ........................................................................ 59

*Coe v. Bell*, 161 F.3d 320 (6th Cir. 1998) ........................................................................ 74

*Gaye v. Lynch*, 788 F.3d 519 (6th Cir. 2015) ........................................................................ 68

*Hayes v. Brown*, 399 F.3d 972 (9th Cir. 2005) ........................................................................ 80

*House v. Bell*, 547 U.S. 518 (2006) ........................................................................ 18

*Humphrey v. U.S. AG Off.*, 279 F. App'x 328, 331 (6th Cir. 2008) ........................................................................ 59

*In re Jackson*, 12 F.4th 604, 610 (6th Cir. 2021 ........................................................................ 28, 43, 79

*Jackson v. Bradshaw*, No. 2:03-cv-983, 2017 WL 1829773 (S.D. Ohio May 8, 2017 ................. 2

*Johnson v. Finn*, 665 F.3d 1063 (9th Cir. 2011) ........................................................................ 67

*Kyles v. Whitley*, 514 U.S. 419 (1995) ........................................................................ 63

*Lott v. Bagley*, 569 F.3d 547 (6th Cir. 2008) ........................................................................ 18

*Moon v. Head*, 285 F.3d 1301, 1309 (11th Cir.2002) ........................................................................ 80

*Napue v. Illinois,* 360 U.S. 264 (1959) ........................................................................ passim

*Phillips v. Ornoski,* 673 F.3d 1168, 1188 (9th Cir. 2012) ........................................................................ 79

*Pouncy v. Macauley*, 546, F. Supp. 3d 565 (E.D. Mich. 2021) ........................................................................ 80

*Queen v. Bertrand*, 16 Eng.Rep. 391, 399 (1867). ........................................................................ 69

*Schlup v. Delo*, 513 U.S. 298 (1995) ........................................................................ 18

*Smith v. Cain*, 565 U.S. 73 (2012) ........................................................................ 63

*Strickler v. Greene*, 527 U.S. 263 (1999) ........................................................................ 59

*United States v. Mejia*, 69 F.3d 309 (9th Cir. 1995) ........................................................................ 68

*United States v. Raddatz*, 447 U.S. 667 (1980) ........................................................................ 67, 68

*United States v. Agurs*, 427 U.S. 97 (1976) ........................................................................ 59

*United States v. Bagley*, 473 U.S. 667 (1984) ........................................................................ 63

*United States v. Lochmondy*, 890 F.2d 817 (6th Cir. 1989) ........................................................................ 74

**Statutes**

28 U.S.C. § 2244 ........................................................................ 3, 17, 18

## <u>PREFACE</u>

Petitioner Kareem Jackson uses the following abbreviations within to reference court proceedings and records:

| Prior Court Proceedings and Records | Abbreviation |
|---|---|
| *Jackson v. Bradshaw*, U.S. District Court, SD OH, Case No. 2:03-cv-00983 | Dist. Ct. Case No. 03-cv-00983 |
| Franklin County Sheriff's Office Records | FCSO |
| Transcript of June 7, 2023, Evidentiary Hearing | Evid. Hrg. Tr. |
| Petitioner's June 7, 2023, Evidentiary Hearing Exhibits | Evid. Hrg. Exh. |

<u>**MEMORANDUM**</u>

## I.      PROCEDURAL HISTORY

This Court is well apprised of the procedural history in Mr. Jackson's case that presents the current posture of these proceedings.[1] However, it is imperative to recount the relevant events that gives rise to the instant request for relief.

In 1998, Mr. Jackson was convicted and sentenced to death for the murders of two young men, Antorio Hunter and Terrence Walker. After his conviction, Mr. Jackson exhausted all possible avenues for relief in state court and proceeded to file his first petition for a writ of habeas corpus. That petition was denied, and upon appeal to the Sixth Circuit, the District Court's decision was affirmed. After the conclusion of his first habeas petition, the only chance of Mr. Jackson not being killed by the State of Ohio was clemency. Once appointed, the Federal Public Defender's Office conducted a thorough review of Mr. Jackson's case, including requesting public records from all agencies involved in the investigation and prosecution of Mr. Jackson. Upon receipt of the requested information, and additional investigation, it was revealed that Mr. Jackson's conviction was obtained in such a way that it offended the principles of justice and disregarded the protections afforded to every man and woman under the Constitution of the United States. In response to this revelation, Mr. Jackson went back to state court to present claims related to his *Brady* and *Napue* claims herein.

Back in state court, Mr. Jackson filed a Successor Post-Conviction Petition. Two main allegations formed the basis of Mr. Jackson's request for post-conviction relief. First, documentation provided in response to the public records request revealed that the prosecution

---

[1] <u>Opinion and Order</u> transferring petition to Sixth Circuit for authorization, ECF 11, PageID 179-81.

suppressed a statement from one of the surviving witnesses who identified the shooter as 5'4",

*contrary to* Mr. Jackson's 5'9" stature, and another statement from an independent witness that

supported the proposition that another individual named Little Bee had committed the murders,

and not Mr. Jackson. (*See* Section IV(A), *infra*). Evidence supported that Little Bee was shorter

than Mr. Jackson. Armed with this newly discovered evidence, undersigned counsel proceeded to

re-investigate every aspect of Mr. Jackson's case to determine if there were any other acts of

misconduct. Unfortunately, there were, leading to Mr. Jackson's second allegation. The second

allegation in Mr. Jackson's Successor Post-Conviction Petition related to Ms. Ivana King's

recantation. After decades of becoming well acquainted with fear, she was finally able to reveal a

truth unknown to most:  Mr. Jackson had never uttered any confession to her, *contrary to* her

statement to the police, the Prosecutor's theory of the case, and her trial testimony. Ms. King's

statement that Mr. Jackson confessed to her came to be after hours of being intimidated and

threatened by detectives. (*See* Section IV(B), *infra*). These two allegations represented Mr.

Jackson's First, Second, Fourth, and Fifth Grounds for Relief. After multiple unnecessary delays

in his successor post-conviction proceedings, to the fault of his post-conviction counsel[2], Mr.

---

[2] *See* <u>Traverse</u>, ECF 31, PageID 3806-3808 (explaining same). As agents of a federal agency, federal public defenders typically do *not* appear in State court proceedings without prior authorization from the federal court. That process can be extremely time consuming, particularly if the State Attorney General chooses to object and insist upon litigating the request before the federal court. That was the case here. On January 30, 2017, Jackson's FPD counsel filed a <u>Motion for Authorization to Appear in Ancillary State Court Litigation</u>. (Dist. Ct. Case No. 03-cv-00983: ECF 107, PageID 1340-46.) The Ohio Attorney General's Office, opposed this request. (Dist. Ct. Case No. 03-cv-00983:  <u>Respondent's Opposition</u>, ECF 108, PageID 1428-37.) The State court authorization was denied by the federal court (*Jackson v. Bradshaw*, No. 2:03-cv-983, 2017 WL 1829773 (S.D. Ohio May 8, 2017)), and outside counsel, originally sought by federal counsel to commence the State litigation so as to avoid delay and comply with diligence requirements, was independently required to litigate the State Successor Post-Conviction petition without FPD counsel's assistance.

Jackson's petition was ultimately denied without a previously-authorized evidentiary hearing and dismissed on procedural grounds. On appeal, the trial court's denial of his petition was affirmed. The Ohio Supreme Court denied review.

Mr. Jackson then filed his second federal habeas corpus petition, currently subject to this Court's review. Due to the successive nature of Mr. Jackson's petition, the Sixth Circuit Court of Appeals reviewed his petition to determine if he presented a *prima facie* showing of satisfying the gatekeeping provision for successor petitions pursuant to 28 U.S.C. § 2244. Finding that he had, the Sixth Circuit then authorized Mr. Jackson to proceed before this Court. After such, Mr. Jackson requested an evidentiary hearing related to his *Napue* claim and sought to expand the record with documentation in support of his *Brady* claim. This Court granted both. The evidentiary hearing, subject to this Court's analysis in the instant matter, was conducted on June 7, 2023. Following the hearing, this Court set a briefing schedule for both parties to address 1) Mr. Jackson's ability to satisfy the gatekeeping provision under 28 U.S.C. § 2244(b)(2)(B), 2) whether Mr. Jackson's *Brady* claim warrants him relief, and 3) whether Mr. Jackson's *Napue* claim warrants him relief. Pursuant to that scheduling order, this brief follows.

## II.    RELEVEANT FACTUAL HISTORY

### A.  The Death of Two Young Men

In the early morning of March 25, 1997, Antorio Hunter, age 19, and Terrance Walker, age 23, were inside an apartment located at 3117 Lupo Court, Columbus, Ohio. Accompanying them were two young women, Nikki Long and Rebecca "Becky" Lewis. Shortly after midnight, Hunter allowed two men to enter the apartment: one Black male identified by his physical appearance as

short, and heavy set and another Black male identified as tall.[3] During this time, both Walker and Long were in a bedroom conversing. Upon hearing additional voices outside the door, Walker proceeded to leave the bedroom, followed by Long. An exchange then took place between Hunter, Walker and the short, heavy-set man. Based on the exchange between the three, it appeared as if Walker and Hunter knew the short, fat, heavy set man, who was there to purchase marijuana.[4] Additionally, before allowing someone to enter the apartment, both Hunter and Terrance would customarily look outside the window to identify who was knocking on the door to gain access.[5] Circumstances suggested that Hunter and Walker knew this individual. After the purchase of marijuana, both men left the apartment. However, a short time later, they would return.

The two men who originally entered the apartment to purchase marijuana returned with two additional men, armed with rifles. Hunter and Walker were ordered to give the assailants money and drugs while the assailants searched the apartment. Long and Lewis were forced into the kitchen while Hunter and Walker were forced to lay face down on the ground. While the young women were in the kitchen, gunshots were fired, and silence followed. Long and Lewis eventually left the apartment and called 911 once they discovered the intruders had left. Officers and detectives of the Franklin County Sheriff's Office ("FCSO") responded to the scene to discover a double homicide with the two young women as surviving witnesses. Immediate attention was turned to Long and Lewis since they were the only ones who could provide any leads. Both Lewis and Long were immediately separated into patrol cars when detectives arrived to interview them.[6]

---

[3] Becky Lewis, Police Interview, 2:57AM, 3/25/1997, ECF 24-1, PageID 3601; Nikki Long, Police Interview 3/25/1997, ECF 24-1, PageID 3597.
[4] *Id.* at PageID 3595-96.
[5] *Id.*
[6] Detective Zachary Scott, Direct Examination Testimony, ECF 15-2, PageID 2249; FCSO Progress of Investigation, 3/25/1997, ECF 24-1, PageID 3286.

**B. The Aftermath**

Both Long and Lewis gave the same account of the events: a Black heavy-set man, accompanied by a taller lighter-complexioned Black man was inside the residence to purchase drugs. After the drug transaction, additional Black males, armed with "long guns" forced entry into the apartment demanding drugs and money. Long and Lewis were forced into the kitchen and shortly thereafter, Walker and Hunter were killed.[7] In her FCSO interview, which prosecutors turned over to defense counsel, Nikki Long described the shooter as a short guy, "probably about my height . . . I'm 5'3" and 3/8" so he must have been like 5'5", 5'4"."[8] Long later testified that the "short" person was carrying "a little handgun."[9] According to Long, the "short" guy did most of the talking during the robbery, and she recognized his voice from the kitchen, where she could not see the killings, asking each deceased victim "are you going to talk" prior to a shot being fired.[10]

In a withheld investigative report, Detective Zachary Scott indicated Becky Lewis likewise identified the short guy as approximately 5'4" when he spoke with her immediately after the crime took place.[11] And in an on-scene investigative report, Officer T.A. Shepard indicated he relayed the 5'4" height description after speaking solely to Rebecca Lewis who, as noted, had been separated from Long.[12] Consistent with all the above, police were searching for a 5'4" individual pursuant to consistent descriptions by **both** surviving witnesses.

Because they both were able to see the individuals who entered the apartment, officers sought to get sketches to circulate to the public. Long indicated she was not able to identify the

---

[7] FCSO Progress of Investigation, 3/26/1997, ECF 24-1, PageID 3288-89.
[8] Nikki Long, Police Interview, ECF 24-1, PageID 3582, 3597-97.
[9] Nikki Long, Direct Examination Testimony, ECF 15-2, PageID 2024.
[10] *Id*. at PageID 2018.
[11] FCSO Progress of Investigation, 3/26/1997, ECF 24-1, PageID 3288.
[12] FCSO Progress of Investigation, 3/25/1997, ECF 24-1, PageID 3286-87.

short guy for composite purposes and subsequently admittedly only identified Mr. Jackson after his arrest and seeing him on television in handcuffs.[13] However, Long *had* focused more directly on the taller individual. Long gave such a robust description of that individual that police were able to create an extremely accurate composite. He was tall and light-skinned and carried a "long gun."[14] Long provided a level of detail that allowed police to create the following computer-generated composite sketch:



Due to the accuracy of Long's description, an individual recognized himself as the person depicted in the composite sketch circulated in the news and immediately turned himself in.[15] This person was Derrick Boone. As she accurately described, driver's license records list Boone as 6'0" 180 lbs, and he is light skinned in complexion.[16]

[13] Nikki Long, Direct Examination Testimony, ECF 15-2, PageID 2035.
[14] *Id.* at PageID 2204.
[15] State of Ohio, Opening Statement, ECF 15-2, PageID 1759.
[16] Derrick Boone Driver's License Report, ECF 24-1, PageID 3617-19.



Long also testified that a "tall, big guy" [not Boone] entered the apartment carrying a long, silver gun, and told everyone to get down on the ground.[17] Prison records show that [co-defendant] Patterson is 6'3" and weighed 250lbs at the time.[18] Thus, Patterson fit the description of the other "tall, big guy" carrying the long, silver gun.

Becky Lewis provided a description of the other individual, who was the alleged shooter. When officers requested that Lewis assist in creating a composite sketch, she stated, "I would try, but I mean, I'm not really sure of what he looked like."[19] Lewis' ability (or rather **in**ability) to recall the individual alleged to be the gunman and later alleged to be Mr. Jackson resulted in this generic and cartoonish, hand-drawn composite:

---

[17] Nikki Long, Direct Examination Testimony, ECF 15-2, PageID 2024.
[18] Michael Patterson, FCSO Booking Sheet, ECF 24-1, PageID 3626.
[19] Becky Lewis, Police Interview, ECF 24-1, PageID 3605.



male black
508' 195 lbs 20ish

Notably, a sketch artist drew the composite for Lewis because her difficulty remembering specific details made it impossible to use the more sophisticated computer program used by Long to create the extremely accurate likeness of the individual identified as Boone.[20]

Not surprisingly, it was Long's composite that would get the results sought by the Sherriff's Office. On March 27th, shortly after seeing the sketches on television, Derrick Boone called the Sheriff's Office and arranged to meet detectives to explain his involvement. He acknowledged his presence at the robbery and named Mr. Jackson as the shooter. Admittedly, as Boone testified, he "wanted to direct the attention away from [him]self and put it on Kareem Jackson."[21] The stories he told the police were needed "to save [his] own neck."[22]

---

[20] Officer Gary S. Wilgus, Direct Examination Testimony, ECF 15-2, PageID 1817.
[21] Derrick Boone, Cross-Examination, ECF 15-2, PageID 2146.
[22] *Id.* at PageID 2142.

During the interview with Boone, detectives doubted Boone's truthfulness, and rightfully so.[23] However, given that Boone was the only one providing any information to the unsolved crime, law enforcement moved forward with what they had. Boone initially explained to detectives that he, Mr. Jackson, Michael Patterson, getaway driver Malaika Williamson, and another unnamed guy went to the Lupo Court apartment, a known drug house, and unbeknownst to him, there was a plan to rob the occupants of drugs and money.[24] After searching the apartment and demanding money and drugs from the young men, Mr. Jackson shot them both, asserting that his motive for doing so was that they knew his name.[25] After discussing his version of events, Boone proceeded to take detectives on a tour of the homes where Mr. Jackson, Patterson, and Williamson lived.[26] He professed to have no idea where the other participant resided. The following day, based upon Boone's information, Mr. Jackson was arrested.

On March 28th, three days following the shooting, an arrest warrant was issued for Mr. Jackson, along with a search warrant for Mr. Jackson's known residence, 2220 Bancroft, Columbus, Ohio. This address was the townhouse home of Mr. Jackson's girlfriend and mother of his newborn daughter, Ivana King. In conjunction with his arrest and the search of Ms. King's townhouse, law enforcement sought a warrant to take forensic samples from the body of Mr. Jackson. It was necessary to provide the court with an Affidavit of factual support warranting these searches. That Affidavit, secured through a Public Records Act request from the Franklin County Sheriff's Office and premised primarily upon information attained from Boone and to a lesser extent from the two surviving young ladies, reads as follows:

---

[23] Derrick Boone, Cross Examination, ECF 15-2, PageID 2119-20, 2124-26, 2131, 2133 (During trial, Boone admitted to lying multiple times to detectives.).

[24] Derrick Boone, Police Statement 10:56PM, 5/27/1997, ECF 24-1, PageID 3342-46.

[25] *Id.* at PageID 3347.

[26] FCSO Progress of Investigation Report, 3/27/1997, ECF 24-1 PageID 3272.

> Statements from [Nikki Long and Becky Lewis] were believable and consistent. The witnesses/victims stated that shortly after midnight two male blacks came to the apartment. Hunter let them in; **a large male black (later identified as Kareem Jackson) and a small male black (identified as Little B.)**[27]

Law enforcement knew that the short guy was Little Bee.

Shortly after receiving a phone call from Boone (a phone call set up to ensure Mr. Jackson was at the residence)[28], countless armed law enforcement officers rushed into Ms. King's townhouse home, searched for weapons utilized in the Lupo Court robbery, and arrested Mr. Jackson.

Meanwhile, Boone visited Williamson's apartment, accompanied by an undercover detective posing as Mr. Jackson's uncle, to retrieve the handgun used to commit the murders.[29] Curiously, Malaika wiped the weapon down before handing it over.[30] Patterson, Williamson, and Boone were all charged in connection with the murders of Hunter and Walker, but all received plea deals in exchange for their cooperation and testimony against Mr. Jackson. Boone and Patterson pled guilty to two counts of manslaughter and were sentenced to fifteen-years prison[31] and Williamson received a ten-year prison sentence.[32] These plea deals and imposition of sentences were executed prior to Mr. Jackson's trial.[33]

---

[27] <u>Affidavit in Support of Search Warrant</u> for Kareem Jackson's body, ECF 35-1, PageID 3921.
[28] Detective Zachary Scott, Direct-Examination Testimony, ECF 15-2, PageID 2263-63.
[29] Malaika Williamson, Direct Examination Testimony, ECF 15-2, PageID 1967.
[30] Detective Mychal Turner, Direct Examination Testimony, ECF 15-2, PageID 2005.
[31] Derrick Boone, Cross-Examination Testimony, ECF 15-2, PageID 2120-2120. Boone acknowledged that the fifteen years he received could itself have been far more serious. The two Manslaughter offenses carried 10 years a piece. In addition to those two charges, Boone pled guilty to an aggravated robbery, which also exposed him to yet another ten years, along with a gun charge. In other words, Boone agreed that "Even on a plea bargain [he] got less than half of what he pled guilty to potentially." *Id.* at 2116. Boone has since been released on or about February 1, 2012.
[32] Malaika Williamson, Direct Examination Testimony, ECF 15-2, PageID 1939-40.
[33] *Id.* at PageID 1953.

### C. Remarkably, there was no Subsequent Investigation into Little Bee

Significantly, none of these co-defendants professed *any* substantive knowledge or information about Little Bee, and the plea deals were accepted based solely upon their assistance in prosecuting Mr. Jackson. At trial, then-detective Zachary Scott testified the police had no leads regarding the identity of "Little Bee" and indicated "it's not a closed case."[34] Detective Scott eventually became Sheriff and was captaining the office when, in response to a Public Records Act Request submitted by counsel in October 2014, the Franklin County Sheriff's Office confirmed it did not further investigate "Little Bee" and lacked any responsive records pertaining to any investigations of an individual known as "Little Bee."[35]

This suggests the State considered their investigation closed upon securing the conviction of Mr. Jackson. It is noted that the getaway driver, Malaika Williamson, testified that pre-robbery, she drove "to the Short North to pick up Michael and another gentleman ["Little Bee"]"[36], and post-robbery action she "ended up taking Michael [Patterson] and Little Bee back home."[37]

### D. The Story Presented by The State of Ohio, Framing Mr. Jackson As the Individual Who Planned the Robbery and Was the Actual Shooter.

After a three-day investigation into the murders of the two young men, Mr. Jackson was arrested and indicted on fifteen charges including six counts of Aggravated Murder, with capital specifications, one count of Felonious Assault, four counts of Aggravated Robbery, and four counts of Kidnapping.[38] After refusing to accept a plea deal offered by the State[39], which would

---

[34] Detective Zachary Scott, Direct Examination Testimony, ECF 15-2, PageID 2274.
[35] Public Records Request and Response, ECF 24-1, PageID 3709-11.
[36] Malaika Williamson, Direct Examination Testimony, ECF 15-2, PageID 1940.
[37] *Id.* at PageID 1942-43.
[38] State of Ohio, Opening Statement, ECF 15-2, PageID 1763.
[39] Pretrial Discussion, ECF 15-1, PageID 892-93. Mr. Jackson has historically denied involvement in the killing. He turned down a plea offer to exercise his right to a trial, confident in the fairness and justness of an impartial judicial truth-finding process imbued with constitutional protections.

have taken the possibility of a death sentence off the table, his capital trial commenced. During opening statements, the Prosecutor told the jury it was Mr. Jackson who initially planned and then involved everyone else in the scheme to rob a drug house.[40] The State indicted Mr. Jackson on a course of conduct specification and principal offender specification, basing its theory of prosecution strictly on the assertion that thereafter, during the robbery, Mr. Jackson realized the victims knew his name, and therefore they had to die.[41] The robbery netted the group a total of forty-five dollars and, "a couple of small bags of marijuana, not even enough to divide up between them."[42] The Prosecutor implored the jury, "[Jackson] took care of the problem. Now you take care of him."[43]

Over multiple days, the State called 13 witnesses, made opening and closing statements, and pushed the narrative that Mr. Jackson was the short guy described by the two surviving young ladies, a cold-blooded killer who deserved to be sentenced to death. Their selective presentation and ultimate misrepresentation of the truth was presented as follows.

### 1. Kareem Jackson planned the burglary, robbery, and attack on local drug dealers

The State presented Mr. Jackson as the master mind behind the burglary of the Lupo Court apartment and robbery and execution-style murders of Hunter and Walker. In his opening statement, the Prosecutor told the jury:

> The facts that caused this incident to initially occur began when this defendant, Kareem Jackson, and the other people that **he** involved in this, had obtained what ultimately turned out to be some bad information.[44]

---

[40] State of Ohio, Opening Statement, ECF 15-2, PageID 1753.
[41] State of Ohio, Closing Argument, ECF 15-2, PageID 2461-62.
[42] State of Ohio, Opening Statement, ECF 15-2, PageID 1758.
[43] *Id.*
[44] *Id.* at PageID 1753.

Consistent with this plan, the Prosecutor explained how Mr. Jackson had involved these individuals in the robbery[45] and how Mr. Jackson recruited Malaika Williamson to be the driver.[46] The Prosecutor stated that there was a total of five participants in the robbery – Michael Patterson, Derrick Boone, Kareem Jackson, a fourth individual known mysteriously only as "Little Bee," and one female getaway driver, Malaika Williamson. The four males entered the apartment, held its four occupants at gunpoint, and demanded money and drugs. According to the State's theory of the case, Michael Patterson, Derrick Boone, Kareem Jackson, and Little Bee were **all** present in the apartment when the victims were killed.[47] As per the Prosecutor's opening statement, Williamson testified that at the time of the shooting all **four** male participants – co-defendants "Little Bee", Patterson, Boone, and Jackson – were **inside** the house to her knowledge and from her vantage point.[48] She said it three times. This was an important acknowledgement and set up anticipated testimony from both co-defendants Boone and Patterson. Because co-defendant Patterson witnessed the shootings he could provide critical corroboration of Boone's story for the jury if it were, in fact, truthful.

To promote this narrative Boone testified as the State's main witness. He claimed to only know Patterson, Williamson, and Little Bee, through Mr. Jackson, and claimed all those individuals were Mr. Jackson's friends.[49] He explained to the jury that Mr. Jackson provided the specific information as to how the robbery would take place[50] and how Mr. Jackson gave him and Patterson instructions on getting guns from the trunk of the vehicle before going toward the Lupo

---

[45] State of Ohio, Opening Statement, ECF 15-2, PageID 1753.
[46] *Id.* at PageID 1754.
[47] *Id*. at PageID 1756-57.
[48] Malaika Williamson, Cross Examination Testimony, ECF 15-2, PageID 1975; Malaika Williamson, Direct Examination Testimony, ECF 15-2, PageID 1953, 1954.
[49] Derrick Boone, Direct Examination Testimony, ECF 15-2, PageID 2057, 2059, 2060.
[50] *Id.* at PageID 2069.

Court apartment.[51] This painted the State's picture that Mr. Jackson, who sought to rob this known drug house, was the ringleader and principle offender in this whole ordeal.

### 2. Kareem Jackson - The sole shooter

After making Mr. Jackson the focal point of the planning process, the prosecution turned its attention to proving Mr. Jackson as the one who killed Hunter and Walker. The prosecution knew that to secure a death sentence, the jury would need to believe that not only was Mr. Jackson involved in the robbery, but that he was the actual shooter, designated as the "principle offender" in the indictment's capital specification.

The prosecution again used Boone to present this trial narrative. Boone testified that after arriving at the Bancroft residence, Mr. Jackson and Little Bee went inside. According to Boone's trial testimony, the plan was for Mr. Jackson and Little Bee to go into the apartment first, followed by Boone and Patterson who would "count to ten and then come on in."[52]

Once all four were in the apartment, the robbery of the drug house ensued. Hunter and Walker were ordered to the ground and demanded to turn over money and drugs. Armed with a 12-guage shot gun, Boone, minimizing his own active participation, explained that he just stood at the front door while the other three men were inside the apartment looking for drugs and money.[53] As will be demonstrated, *infra*, Boone was a very active participant.

Mr. Jackson was the only one alleged to have a handgun.[54] After searching the apartment, Little Bee left but returned to the apartment several times. Laying side by side, Hunter and Walker were face down on the floor in the living room. According to Boone, while Hunter and Walker

---

[51] Derrick Boone, Direct Examination Testimony, ECF 15-2, PageID 2069-70.
[52] *Id.* at PageID 2068.
[53] *Id.* at PageID 2075.
[54] *Id.* at PageID 2076.

made pleas for their life, Mr. Jackson randomly stated that he had to kill them because they knew his name.[55] In closing argument, the Prosecutor reiterated, "[t]he **only** person who has a motive to eliminate the people is the **only** person who was known by the people."[56] Thereafter, Mr. Jackson allegedly grabbed a cushion from the couch, placed it over their heads, and shot them.[57]

The Prosecutor also used Lewis' and Long's in-court identification of Mr. Jackson to corroborate and support Boone's identification of Mr. Jackson as the shooter. Their identification of Mr. Jackson as the short guy with the handgun they described on the night in question provided the corroborative inference that he was in fact the one who pulled the trigger. The surviving eyewitnesses testified it was indeed the "short guy" who carried a handgun whereas the other intruders had "long guns."[58] This important testimony placed the murder weapon in Mr. Jackson's hands rather than Boone, Patterson, or the illusive "Little Bee." And by comparison to Boone and Patterson, Mr. Jackson *was* relatively short.

Arguably the most damning evidence confirming Mr. Jackson as the shooter was the testimony of Ivana King. (*See* Section III(G), *infra*, for a complete discussion and analysis of Ms. King's trial and evidentiary hearing testimony.) Ms. King was Mr. Jackson's girlfriend during this time and had recently given birth to their daughter, Kyanna Jackson. Due to the birth of his daughter, Mr. Jackson had been spending more and more time at King's house. For all intents and purposes, Mr. Jackson shared this residence with Ms. King, located at 2220 Bancroft. On the day of his arrest, law enforcement arrived at their home with a search warrant and an arrest warrant.

---

[55] *Id.* at PageID 2088, Derrick Boone, Direct Examination Testimony. *See also,* Becky Lewis, Direct Examination Testimony, ECF 15-2, PageID 1884 (indicating it was the person with the little gun who came in to purchase marijuana that appeared to know the male victims.).
[56] State of Ohio, Closing Argument, ECF 15-2, PageID 2458-59.
[57] *Id.*
[58] Becky Lewis, Direct Examination Testimony, ECF 15-2, PageID 1889-90; Nikki Long, Direct Examination Testimony, ECF 15-2, PageID 2024.

After the search of the home and the arrest of Mr. Jackson, detectives took Ms. King to the police station for questioning. During this questioning, Ms. King revealed that three days prior, Mr. Jackson had confessed to the killings.

This was the single most incriminating piece of evidence against Mr. Jackson. During closing argument, the Prosecutor urged the jury to give great weight to King's testimony because she was "the final piece of the puzzle."[59] "Ivana King was not a participant in this case. She didn't get any deals."[60] The Prosecutor argued King was in love with Mr. Jackson[61]; therefore, her statement that he confessed to her "in its **overwhelming and powerful nature**, considering who it was coming from at the time it was said, **would convict him in and of itself**."[62]

By the State's account, the theory of their prosecution was simple, albeit a cherry-picked presentation of the truth. Kareem Jackson planned the robbery, he recruited the participants, he was the sole person with a handgun, he killed both young men because they knew his name, and Kareem Jackson confessed to the killings. End of story. At the conclusion of trial, the jury found Mr. Jackson guilty and sentenced him to death. This simple narrative presented by the prosecution was a gross mischaracterization of the complete story, belied by a plethora of substantive, exculpatory evidence, much of which was withheld from the defense. It was a disingenuous story,

---

[59] State of Ohio, Closing Argument, ECF 15-2, PageID 2459.
[60] *Id.* While that is true in the sense that all the co-defendants (Boone, Patterson, Williamson) were given plea bargains, pled guilty to various criminal charges, and were sentenced accordingly, all in advance of Mr. Jackson's trial, Ms. King declared: "I was extremely intimidated and afraid when the police asked me if I had someone who could watch my children and implied I would not be seeing them for a very long time unless I said what the police wanted to hear." (Declaration of Ivana King, 09/26/15, ECF 24-1, PageID 3703; Evid. Hrg. Exh. 5.) As a result: "The police had a story they wanted to hear, and I told them what they wanted to hear so that I could go home to my children because I had nothing to do with any crime and knew nothing about the guns the police took out of my house." (*Id.* at PageID 3704.).
[61] State of Ohio, Closing Argument, ECF 15-2, PageID 2415.
[62] *Id.* at PageID 2461-62, State of Ohio, Closing Argument.

the truth of which the twelve individuals responsible for making such a grave, life and death decision were not privy. As will be discussed more fully in Section III, *infra*, in discussing the actual innocence gateway, it will be shown by clear and convincing evidence that had the jury been presented with all evidence relating to such, no reasonable jurist would have found Mr. Jackson guilty, and it is arguably asserted that this Court would not be sitting here in this position to correct this injustice formulated by the State.

### III.   ACTUAL INNOCENCE - 2244(B)(2)(B)

#### A.  The Factual Predicate for These Claims Reasonably Could Not Have Been Discovered Previously Through the Exercise of Due Diligence. (2244(b)(2)(i))

Mr. Jackson incorporates by reference his extensive discussion of his diligence pursuant to 28 U.S.C. § 2244(b)(2)(i), as detailed in his <u>Traverse</u>, ECF 31, PageID 3793-3813.

#### B.  2244(b)(2)(ii) A Reasonable Factfinder

The Sixth Circuit Court of Appeals authorized Mr. Jackson's successive petition, currently before this Court. In its March 27, 2023, <u>Opinion and Order</u>[63], the Sixth Circuit evaluated whether Mr. Jackson presented a *prima facie* showing that the facts giving rise to his *Brady* and *Napue* claims completely undermined his conviction. More specifically, under 2244(b)(2)(B)(ii), the Court found that on its face, in light of the record as a whole including the withheld evidence currently available, no reasonable juror would have found him guilty of the murders.

Claims presented in a successive habeas petition pursuant to § 2244 that were not presented in a prior habeas petition, as is the case here, must be dismissed unless "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would

---

[63] ECF 41, PageID 3977.

have found the applicant guilty of the underlying offense." Although not a standalone claim to be reviewed on the merits to warrant relief, this actual innocence gateway allows for the merits of a successive petition to be reviewed within the context of all evidence produced, not just that found to be admissible at trial. Under this gateway, it is not required for a petitioner such as Mr. Jackson to prove he is innocent. Instead, the burden is to "advance facts that establish that it is more likely than not that he is actually innocent" of the crimes of which he has been convicted. *Lott v. Bagley*, 569 F.3d 547, 549 (6th Cir. 2008). Mr. Jackson is therefore tasked with "persuad[ing] the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty ***beyond a reasonable doubt***." *Schlup v. Delo*, 513 U.S. 298, 329 (1995) (emphasis added).

Conclusive exoneration is not required to be successful. *House v. Bell*, 547 U.S. 518, 538 (2006). The Court in *House* was able to recognize that various pieces of evidence still supported an inference of guilt, however, the new evidence presented was sufficient to support the showing that considered in its entirety and collectively, said evidence could have caused a reasonable juror to have reasonable doubt. *Id*. at 554. The same is true here.

The Supreme Court of the United States has made clear that a reviewing court must consider " 'all the evidence,' " old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under "rules of admissibility that would govern at trial." *See Schulp*, 513 U.S. at 327–328 (1995), citing *House, supra*. This Court has before it, all the evidence for its review. And with such, as argued *infra*, it is evident that Mr. Jackson satisfies his burden.

## C. A Rush to Judgment

As set forth in the upcoming paragraphs, the State's case, at best, was weak. The timeline of events that took place prior to the arrest of Mr. Jackson for the murders of Antorio Hunter and Terrance Walker illuminates why.

The days following the murders produced various potential suspects. Some leads were investigated, and others were not. By all accounts, there was no shortage of information given to detectives to assist in identifying the individuals responsible for the death of Hunter and Walker.[64] To be fair, some information was conclusively determined to be unhelpful. However, to be honest, stones were left unturned.[65] By Thursday, March 27th, no arrest had been made and no viable suspects had been identified by detectives. That was, until the composite aired on television and Boone came forward to law enforcement. Boone was interviewed on Thursday at 10:56 p.m.[66] He was interviewed for a second time by Detectives Scott and Rich on Friday, March 28th, at 12:54 a.m.[67] It was during these two interviews that Mr. Jackson was introduced into the investigation. At the conclusion of Boone's interview, pointing the finger at Mr. Jackson, detectives took Boone on a quest to locate the known residences of Mr. Jackson, Patterson, and Williamson.[68] This lasted until approximately 3 or 4 a.m. on Friday, March 28th.[69] In total, detectives had spent approximately four to five hours with Boone. Due to being tired, detectives decided to resume their investigation at 9:00 a.m.[70] But, the investigation was over for all

---

[64] FCSO Progress of Investigation Reports, ECF 24-1, PageID 3268, 3270-71, 3274, 3276, 3278-79.
[65] Id.
[66] Derrick Boone Police Interview, ECF 24-1, PageID 3344.
[67] PageID 3365, ECF 24-1.
[68] FCSO Progress of Investigation Report, ECF 24-1, PageID 3272.
[69] Id.
[70] Id.

practical purposes. By 11:00 a.m., 12 hours after meeting with Boone, of which only four or five hours were spent actively investigating the information received from Boone, detectives and law enforcement were at Mr. Jackson's residence en masse, armed with weapons, a search warrant, and an arrest warrant. By 2:00 p.m., a news release was published declaring that Mr. Jackson had been arrested for the murders.[71]

At the time of Mr. Jackson's arrest, the only information or evidence the Franklin County Sheriff's Office had implicating Mr. Jackson as a killer was Boone's statement. When they sought the arrest warrant, declaring Mr. Jackson as the shooter, Malaika Williamson had not been interviewed, Michael Patterson had not been interviewed, Ivana King had not been interviewed, no weapons had been recovered and no forensic evidence had been found.[72] In fact, there was *no corroborating evidence* to lead detectives to believe that anything Boone told them hours earlier was in fact true. *All* evidence, outside of Boone's statement, was secured *after* Mr. Jackson was arrested and declared the shooter. This is the initial lens in which the integrity of Mr. Jackson's conviction should be viewed.

### D. The Identification of Mr. Jackson as the Shooter is Unreliable.

Mr. Jackson was identified as the shooter by Derrick Boone. Becky Lewis picked Mr. Jackson out in a lineup and later identified him in court, as did Nikki Long. There are valid concerns that call into question the reliability of these identifications.

### 1. Becky Lewis's identification of Mr. Jackson is unreliable.

The Prosecutor emphasized to the jury that Lewis was in the best position to identify Mr. Jackson.[73] Lewis had identified Mr. Jackson both in a lineup and at trial. These identifications

---

[71] <u>FCSO News Release, March 28, 1997</u>, ECF 24-1, PageID 3523-3524.

[72] Malaika Williamson, Michael Patterson, and Ivana King were not interviewed until the evening following Mr. Jackson's arrest. ECF 24-1 PageID 3409, 3397, 3430.

[73] State of Ohio, Opening Statement, ECF 15-2, PageID 1761.

should be given minimal weight. The first point, is that at trial, Ms. Lewis admitted that in the short time she was at the apartment **before** the incident unfolded, ("only about maybe 45 minutes"[74]), she had finished smoking a blunt, that she described as being like a "cigar,"[75] the size of "maybe like two joints."[76] She admitted she had smoked another two blunts earlier in the evening.[77] Similarly, when asked to describe what "the white girl" was doing, referring to Lewis, Boone also explained that he didn't know what was wrong with her and that "she was high, I guess."[78] Lewis admitted that smoking marijuana that night had an effect on her.[79] So her perceptions were certainly skewed.

Secondly, Ms. Lewis did not make a photo identification of Mr. Jackson until **after** his arrest.[80] Of importance, and something the jury was not made aware of, the photo identified by Ms. Lewis was **not** the recent March 28, 1997, mugshot of Mr. Jackson as he looked at the time of his arrest.

---

[74] Becky Lewis, Direct Examination Testimony, ECF 15-2, PageID 1922.
[75] *Id*. at PageID1909.
[76] *Id.* at PageID 1920.
[77] *Id*. at PageID 1912.
[78] Derrick Boone, Direct-Examination Testimony, ECF 15-2, PageID 2078.
[79] Becky Lewis, Direct Examination Testimony, ECF 15-2, PageID 1910.
[80] Detective Zachary Scott, Direct Examination Testimony, ECF 15-2, PageID 2271-72 (stating that Lewis identified Mr. Jackson's photo from a photo array at 1PM on March 28, 1997); Detective Zachary Scott, Cross Examination Testimony, ECF 15-2, PageID 2281 (stating that Kareem Jackson was arrested at approximately 11AM on March 28, 1997).



Rather it was a several years-old photo of Mr. Jackson from his earlier unarmed[81] robbery (a federal prosecution to which he confessed). The photo did **not** resemble his appearance at the time of the murders,[82] but did, ironically, coincide more closely (perhaps) with that generic cartoonish composite, generated from her cross-racial identification.

---

[81] FBI ID Record, Unarmed Robbery, ECF 29-1, PageID 3775.
[82] *See* ECF 24-1, PageID 3319 (Photograph of Kareem Jackson at time of arrest for Hunter and Walker murder); *but see* ECF 24-1, PageID 3319, 3501 (Photograph of Kareem Jackson Identified by Becky Lewis, that was taken four years prior in 1993.)




male black
503' 195 lbs 20ish

Thirdly, in the aftermath of Mr. Jackson's conviction, an eyewitness expert and Associate Professor of Psychology at John Jay College of Criminal Justice, who teaches courses at both the undergraduate and graduate levels and who conducts scientific research in the field of memory, psychology, and the law, reviewed materials, information and testimony specific to the identification made by Lewis and concluded that "her identification of Jackson should **not** be considered reliable based on a number of factors, including:

> **Stress.** People tend to believe that stress *improves* memory but that is simply not accurate. Instead, research reveals that extreme stress—the kind that might be experienced during a violent or unexpected encounter . . . negatively affects the person's memory for both the minor and major details of an event[.]

> \* \* \*

> **Weapon-focus.** Research with both laypeople and trained weapons experts reveals that when a weapon is present during an event—or something people *believe* to be a weapon—memory for other details, such as facial features of an unfamiliar perpetrator or other peripheral details, are impaired[.]

> **Multiple perpetrators.** When there are multiple perpetrators to a crime, the ability of an eyewitness to accurately identify any particular perpetrator diminishes. There is evidence that as the number of perpetrators increases, an eyewitness's ability to

identify any single individual decreases accordingly—especially when the witnessed event was violent[.]

**Cross-race Identifications.** Research conducted over several decades has shown that there is a cross-race effect, such that people are more accurate at identifying strangers from their own racial group than from other racial groups[.] Indeed, a meta-analysis of 39 empirical articles with 91 independent samples and over 5000 participants suggests that there is a significant "moderately sized" Own-Race Bias. Put another way, people are 1.4 times more likely to correctly identify a previously-seen face from their own race compared to other-race faces and 1.56 times less likely to be falsely identified than other-race faces. Thus, generally speaking, people are more likely to falsely identify an innocent suspect when he is from a different racial group[.][83]

Dr. Strange further pointed out in her expert report that phenomena she discussed were "not within the knowledge and understanding of the common juror or layperson[.]"[84] In addition to the cross-racial issues with Lewis' identification, jurors had no knowledge of the impact that the stress of the chaotic robbery, Lewis' focus on the weapon she was beaten and threatened with, and the presence of multiple perpetrators would have definitely had on Lewis' ability to recall details about the "short" guy with the "little gun." Dr. Strange mentions multiple times that violence negatively affects a witness's ability to recall events, and it is a fact Lewis was struck in the head and began bleeding almost immediately when the robbery began.[85]

A final point of concern consistent with the above, is that when originally asked by police whether she got a good look at the individual she would later point out in the courtroom as being Mr. Jackson, Lewis, in explaining why she did **not**, stated she was hit in the head immediately after looking at the short guy, at which point she went blank and fell to the ground.[86] Lewis stated, "that's when he picked me back up and then put me back into the kitchen so I never really got to

---

[83] Dr. Strange Expert Report, 04/12/16, ECF 24-1, PageID 3630-31.
[84] *Id.* at PageID 3633.
[85] Becky Lewis, Direct Examination Testimony, ECF 15-2, PageID 1886.
[86] Becky Lewis, Police Interview, ECF 24-1 PageID 3605.

see [his] face again or anything."[87] Lewis further told detectives that she could not identify the shooter.

> Q: Let me ask you this, if I was an artist, could you describe to me how to draw a picture of this guy?
>
> A: I mean, I could try, but I[m] not really that sure of what he looked like.
>
> Q: Would you try?
>
> A: I would try, but I mean, I'm not really sure what he looked like.[88]

Despite her adamant vocalization that she could not describe the shooter, detectives still moved forward with a composite sketch and almost a year later at trial, Lewis testified with an unexplained confidence that the person at the defense table, Mr. Jackson, was the guy that hit her in the head with the little gun.[89] Lewis' identification, however, is offset by co-defendant Patterson's post-arrest interview with law enforcement. In his police interview of March 28, 1997, Michael Patterson, having acknowledged that Little Bee **did** have a handgun during the robbery, was asked directly: "Who hit the girls?" He answered: "I think it was um Little Bee, I think it was him and the light skinned Dude [Boone.]" The Detective pressed him: "Little Bee and the light skinned Dude?" Patterson answered, "Yeah."[90] Dr. Strange mentions multiple times that violence negatively affects a witness's ability to recall events, and it is a fact Lewis was struck in the head and began bleeding almost immediately when the robbery began.[91] It is hard to believe that had Patterson been called to testify, defense counsel would not have asked about this statement that impeached the identification testimony of Becky Lewis.

---

[87] *Id.* at PageID 3577.
[88] *Id.* at PageID 3605.
[89] Becky Lewis, Direct Examination Testimony, ECF 15-2, PageID 1889, 1894.
[90] Michael Patterson, Police Interview 7:33 and 7:35PM, 03/28/1997, ECF 24-1, PageID 3695.
[91] Becky Lewis, Direct Examination Testimony, ECF 15-2, PageID 1886.

Credibility of Patterson's assertion is further anchored in the fact that his comment references that **both** Little Bee and Boone had each hit one of the young ladies. While there was no testimony at trial from Long reflecting that Boone, (who she had interacted with sufficiently to provide such an accurate composite), had injured her, nor was there any testimony to that effect elicited from Boone himself, it **was** indicated in FCSO investigative reports that in fact Long *had* been injured during the robbery. Detective Scott indicated: "I interviewed Becky Lewis while Nikki Long was being treated by the Medics apparently she had some kind of injury to her ribs."[92]

## 2. Nikki Long's in-court identification of Mr. Jackson is equally troubling.

Nikki Long's identification is even more troubling. In describing the shooter, Long had described him as short. More specifically, Long provided this detailed description to law enforcement:

> A. Um, he was short, kind of thick . . .I think he had on a hat, I don't know. He's brown skin like my complexion, and I think he had a mustache and I don't remember any other, I guess he had on dark clothes, I think black pants, um, and he was short though, he was like stocky short kind of, thick like, he was probably about my height.

In identifying his height, Long explained, "I'm 5'3 3/8". So he must have been like 5'5", 5'4".[93]

During trial, the following exchange took place before Ms. Long provided her in-court identification:

> Q. Now you said that you also got a look at the short guy that you described pretty much being in charge and doing most of the talking?
>
> A. Yes.

[92] FCSO Progress of Investigation, ECF 24-1, PageID 3288.
[93] Nikki Long, Police Interview, ECF 24-1, PageID 3598.

Q. That's the same person that had the handgun; is that correct?

A. Yes.

Q. Do you think that if you saw that person again you would be able to identify him?

A. **I don't know.**

Q. Can you look around the courtroom and tell me if the short guy that had the handgun is in the courtroom anywhere that you recognize?

A. Yes.

Q. **You said you weren't sure whether you would be able to recognize someone as being the short person?**

A. **Yes.**

Q. Can you point him out for us?

A. (Indicating).[94]

Long identified the only possible person who could have been, but not necessarily was, the individual she described on the night in question as the short guy. That is, she identified the person at defense counsel's table who was on trial. Even after she had been on the stand, facing the audience of the courtroom, and presumably seeing Mr. Jackson, she stated she did not know if she could identify the person. Yet, pressed for corroborating testimony, the Prosecutor decided to give her an "indicating" hint.

Mr. Jackson is 5'9" as per his mug shot, *supra*, and the State knew this. To be discussed more fully in Section IV(A) *infra*, the search warrant affidavit filed with the court to secure Mr. Jackson's arrest, revealed that the police knew Little Bee was the small male being discussed by the surviving witnesses:

> Statements from [Nikki Long and Becky Lewis] were believable and consistent. The witnesses/victims stated that shortly after midnight two male blacks came to the apartment. Hunter let them

---

[94] Nikki Long, Direct Examination Testimony, ECF 15-2, PageID 2033-34.

in; **a large male black (later identified as Kareem Jackson) and a small male black (identified as Little B.)**[95]

As an aside, and of considerable importance, it must be addressed that the composite sketch, alleged to be Mr. Jackson, provided that the induvial was 5'8". To date, there are no records, documents, or testimony that explains or provides any indication where this height came from, especially given the fact that Long and Lewis described the individual as 5'4", 5'5".



male black
5'08" 195 lbs 20ish                    96

### 3. Boone's testimony is unreliable, inconsistent, and lacking in credibility.

The Sixth Circuit Court of Appeals recognized, if the surviving eyewitness identifications are undermined, the only remaining eyewitness identification of Mr. Jackson is the highly suspect identification by co-defendant Boone. *In re Jackson*, 12 F.4th 604, 610 (6th Cir. 2021). In discussing Boone's account that Mr. Jackson was the shooter, the Sixth Circuit found that "incriminating testimony from inmates, suspects, or friends or relations of the accused" may have less probative value than "eyewitnesses with no evident *motive to lie*." *Id.* (emphasis

---

[95] Affidavit in Support of Search Warrant for Kareem Jackson's body, ECF 36-1, PageID 3928.
[96] FSCO Composite Sketch, ECF 24-1, PageID 3608.

added). Here, Boone was a friend of Mr. Jackson and as an informant co-defendant, had received a plea deal and sentence in exchange for his cooperation in prosecuting Mr. Jackson in the murders of Hunter and Walker. In reviewing all the circumstances surrounding Boone's statement to police that Mr. Jackson was the shooter, more questions and doubts are raised. **Boone admittedly had motive to lie.** [97] This motive is not only implied by the circumstances but was admitted directly by Boone. In addition, much of Boone's testimony is internally inconsistent specific to substantive issues and contrary to and outright negated by other evidence such that no reasonable juror would have believed Boone's uncorroborated testimony beyond a reasonable doubt. This is especially true considered in conjunction with the exculpatory and unconstitutionally withheld evidence.

### a. Little Bee had a handgun.

As noted, Boone had indicated that Mr. Jackson was the only one alleged to have a handgun.[98] During her trial testimony, when asked about the preparations that occurred at her apartment before the robbery, Malaika Williamson was asked specifically, "what weapons did you see at your house?" In response she testified repeatedly that indeed Little Bee had a handgun.[99]

Of equal significance is that in his police interview of March 28, 1997, Michael Patterson, informed them that Little Bee **did** have a handgun during the robbery:

Q: Okay and [Little Bee] had a handgun is that right?

A: Yes.[100]

---

[97] Derrick Boone, Cross Examination Testimony, ECF 15-2, PageID 2146 (agreeing he wanted to direct attention away from himself and put it onto Mr. Jackson when he came forward and turned himself into law enforcement.)

[98] *Id.* at PageID 2076, Derrick Boone, Direct Examination Testimony.

[99] Malaika Williamson, Direct Examination Testimony, ECF 15-2, PageID 1946-47, 1951.

[100] Michael Patterson, Police Interview, ECF 24-1, PageID 3695.

It is noteworthy that at **no** point in co-defendant Patterson's interview with police did he **ever** identify or even suggest that Mr. Jackson was the actual shooter. Patterson told the police detectives that, 1) in planning the robbery, there was never any plan to shoot or to harm anyone,[101] 2) that he did not know whether Mr. Jackson even had a gun that night, and 3) if he did, Patterson did not see it.[102] Confirmation that Little Bee had a gun further point to him being the shooter and not Mr. Jackson. In conjunction with having a gun, Williamson's trial testimony provides strong support for this. At trial, when asked about the moment of the killing, Williamson testified she was sitting in the getaway car just outside:

> I heard the door open and the door close. At that point they were all in the house. And I'd say about five minutes later "Little Bee" came back out to my car and got back in the car. He sat there for a minute, then he got back out of the car and went back in the House. At this point **Michael [Patterson]and Little Bee – at that point it was when I heard the shots go off**. Little Bee and Michael came back out the door and got in the car, and a few minutes later Derrick and Kareem came out and got in the car and I left. We went back to my house.[103]

And just to be perfectly clear: "When Little Bee went back in, I heard the shots."

### b. Little Bee was the one who knew the victims and thus possessed the sole motive asserted by the Prosecutor as the reason for the killings.

Despite the Prosecutor's assertions and Boone's testimony that Mr. Jackson executed the two young men because they knew him, the evidence that emerged both at trial and subsequently, indicates "Little Bee" and Patterson were the ones who knew the drug house and the male victims. There is **no** evidence that Jackson knew the victims at all aside from Boone's assertion. Significantly, Boone himself admitted in his testimony that it was "Little Bee" who "was talking

---

[101] *Id.* at PageID 3435, <u>Michael Patterson, Police Interview</u>. Because Patterson was never called to testify it is not known whether his statement to police was ever disclosed to defense counsel.
[102] *Id.* at PageID 3436.
[103] Malaika Williamson, Direct Examination Testimony, ECF 15-2, PageID 1942.

about how much money there was and how much weed there was. **He knew the people**."[104] And

with that being the case, Boone then clarified that "Little Bee" gave this information to Mr. Jackson

to try to persuade Mr. Jackson to participate in the robbery with him:

> Q.  Tell us what Mr. Jackson said.
>
> A.  Little Bee was the one trying to plan everything out.
>
> Q.  Okay. Tell us what was being said.
>
> A.  I can't remember exactly everything that was said. He [Little Bee] was just planning everything out.
>
> Q.  As best you can, tell us what was being said.
>
> A.  He was just telling Kareem about a robbery or about some money and drugs, and he was trying to get Kareem to go and rob these people for it.[105]

Co-defendant Malaika Williamson similarly testified that "Mike [Patterson] and Little Bee

told Kareem about these two guys sitting on this money and dope. And I guess about, you know,

for us to go rob them."[106] Once again, trial testimony indicated Little Bee was the one planning

and recruiting for the robbery and he was the one familiar with the drug house.

Consistent with this trial testimony, which directly contradicted the Prosecutor's opening

statement that Mr. Jackson planned this whole thing, is a lot of corroborating evidence. The

Prosecutor certainly knew about this information because the corroboration came in the form of

word for word statements Williamson gave to the police soon after she was first arrested.

---

[104] Derrick Boone, Direct Examination Testimony, ECF 15-2, PageID 2067.
[105] *Id.* at PageID 2066.
[106] Malaika Williamson, Redirect Testimony, ECF 15-2, PageID 1981.

In Williamson's initial statements to police, she repeatedly referred to the unknown "Little Bee" as "little" or "the little one." And when police asked her directly who knew the victims, Malaika clearly explained that Jackson did **not** know them, but that the "little" guy did.

> Q. OK, did you know the two individuals that were killed?
>
> A. No sir.
>
> Q. Who knew them? You don't know?
>
> A. I think the [guy] that I'm not for sure about, [Little Bee], I'm pretty sure he's the one that knew em.
>
> Q. Why did Kareem pick that particular location?
>
> A. Because they were telling him about it, it was like Mike and the guy that I'm not sure about, they called him, like I said, they called him and was telling him about you know that there's, **that they [Little Bee and Patterson] know such and such** I guess and you know that they could stand to make some money and probably get some dope and stuff, **so he [Jackson] didn't, he didn't know em, you know, he didn't know em**, but I know that, I'm pretty sure that **the little one, like I said, I'm not for sure what his name is, he knew em.**
>
> Q. OK.
>
> A. And so it was just more or less like they were sitting [sic] it up for him to come and help them do this. [107.]

The jurors were never made aware of those statements and so were unaware that the Prosecutor's opening words were deliberately misrepresenting the evidence.

In yet a second police interview, Williamson reiterated, "the unknown person [Little Bee] that I keep referring to, what he said, when they were back at the house, from what I overheard him saying, it sound like to me, **he knew the guy that got shot, that guy knew him, okay.**"[108]

### c. Little Bee is shorter than Mr. Jackson.

---

[107] <u>Malaika Williamson, Police Interview 6:21PM, 3/28/1997</u>, ECF 24-1, PageID 3406.
[108] <u>Malaika Williamson, Police Interview 7:46PM, 3/28/1997</u>, ECF 24-1, PageID 3658.

In that same initial interview with detectives from the Franklin County Sheriff's Office, co-defendant Williamson described "Little Bee" as "short." In fact, throughout her interviews with detectives, Williamson – who never referred to "Little Bee" by name, not only described him as "short," but repeatedly called him "little" and significantly, also described him as "little" in relation to Jackson:

> A. [W]e went over to Mike [Patterson]'s house . . . picked them up. We came back over here to my house. Okay and then we were there for a minute, then me, me, Kareem, Mike and Red [Boone] and another gentleman and I can't even think of his name right now. . .
>
> Q. What's he look like?
>
> A. **He's short**, his hair is kind of growing out a little bit, medium build, eh, maybe a little darker than me. [109]
>
> * * *
>
> Q. Why did Kareem pick that particular location?
>
> A. [B]ecause they were telling him about it, it was like Mike and the guy that I'm not for sure about, they called him, like I said, they called him and was telling him about you know that there's, that they know such and such I guess and you know that they could stand to make some money and probably get some dope and stuff, so, he didn't, he didn't know em, you know, he didn't know em, but I know that, I'm pretty sure that **the little one**, like I said, **I'm not for sure what his name is**, he knew em.[110]

As Williamson related it: "Kareem **and the little guy** was in the house, Mike [Patterson] and Red [Boone], they were just standing along the side of the building…"[111] All roads factually and logically led to Little Bee, the never apprehended or investigated individual known to be present during the robbery and murders of Hunter and Walker, as the one who knew them, and the

---

[109] <u>Malaika Williamson, Police Interview 6:21PM, 03/28/1997</u>, ECF 24-1, PageID 3398.
[110] *Id.* at PageID 3406.
[111] *Id.* at PageID 3402.

one who fit the description offered by Long and Lewis. Williamson's repeated and consistent descriptions indicating the unknown fourth male identified only as "Little Bee" was "short" and "little" in comparison to Mr. Jackson support the assertion that he can navigate the gateway provisions of Section 2244.

### E. It Is Possible There Were Only Three People Involved in The Actual Robbery, Eliminating Mr. Jackson Entirely If The "Short" Guy with the "Little Gun" Was Only 5'4".

As noted, inexplicably, indeed bafflingly, given that this was a double homicide, and in what may well be considered a true rush to judgment, police did not bother to investigate "Little Bee" or his role in the robbery and murders.[112] The failure to investigate "Little Bee" is extremely troubling for a number of reasons, not least of which is that the surviving victims **both** testified rather insistently that there were in fact only **three** assailants in the apartment during the murders, and the probable shooter was undeniably "short" or "little," as the case may be.

During opening statements, the Prosecutor insisted to the jury, in spite of what the non-co-defendant witnesses would testify to, that there were **four** persons involved in the actual robbery, and all four were inside the apartment during the shooting.[113] This four-person scenario accommodated Mr. Jackson as the fourth person and the shooter. Yet, Lewis testified that the short individual the prosecution claimed to be Mr. Jackson and a second, "skinny" individual left the apartment after a brief marijuana transaction, but Mr. Jackson reappeared with a "little gun" accompanied by two guys with "long guns" whereas the "skinny" person who was originally with him never returned.[114]

---

[112] In response to a Public Records Act Request submitted by counsel in October 2014, the Franklin County Sheriff's Office confirmed it did not investigate "Little Bee." ECF 24-1, PageID 3709-11, Public Records Request and Response.

[113] State of Ohio, Opening Statement, ECF 15-2, PageID 1756.

[114] Becky Lewis, Redirect Examination Testimony, ECF 15-2, PageID 1925.

Likewise, Long testified there were only **three** assailants during the shootings:

> Q. How many total people I mean in the apartment?
>
> A. **It was three.**
>
> Q. There was you and Becky and Terrence and Antorio?
>
> A. So that would be seven.
>
> Q. And then three other people in addition to the four of you?
>
> A. Right. Four and three, seven.[115]

This was clarified in her recounting.

> Q. How were the people dressed if you remember?
>
> A. Well, the one tall guy that came in with the gun at first had on like trenchcoat like. The **short guy** had on a black hat, and I'm not sure if it was a blue jean jacket or leather jacket. I'm not sure, but it was like a jacket.
>
> Q. Okay.
>
> A. And the tall light-skinned guy had on a long coat as well.[116]

And again reiterated:

> Q. **There were basically three strangers in that apartment that night when everything happened, or at least three people, correct?**
>
> A. **Yes.**
>
> Q. **Could there have been a fourth that you may have seen?**
>
> A. **No, I don't think so.**[117]

---

[115] Nikki Long, Direct Examination Testimony, ECF 15-2, PageID 2023.
[116] *Id.* at PageID 2026-27.
[117] *Id.* at PageID 2041-42, Nikki Long, Cross Examination Testimony.

In an investigative interview shortly before trial, Long also indicated that, although she had heard a fourth male was allegedly involved, she did **not** see a fourth male during the robbery.[118] In a Franklin County Sheriff's Office Department Investigation Summary secured through Public Records Act requests, it is similarly reported that the 911 call that first reported the homicides indicates that the "Caller described the perps as **three male black subjects** in a boxy brown colored 4 door car."[119]

Consider again the surviving witness's statements about the "short guy" with the "little gun." There are four initial possible gunmen based upon the prosecution's theory of the case, and two (Boone and Patterson) are immediately eliminated because of their height, which simply cannot be considered short; the third ("Little Bee") is an unknown individual who was not subsequently investigated by law enforcement, **at all**. The descriptions given by the surviving witnesses, and whether those descriptions match or **differ** from the remaining known suspect (Mr. Jackson) therefore become of utmost importance, as does any evidence implicating the unknown individual ("Little Bee") because such evidence invariably casts doubt over a case wherein identity is the key to conviction. The unconstitutionally withheld evidence casts ample doubt under these circumstances such that a reasonable juror would not have convicted Jackson in light of it.

## F. Contrary To the States Theory of Prosecution, Little Bee Planned the Robbery, NOT Mr. Jackson

Just as it is indicated that Little Bee knew the victims, it is equally compelling that there is evidence that Little Bee was also the one who planned the robbery. Although the State pushed the narrative that this was all about a robbery planned by Mr. Jackson, Little Bee was the one who

---

[118] <u>Robert Tarpley Interview Summary re Nikki Long,</u> ECF 24-1, PageID 3616.
[119] <u>FCSO Homicide Investigation Summary,</u> ECF 24-1, PageID 3247.

planned everything, not Mr. Jackson.[120] Little Bee was the one "telling Kareem about a robbery or about some money and drugs, and he was trying to get Kareem to go and rob these people for it."[121] Little Bee was the one "talking about how much money there was and how much weed there was."[122]

Given that Little Bee knew about the drug house there is a logical inference that supports the previous argument that Little Bee was the one who knew Hunter and Walker. Boone acknowledged this. "He [Little Bee] knew the people."[123] As noted, Williamson also confirmed that Little Bee knew Hunter and Walker.[124] In her initial statement to police, Williamson remained steadfast in her knowledge of who knew Hunter and Walker and who planned the robbery:

> "I backed the car in, and a, Kareem and Red got out the car first, and I guess, and the guy I'm not for sure about, he got out the car too, because I think the guy, that's the guy that actually knew the house, knew where they was going too, he knew who they were."[125]

When detectives asked who knew them, referring to Hunter and Walker, Williamson responds, **"I think the gu[y] that I'm not for sure about, I'm pretty sure he's the one who knew em**." Still insistent on making Mr. Jackson the mastermind, detectives followed up with "why did Kareem pick that particular location?" And again, Williamson tells them it was not Mr. Jackson's plan:

> "because t**hey were telling him about it**, it was like Mike and the guy that I'm not sure about, they called him, like I said, they called him and was telling him about you know that there's that they know such and such I guess and you know that they could stand to make some money and probably get some dope and stuff, so, **he didn't, he didn't know em, you know, he didn't know em, but I know**

---

[120] Derrick Boone, Direct Examination Testimony, ECF 15-2, PageID 2066.
[121] *Id.*
[122] *Id.* at PageID 2067.
[123] *Id.*
[124] *See* Section C.1.b., *supra.*
[125] <u>Malaika Williamson, Police Interview</u>, ECF 24-1, PageID 3401.

**that, I'm pretty sure that the little one, like I said, I'm not for
sure what his name is, he knew em**."[126]

The prosecution was so adamant that Mr. Jackson killed Hunter and Walker because they knew him, yet Boone and Williamson explicitly admitted that it was Little Bee who knew Hunter and Walker and under the State's theory, it would have been him who had the motive to kill. In addressing the jury in closing arguments, the prosecution stated, "[t]he only person who has a motive to eliminate the people is the only person who was known by the people."[127] That person was Little Bee.

### G. The State's Theory of Prosecution That the Handgun Recovered from Williamson Was Left at Her House by Mr. Jackson On the Night of The Homicides Is Contradicted by Information Provided by Williamson Herself.

At trial the Prosecutors evoked testimony from Williamson as to how she came to possess the handgun recovered from her possession by Boone and an undercover detective, who was introduced a Mr. Jackson's "uncle." Boone, with great detail, informed police that Mr. Jackson committed the murders with a .38 caliber revolver that Boone described in detail as "a dingy silver color" with "black tape around the handle."[128] The State elicited trial testimony from Williamson that Jackson **himself** placed the gun in a closet at her house, and that he did so on the night of the murders.[129] This version of events painted a picture of Mr. Jackson ditching the murder weapon immediately after using it by hiding it in Williamson's closet, supporting his identity as the "short" guy with the "little gun." This official trial version is blatantly contradicted by Williamson herself.

---

[126] *Id*. at PageID 3406.
[127] State of Ohio, Closing Argument, ECF 15-2, PageID 2458-59.
[128] <u>Derrick Boone, Police Interview 10:56PM, 3/27/1997</u>, ECF 24-1, PageID 3350.
[129] Malaika Williamson, Direct Examination Testimony, ECF 15-2, PageID 1966-67.

In her initial police interview, taken at 6:21 p.m. on March 28, 1997, get-away driver Williamson stated that Mr. Jackson came back to her home **several days after the homicide**, to drop off the revolver with her:

> Q. [A]t what time did you become in possession of the gun?
>
> A. [W]hat's today, today is Friday[?]
>
> Q. Um huh.
>
> A. Wednesday, Wednesday[.].
>
> Q. [T]ell me how that occurred?
>
> Q. Okay, this happened Monday night, Tuesday morning[.]
>
> A. [R]ight . . . A, how I got the gun, I went, well he came over here, and, a, he had it with him, and he was just like, well, I'm just going to leave it here . . . .[130]

In her second police interview, taken about an hour and a half later at 7:46 p.m. that same evening, Williamson's story of how she became the keeper of the murder weapon began to vary slightly to include a more detailed and a bit more sinister picture:

> Q. Okay. How did you come to have the gun that Kareem used in this? How did the gun come to be in your possession?
>
> A. Okay when it came in my possession, it was Wednesday and he was over at my house, okay, and he was headed back home and I guess because he didn't want to carry it on him walking home and probably do [sic] to the fact of all that had happened already. So, he was just like keep this and he was going, you know, he'll get it later or whatever . . . .
>
> Q. Repeat it for me, what day was it and about what time whenever he gave you the gun?
>
> A. That Wednesday, it was probably in the afternoon, cause it was early.

---

[130] <u>Malaika Williamson, Police Interview</u>, ECF 24-1, PageID 3405-06.

Q. So Wednesday, you're saying two days ago?

A. Yes sir[.].

Q. And in the early afternoon?

A. Yeah[.]

Q. Okay. Did anyone else know you had the gun?

A. Uh my cousin seen it, so she knew it was in the house.

Q. What did you do with the gun after he gave it to you?

A. Put it in the closet.

Q. So he just gave you the gun because he didn't want to carry it walking home?

A. Right, he didn't want it on him.

Q. And to the best of your knowledge, other than your cousin, **no one else knew you had this gun? Did you tell anyone you had it?**

A. **Besides him, oh no, I mean, I didn't go like I got a gun, no, no, no. Like I said, I put it up in the closet**.[131]

That statement in itself, raises questions as to how it was that Boone knew to bring the detective "uncle" to Williamson to retrieve the handgun that was in her possession.

When conversing with the undercover detective believed to be Mr. Jackson's "uncle", Williamson provided yet another, significantly different story. This time, she stated she got the gun from Mr. Jackson, again on Wednesday, but supposedly Mr. Jackson gave it to her when she dropped him off somewhere.[132]

---

[131] *Id.* at PageID 3415-16
[132] FCSO Progress of Investigation 3/31/1997, ECF 29-1, PageID 3776-78.

Mr. Jackson's jury never became aware of Williamson's inconsistent statements because, for unknown reasons, trial counsel engaged Williamson in only the most cursory and extremely truncated questioning about one of her inconsistent statements, before ending the questioning abruptly:

> Q. You also indicated that the gun that supposedly Kareem gave you right after all this happened would have been Tuesday morning; is that right?
>
> A. Yes.
>
> Q. Again, when you were talking to the detectives, when they arrested you that day, page 9, didn't you tell them that Kareem came over on Wednesday and it was not Tuesday morning but Wednesday?
>
> A. I don't remember that.
>
> Q. Okay.
>
> MR. RIGG:    May I approach the witness?
>
> THE COURT: Yes, you may.
>
> Q. (By Mr. Rigg) I have a copy of your transcript when you – I believe at the bottom you indicate that this happened on Monday night or Tuesday Morning. But it was Wednesday when Kareem came over to your house; is that right?
>
> A. I don't understand.
>
> Q. If you want to read that over, take a minute. I will withdraw the question, Ma'am.[133]

After the Defense questioning, however, the Prosecutor engaged in the following misleading line of questioning:

> Q. There was a second place where [defense counsel] asked you questions concerning the guns. Do you recall those questions?

---

[133] Malaika Williamson, Cross Examination Testimony, ECF 15-2, PageID 1974.

A.  Yes.

Q.  And the fact about at least initially you said Wednesday?

A.  Yes.

Q.  The next question, you corrected it, did you not?

A.  Yes.

Q.  And you told them then when you had done it?

A.  Yes.

Q.  Specifically describing how he left the guns behind on Tuesday morning?

A.  Yes.[134]

What the jury never found out was that Williamson gave three separate statements, to the police that Mr. Jackson did **not** leave the gun with her on the night of the homicides. The Prosecutor's attempt to make it seem like Williamson corrected herself during the 6:21 p.m. interview and subsequently maintained Mr. Jackson left the gun with her the night of the murders is belied by every pre-trial statement she gave.

As noted, in none of her varying accounts did Williamson indicate anyone aside from Mr. Jackson, herself, and perhaps her female cousin, knew where the murder weapon was located. Yet, the detective posing as Mr. Jackson's "uncle" testified at trial that an individual named "Baby Shawn" was present when he and Boone retrieved the handgun, and it was "Baby Shawn" who directed Williamson to get the handgun from the closet.[135] Thus, because Boone and "Baby Shawn" also knew the murder weapon's location, which is inconsistent with both Williamson's trial testimony and her previous statements to law enforcement, a reasonable juror could discredit

---

[134] *Id.* at PageID 1982, Malaika Williamson, Redirect Examination Testimony.
[135] Detective Mychal Turner, Direct Examination Testimony, ECF 15-2, PageID 2004.

Williamson's story and the Prosecutor's theory of prosecution about Mr. Jackson hiding the murder weapon in her closet immediately after the homicides, and even her previous stories about him giving her the weapon days later.

This discrediting is properly coupled with the decision by Williamson to wipe down the gun before handing it over[136] to Mr. Jackson's "uncle" as brought to her house by Boone. There was no forensic evidence in this case, and none linked Mr. Jackson to the murder weapon.

As the Circuit Court noted, "[t]he Supreme Court has recognized that 'incriminating testimony from inmates, suspects, or friends or relations of the accused'" when standing alone may have lessened probative value than when supported by independent corroborating evidence. *In re Jackson*, *supra*. Coupled with Boone's dubious credibility and the young ladies' differing description of the shooter, the State's assertion of the validity of the "uncle"-ruse scenario set up by Boone to recover the murder weapon is itself called into question, especially given Williamson's inconsistencies and possibly perjured testimony.

**H. There was no Confession by Mr. Jackson made to Ivana King.**

**1. Trial Testimony**

At trial, Ivana King testified about Mr. Jackson's alleged confession. Ms. King testified that Mr. Jackson began staying with her in early March, shortly before the crime, and Boone moved in with them just a few days after that.[137] Ms. King also testified that Boone came and went as he pleased and possessed a key to the apartment.[138] Ms. King told the jury that when police arrested Mr. Jackson at her residence and executed a search warrant there, she was surprised at the

---

[136] *Id.* at PageID 2005.
[137] Ivana King, Direct Examination Testimony, ECF 15-2, PageID 2159.
[138] *Id.* at PageID 2160; *Id.* at PageID 2185, Ivana King, Cross Examination Testimony.

discovery of weapons and other evidence hidden in her apartment.[139] As Detective Wilgus testified, it was after talking to Boone that the police secured the information to support the search warrant.[140] Upon executing the search warrant, law enforcement went "specifically looking" for the firearms that Boone and Patterson had used in the robbery.[141] Detective Wilgus admitted that specific to the search of Ms. King's townhouse, law enforcement "had been given information, [] more specific information as to what [law enforcement] were looking for" or "where it would be found."[142] Not surprisingly, they found the long guns. Although she was not technically under arrest, Ms. King did not go down to the police station for interrogation "of her own free will," and she believed the police would "make things tough" on her if she did not "tell the police what they wanted to hear."[143]

Underlying Ms. King's recantation is her unsworn statement during the police interrogation, in which Ms. King claimed Mr. Jackson told her he had "done two people," meaning he killed two people.[144] Ms. King recounted that this confession occurred on Tuesday evening, March 25th, the day of the murders. She linked the alleged incriminating statement temporally with seeing the two composites come across her television screen shortly thereafter showing the two individuals who were suspects in the murder of Antorio Hunter and Terrance Walker. Ms. King and Mr. Jackson recognized Boone to be one of the composites, in which Mr. Jackson responded, "shhh! Don't say nothing." Raising questions about the veracity of that unsworn statement, the fact is that the two composites she referenced had not been completed

---

[139] *Id.* at PageID 2163-64, Ivana King, Direct Examination Testimony.
[140] Detective Wilgus, Direct Examination Testimony, ECF 15-2, PageID 1823.
[141] *Id.* at PageID 1825-26.
[142] *Id.* at PageID 1863.
[143] Ivana King, Cross Examination Testimony, ECF 15-2, PageID 2185.
[144] Ivana King, Police Interview, ECF 24-1, PageID 3706; Evid. Hrg. Exh. 4.

until the *following day*, on March 26th.[145] As will be discussed in Section IV(B), *infra*, this discrepancy is quite indicative of the falsity of that statement asserting Mr. Jackson's confession.

When questioned under oath at trial about the alleged confession, Ms. King testified multiple times that she did not remember the alleged conversation or confession ever taking place.[146] She did remember watching television with Jackson at around 10:00 p.m. on Wednesday, March 26, 1997, contrary to her statement to police that it was on Tuesday, May 25th, when the composites done by Rebecca Lewis and Nikki Long were displayed on the evening news.[147] As reflected in her unsworn statement to police, Ms. King commented to Mr. Jackson that one of the composites looked like Boone. Mr. Jackson, who clearly agreed, responded by saying "shhh" and asking her to call Boone's girlfriend, Michelle.[148] There was no indication or acknowledgement the other composite looked anything like Mr. Jackson.

### 2. The sworn Declaration[149].

Ivana King, the source of Mr. Jackson's alleged four-word confession, "he done two people," declared under penalty of perjury that her testimony at trial was false and coerced by law enforcement. The questioning at trial failed to reveal the extent of what had happened to Ms. King, her young children, and her townhouse apartment when the police searched her residence based upon a warrant secured with information provided by Boone. The search can only be described as intentionally intimidating and humiliating. These stunning details provide the context for the

---

[145] Composite Sketches, ECF 24-1, PageID 3506-08.
[146] Ivana King, Direct Examination Testimony, ECF 15-2, PageID 2168-69.
[147] *Id.* at PageID 2170-71.
[148] *Id.*
[149] Declaration of Ivana King, ECF 24-1, PageID 3701-02; Evid. Hrg. Exh. 5.

interrogation and **un**sworn Statement Ms. King provided to the police just a few hours later at the police station:

2. In March of 1997, the police kicked in my door and tore my house apart while serving an arrest warrant for Kareem.

3. My daughter with Kareem was three months old when the police served Kareem's arrest warrant, and she started to cry when the police were ransacking my home.

4. I asked if I could pick up my crying daughter to comfort her, and the police refused.

5. I was naked while the officers tore my home apart, and they would not allow me to cover myself.

6. One officer grabbed my crying daughter by one arm and dangled her in the air while he looked in her crib and flipped her crib mattress; the officer then threw my three-month-old infant back into her crib and stated that I could pick her up.

7. It seemed like there were at least half a dozen officers in my home, and they were all males.

8. The officers kept their guns drawn and pointed at me and Kareem even though we were completely naked, unarmed, and surrounded.

9. I felt like if I moved at all I would be shot to death, and I was terrified.

A few hours later, down at the police station where her "official" statement was taken, Ms. King clarified the context in which she acknowledged Mr. Jackson's alleged four-word confession, "He done two people." Ms. King declared[150]:

12. The police picked me up in an unmarked police car, and they took me to a location that did not look like a police station.

13. The police took me into a room where the guns that were taken from my home were spread out on a table.

---

[150] *Id.* at PageID 3702-03.

14. We walked into a smaller room where they interrogated me.

15. I was extremely intimidated and afraid when the police asked me if I had someone who could watch my children and implied I would not be seeing them for a very long time unless I said what the police wanted to hear.

16. It was late afternoon around the time that the police came to get me.

. . .

29. After the police destroyed my home, tossed my baby like a ragdoll, and accused me of being involved in a crime that I knew nothing about, I was scared, stressed, and confused.

Finally, in support of the argument that Mr. Jackson's "confession," as she told it to the police in her unsworn taped interview, was coerced and occasioned because of her having been intimidated, Ms. King is seemingly prepped as to what to say before the police turned on the tape recorder. As the prepared transcript[151] from that taped conversation reflects, Ms. King literally blurts out the confession almost immediately upon the police turning on the tape recorder for the commencement of her "interview." The alleged confession comes a mere five (5) questions into the interview, and with no specific question having been asked that would warrant such an answer. Inferentially, she "told them what they wanted to hear" as soon as she could manage it:

Q: Go ahead and begin Monday of this week.

A: On Monday, I don't know the exact date or anything, Monday evening to be exact five guys left from my house, Kareem Jackson, Derrick Boone, a guy named Red,[152] another guy named Sonny and another guy unknown to me. They left came back 5 or 6 o'clock in the morning on a Tuesday, left again that same morning, didn't see them until dark on Tuesday.

Q: See who?

---

[151] Ivana King, Police Interview, ECF 24-1, PageID 3705-06.; Evid. Hrg. Exh. 4.

[152] "Red" **is** Derrick Boone. In claiming five people left her house, Ms. King named Boone twice.

A:  Kareem Jackson, Derrick Boone. Derrick Boone left my house. **Kareem Jackson told me he done two people.**

As noted, during closing argument, the Prosecutor urged the jury to give great weight to Ms. King's testimony because she was "the final piece of the puzzle."[153] "Ivana King was not a participant in this case. She didn't get any deals."[154] [155]

In such a weak identification case, where the prosecution urged the weight of these statements and asserted Ms. King's testimony could, on its own, be a legitimate basis upon which to convict Mr. Jackson, the inferential breadth of Ms. King's recantation creates too much room for doubt to comfortably ensure the same outcome of a conviction beyond reasonable doubt. Given the professed significance of Ms. King's recantation, Mr. Jackson's current counsel sought an evidentiary hearing so this Court could assess for itself the credibility of her Declared attestations.

**3.  The Evidentiary Hearing.**

**a.  Cold record, hot tears: Ms. King's June 7, 2023, evidentiary hearing testimony.**

Mr. Jackson incorporates by reference that factual predicate of this testimony as detailed in the Sections IV(B)(i) Facts Giving Rise to Mr. Jackson's *Napue* claim, and (ii) the "Evidentiary Hearing- Ivana King's Truth," *infra,* specific to the merits discussion of his *Napue* claim.

**b.  The failure of the State to call any witnesses in rebuttal of Ms. King's evidentiary hearing testimony.**

---

[153] State of Ohio, Closing Argument, ECF 15-2, PageID 2459.

[154] *Id.*

[155] While that is true in the sense that all the co-defendants (Boone, Patterson, Williamson) were given plea bargains, pled guilty to various criminal charges, and were sentenced accordingly, all in advance of Jackson's trial, Ms. King declared: "I was extremely intimidated and afraid when the police asked me if I had someone who could watch my children and implied I would not be seeing them for a very long time unless I said what the police wanted to hear." (Declaration of Ivana King, ECF 24-1, PageID 3703; Evid. Hrg. Exh. 5.) As a result: "The police had a story they wanted to hear, and I told them what they wanted to hear so that I could go home to my children because I had nothing to do with any crime and knew nothing about the guns the police took out of my house." (*Id.* at PageID 3704.).

Because Derrick Boone was living with Ms. King at the time of the homicides and robbery, and because the long guns that Boone and Patterson utilized in the robbery were found hidden under the sink in Ms. King's residence pursuant to the search warrant, which itself was premised upon information provided by Boone, there is a legitimate inference that having turned himself in to law enforcement, Boone told the police exactly where everything was hidden.[156] Thus, there was, arguably, no reason for the police to tear through Ms. King's townhouse unless they intentionally sought to send a message to Ms. King that she had best cooperate with them. In this context, the now uncontradicted testimony from Ms. King specific to her intimidation occasioned by what she experienced to be an unnecessary and complete trashing of her townhouse is not inconsistent with the record.

Significantly, on at least three occasions during the evidentiary hearing, this Court asked and provided the State the opportunity to bring forth any rebuttal witnesses.[157] That none were forthcoming is telling. In its opposition to Mr. Jackson's request for this evidentiary hearing, the Warden opposed in part because Ms. King's 2015 sworn Declaration alleged her being coerced by "unnamed law enforcement personnel."[158] However, the record in this case both before and during the evidentiary hearing itself references Ms. King's March 28, 1997, Taped Interview Transcript, that identifies the Detective who conducted the coerced interview.[159] Had the Warden sought to

---

[156] *See e.g.,* ECF 15-2, PageID 1863, Detective Wilgus, Direct Examination Testimony (acknowledging that specific to the search of Ms. King's townhouse law enforcement "had been given information, [from Boone]," "specific information" as to both what law enforcement "were looking for" or "where it would be found.").
[157] *See e.g.,* Evid. Hrg. Tr., ECF 47, PageID 4077, 4083, 4108.
[158] ECF 37, PageID 3950.
[159] *See* Evid. Hrg. Tr., ECF 47, PageID 4058, referencing ECF 24-1, PageID 3583 (Ivana King, Police Interview).

rebut Ms. King's evidentiary hearing testimony, it knew precisely who had conducted the interview. Moreover, the Prosecutor was present at the hearing sitting outside the courtroom.[160]

### c. The impact of Ivana King's evidentiary hearing testimony on the gateway assessment pursuant to 2244.

The import of Ms. King's recantation cannot be overstated. Contextually, the Prosecutor, apparently sensing the shaky credibility of Boone's uncorroborated version of events about the homicides, beseeched the jury that it was Ms. King's testimony that Mr. Jackson confessed to her that they should believe, even if they didn't believe Boone. The oration was profound and demanding. Over four pages of transcript testimony, the Prosecutor urged the jury to give great weight to Ms. King's testimony because Ms. King was in **love** with Mr. Jackson[161]; therefore, her statement that he confessed to her "in its **overwhelming and powerful nature**, considering who it was coming from at the time it was said, **would convict him in and of itself**." [162]

The terminology of "un-corroborated" is significant because the *only* other eyewitness to the shootings was co-defendant Patterson. Having pleaded guilty *and* been sentenced by the time of Mr. Jackson's trial, (thereby eliminating any Fifth Amendment right to refuse testifying), there was no reason why the State would not call him as a witness to corroborate for the jury Boone's version of events. As discussed *supra,* however, there are valid and reliable inferences to be drawn that Patterson would *not* have corroborated Boone, and arguably in Section I, *infra*, he would have actually implicated Boone as one of the possible shooters. Thus, the credibility of Boone's testimony was weakened, prompting, not surprisingly, the Prosecutor's closing-argument

---

[160] Evid. Hrg. Tr., ECF 47, PageID 4015 (referencing Warden's witness as sitting outside the courtroom specific to separation of witnesses consideration.).
[161] State of Ohio, Closing Argument, ECF 15-2, PageID 2415.
[162] State of Ohio, Closing Argument, ECF 15-2, PageID 2461-62.

comments to the jury about the reliability of convicting Mr. Jackson solely upon the credibility of Ms. King's statement to the police about Mr. Jackson's "he done two people" confession.

Having subjected her recanted testimony to a true credibility assessment by this finder of fact, the generic caveat that recanting testimony should be treated with suspicion is eliminated. Assuming *arguendo,* that this Court finds Ms. King's testimony to be credible, the following arguments become viable and of greater significance than they otherwise might have been if assessed in the context of a cold record.

In assessing the probable impact of Ms. King's testimony specific to her intimidation and its relevance for § 2244's gateway analysis, it is best contextualized, again, by the way this information was *not* presented at trial. How extensively was Ms. King's apartment searched? At trial, numerous photos (39 in all) were presented to reflect the thoroughness of the search. Those photos also reflect the disarray her house was left in by the police.[163] Outside the context of any factually-presumed intimidation, defense counsel objected to the introduction of State Exhibits 3-H to 3-I, 3-Q, 3-U, 3-X to 3-Z, 3-AA to 3HH, and 3-JJ, as all photographs that "depict areas of the apartment [] where I believe nothing was found."[164] Before the jury, defense counsel understatedly questioned Ms. King specific to only two (2) photographs: "It appears as though things were kind of thrown around?"[165] Ms. King only acknowledged at trial that her "house didn't look like that until the police were done searching."[166]

Yet other trial testimony now lends credence to Ms. King's unrebutted evidentiary hearing recantation as to Mr. Jackson's alleged four-word confession. The veracity of Ms. King's

---

[163] *See* ECF 15-2, PageID 1829, referencing State's Exhibits 3A- 3MM.
[164] ECF 15-2, PageID 2330.
[165] Ivana King, Cross Examination Testimony, ECF 15-2, PageID 2187-88.
[166] *Id.*

evidentiary hearing testimony is supported and properly contextualized by her trial testimony in which she repeatedly asserted, to the clear frustration of the Prosecutors, that she had no independent recollection of Mr. Jackson ever having confessed. When asked about that four-word "confession" at trial, Ms. King, under oath, twice testified she did not remember that conversation ever having taken place.[167] When the Prosecutor asked Ms. King on direct examination specifically about Jackson's "confession," that "he done two people," she responded clearly:

> I do not remember that much. I remember the transcript [of the taped interview] as far as that, **but as far as the conversation between me and Kareem Jackson, no.[168]**

The Prosecutor immediately followed up: "Q: As you sit here today, do you remember the conversation?" To which Ms. King, under oath, answered for a second time, "No."[169] Ms. King did acknowledge, having heard the police tape, that she **had** said it to the police during that taped interview of March 28, 1997. But when asked again whether she actually recalled the conversation taking place, she reiterated, again, she had no recollection.[170]

Those denials, consistent with Ms. King's recent evidentiary hearing testimony, reflect the honesty of Ms. King at the age of 22, in a surely strained effort to tell the truth to the best of her ability when subpoenaed and under oath before the jury. Perhaps ironically, the Prosecutor himself recognized the reluctance of Ms. King to acknowledge at trial that Mr. Jackson had ever actually uttered those words of confession. The Prosecutor felt compelled to argue it was hard to believe that if Mr. Jackson had really confessed, she would have forgotten it. But to insist upon maintaining

---

[167] *Id.* at PageID 2167-2168; 2169, Ivana King, Direct Examination.
[168] *Id. at* PageID 2167.
[169] *Id. at* PageID 2168.
[170] *Id. at* PageID 2169.

the credibility of this young witness, it was far more likely, therefore, that she did not want to remember:

> [Ivana King] didn't **want** to remember what Kareem Jackson had told her back in March of 1997. **Whether it is true, that she doesn't remember or not, I don't know.**[171]

But that was insignificant because she **had** told law enforcement and it was on tape that Mr. Jackson had confessed. The Prosecutor argued that Ms. King was a lady to be believed, imploring the jury to "use the tests of credibility that [Prosecutor] Stead went over with you in voir dire and in which the judge will instruct you on."[172]

Perhaps most importantly, the trial record makes clear defense counsel could only surmise and conjecture as to how to explain away the damning confession to the jury; perhaps Ms. King *had* been threatened or intimidated as a possible explanation for her inculpatory comments made to the police. As the Prosecutor summed up to the jury, he referenced defense counsel's surmise:

> [Defense counsel] Mr. Rigg says, why would Ivana go in and say those things to the police that night? It must have been because the police threatened her or coerced her to do it. *I have a different option for you to consider. You think about it. Perhaps it is because she is honest.* Anybody ever think about that? Perhaps when she was questioned by the police she told them the truth because she didn't do anything wrong, and she's not going to lie to protect someone, even if she loves them. Try honesty as an explanation for why she would have said those things that night. He told me he done two people, killed two people.[173]

This same "different option" argument bears relevance 25 years later upon Ms. King's expressive evidentiary hearing testimony asserting that indeed she *was* intimidated by law enforcement to say what they wanted to hear, and that they knew she had done just that in telling them, falsely, that Mr. Jackson had confessed. "The police had a story they wanted to hear, and I

---

171 State of Ohio, Closing Argument, ECF 15-2, PageID 2415.
172 *Id.*
173 State of Ohio, Closing Argument, ECF 15-2, PageID 2459-60.

told them what they wanted to hear so that I could go home to my children."[174] The reasoning underlying the intimidation for the false confession, however, was not driven by her love for Mr. Jackson, but rather her honest love *for her children*.

Important for this gateway analysis is that Ms. King's assertion that she had only told law enforcement what "they wanted to hear" is consistent with Detective Bedard's <u>Progress of Investigation</u> report of 3/28/1997. In that report it is written that prior to conducting the interview with Ms. King he was briefed as to the details of the incident and informed "what information homicide investigators **wanted to obtain from Ms. King**."[175]

As the Prosecutor closed to the jury: "Ivana King is a young lady, you know, who is living on her own basically trying to support a number of children, and she's in love with that man. She was in love with him back then, and she's still in love with him today."[176] The truth was, as Ivana King explained and reiterated, she has always loved her children more.

Properly contextualized, the scenario specific to Ms. King's clear recantation is consistent with the history of this case from the time of Mr. Jackson's arrest to the present. And Ms. King's honesty, promoted by the State at trial, is reflected throughout. Her testimony from the evidentiary hearing should be found to be credible.

### I. Michael Patterson's Letter that "Boone did it."

Very soon after his own arrest, on March 28, 1997, and less than a day after Boone turned Patterson in to the police, Patterson gave his own taped statement to the police.[177] It is noteworthy

---

[174] <u>Declaration of Ivana King</u>, ECF 24-1, PageID 3701-02; Evid. Hrg. Exh. 5.
[175] <u>FCSO Progress of Investigation</u>, ECF 24-1, PageID 3302.
[176] State of Ohio, Closing Argument, ECF 15-2, PageID 2459.
[177] *See*, ECF 15-2, PageID 2387-88, This is the only statement by Patterson referenced in the trial record. A transcription of Patterson's taped statement, while marked at trial as Defendant's Exhibit B, was **never** allowed to be shown to the jury.

that at **no** point in those initial interviews did Patterson **ever** identify or even suggest that Mr. Jackson was the actual shooter. Patterson told the police detectives that, 1) in planning the robbery, there was never any plan to shoot or to harm anyone,[178] 2) that he did not know whether Mr. Jackson even had a gun that night, and 3) if he did, Patterson did not see it.[179] Just as importantly, Patterson told the detectives that the mysterious "Little Bee" **did** have a handgun.[180] Taken at face value, Patterson's statement contradicted Boone's statement in critical ways. But even so, it would be expected that all members involved in the robbery would testify, especially after all plea deals had been entered into and solidified. This most likely was the case until a "potential problem" developed.

Patterson would not join the likes of Boone on the stand to testify on behalf of the State. Although Patterson had been brought to the local jail by the Prosecutor in anticipation of his corroborating testimony, the truth began to rear its head to the dismay of the State. Out of the hearing of the jury, Mr. Jackson's defense counsel informed the trial court there was an important matter they needed to bring to its attention. It was a significant disclosure by defense counsel: During the prior week, Mr. Jackson had received an unsolicited letter from State witness Patterson, in which Patterson **twice** indicated he wanted "to tell the truth", and in that context, further referenced the fact that, "Boone did it."[181] Counsel presented the letter to the court for review. It was as described. Defense counsel acknowledged the obvious even if in remarkably understated terms: the letter "of course, could be beneficial in Mr. Jackson's defense."[182] Thereafter, defense

---

[178] <u>Michael Patterson, Police Interview</u>, ECF 24-1 PageID 3435. Because Patterson was never called to testify it is not known whether his statement to police was ever disclosed to defense counsel.
[179] ECF 24-1, PageID 3436.
[180] *Id.*
[181] <u>Patterson Letter to Jackson</u>, ECF 29-1, PageID 3772.
[182] ECF 15-2, PageID 2383.

counsel informed the court they had immediately, (and properly), contacted Patterson's defense attorney who had negotiated Patterson's plea agreement. Together they set up a meeting with Patterson. Patterson agreed to talk to Mr. Jackson's counsel.

The Prosecutor candidly acknowledged that now "there was a potential problem."[183] This acknowledgement was correct. Patterson's letter to Mr. Jackson was inconsistent with the scenario the Prosecutor had depicted for the jury: that the actual killer was Mr. Jackson, and only Mr. Jackson, and that did not include a storyline that allowed for one of the prosecution's key witnesses to also be the potential killer. There were two victims. That someone who was **not** Mr. Jackson had killed those young men was, in truth, not an unreasonable argument. Boone had turned himself in and solved the case for the police; all in return for his life: a much-reduced plea to manslaughter and a sentence that skirted any possible death sentence. Boone agreed to testify against Mr. Jackson. But a man might say or do anything to save his own skin.[184] At the end of the day, the prosecution did not need Patterson to push their narrative as presented to the jury and in fact, he now posed a serious threat to the jury's believability of that narrative:

> I was unaware that co-defendant Michael Patterson had written a letter to Mr. Jackson, confessing to knowing someone else had committed the crime, and that Mr. Patterson was wrongfully influenced, or threatened by the prosecutors into not testifying. I believe Mr. Patterson should have been able to testify he wrote that letter. I read that letter and it upset me.
>
> -   Affidavit of Juror Tina Taylor-Stewart[185]

---

[183] ECF 15-2, PageID 2386.

[184] As the Prosecutor later admitted to the jury, as it had become clear from the evidence, "[w]hen [Boone] spoke to the police, they knew he wasn't being truthful. They encouraged him to come clean and tell the complete truth, but he didn't because he was trying to protect himself." State of Ohio, Closing Argument, ECF 15-2, PageID 2408; *also, id.* at PageID 2452 ("The State concedes . . . Derrick Boone, when he went down to police headquarters that night he lied. He didn't tell the complete truth. . . . Derrick Boone went down and tried to talk himself out of trouble.") It is clear that Boone wasn't completely unsuccessful in this regard.

[185] Affidavit of Juror Ms. Tina Taylor-Stewart, ECF 1-3, PageID 119.

As a juror, the letter I read that was written from co-defendant Michael Patterson to Mr. Jackson, should have definitely been shown to us and we should have been able to hear Mr. Patterson testify to having written that letter. This really would have made a difference in my decision on how I would have decided this case.

- Affidavit of Juror Donna Morrison[186]

Boone had already told the jury what was needed to paint Mr. Jackson as the killer. Based on the State's actions and inactions, Patterson was immaterial for their agenda of convicting Mr. Jackson. However, it does not negate the significance of Patterson's "truth." The contents of his letter are consistent with his initial interview with police that did not identify or suggest that Mr. Jackson was the shooter and he did not see Mr. Jackson with a gun that night. Patterson's letter makes clear why Boone was so eager to "direct the attention away from [him]self and put it on Kareem Jackson"[187] in order to "to save [his] own neck."[188]

**J.  Conclusion.**

In reviewing the information currently available, it is apparent that the state misrepresented and manipulated the testimony of witnesses in order to win a death sentence against Mr. Jackson. It is unclear why the State withheld evidence relating to a key witness's description of the actual shooter. It is also unclear why law enforcement officers would intimidate a young mother. Although speculative motive can be provided, only the State can address these faults. But here is what is evident: no jury would have convicted Mr. Jackson had the truth, in full, been presented in the courtroom. The cumulative effect of the government's misconduct has distorted the truth-finding process and compromised the integrity of the imposed death sentence.

---

[186] Affidavit of Juror Donna Morrison, ECF 1-3, PageID 121-22.
[187] Derrick Boone, Re-Cross-Examination, ECF 15-2, PageID 2146.
[188] *Id.* at PageID 2142, Derrick Boone, Cross-Examination.

Mr. Jackson asserts that no reasonable fact finder would have found him guilty of the murders of Terrance Walker and Antorio Hunter had the evidence from his *Brady* and *Napue* claims been presented, in addition to all other documented evidence. Because Mr. Jackson has presented by clear and convincing evidence an actual innocence showing, this Court can review the merits of his *Brady* and *Napue* claims.

## IV.     THE MERITS OF MR. JACKSON'S BRADY AND NAPUE CLAIMS

The demand for truthfulness within the judicial system is no new requirement imposed upon governmental actors. The United States Supreme Court has long recognized the duties of prosecutors and law enforcement in their efforts to seek justice.[189] Precedent has made clear that there is zero tolerance for abuse of power, coercion, or dishonesty. Yet here we are. Mr. Jackson's *Brady* claim is rooted in one word: deceit. Mr. Jackson's *Napue* claim is partly rooted in four words: "he done two people." However, four different words brings his *Napue* claim to life: intimidation by the State. As will be discussed in the forthcoming paragraphs, the evidence withheld from the State and the false, coerced statement uttered by Ivana King in 1997, including the unsettling circumstances surrounding the procurement of that statement, warrants relief.

### A. *Brady* – Withheld Statements Presenting Proof That Mr. Jackson Was NOT the Shooter

It is a well-established and recognized principal that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Following this decision, the Supreme Court clarified that a *Brady* violation may result even absent a request for such evidence by defense counsel. *See*

---

[189] *See Berger v. United States*, 295 U.S. 78, 88 (1935)( the [prosecution's] goal in a criminal prosecution is not that it shall win a case, but that justice shall be done.").

*United States v. Agurs*, 427 U.S. 97 (1976). To succeed on a *Brady* violation, a petitioner must satisfy three elements:

> "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

The State herein violated this well-established and recognized principal when it withheld evidence supporting the defense that Mr. Jackson did not match the description of the shooter. Although thoroughly explained in Petitioner's <u>Traverse</u>,[190] the gravity of these circumstances demands a recounting of Mr. Jackson's *Brady* discussion therein. Before turning to the merits of his claims, Mr. Jackson reasserts that because the Warden did not address the merits of Mr. Jackson's *Brady* claim[191], the Warden has therefore waived all arguments contesting its merits. *See Humphrey v. U.S. AG Off.*, 279 F. App'x 328, 331 (6th Cir. 2008) (stating that where plaintiff failed to respond to argument, any opposition was waived).

The last state court to address Mr. Jackson's *Brady* and *Napue* claims, the state appellate court in Mr. Jackson's successor postconviction proceedings, rejected Mr. Jackson's successor petition on procedural grounds (failure to satisfy the statutory standard for filing a successive postconviction action), and not on the merits[192], and as such the state court adjudication is not one to which this Court must defer for purposes of assessing the merits. *See Clark v. Warden*, 934 F.3d 483, 491 (6th Cir. 2019). And while the enforcement of a state procedural bar would normally

---

[190] ECF 31, PageID 3866-75.
[191] ECF 27, Warden's <u>Answer to Doc. 1 Successive Habeas Petition</u>.
[192] Ohio Tenth District Court of Appeals Decision, ECF No. 21-1, PageID 3048-49.

invoke procedural default, that presents no barrier here because, as this Court has recognized, the Warden did not raise procedural default and thus waived that defense.[193]

## 1. Withheld Reports were Exculpatory

Rebecca Lewis and Nikki Long were the only surviving witnesses to the murders of Antorio Hunter and Terrence Walker. There were repeated references to one of the initial two individuals who entered the apartment as the "short" guy. This is significant because Mr. Jackson is not short. He is listed at the time of his arrest and in both his mug shot and fingerprint card as 5'9" tall.[194] Co-defendant Williamson had acknowledged to law enforcement that Little Bee was shorter than Mr. Jackson. Because "short," is a relative term, it is of defining importance that the initial descriptions given by **both** Ms. Lewis and Ms. Long carried a reference that anchored the height of the shooter as actually being only about **5'4"**, an observable height that does not match Mr. Jackson.

Initially, Long was the only person able to provide a height description of the short guy. Long provided the following description to police:

> Q. When you say short guy, describe him to me.
>
> A. Um, he was short, kind of thick . . .I think he had on a hat, I don't know. He's brown skin like my complexion, and I think he had a mustache and I don't remember any other, I guess he had on dark clothes, I think black pants, um, and he was short though, he was like stocky short kind of, thick like, he was probably about my height.
>
> Q. How tall are you?
>
> A. I'm 5'3 3/8". So he must have been like 5'5", 5'4".[195]

---

[193] *See*, <u>Opinion and Order</u>, fn.7, ECF 42, PageID 3997.
[194] <u>FCSO Booking Sheet,</u> ECF 24-1, PageID 3317, 3320, 3323.
[195] <u>Nikki Long, Police Interview</u>, ECF 24-1, PageID 3598.

Lewis also explained that the shooter, the "short, fat guy," initially came in and bought drugs, left briefly, and then reappeared with "a little gun."[196] Lewis told police that this short guy was one of the assailants in the house when the shootings occurred:

> Q. When the fat guy was running around with the gun and stuff, what were the other, you called them boys, were they young?
>
> A. I'm just saying boys, they were about maybe like 24 or, around their 20's.
>
> Q. What were they doing when the fat guy was running around looking for stuff.
>
> A. They just had guns at Terrence and Antorio and at us.
>
> Q. Did they look like shotguns?
>
> A. Yeah, it was a long gun, the two guys had long guns and the **short** fat guy had a little gun.[197]

Lewis consistently referred to the third participant in the robbery and likely shooter as the "short, fat guy,"[198] and indicated that the shooter had somewhat of a beard.[199] But noticeably absent from her description was a height. Lewis never provided a height for the short guy in her transcribed interview with detectives, her suppression hearing, nor was she asked about the height by the Prosecutor when she testified at trial.[200] However, after Mr. Jackson was on death row and facing an execution date, police reports secured through Public Records Act presented information materially different than what was presented to the jurors at trial. Documents secured from these

---

[196] <u>Becky Lewis, Police Interview</u>, ECF 24-1, PageID 3603.
[197] <u>Becky Lewis, Police Interview</u>, ECF 24-1, PageID 3604.
[198] *Id.* at PageID 3603, ("[T]he same fat guy that came in earlier to buy whatever, he came back in and he had a little gun.").
[199] *Id.*
[200] Warden's <u>Answer to Doc. 1 Successive Habeas Petition</u>, ECF 27, PageID 3727.

requests make clear that Becky Lewis also initially independently described the probable shooter as approximately **5'4"** in height, very heavy set or fat, and medium complexion:

> Becky stated that while she was at this location her friend Terrence was selling drugs to a black male, approximately **5'4", very heavy set, she referred to him as fat** and he was with a skinny male black inside the residence.[201]

Detective Scott clearly indicated he had interviewed Lewis by herself "while Nikki Long was being treated by the medics."[202] And consistently, the day before, in reporting the progress of the ongoing investigation, a withheld police report similarly reflected that Becky informed the investigating Detective: "of the one suspect as being M/B, **5'4" − 5'5",** thick heavy build, possible mustache, medium complexion."[203] This Progress Report also clearly stated that Detective Shephard spoke with Lewis independently and that he "never spoke" to Nikki Long.[204] These reports were not disclosed prior to trial to defense counsel.[205]

Not only did the government withhold official documents of Becky Lewis's description of the shooter being 5'4", but it also failed to disclose the statement of Lisa Flewellen that was taken by law enforcement who canvassed the scene of the homicides immediately after the killings. Flewellen lived in the upstairs unit above the residence occupied by Hunter and Walker. She provided the police a statement of what she observed that early morning of March 25, 1997:

> I heard someone knock on the door downstairs[.] They open[ed] the[n] closed the door. I heard someone say get the fuck down. I heard things falling and tussling. I looked out my window and saw a 4-door dark brown car with one guy [in] the front and one in back. The car went to the side of the building. The one in back got out and went in the house downstairs too. I heard two or three muffle[d]

---

[201] FCSO, Progress of Investigation Report # 97/02554, 3/26/1997, ECF 24-1, PageID 3288.
[202] *Id.*
[203] FCSO, Detective Bureau, Progress of Investigation, Reporting Officer T.A. Shephard, 3/25/1997, ECF 24-1, PageID 3286-87.
[204] *Id.*
[205] Affidavit of Brian J. Riggs, ECF 1-3, PageID 125-30.

sound[ind] shots. The brown car left Lupo C[our]t and went left on
Oakland Park[.][206]

This statement corroborated Williamson's trial testimony of when she heard the shots fired:

"When Little Bee went back in, I heard the shots."[207] As with the withheld statement of Lewis,

this undisclosed statement from Flewellen bolsters the position that Little Bee was the shooter, and

therefore changes the State's narrative and indeed raises reasonable doubt.

## 2. Materiality of the Suppressed Reports

Materiality of evidence is determined by whether "there is a probability that, had the

evidence been disclosed to the defense, the result of the proceeding would have been different."

*United States v. Bagley*, 473 U.S. 667, 682 (1984). It is not required to show that the disclosure of

the evidence would have ultimately led to an acquittal. *Kyles v. Whitley*, 514 U.S. 419, 434-35

(1995). Instead, a defendant must show "only that the likelihood of a different result is great

enough to undermine confidence in the outcome of the trial." *Smith v. Cain*, 565 U.S. 73, 75 (2012).

In detailing the significance of these withheld reports, Mr. Jackson's trial counsel, Brian J.

Rigg, explained the difference these reports would have made had they been disclosed under the

State's obligation pursuant to *Brady*"

> 13. Without the police report indicating that Rebecca Lewis also
> estimated the shooter's height as 5'4" tall, defense counsel's
> impression upon reading the statements that were turned over
> was that Nikki Long made a possibly poor height estimation
> that, while notable, was not necessarily significant. As such,
> defense counsel did not press the issue at trial.

> 14. Identity was a central issue in this case, and the Prosecutor
> acknowledge that to the jury from the start. Had the defense
> known that both witnesses estimated the shooter to be
> approximately 5'4", much shorter than Jackson's height
> of approximately 5'8" to 5'9", we would have focused on

[206] Statement of Lisa Flewellen, 3/25/1997, ECF 24-1, PageID 3700.
[207] Malaika Williamson, Direct-Examination Testimony, ECF 15-2, PageID 1953.

and emphasized this important discrepancy. Especially since Jackson did not fit Ms. Lewis' "fat" description either.

16. This was particularly significant given that there was no forensic evidence linking Jackson to the crime.

19. If defense counsel had been aware that both surviving witnesses similarly identified the shooter as being only 5'3" to 5'4", the defense would have focused on the identifying height of the shooter and proved to the jury that Mr. Jackson did not fit that telling description. Nor did he fit the "short" and "fat" description.[208]

These withheld reports supported the position that Mr. Jackson was not the shooter. The jury was not privy to the fact that both Long *and* Lewis described the short guy, who was declared to be the shooter, as 5'4", at most 5'5". The materiality of this evidence is made clear by the Prosecutor's strategy in purging Long's and Lewis's trial testimony of any mention of height. As made evident by all the circumstance surrounding Mr. Jackson's case, defense counsel recognized this was an identification type of case.[209] Given so, it is telling that the Prosecutor never had either of the young women identify the height of the shooter for the jury. In closing argument, the Prosecutor made the following statement to the jury with regard to height:

We have been together a long time. If I ask each and every one of you to go back in that room and write down on a piece of paper how tall I am, what I weigh, hair color, eye color, description of eyes, clothing, you are not all going to come out the same. I bet there is a lot of difference.[210]

But to the contrary, Lewis and Long **both** gave the same height description of the shooter as being 5'4". The jury did not know that. Mr. Jackson's trial counsel did not know that. Completely stripping away any reference to Lewis's and Long's description to the police that the shooter was

---

[208] ECF 1-3, PageID 125-30.
[209] Defense, Opening Statement, ECF 15, PageID 1768.
[210] State of Ohio, Closing Argument, ECF 15-2, PageID 2557.

small 5'4" and given this was an identification case without any forensic evidence to support the identification, reasonable inferences can be made that the prosecution was well aware. After all, as the trial came to a close the Prosecutor argued, "[t]he only element that the defense is going to put into issue here for you in identification. Who committed these crimes?"[211] The State was both insistent and successful in making the jury believe Mr. Jackson was the shooter.

It is also clear why the prosecution never called Flewellen, a truly impartial eyewitness to the crime. Her statement perfectly corroborated Malaika Williamson's testimony that Little Bee was in the house when the shots were fired, and it was only after Little Bee re-entered the apartment that the shots were fired.[212] With the existence of this statement, unknown to Mr. Jackson's counsel, they were unable to inquire further into what Flewellen witnessed. Although her statement, paired with Williamson's provides additional support that the shooter was Little Bee, had counsel been given the opportunity to learn of this witness, they could have gathered more information about the physical description of this individual who exited the car and went back into the house. This arguably could have definitively and conclusively identified Little Bee. However, due to the government's misconduct and unconstitutional inaction, defense counsel was left in the dark.

This course of action taken by the State of Ohio in its prosecution of Mr. Jackson went outside the bounds of constitutionally acceptable strategy or tactics. It is intolerable that confirmation of the killer's height, that was exculpatory evidence, was withheld from Mr. Jackson, his defense counsel, and the jury, and only when Mr. Jackson was near execution that it was finally disclosed. As such, Mr. Jackson's *Brady* claim warrants relief.

---

[211] *Id.* at PageID 2407, State of Ohio, Closing Argument.
[212] Malaika Williamson, Direct Examination Testimony, ECF 15-2, PageID 1942, 1953.

### B. Napue – Intimidation by Law Enforcement Resulting in King's False Statement That Mr. Jackson Confessed

#### 1. Facts giving rise to Mr. Jackson's *Napue* Claim

At Mr. Jackson's trial, the prosecution called Ivana King to testify. Approximately one year prior to his trial, Ms. King was interviewed by detectives and made a statement, claiming that Mr. Jackson told her he had "done two people."[213] Ms. King's testimony was critical for the prosecution in showing that Mr. Jackson was, in fact, the shooter. While on the stand, Ms. King was asked about the statement she made to detectives regarding Mr. Jackson's alleged confession. Although she acknowledged that she did tell detectives that Mr. Jackson confessed to her, she was adamant that she did not have independent recollection of making the statement.[214] Even so, the prosecutor continuously made Ms. King acknowledge that she told detectives that Mr. Jackson confessed, which she did.

When appointed to represent Mr. Jackson for the sole purpose of Clemency, it was discovered that Ms. King had been living with something that plagued her life for decades. During an interview with members of the Federal Public Defender's Office, Ms. King disclosed that the statement she gave to detectives on March 28, 1997, that Mr. Jackson had confessed to the murders of Hunter and Walker, was false. After this revelation, and with the assistance of members of the Federal Public Defender's Office, Ms. King executed a declaration.[215] The declaration, dated September 26, 2015, outlined the intimidation that Ms. King experienced that led to her making the false statement that Mr. Jackson told her he had done two people. Ms. King declared that officers "ransack[ed]" her home, refused to allow her to cover her nakedness, grabbed her daughter

---

[213] Ivana King, Police Interview, ECF 24-1, PageID 3706; Evid. Hrg. Exh. 4.
[214] Ivana King, Direct Examination Testimony, ECF 15-2, PageID 2163-64.
[215] Declaration of Ivana King, ECF 24-1, PageID 3701-04.

by one arm, dangling her in the arm, and pointed guns at her.[216] Ms. King further declared that after this, officers took her down to the police station where she was "interrogated," "extremely intimidated," and "repeatedly threated."[217] It was these circumstances that led to Ms. King to tell officers "what they wanted to hear."[218] Serving as the basis for his Second Claim for Relief, undersigned counsel requested an evidentiary hearing to allow this Court to assess Ms. King's credibility and makes its own determination in reviewing the merits of Mr. Jackson's *Napue* claim. This Court granted Mr. Jackson' request for an evidentiary hearing, solely related to the herein *Napue* claim, providing an opportunity for Ms. King to finally tell her story.

### 2. Evidentiary Hearing – Ivana King's Truth

In granting Mr. Jackson's request for an evidentiary hearing, this Court accurately recognized its role in assessing Ms. King's credibility related to her recantation.[219] When a factual dispute hinges on the credibility of a witness, district courts have an opportunity to return to their judicial roots. *United States v. Raddatz*, 447 U.S. 667, 672-73 (1980). In such instances, the district court decides who is reliable based on its own observations of the witnesses at issue. It is up to the district court to make a deeply human determination: who is accountable to the truth and who is not. This Court has an extensive and detailed record before it, but Ms. King's credibility is best assessed by the Court's own observations.

While most decisions on appeal are confined to the written record, a credibility determination based on a cold record is "substantially more likely to be in error than one based on an in-person evaluation of a witness." *Johnson v. Finn*, 665 F.3d 1063, 1073, 1075-76 (9th Cir.

---

[216] *Id*.; <u>Petition for Writ of Habeas Corpus,</u> ECF 1-2, PageID 74.
[217] *Id*. at PageID 74-75.
[218] *Id.*
[219] <u>Opinion and Order</u>, ECF 41, PageID 3990.

2011). This is due to the nature of a cold record. A cold record is flat. It reduces testimony to merely the words uttered. But "[l]ive testimony enables the finder of fact to see the witness's physical reactions to questions, to assess the witness's demeanor, and to hear the tone of the witness's voice—*matters that cannot be gleaned from a written transcript*." *United States v. Mejia*, 69 F.3d 309, 315 (9th Cir. 1995) (emphasis added).

When a genuine issue of material fact hinges upon the credibility of a witness, federal courts must hear the witness's testimony. *Caldwell v. Lewis*, 414 Fed. Appx. 809, 817 (6th Cir. 2011)(unpublished) (holding that making a credibility determination from the cold record alone was a legal error). In *United States v. Raddatz*, both the majority and the dissent agreed the person making a credibility determination to settle a factual dispute must hear the testimony of the witnesses at issue. 447 U.S. at 669 ("[O]ur constitutional tradition rejects the notion that factual findings in criminal cases may be made by an official who acts in isolation and on the basis of a cold record." *Id*. at 695-96 (Marshall, dissenting). "It is generally the case that '[t]he one who decides must hear,' and must, for herself, assess credibility." *Gaye v. Lynch*, 788 F.3d 519, 532 (6th Cir. 2015) (quoting *United States v. Raddatz*, *supra*)).

The *Raddatz* Court struggled to allow separation between the ultimate decision maker and the person who witnessed the live testimony. 447 U.S. at 680-81 (allowing, ultimately, district judges to defer to magistrate's credibility recommendations on live testimony the judge did not hear, the Court first determined the weight of the disputes at issue "do not coincide with the criminal law objective of determining guilt or innocence" and reserved the judge's right "to conduct a hearing and view the witnesses itself" if there was any suspicion of inaccuracy). The tension in *Raddatz* emphasizes the fundamental role evidentiary hearings play in making credibility determinations—the court must rely heavily on the impressions made in live testimony

before it. Credibility must be found in "the look or manner of the witness," in their hesitation and doubts, their "calmness or consideration," and in their "variation of […] language." 447 U.S. 667, 679 (1980) (quoting *Queen v. Bertrand*, 16 Eng.Rep. 391, 399 (1867)). These are not things a judge can weigh from a cold record.

This Court is best suited to determine Ms. King's credibility by the timber of her voice as she testified to what she endured: police breaking down her door; training guns on her naked body; and ransacking her home. We ask the court to assess Ms. King by the weight and heat of her tears, how they fell when she described the officer dangling her four-month-old infant by the arm. Consider the appearance of Ms. King, sitting before the bench with her arms tensed and wrapped around her purse, pulling it tight to her chest – recalling hours of fear while the police's camera was turned off. Assess Ms. King by her demeanor as she described her nakedness, her vulnerability, her helplessness, as one hour crept to the next, wanting only to return to her children. This Court granted Ms. King the invaluable opportunity to be witnessed. We ask only that this Court weigh what it observed accordingly. Credibility cannot be found in a cold record. Nor should the Court look for it there.

In addition to her demeanor, this Court should take into account Ms. King's background in assessing her credibility. From her extensive education and certification to her constant employment, there is nothing to suggest, even the slightest, that Ms. King does not possess the quality of being a trusted individual.

In revisiting Ms. King's testimony, key points must be made. As a young 23-year-old mother of three, Ms. King was devoted to her children, as she is today. By all accounts, Ms. King was devoted to her children under all circumstances. They were and are today her priority.

Understanding this sheds light on the gravity of the threat Ms. King perceived when questioned and interrogated by law enforcement for hours.

During the June 7, 2023, evidentiary hearing, Ms. King revisited the past in an effort to provide understanding as to how her statement to police came about. In the morning of March 28, 1997, Ms. King, Mr. Jackson and their infant daughter Kyanna were at Ms. King's home, located at 2220 Bancroft, Columbus, Ohio. That day, the Franklin County Sheriff's Office had received a warrant for Mr. Jackson's arrest and a search warrant for the Bancroft property. Scheduled to work, Ms. King woke up to get her day started. When doing so, a phone call from Derrick Boone was received and he requested to speak to Mr. Jackson. Shortly after that conversation, which we now know was a plan for law enforcement to ensure that Mr. Jackson was present at the home,[220] law enforcement officers kicked down her door and flooded into her apartment.[221] Clothed in full tactic gear and guns drawn, law enforcement made their way upstairs in search of Mr. Jackson. During the time of entry, Ms. King was completely undressed and had begun taking a shower. Once upstairs, officers "aggressively" ordered Ms. King out of the shower.[222] Ms. King recalled "very big guns" being pointed at her as she stood outside of the shower "completely naked."[223] Initial requests to cover herself were denied until an officer finally handed her a hand towel. Although insufficient to cover her nakedness, Ms. King simply accepted the opportunity. Mr. Jackson, who was also naked had been taken to the ground and also surrounded by law enforcement with their guns drawn. After being naked for what seemed like forever, Ms. King was finally allowed to cover herself with a robe.

---

[220] Detective Zachary Scott's Direct-Examination, ECF 15-2, PageID 2263-63.
[221] Evid. Hrg. Tr., ECF 47, PageID 4040.
[222] *Id.*
[223] *Id.* at PageID 4041.

After securing both Ms. King and Mr. Jackson, officers began destroying her townhouse. While upstairs, officers searched her bedroom, where Kyanna lay in her crib. Unaware of what was going on around her, Kyanna screamed and cried while commotion filled the atmosphere. As she continued to scream in response to the commotion, yelling, and rummaging of the apartment, Ms. King asked if she could comfort her crying child.[224] After telling her no, an officer grabbed three-month-old Kyanna by one arm, picked her up, and searched the crib beneath her.[225] It was only after that display of disregard for her daughter that Ms. King was allowed to hold her daughter.

Admitted into evidence were multiple photos depicting the havoc that ensued, identified as Petitioner's Exhibits 3a-e. Tearfully reliving what happened, Ms. King identified the damage and mess that resulted from the search of her apartment. In reference to Petitioner's Exhibit 3-a, two photographs of her living room after the search, Ms. King described the officer's actions as "flipping stuff over, just knocking stuff over."[226] In reference to Petitioner's Exhibit 3-b, two pictures of her kitchen sink area, Ms. King explained that officers tore that area up really bad" and "[t]hey pulled everything out."[227] Ms. King continued to describe how officers pulled everything out of her closets, removed mattresses from beds, and pulled everything onto the floor.[228]After her home was destroyed, Mr. Jackson was taken into custody, and she was allowed to go to her mother's house, but not before officers made it clear that she had to go make a statement at some point.

---

[224] *Id.* at PageID 4043.
[225] *Id.*
[226] *Id*. at PageID 4047.
[227] *Id.*
[228] Petitioner's Evid. Hrg. Exhs. 3a-e; Evid. Hrg. Tr., ECF 47, PageID 4047-49.

At approximately 5:00 p.m., law enforcement officers arrived at Ms. King's mother's home to pick her up. Two men in suits approached Ms. King as she sat outside in the driveway and told her she had to make a statement. She did not perceive their request as an option, so she went.[229] They proceeded to take Ms. King to a police station and into a room with no windows. On her way to this room, officers led her past weapons that were retrieved from her home during the search hours prior. Once in the room, officers began asking her questions about the murders of Antorio Hunter and Terrance Walker. Ms. King spent approximately three hours with these officers before they began audio recording her statement. During this statement, Ms. King twice said Mr. Jackson told her "he done two people." However, the most relevant discussions happened during the three hours prior to the tape recorder being turned on.

Ms. King acknowledged that she "was there hours before they taped anything. They were just talking and talking and talking about the murders." [230] Officers continued to question Ms. King about Mr. Jackson's whereabouts, Derrick Boone, and the other individuals who had been involved in the robbery. Ms. King repeatedly told them that she "had no knowledge of Kareem killing those people"[231] but when she failed to "giv[e] what they needed, they asked [her] if [she] had somebody to take care of [her] kids."[232] Ms. King understood that statement as a threat that she would go to jail.[233] The following testimony from Ms. King is the most chilling:

- "They wanted to me to make sure that Kareem- - Kareem would go to jail for the murders."[234]

---

[229] *Id.* at PageID 4052.
[230] *Id.* at PageID 4054.
[231] *Id.* at PageID 4082.
[232] *Id.* at PageID 4055.
[233] *Id.*
[234] *Id.*

- "When they started, they said just tell us that Kareem done two people. They just kept bringing - - kept reiterating that Kareem done two people, just tell us."[235]

- "Once they said it to me once, all I know is I did not want to go to jail. They just kept saying I need to take care of my kids, and if I don't say - - tell me what happened because Kareem, you know he done those two people. They just kept saying that."[236]

By the time they turned the tape recorder on, she was "scared to death." Scared of "[l]osing [her] kids, being in jail for the rest of [her] life for a crime [she] didn't commit."[237] The complete context in which her statement was given provided an unnerving picture. Ms. King said what she needed to say to get back to her children. In addressing her statement that Mr. Jackson told her he had done two people, Ms. King explained that those words were not hers, but rather "the words they kept asking me just to tell them, that he just done two people."[238] After three hours of urging Ms. King to provide incriminating information, Ms. King broke down and did what they demanded. When they turned the recorder on, Ms. King had been utterly exhausted by the intimidation and threats. She simply wanted to go home to her kids and to do so, she felt that she had to tell them that Mr. Jackson killed Hunter and Walker, "*which in their statement, was done two people.*"[239] Hearing the circumstances surrounding Ms. King's statement to police solidified the false nature of Mr. Jackson's confession. At the end of the day, Ms. King unequivocally declared that Mr. Jackson did not tell her "he done two people."[240] As a matter of fact, if he had, Ms. King stated that she would have turned him in to the authorities, as she had done before.

---

[235] *Id.*
[236] *Id.*
[237] *Id.* at PageID 4058.
[238] *Id.* at PageID 4061.
[239] *Id.* at PageID 4107.
[240] *Id.* at PageID 4064.

In 1993, Ms. King saw Mr. Jackson on the news as a suspect in an unarmed bank robbery.[241] Upon seeing him, she immediately called the tipline and aided with law enforcement apprehending Mr. Jackson. At the time, Ms. King had loaned Mr. Jackson money, money she needed for herself and mainly for her unborn child. When she discovered that Mr. Jackson deprived her unborn son of money he never repaid, she became upset.[242]

In all, Ms. King's testimony explaining the circumstances that lead to her statement that Mr. Jackson told her he done two people provides this Court with the assessment needed to review the merits of his *Napue* claim.

### 3. *Napue* Standard

A petitioner brings forth a *Napue* claim when alleging that a witness falsely testified. Three elements must be satisfied to successfully show that a *Napue* violation occurred: 1) the statement made must be false, 2) the statement must be material, and 3) the prosecution mut have known the statement was false. *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998) (quoting *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989)). In *Napue*, the principal state witness testified that he had received no promise in return for his testimony. When said testimony was provided during trial, the prosecutor failed to correct the statement, knowing it was false. After Napue was convicted and sentenced to death, it was revealed that the principal state witness – who received a sentence of 199 years for the same murders for which Napue was sentenced to death – had in fact received a promise of a recommended sentence reduction. *Id.* at 266. In its preliminary discussion leading to the merit review of *Napue*'s claim, Justice Warren explicitly identified that "a conviction obtained through use of false evidence, known to be such by representatives of the State, to obtain

---

[241] *Id*. at PageID 4033-34.
[242] *Id.* at PageID 4035.

a conviction" and relatedly, "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears," is a violation of the Fourteenth Amendment. *Id.* at 269.The Court ultimately determined that the "false testimony used by the State in securing the conviction of petitioner may have had an effect on the outcome of the trial." *Id.* at 272. The same is true here.

### a. Ivana King's Statement that Mr. Jackson told her he had "done two people" was false.

Seventeen years after testifying at Mr. Jackson's trial, Ms. King came forward declaring that her statement that Mr. Jackson had "done two people" was false. Initially stated in her 2015 declaration, Ms. King reiterated the falsity of the statement on June 7, 2023, in front of this Court. At the evidentiary hearing, Ms. King provided a full, detailed description of the circumstances surrounding her statement to detectives. Prior to being taken down to the police station for questioning, officers destroyed Ms. King's house, made her stand naked in front of countless men, and disregarded the safety and well-being of her newborn daughter. This is the initial foundational context in which Ms. King's claim of intimidation should be viewed. After involuntarily being taken to the police station and threatened for hours, Ms. King told them what they wanted to hear. This presents the full context of her claim of intimidation. It is the intimidation that birthed the false statement.

For approximately three hours, Ms. King was asked about Mr. Jackson and the murders of Hunter and Walker. She told them "repeatedly" that she did not have any information or knowledge about the murders.[243] Yet, that did not suffice. Before hearing anything that Ms. King had to say, detectives already knew "what information homicide investigators **wanted to obtain from Ms. King**."[244] Upon threatening to take her away from her kids, Ms. King surrendered and gave them

---

[243] *Id.* at PageID 4082.
[244] FCSO Progress of Investigation, ECF 24-1, PageID 3302.

what they wanted. Her priority was getting back to her kids and the only way she knew how was to give the detectives what they wanted. The 23-year-old Ivana King was scared, concerned, threatened, and full of fear. The 48-year-old Ivana King, while still traumatized, was no longer scared or threatened. Instead, she had become empowered. Ms. King explicitly told this Court that Mr. Jackson did not confess to her in March of 1997.[245] In fact, her statement that Mr. Jackson told her he had "done two people" came from the language detectives used in urging her to provide incriminating evidence.[246] Ms. King explained that "they said just tell us that Kareem done two people. They just kept bringing - - kept reiterating that Kareem done two people, just tell us."[247] She further expressed that "[o]nce they said it to me once, all I know is I did not want to go to jail. They just kept saying I need to take care of my kids, and if I don't say - - tell me what happened because Kareem, you know he done those two people. They just kept saying that."[248] In response, Ms. King told them that Mr. Jackson told her he had done two people. It was only after this that she was allowed to go home.

In reviewing her transcribed recorded statement, it is disturbingly apparent that Ms. King was prepped on what to say prior to the record button being pressed.

Q: Go ahead and begin Monday of this week.

A: On Monday, I don't know the exact date or anything, Monday evening to be exact five guys left from my house, Kareem Jackson, *Derrick Boone, a guy named Red*, another guy named Sonny, and another guy unknown to me. They left came back 5 or 6 o'clock in the morning on a Tuesday, left again that same morning, didn't see them until dark on Tuesday.

Q: See who?

---

[245] *Id.* at PageID 4064.
[246] *Id*. at PageID 4061.
[247] *Id*. at PageID 4055.
[248] *Id.*

A: Kareem Jackson, Derrick Boone. Derrick Boone left my house. *Karem Jackson told me he done two people.*[249]

First, during her recitation of events that occurred the day of the shooting, Ms. King identifies individuals who were at her house. At the time, Ms. King knew Red, however, she did not know that Red's government name was Derrick Boone[250], but the police did. Had she known that Derrick Boone was in fact who she knew to be Red, she would not have identified them as two separate individuals. The fact that she identifies Red and Boone as two different people highlights the undocumented discussions officers had with Ms. King prior to the recording her statement to ensure that she named key players in the matter.

Secondly, Ms. King's statement that "Kareem Jackson told me he done two people" was completely unresponsive to the question posed. Although initially confusing taken at face value, her response makes perfect sense when understanding what transpired the three hours prior to the utterance of those words. Ms. King did not provide detectives a confession, she provided them the needed password to return to her kids.

Lastly, Ms. King's timeline of events is contradicted by police documents, further supporting her evidentiary hearing assertion that no confession was ever uttered. During her statement to police, Ms. King explained that Mr. Jackson's alleged confession occurred on Tuesday (March 25th ) just "a few minutes" before they were watching the news on television and "heard about the incident, viewed two composites; and immediately recognized the one as 'Red'".[251] An investigative summary authored by Detective Bedard, confirmed this scenario that Mr. Jackson confessed to Ms. King on March 25th.[252] The remembering event of when Mr. Jackson

---

[249] Ivana King, Police Interview, ECF 24-1, PageID 3706; Evid. Hrg. Exh. 4.
[250] Ivana King, Direct Examination Testimony, ECF 15-2, PageID 2157.
[251] Ivana King, Police Interview, ECF 24-1, PageID 3706.
[252] FCSO Progress of Investigation 03/28/1997, ECF 24-1, PageID 3302.

allegedly confessed is tied to Ms. King seeing the composite of Boone on the news. But, on March 25th, those composites had **not** been released to the media because they had not been completed by Nikki Long or Becky Lewis. It was not until approximately 2:00 p.m. on March 26th that those composites had been completed.[253]

Conveniently, a year later at trial, this significant discrepancy was reconciled. Ms. King testified that Mr. Jackson confessed on Wednesday, March 26th, not Tuesday, March 25th. It is perhaps significant that it is the Prosecutor who provides the Wednesday date to Ms. King, given that she professed uncertainty.[254]Ms. King's testimony at trial had changed to support the Prosecutor's theory of the case.

### b. The Statement "done two people" was material.

The four-word confession, that we now know is false, was given considerable weight during trial. Absent this confession, the only evidence that Mr. Jackson was the shooter was that of his biased, untrustworthy co-defendant Derrick Boone. As reiterated previously, Boone's testimony should be afforded little weight due to his admittance that he pointed the finger at Mr. Jackson because he wanted to save his own life. During closing arguments, the Prosecutor recognized the credibility concerns associated with Boone's testimony. Because of this being so, the Prosecutor emphasized the following:

> "Ivana King was not a participant in this case. She didn't get any deals."[255]

And because of that Ms. King's testimony about Mr. Jackson's alleged confession:

---

[253] <u>Composite Sketches</u>, ECF 24-1, PageID 3506-08.
[254] *See* ECF 15-2, PageID 2170 ("Q: I want to turn your attention now to Wednesday night, this would be March 26. Do you recall watching the news at your home that night?" A: I recall watching the news. I don't know what day it was or what time.").
[255] State of Ohio, Closing Argument, ECF 15-2, PageID 2459.

"in its overwhelming and powerful nature, considering who it was coming from at the it was said, would convict him in and of itself."[256]

The Prosecutor continued to urge the jury to give weight to Ms. King's testimony that Mr. Jackson confessed to her because she was the "final piece of the puzzle."[257] The continued request for the jury to believe this false statement increases the materiality of this false statement. *See Phillips v. Ornoski,* 673 F.3d 1168, 1188 (9th Cir. 2012) (holding that "[r]einforcement of false testimony of a key witness makes the statement "particularly egregious.". Even the Sixth Circuit Court of Appeals was able to recognize that this testimony from a key prosecution witness was "quite incriminating evidence." *In re Jackson,* 681 F.3d at 763. It is not farfetched to assert that this incriminating confession affected the jury's judgment. When looking at both the prosecution and defense closing argument, both spent considerable time discussing Ms. King's statement. Defense counsel addressed the jury to undermine the truthfulness of Ms. King's statement that Mr. Jackson confessed to her in an effort to minimize the damage of such statement.[258] The prosecution went on for 41 sentences on rebuttal alone discussing Ms. King and the confession.[259] Both parties knew exactly how important, how material, how critical those four words were to the fate of Mr. Jackson. And ultimately, those four words would put him not just behind bars but subject him to execution by the State.

### c. The Falsity of the Statement Was Known by The Government.

This Court's <u>Opinion and Order</u> granting an evidentiary hearing regarding Mr. Jackson's *Napue* claim provides that the prosecutor's knowledge element of *Napue* claims can be satisfied

---

[256] *Id.* at PageID 2461.
[257] *Id.* at PageID 2459.
[258] Defense Closing Statement, ECF 15-2, PageID 2440-41.
[259] State of Ohio, Rebuttal, ECF 15-2, PageID 2459-62.

by "reasonable inferences and demonstration that the investigative team possessed knowledge of false testimony." Opinion and Order[260] citing *Pouncy v. Macauley*, 546, F. Supp. 3d 565 (E.D. Mich. 2021) (holding that the petitioner's *Napue* claim failed because he did not "demonstrate that anyone on the prosecution team or the investigative team" knew that the testimony presented was false); *Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005) citing *Napue,* 360 U.S. at 269 (confirming that "a conviction obtained through use of false evidence, *known to be such by representatives of the State*, must fall under the Fourteenth Amendment.")(emphasis added).

Likewise, the Sixth Circuit correctly identified that "*Napue* pointedly referred to "(t)he principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction ...", *Burks v. Egeler*, 512 F.2d 221, 225 (6th Cir. 1975) citing *Napue,* 360 U.S. at 269. This acknowledgement provides support as to why courts have found that an investigative team's knowledge is imputed on the prosecution as a whole. In assessing a *Napue* claim, the Eleventh Circuit Court of Appeals held that "[t]he prosecution team is defined as "the prosecutor or anyone over whom he has authority," and includes "both investigative and prosecutorial personnel." *Moon v. Head,* 285 F.3d 1301, 1309 (11th Cir. 2002) (citation omitted).

In executing her 2015 declaration, Ms. King acknowledged that she was intimidated when being questioned by detectives on March 28, 1997. For approximately three hours, detectives questioned Ms. King regarding the shooting of Hunter and Walker and Mr. Jackson's involvement and in response, she "told them repeatedly that [she] had no knowledge of Kareem killing those people."[261] The questioning quickly turned into threats when Ms. King did not provide information that would be useful in supporting their theory, based on Boone's statement, that Mr. Jackson was

---

[260] Evid. Hrg. Tr., ECF 41, PageID 3997.
[261] *Id*.

the shooter responsible. It was only after three hours of being in a room with no windows, being threatened by detectives, and being urged coercively to "just tell us that Kareem done two people"[262] that Ms. King finally just told detectives that Mr. Jackson had "done two people." Ms. King repeated back, word for word, what detectives had been pressuring her to say for hours. They were not satisfied with her initial cries to having no knowledge of Mr. Jackson being involved in any murder.

Detectives knew that Ms. King's statement that Mr. Jackson told her "he done two people" was false and there is nothing contrary to such. Given the opportunity to showcase the falsity of Ms. King's declaration at the recent evidentiary hearing, the State remained silent. Given the opportunity for then-Detective Bedard and then-Detective Zachary Scott to rebut Ms. King's assertion that she was coerced, threatened and intimidated, the State remained silent. Given the opportunity for the Prosecutors to deny any such knowledge the State remained silent. Three times this Court graciously asked the State if there were any rebuttal witnesses it wanted to call. There were none. As often noted in moments of profoundness, silence speaks louder than words.

<u>**CONCLUSION**</u>

At some point, the justice system must live up to its name. Mr. Jackson's life hangs in the balance because prosecutors simply chased a conviction, instead of chasing the truth. Now the truth is before this Court, and the only just resolution is to grant Mr. Jackson relief. Based on the foregoing, Mr. Jackson respectfully requests this Court to grant his petition for a Writ of Habeas Corpus and declare his conviction for Aggravated Murder and death sentence unconstitutional, and therefore invalid.

---

[262] *Id.*

Respectfully submitted,

STEPHEN C. NEWMAN (0051928)
Federal Public Defender

*/s/ Alan C. Rossman*
ALAN C. ROSSMAN (0019893)
Assistant Federal Public Defender
Director, Capital Habeas Unit
Office of the Federal Public Defender,
Northern District of Ohio
1660 West Second Street, Suite 750
Cleveland, Ohio 44113
(216) 522-4856; (216) 522-1951 (f)
alan_rossman@fd.org

*/s/ Tiana S. Bohanon*
TIANA S. BOHANON
Research and Writing Attorney
Office of the Federal Public Defender,
Northern District of Ohio
1660 West Second Street, Suite 750
Cleveland, Ohio 44113
(216) 522-4856; (216) 522-1951 (f)
tiana_bohanon@fd.org

***Counsel for***
***Petitioner Kareem Jackson***


\* *This pleading was written with the able assistance of legal interns Olivia Cobb and John Erikson.*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that a true and correct copy of the foregoing **Petitioner Kareem Jackson's Merit Brief,** was filed electronically this 14th day of July 2023. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

*/s/ Alan C. Rossman*
ALAN C. ROSSMAN
Assistant Federal Public Defender
Director, Capital Habeas Unit
